## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHNNIE SIMMONS, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| MARK GARMAN, et. al., | : | NO. 19–2624 |
| Respondents. | : | |

**RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS**

I.    INTRODUCTION ........................................................................ 1

II.    FACTUAL AND PROCEDURAL HISTORY .......................................... 1

    1.    THE VICTIM'S PRIOR STATEMENTS WERE THE ONLY DIRECT EVIDENCE THAT SIMMONS COMMITTED A CRIME, AND THE JURY BELIEVED THEM DESPITE THE VICTIM'S RECANTATION AT TRIAL. ........................................................................ 1

        *i.   In his police statement and preliminary hearing testimony, Talbert consistently identified Simmons as the man who shot him. ........................ 2*

        *ii.  At trial, Talbert recanted his earlier police statement and preliminary hearing testimony but acknowledged writing a letter where he accused Simmons of shooting him and asked him why he had done so. .................. 4*

        *iii. Other eyewitnesses who had not seen the actual shooting corroborated parts of Talbert's earlier account and identified Simmons as fleeing the scene. ........................................................................ 6*

        *iv. In their closing arguments, trial counsel and the prosecutor said a central issue for the jury was the credibility of Talbert, and neither party mentioned T.I. or the supposed motive that stemmed from him. ............... 7*

        *v.  In two days of deliberations, the jury did not ask any questions about T.I. before rendering their guilty verdict on the conspiracy charge. ......... 9*

    2.    SIMMONS'S DIRECT APPEAL AND POST-CONVICTION RELIEF PETITIONS WERE REJECTED BY THE STATE COURTS BEFORE HE FILED THE INSTANT PETITION. ........................................................................ 10

    3.    HABEAS COUNSEL DISCOVERED NOTES FROM A POLICE INTERVIEW WITH TALBERT, IN WHICH HE CONTRADICTED HIS EARLIER SPECULATION ABOUT T.I.'S INVOLVEMENT AND MENTIONED TWO OTHER MEN WHO MIGHT WANT TO HURT HIM, LEADING TO THE INSTANT *BRADY* CLAIM. ..................................... 13

III.  DISCUSSION ........................................................................ 15

    1.    THE HANDWRITTEN NOTES WERE FAVORABLE TO SIMMONS BECAUSE THEY SUGGESTED AN ALTERNATE MOTIVE. ........................................... 16

    2.    THE NOTES WERE SUPPRESSED BECAUSE THE COMMONWEALTH NEVER DISCLOSED THEM ........................................................................ 16

    3.    THE NOTES WERE NOT MATERIAL BECAUSE THEY COULD NOT REASONABLY BE TAKEN TO PUT THE WHOLE CASE IN SUCH A DIFFERENT LIGHT AS TO UNDERMINE CONFIDENCE IN THE VERDICT. ..................................... 17

IV.  CONCLUSION ........................................................................ 25

## I.    INTRODUCTION

Petitioner Johnnie Simmons, a Pennsylvania state prisoner, is currently incarcerated for conspiracy to commit murder. Before this Court is his counseled petition for a writ of habeas corpus.[1] Because Simmons's grounds for relief are without merit, his petition should be dismissed with prejudice and without a hearing.

## II.    FACTUAL AND PROCEDURAL HISTORY

A jury convicted Simmons of conspiracy to commit murder and deadlocked on four other charges. NT 12/15/2011 at 11.[2] Simmons conspired with an accomplice to murder Charles Talbert. *Commonwealth v. Simmons*, No. 1559 EDA 2012 (Pa. Super. Ct., Aug. 16, 2013). At trial, the Honorable Sandy L. V. Byrd presided. Stacy Forchetti, Esq. prosecuted the case, and Vincent Lorusso, Esq. represented Simmons.

### 1.  The victim's prior statements were the only direct evidence that Simmons committed a crime, and the jury believed them despite the victim's recantation at trial.

The most substantial evidence of guilt came from the victim, Talbert. Talbert was shot several times on February 4, 2011. NT 12/6/2011 at 151. Four days after the shooting, Talbert made a statement to police identifying Simmons as his attacker. Two months later, at the preliminary hearing,

---

[1] As discussed more fully below, Respondents previously responded to Simmons's first five claims, and Respondents rest on their earlier response to those claims. *See infra* note 25 and accompanying text.

[2] The jury deadlocked on charges of attempted murder, aggravated assault, possession of an instrument of crime, and possession of firearm without a license. NT 12/15/2011.

Talbert testified that Simmons shot him. At trial when the prosecutor read Talbert his signed police statement and his testimony from the preliminary hearing, Talbert disavowed his earlier statements.[3]

### i. In his police statement and preliminary hearing testimony, Talbert consistently identified Simmons as the man who shot him.

While Talbert was recovering in the hospital four days after the shooting, he circled a photo of Simmons in a police photo array. *Id.* at 217–18.[4] At first, Talbert told Detective Michael Acerenza that he had never seen the man he identified as the shooter before, but later said "Now that I think about it, his name is Johnnie" who he knew "from the neighborhood." *Id.* at 165–68.

In that initial interview, Talbert speculated that Simmons may have wanted to shoot him because Simmons had ties to T.I., a man who "got

---

[3] Under Pennsylvania evidence law, the prior inconsistent statements of a non-party witness can be used as substantive evidence when the statements were given under "reliable circumstances," such as "under oath at a formal legal proceeding" or in a "writing signed and adopted by the declarant." *Commonwealth v. Chmiel*, 738 A.2d 406, 419 (Pa. 1999) (discussing *Commonwealth v. Brady*, 507 A.2d 66 (Pa. 1986) and *Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992)). Because Talbert's prior statements—two signed writings and the testimony at Simmons's preliminary hearing—were inconsistent with his statement that Simmons was "innocent," *see infra*, the jury could properly consider them as substantive evidence.

[4] After circling the photo of Simmons, Talbert immediately circled a different photo. NT 12/6/2011 at 217–18. At first, Talbert told the detective that he circled the second photo because "it could also be him," but then acknowledged he did so because he was "scared." *Id.* at 167, 218, 226. Detective Michael Acerenza identified the other individual as John Rivera and said his photo had been included in the array because his description was similar to Simmons. NT 12/7/2011 at 33–34. The detective had "no reason to believe" that Rivera had anything to do with the incident. *Id.*

locked up" for running Talbert over with his car. *Id.* at 168–69. In this interview Talbert stated that he had testified against T.I. at some point three or four years prior but ultimately did not testify against him. *Id.*[5] Talbert said that he had previously seen Simmons with T.I. *Id.* at 170. Talbert told the detective he believed T.I. may have been involved because he had heard through hearsay that T.I. "was calling from jail letting people know that I was home." *Id.* at 169–70. Talbert was discharged from the hospital on February 22. NT 12/12/2011 at 40–43.

At the April 2011 preliminary hearing, Talbert testified consistent with his police statement that on the day of the shooting, a young man[6] bought a bag of weed from him, and soon after, while Talbert was buying something at a nearby store, Simmons approached and told him that the bag he had sold the young man was too small; Talbert gave Simmons another bag in exchange. NT 12/6/2011 at 161–63, 174–79. While Talbert was still in the store, the young man came back and said someone across the street wanted to buy more weed from him. *Id.* at 163, 179. Talbert went across the street and approached Simmons, asking "What's up?" *Id.* at 164,

---

[5] Talbert's statement is seemingly contradictory. One possible interpretation of his statement is that Talbert testified against T.I. at a preliminary hearing, but then did not testify against him at trial. Another is that Talbert was imprecisely saying that he made a statement to police about T.I. but did not testify against him in court.

[6] Detective Acerenza testified that Talbert identified the accomplice as a man named Khalif Collins, but Acerenza did not "feel there was enough evidence" to arrest Collins so he was not charged. NT 12/7/2011 at 15–16. The Superior Court agreed with the trial court that Collins made a transaction with Talbert and then advised him to go to the place where he was later shot. *Commonwealth v. Simmons*, No. 1559 EDA 2012 (Pa. Super. Ct., Aug. 16, 2013).

179. Simmons pulled out a gun and started shooting Talbert from about three feet away. *Id.* at 164, 179–81.

In his preliminary hearing testimony, Talbert did not speculate that Simmons may have been acting on behalf of T.I. or anyone else. When the prosecutor asked Talbert whether he knew of any reason Simmons would want to shoot him, he testified, "I don't even know honestly." *Id.* at 185.

### ii. At trial, Talbert recanted his earlier police statement and preliminary hearing testimony but acknowledged writing a letter where he accused Simmons of shooting him and asked him why he had done so.

At trial, Talbert recanted his police statement and preliminary hearing testimony. Talbert claimed Simmons was "innocent." *Id.* at 150. Talbert testified that he did not remember speaking to detectives but said he remembered the detectives harassing him. *Id.* at 152, 157. Talbert recalled circling one face in a photo array but said the detective had circled the picture of Simmons's face. *Id.* at 158. Talbert insisted that the person whose picture he had circled had shot him. *Id.* at 184. Talbert described his signature on the interview notes as "scribble scrabble." *Id.* at 154–55. The signature next to Simmons's face on the photo array was also "scribble scrabble," according to Talbert, but the signature next to the other face on the array was his. *Id.* at 158. Talbert told the jury that during his interview he "had to lie" and "just said anything" so the detectives would leave. *Id.* at 155, 157. Talbert testified that he was high and medicated when the detectives interviewed him. *Id.* at 152, 157. Talbert also testified that he was bipolar and schizophrenic. *Id.* at 174. Talbert claimed he did not remember testifying at Simmons's preliminary hearing and might forget his trial testimony

4

too. *Id.* at 174, 200. Talbert testified that he didn't "even know who TI is," asking, "Who that?" *Id.* at 168.

Talbert was impeached with what he called a "hate letter," postmarked six months after the preliminary hearing, that he wrote to Simmons. In the letter Talbert told Simmons, "You shot me," asked why Simmons shot him,[7] and offered not to testify against Simmons at trial if Simmons paid him $1,000 and told him who sent Simmons after him. *Id.* at 202–06.[8] The letter also stated that Talbert had previously testified (falsely) at T.I.'s trial that he did not know T.I., and Talbert offered to do the same for Simmons. *Id.* at 205.[9] Talbert said he did not want to shoot Simmons in retaliation but that he did want to beat him up. *Id.* at 206. In his trial testimony Talbert acknowledged writing the letter, but he testified that when he wrote it, he knew Simmons had not shot him but wanted to "swindle[]" money from Simmons. *Id.* at 206–07.[10] Talbert said that Simmons never paid him the $1,000 but explained he would not cooperate to "put somebody innocent in jail." *Id.* at 204, 209. Trial counsel chose not to cross-examine Talbert.

---

[7] Talbert wrote that someone "must have paid you or sent you at me because that was none of our beef." NT 12/6/2011 at 204–05.

[8] Talbert asked Simmons to send him a "letter stating who send you at me." NT 12/6/2011 at 204–05.

[9] "Ask T.I. When I came to court for him, I told the judge that I didn't know him. I can do the same for you cause testifying ain't in my blood." NT 12/6/2011 at 205.

[10] There was a stipulation that the letter was provided to the prosecutor by trial counsel. NT 12/12/2011 at 74.

### iii. Other eyewitnesses who had not seen the actual shooting corroborated parts of Talbert's earlier account and identified Simmons as fleeing the scene.

While there was no physical evidence tying Simmons to the crime, other witnesses corroborated Talbert's police statement, placing Simmons near the scene of the crime. Kyle Holman, a neighbor who was working on his car in a back alley during the shooting, testified that he saw a man he identified at trial as Simmons moving briskly away from where the gunshots had been fired. NT 12/7/2011 at 121–23. Simmons was out of breath with his hands in his pockets and "looking around like someone was following him." *Id.* Officer James Edmiston, who arrived minutes after the shooting, testified that from speaking to people at the scene, he learned that there was a suspect, whose general description matches the height and complexion of Simmons, as well as a taller accomplice. *Id.* at 46–50. Off-duty Officer Richard Alexander testified that he chased a suspect down an alley who appeared to be taller than Simmons.[11] Officer Michael Long testified that he arrested Simmons at a barbershop nearby roughly two-and-a-half

---

[11] Simmons had given his height as 5′5″. NT 12/7/2011 at 64. Off-duty Officer Alexander chased a suspect whom he estimated was six-feet-tall, but since he did not see the shooting, he may have been chasing the co-conspirator, not the shooter. *See* NT 12/6/2011 at 85, 92. The person that Officer Alexander chased was running in a southwesterly direction, whereas the neighbor, Holman, saw Simmons walking in a northeasterly direction. *Id.* at 97 (describing the suspect whom Officer Alexander chased fleeing down an alley, and then taking a right on Duval Street, toward Chew Avenue); NT 12/7/2011 at 122–23 (describing Simmons walking in an alley between Duval and Johnson streets from the area of Stenton Avenue across Mansfield Avenue). Holman testified that the person he identified as Simmons was about 5′10″, or about eye-level with Holman, who is about 5′10″. NT 12/7/2011 at 132–35. Trial counsel acknowledged in closing that "maybe [Holman] actually can identify" Simmons. NT 12/12/2011 at 103.

hours after the shooting. *Id.* at 59–61.[12] Store employee Gerald Wright could not identify anyone besides the victim, Talbert, but Wright did corroborate that someone came into the store and spoke to Talbert before Talbert left with that person shortly before the shooting. NT 12/6/2011 at 110–12, 120–22, 130.

> ### iv. In their closing arguments, trial counsel and the prosecutor said a central issue for the jury was the credibility of Talbert, and neither party mentioned T.I. or the supposed motive that stemmed from him.

In his closing, trial counsel did not discuss possible motives or T.I., and argued the case was about "who done it" and the credibility of the victim, Talbert. NT 12/12/2011 at 93, 110–11.[13] Trial counsel attempted to discredit Talbert, saying, "I don't think a whole lot more needs to be said about Charles [Talbert] or the extent of any weight that you should give to his testimony." NT 12/12/2011 at 101; *see id.* at 110.[14] Trial counsel argued that Talbert did not change his testimony due to intimidation. *Id.* at 101. Trial counsel suggested it was incredible that after first saying he did not know the man who shot him, Talbert "out of the blue" identified him by name. *Id.* at 107. Trial counsel argued that police had zeroed in on Simmons because of an unreliable anonymous tip and then Talbert went along with the police story that Simmons was the shooter. *Id.* at 105–09. In an allusion to the Battle

---

[12] Officer Long testified that Simmons was arrested based on information from an anonymous source that his captain had received via a cell phone call. NT 12/7/2011 at 63.

[13] "What does [what] Charles [Talbert] might tell you would you take to the bank as being worthy of belief[?] That's what this is all about." NT 12/12/2011 at 110.

[14] Trial counsel also recalled for the jury that Talbert said, "I'm not sending an innocent person to jail." NT 12/12/2011 at 108.

of Mobile Bay, trial counsel portrayed the prosecution as declaring, "[D]amn the evidence[,] full speed ahead," *Id.* at 94. Trial counsel said it made sense for Talbert to portray Simmons as the shooter in his letter because the letter would look worse for Talbert if he was expressly threatening to lie. *Id.* at 110. Trial counsel conceded that Holman may have seen Simmons walking away from the area of the shooting but pointed out that the man Holman saw was heading a different direction than the man Officer Alexander had chased. *Id.* at 103–05, 109.

In her closing, the prosecutor argued that Simmons's motive for shooting Talbert was that Talbert had done "someone wrong" and been "marked" for "street justice." NT 12/12/2011 at 121, 133. The prosecutor's motive theory did not get any more specific than that, and she did not mention or allude to T.I.[15] The prosecutor paraphrased the part of Talbert's letter where Talbert asked Simmons to divulge "who told you to shoot me." *Id.* at 127. The prosecutor encouraged the jury to believe Talbert's earlier statements, when he had the courage to tell the truth, and explained that Talbert had changed his story because he wanted to handle the shooting "out in the street." *Id.* at 124–29, 134–35. The conspiracy, the prosecutor argued, was with the "setup guy" who "lured Charles [Talbert] out there so he can get shot in the street." *Id.* at 132–33, 138. The prosecutor acknowledged that it was "not a perfect case" and it "may not have all the evidence you want," but contended the detectives had done a "thorough

---

[15] The closest the prosecutor came to alluding to T.I. was describing how "Simmons and his boys have so much juice in that neighborhood." NT 12/12/2011 at 122. *See also id.* at 141 (referring to Simmons's "posse").

job investigating." *Id.* at 139–40. The prosecutor asked the jury to focus on the "one question" in the case: whether Simmons shot Talbert. *Id.* at 128–29.

> **v.  In two days of deliberations, the jury did not ask any questions about T.I. before rendering their guilty verdict on the conspiracy charge.**

The jury began deliberations late in the day on December 12, 2011. NT 12/12/2011 at 180. The jury deliberated for two full days and asked to review the testimony of the three eyewitnesses—the off-duty Officer Alexander, the neighbor Holman, and Talbert's preliminary hearing testimony[16]—as well as to review the testimony of Officer Edmiston, who conducted a cursory investigation right after the shooting.[17] NT 12/13/2011, 12/14/2011. The jury did not ask any questions specifically about T.I. Midway through the fourth day of deliberations, the jury reported that they were hopelessly deadlocked on four of the charges but had reached a guilty verdict on the charge of conspiracy to commit murder. NT 12/15/2011. At a sentencing hearing a few months later, Judge Byrd imposed the maximum sentence of twenty to forty years imprisonment. NT 2/10/2012 at 39–40.

---

[16] Judge Byrd directed the court reporter to read back the portion of Talbert's trial testimony where his preliminary hearing testimony was introduced. NT 12/14/2011 at 11. The Notes of Testimony indicate that the court reporter read back about twenty-three pages of testimony that—in the current Notes of Testimony pagination—do not correspond to the portions of the trial where Talbert was even on the stand, but there is no indication that the jury heard anything but Talbert's trial testimony where his preliminary hearing testimony was introduced. *See id.*

[17] The judge disallowed a review of Edmiston's testimony. NT 12/14/2011 at 13–14.

   2.  **Simmons's direct appeal and post-conviction relief petitions were
       rejected by the state courts before he filed the instant petition.**

In a post-trial opinion,[18] Judge Byrd found that Talbert's trial recantation
was not credible and seemed of a piece with the "all too familiar
occurrence" of Philadelphia criminal witnesses adhering to "the prevalent
'stop snitching' culture" or acting out of fear of retaliation. Trial Ct. Op at
13 (C.P. Oct. 19, 2012) (finding that Detective Acerenza's suppression
hearing testimony about the interview was "more credible" than Talbert's
disavowal at trial). Judge Byrd determined there was "no credible
evidence" to back up Talbert's allegations of improprieties in his
identification of Simmons. *Id.*[19]

Responding to Simmons's contention that the Commonwealth had
failed to prove conspiracy to murder, Judge Byrd reasoned that there was
sufficient evidence to find Simmons guilty of conspiring with either of two
people: Khalif Collins, the young man who bought weed from Talbert and
then lured him to Simmons; or T.I., whom Talbert had "speculated ... may
have hired [Simmons] to murder him..." *Id.* at 16. Judge Byrd noted that the
co-conspirator was "not explicitly identified." *Id.* Judge Byrd interpreted
the motive for the shooting as a "drug transaction gone bad." *Id.* at 2.

_____

[18] Pennsylvania Rules of Appellate Procedure require that upon receipt of a
notice of appeal, the judge who entered the order giving rise to the notice
of appeal must file a "brief opinion of the reasons for the order." Pa. R.A.P.
1925(a)(1). The rules permit the judge to direct the appellant to file a concise
statement of errors complained of on appeal. Pa. R.A.P. 1925(b). Judge Byrd
filed his opinion pursuant to Rule 1925. Trial Ct. Op. at 10, (C.P. Oct. 19,
2012).

[19] Talbert had testified at trial that Detective Acerenza, not Talbert, had
circled the photo of Simmons and that detectives harassed him. *See supra.*

The Superior Court rejected Simmons's only claim on direct appeal, that the trial court abused its discretion in its sentence. *Commonwealth v. Simmons*, No. 1559 EDA 2012, slip op. (Pa. Super. Ct., Aug. 16, 2013). After his direct appeal was denied by the Superior Court, Simmons filed a pro se petition under the Post-Conviction Relief Act and was subsequently appointed PCRA counsel who filed a supplemental amended petition. *Commonwealth v. Simmons*, No. 1649 EDA 2017, slip op. (Pa. Super. Ct. Dec. 19, 2018). The PCRA court dismissed the amended petition as meritless, and Simmons proceeded pro se for review of the dismissal by the Superior Court. *Id.* Simmons raised eight issues, including *inter alia* that his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), had been violated because the trial prosecutor failed to disclose "material evidence that Talbert was relocated in the past and that Talbert had an ongoing feud with individuals from the neighborhood." *Id.* The Superior Court found no merit in any of Simmons's eight claims and affirmed the PCRA court's denial of relief. *Commonwealth v. Simmons*, No. 1649 EDA 2017, slip op. (Pa. Super. Ct. Dec. 19, 2018). While his PCRA petition was pending, Simmons filed a petition for writ of habeas corpus, raising six claims, five of which were unexhausted. *Simmons v. Garman*, No. 16–4068, 2017 WL 2222526 (E.D. Pa. Feb. 14, 2017), *approved and adopted*, 2017 WL 2215274 (E.D. Pa. May 19, 2017). This earlier habeas petition was dismissed without prejudice. *Id.*

After the Superior Court affirmed the denial of his PCRA claims, Simmons filed a timely[20] pro se petition for habeas corpus on June 17, 2019.

---

[20] The one-year statute of limitations for habeas petitions begins to run either when the judgment is final, or when the factual predicate of the claim could have been discovered through due diligence. 28 U.S.C. 2244(d)(1)(A), (D). Amendments to habeas petitions relate back to the time the original petition was filed only when the grounds for the amendment "are tied to a

ECF No. 1. This Court granted Simmons's motion for appointment of counsel and appointed the Federal Community Defender Office for the Eastern District of Pennsylvania. ECF No. 9. In March 2020, Simmons filed

---

common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). In his original petition, Simmons claimed in Ground Six that Respondents failed to turn over evidence that Talbert was under threat of people whom he had testified against. ECF No. 1 at 18. That is the "common core" of the instant amended claim. *See* ECF No. 55. Therefore, the amendment should relate back to the time the original petition was filed. The judgment becomes final upon "the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. 2244(d)(1)(A). Direct review of a conviction ends after the defendant fails to seek review by the Pennsylvania Supreme Court. *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 718 (3d. Cir. 2022). Pennsylvania Rule of Appellate Procedure 1113(a) provides that appeals must be filed within 30 days of entry of the order of the Superior Court. The Superior Court entered its judgment on August 16, 2013. Thus, the statute of limitations began running 30 days later, on September 15, 2013. The statute of limitations is tolled during the time that a "properly filed" application for state post-conviction review is pending. Simmons timely filed his PCRA petition on December 16, 2013. Thus, the limitations period ran for 93 days. The Superior Court entered its judgment affirming the denial of PCRA relief on December 19, 2018, so the statute of limitations began running again 30 days later on January 17, 2019. Simmons's habeas petition was filed on June 17, 2019, 152 days later. Thus, Simmons still had 120 days before the expiration of the statute of limitations when he filed his petition for writ of habeas corpus. The petition was timely. Moreover, the factual predicate of the claim that Respondents suppressed material exculpatory evidence, in the form of handwritten notes discussed *infra*, could not have been discovered through due diligence until Simmons's habeas counsel reviewed the police file. The Commonwealth made the police file available on February 24, 2021. ECF No. 55. The amendment was filed on June 7, 2021, within a year of when the notes were disclosed. ECF No. 35. The instant amendment, ECF No. 55, relates back to that earlier amendment and falls within the statute of limitations.

a counseled amended petition for habeas corpus raising five claims and withdrawing two claims from his pro se petition. ECF No. 17.[21]

### 3. Habeas counsel discovered notes from a police interview with Talbert, in which he contradicted his earlier speculation about T.I.'s involvement and mentioned two other men who might want to hurt him, leading to the instant *Brady* claim.

Pursuant to its internal policy, the Commonwealth provided Simmons's counsel with open-file discovery, including access to the police file associated with Simmons's case. The Court granted Simmons's unopposed motion for leave to amend, and on June 7, 2021, Simmons filed an amendment to the petition claiming that handwritten notes (hereinafter "Notes") found in the police file show that the Commonwealth suppressed material, exculpatory evidence in violation of *Brady*. ECF No. 35. The Notes were not present in the District Attorney's file. ECF No. 36. Simmons requested a stay of his habeas petition to exhaust the new *Brady* claim in state court, which the court granted. ECF Nos. 36, 34. Simmons filed a pro se PCRA petition on June 30, 2021. PCRA Petition, *Commonwealth v. Simmons*, No. 4773–2011 (C.P., June 30, 2021). The listing for Simmons's PCRA claim was subsequently rescheduled twice, most recently to December 29, 2023. ECF No. 36. On February 9, 2023, in light of the delays in state court, the former supervisor of the DAO's federal habeas unit agreed to waive exhaustion of Simmons's *Brady* claim. *Id.* Simmons subsequently withdrew his PCRA claim. ECF No. 55. The Commonwealth

---

[21] Respondents filed a response to Simmons's amended petition arguing that the petition should be denied. ECF No. 22. Respondents rest on that response with respect to Grounds One through Five.

provided Simmons counsel with additional discovery, and Simmons filed a new amendment incorporating some of that additional discovery. *Id.*

The Notes[22] dated February 12, 2011, are unsigned and unattributed[23] but reflect a police interview with Talbert about ten days before his discharge from the hospital. The Notes point to Christopher Edge and Sergio Hyland as individuals who may have wished Talbert harm. *Id.* They indicate that Talbert testified against Edge, who "beat" a homicide charge, while Hyland pleaded guilty. *Id.* Talbert told the interviewer that he did not believe the shooter's motive "stem[med] from 'T.I.,'" as he and T.I. had already "squashed all arguments," to the effect that they had "both put each other in hospital so let's end it." *Id.* Talbert reported that he had contacted Hyland by letter in prison, but Hyland did not respond. *Id.*[24] Talbert also claimed that Hyland had asked a correctional officer about Talbert. *Id.* Talbert surmised that Hyland learned of Talbert's January 7, 2011, discharge from prison—less than one month before the shooting—from that guard. *Id.* Two days before Talbert left SCI–Greene he heard someone

---

[22] ECF No. 53, Ex. 1.

[23] Detective Acerenza, who was the assigned detective, testified that Talbert had not contacted him since his February 8, 2011, interview, apart from an occasion where Detective Acerenza showed Talbert a photo array to identify Khalif Collins, the co-conspirator. NT 12/6/2011 at 229–30, 234–35.

[24] Simmons interprets the Notes to indicate that the communication went the other way around: Hyland had contacted Talbert. ECF No. 55 at 2 ("While there, Mr. Hyland had tried to contact him through letters ..."). The syntax of the Notes is unclear. The relevant portion of the Notes reads: "—Compl contacted by letters inside[.] Prisoner Sergio didn't respond back[.]" The more logical reading is that Complainant Talbert contacted Hyland by letters not that Talbert was contacted by letters from Hyland. Otherwise, the second line, that "Sergio didn't respond back" does not make sense.

say, "Dead man walking." *Id.* Talbert had "no firm facts" that Edge and Hyland were behind Talbert's shooting, the notetaker reported, but Talbert believed Edge and Hyland to be involved. *Id.* The Notes do not mention Simmons, and they are not signed by Talbert. The police file also included arrest reports for Hyland and Edge and their Philadelphia Police Department criminal history records. [25]

## III.    DISCUSSION

The Notes regarding Highland and Edge in the police file were not material to the outcome of this case and therefore do not entitled Simmons to relief. Suppression of information that is favorable to a defendant is a violation of the defendant's due process rights when the suppressed information was material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). To make out a *Brady* claim, a petitioner must prove that the evidence was favorable to the defendant; that it was suppressed either intentionally or inadvertently by the state; and that the evidence was material such that its suppression prejudiced the defendant. *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 285 (3d Cir. 2016) (*en banc*). Here, the Notes regarding Highland and Edge were marginally favorable and were suppressed, but

---

[25] Respondents' investigation shows that Talbert did testify against Edge, and that Talbert and Hyland were incarcerated together at SCI–Greene until the completion of Talbert's sentence on January 7, 2011. Edge was acquitted of the murder of Bryan Vertreace, *see Commonwealth v. Edge*, No. 406591–2002 (Pa. C.P. Dec. 9, 2003). Hyland pleaded guilty to conspiring to murder Vertreace and to murdering a minor who had been in a relationship with Edge. *Commonwealth v. Hyland*, Nos. 406601-2002, 306441-2002, NT 3/29/2004 (Pa. C.P. March 29, 2004).

they were not material to Simmons's conviction, and therefore Simmons is not entitled to relief.

**1. The handwritten Notes were favorable to Simmons because they suggested an alternate motive.**

Evidence is favorable as long as it has "some weight" and "its tendency" would be favorable to the accused. *Kyles v. Whitley*, 514 U.S. 419, 450 (1995). The favorability analysis is independent of the weight the evidence should be given. *See id.* The prosecutor is "presumed" to understand the significance of any "evidence highly probative of innocence." *United States v. Agurs*, 427 U.S. 97, 110 (1976).

Here, the Notes and the information about Edge and Hyland that flows from them show that Talbert had contradicted his earlier speculation about Simmons's motive and had information raising an alternative motive. This evidence suggested others—apart from T.I.—had reason to want to harm Talbert, and that Edge had menaced Talbert in custody, calling him a "snitch." The Notes could have formed a basis for further defense inquiry or for cross-examination of Talbert.[26] The Notes therefore had some weight and could have benefitted Simmons. Given the low standard for favorability, the Notes were favorable.

**2. The Notes were suppressed because the Commonwealth never disclosed them.**

The prosecutor has an "inescapable" duty to learn of and disclose to the defendant "any favorable evidence known to the others acting on the

---

[26] Trial counsel believes he would have used the notes to question Talbert about Simmons's motive and would have investigated whether Simmons or anyone else had any connections to Hyland or Edge. ECF No. 53 Ex. 9.

government's behalf … including the police." *Kyles*, 514 U.S. at 437–38. The prosecutor has a "duty to volunteer evidence 'obviously of such substantial value to the defense that elementary fairness requires it to be disclosed.'" *United States v. Higgs*, 713 F.2d 39, 41–42 (3d Cir. 1983) (quoting *Agurs*, 427 U.S. at 110.).

The Notes were found in the police file. The Notes were not in the Commonwealth's trial materials, ECF No. 55 at 4, and the undersigned has found no record of them being passed as discovery. Trial counsel has no recollection of receiving the Notes. ECF No. 53 Ex. 9. Therefore, Respondents concede that the Notes were suppressed.

### 3. The Notes were not material because they could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

The materiality standard must "reflect our overriding concern with the justice of the finding of guilt." *Agurs*, 427 U.S. at 112. The "touchstone of materiality is a 'reasonable probability' of a different result," meaning that the suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). Suppressed evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. The question is whether disclosure "would have impacted the course of trial, which includes investigative activities." *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 307–08 (3d. Cir. 2016) (*en banc*).

The jury reached a verdict on only one charge, that Simmons was guilty of conspiracy to commit murder. The evidence that Simmons conspired to murder Talbert came from Talbert's prior statement to the police, his

consistent preliminary hearing testimony, and the letter that he wrote to Simmons, which all identified Simmons as the person who shot him. A neighbor, Holman, also saw Simmons hurriedly walking away from the area of the gunfire, although he did not see the shooting itself. Therefore, the jury necessarily believed Talbert's prior statements accusing Simmons of shooting him and disbelieved Talbert's recantation during trial.

Introducing evidence that Edge or Hyland wanted to kill Talbert (and therefore may have been the ones prompting Simmons to shoot Talbert rather than T.I.) would not alter Talbert's statement, preliminary hearing testimony, or the accusation within his letter that Simmons was, in fact, the person who shot him. Ironically, Talbert's pre-trial identifications of Simmons as his shooter seem more credible because his attempts to refute them were patently not credible. Talbert claimed not to remember giving a statement to Detective Acerenza but then did remember exactly the photo he had circled and remembered that the detective supposedly circled Simmons's photo. Talbert claimed not to know who T.I. was but then acknowledged writing a "hate letter" in which he referred to T.I., describing a prior instance in which he testified falsely that he did not know T.I. Because of all of this, Judge Byrd found that Talbert's trial recantation lacked credibility, Trial Ct. Op. at 13.

Talbert's statement to the detective, his testimony at the preliminary hearing, and his letter to Simmons were consistent in accusing Simmons of shooting him. The shooting occurred during the daytime, at close range, and Talbert knew the shooter from the neighborhood, volunteering his name when interviewed by Detective Acerenza. The jury disbelieved Talbert's trial testimony and believed his earlier statements to the extent that they showed Simmons conspired to murder Talbert. Those conclusions

by the jury would be unaffected by evidence from the Notes suggesting an alternative motive (that is, other people who could have been the motivating force behind Simmons shooting Talbert).

The suppressed Notes draw into question the ultimate motive behind the shooting, but the motive was not a central issue in the case. Under Pennsylvania law, "Motive is not an element of first-degree murder," and "[a]t most" motive can help the factfinder determine whether the defendant had the requisite intent. *Commonwealth v. Fitzpatrick*, 255 A.3d 452, 465 (Pa. 2021). Neither is motive an element of conspiracy to commit murder.[27] The specific intent to kill element can also be inferred when the defendant used a "deadly weapon upon a vital organ of the body." *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014). There was no need to prove motive to convict Simmons, and the prosecutor made no attempt to prove a specific motive.[28]

---

[27] The elements of conspiracy to commit murder are that (1) that the defendant agreed with at least one person that one of them engage in conduct that constitutes murder or attempted murder, (2) the defendant did so with the intent of promoting or facilitating the murder, and (3) one of the conspirators undertakes an overt act in furtherance of the conspiracy. *Commonwealth v. Koehler*, 36 A.3d 121, 157 n.34 (Pa. 2012) (citing 18 Pa. C.S. § 903(a)).

[28] Simmons urges this court to follow *Mendez v. Artuz*, 303 F.3d 411 (2d. Cir. 2011), but in *Mendez* the suppressed evidence attacked a motive theory that was actually argued by the prosecutor, and the grant of habeas was upheld because the suppressed evidence supplied a "possible alternative perpetrator." *Id.* at 413. In *Mendez*, the suppressed evidence detailed how someone unconnected to the defendant put a hit out on one of the victims of a shooting and then bragged about it afterwards. *Mendez v. Artuz*, 2000 WL 722613, at *6–10 (SDNY June 6, 2000) *report and recommendation adopted* 2000 WL 1154320 (SDNY Aug. 14, 2000) (unpublished) *aff'd* 303 F.3d 411, 412 (2d. Cir. 2002) (praising the "thorough and convincing opinion" of the magistrate judge). The suppressed evidence came from law enforcement

Trial counsel did not discuss motive in his closing and the prosecutor only argued that Talbert had wronged "someone" and had been "marked" without specifying who marked him or for what reason. Neither party referenced T.I. in their closings. Based on Talbert's police statement, the jury may have concluded that Simmons shot Talbert on behalf of T.I., but just as likely, they may have thought that Talbert was "marked" for an some other reason given that he was a drug dealer. Or given that motive is not an element of the crime, the jury may have given little thought at all to who was behind Simmons shooting Talbert.

In Talbert's preliminary hearing testimony, which was introduced at trial, the prosecutor asked him whether he knew of any reason Simmons would want to shoot him, and Talbert responded, "I don't even know honestly." Similarly, in Talbert's "hate letter" accusing Simmons of shooting him, Talbert made clear he did not know why Simmons shot him. Talbert told Simmons he knew he and Simmons did not have "beef" and said he wanted to know why Simmons had shot him. The only reference in the letter to T.I. was Talbert's description of lying in court for T.I. Talbert's suggestion in the letter that T.I. could vouch for him puts T.I. in a much friendlier light than T.I.'s portrayal in Talbert's police statement. Thus, the Commonwealth had already introduced two other statements from Talbert indicating that he did not know who was behind Simmons shooting him.

---

interviews with three people involved with the man who allegedly ordered the hit, whose accounts corroborated one another's. *Id.* After trial, the alleged hit-solicitor admitted that the target of the hit had stolen from him, and that he complained about that to an associate who told him that he "would take care of it." *Id.* at *8. Here, in contrast, the Notes supply no direct evidence that Edge or Hyland wanted to kill Talbert, nor do they provide an alternate perpetrator, and they contradict a motive theory that was not argued by the prosecutor.

Nothing about the jury's questions suggest it was wrestling with motive. The jury asked to review the testimony of witnesses who had first-hand accounts of what occurred at the scene—off-duty officer Richard Alexander and neighbor Kyle Holman. The jury wanted to review the testimony of Officer Edmiston who was one of the first officers on the scene. The jury asked for a recital of Talbert's preliminary hearing testimony, and Judge Byrd allowed a recital of Talbert's trial testimony in which the prosecutor read the preliminary hearing testimony that Talbert claimed not to remember. In that testimony, Talbert said that he did not know of any reason why Simmons would want to shoot him. The jury did not ask any questions about the motive and had no need to determine a motive to render its verdict. Therefore, the handwritten Notes documenting further speculation by Talbert of who else might have wanted to harm him—other individuals who could have been behind Simmons's shooting—would not put the case in a different light.

Trial counsel chose not to cross-examine Talbert. Trial counsel did not object to the introduction of Talbert's statement repeating double hearsay, which relayed the assertion that T.I. had been calling people to tell them Talbert was home. Trial counsel did not object when Talbert's statement speculating about why T.I. might want him killed was introduced.[29] Trial

---

[29] The statement from Talbert's interview with Detective Acerenza was as follows: "[T]oday my cousin Rachel told me that her friend Janae said that TI was calling from jail letting people know that I was home. He maybe trying to have me set up." NT 12/6/2011 at 170. Under Pennsylvania law, hearsay is an out-of-court statement offered for the truth of the matter asserted. Pa. R. Evid. 801(c). A witness's prior inconsistent statement is admissible to impeach the witness's credibility. Pa. R. Evid. 613(a). The Superior Court held that the hearsay about T.I. was a prior inconsistent statement, *Commonwealth v. Simmons*, No. 1649 EDA 2017 at 9–12 (Pa. Super.

counsel's apparent strategy was to diminish Talbert's importance by ignoring him and then argue to the jury that all of his prior statements were not credible.

Talbert's statement recorded in the Notes occurred after his statement to Detective Acerenza and before his testimony at the preliminary hearing. Trial counsel would risk rehabilitating Talbert if he argued that the statements in the Notes were credible. The Notes also evince Talbert as someone concerned with providing accurate information to the police, because they show him correcting his earlier statement about T.I. In light of the Notes, the fact that during his preliminary hearing testimony, Talbert no longer claimed that T.I. might be behind his shooting makes that testimony seem more credible. Talbert was not blindly adhering to his earlier police statement but had instead adjusted his understanding of the shooting after giving it more thought. Thus, not only would use of the Notes by defense counsel not have impeached the police investigation, it would have underlined Talbert's initial cooperation and the reasonableness of detectives believing his initial accounts.

Simmons argues that if the Notes had been disclosed, trial counsel may have investigated whether there were any connections between Edge and Hyland and the other individual whose photo Talbert circled in the array.

---

Ct. May 5, 2017), but that is difficult to square. It was a prior inconsistent statement as to Talbert, but Talbert's out-of-court statement included double-hearsay. Neither of the double-hearsay declarants—Rachel or Janae—could be impeached by prior inconsistent statement since their statements about T.I. were the only statements from either of them introduced at trial. Regardless, because there was no objection, nor any limiting instruction, nothing would prevent the jury from considering the statements for the truth of the matter asserted: that T.I. had been calling people and telling them that Talbert was getting out of jail.

ECF No. 55 at 8. But an investigation into Hyland would have disclosed that he was incarcerated in the six-and-a-half years preceding the murder. *See* ECF No. 53 Ex. 7. Trial counsel already had an opportunity to investigate the other individual whose photo Talbert had circled, as trial counsel already knew that Talbert had circled another photo on the array. That individual's name was disclosed at trial. His picture was incorporated into the photo array because of his superficial likeness to Simmons. That individual had no other apparent connection to the crime, and Simmons has not demonstrated that such an inquiry would have yielded anything relevant.

Simmons also argues in his petition that trial counsel could have argued that Talbert falsely accused Simmons because he feared further retaliation from Hyland and Edge. *See* ECF No. 55 at 11–12. This would complicate the argument trial counsel did make that Talbert had not been intimidated into changing his story and that Talbert should be ignored because he was just generally untruthful. Also, it would be a difficult argument that Talbert chose to falsely accuse someone he knew (Simmons), who was associated with someone he had beefed with previously and who could have retaliated for being falsely accused (T.I.), to avoid retaliation from Hyland and Edge (people he had previously testified against in another matter and who already had a motive to retaliate against him). If avoiding retaliation was his goal, it would have been much easier to have claimed not to have seen the shooter.

Simmons suggests that the jury concluded his co-conspirator was T.I., not Khalif Collins, the young man who sent Talbert across the street where Simmons shot him. *See* ECF No. 55 at 9–10. The evidence at trial of a murder conspiracy between Simmons and Collins was much stronger than Talbert's

speculation that Simmons may have been acting on T.I.'s behalf when he shot him. Simmons and Collins took turns interacting with Talbert in the minutes leading up to the shooting. In his preliminary hearing testimony introduced at trial Talbert testified that Simmons's "homie basically lured me out the store" to where he was shot. NT 12/6/2011 at 189. The evidence showed that right after the shooting off-duty Officer Alexander chased one man down an alley while Simmons went in a different direction, *see supra* note 11, which indicated a conspiracy between Simmons and the young man who had been present at the scene.

Although Judge Byrd held that there was sufficient evidence to convict Simmons of conspiring with T.I., that evidence was exceedingly thin. As Judge Byrd noted, it amounted to speculation by Talbert that T.I. may have wanted to kill him, combined with Talbert's knowledge that he and T.I. had a conflict years prior. Trial Ct. Op. at 16. The fact that two suspects fled from the scene of the shooting bolstered the theory that the shooter conspired with someone else who was at the scene. When the Superior Court held the evidence was sufficient[30] to support Simmons's conspiracy conviction, it focused only on the conspiracy with Collins, the "set-up guy," finding that Simmons and he "worked in concert, under the guise of multiple drug transactions, to lure Mr. Talbert into the street so that [Simmons] could shoot him." *Commonwealth v. Simmons*, slip op. at 16–18, No. 1649 EDA 2017 (unreported). The opinion did not even consider a conspiracy with T.I. *Id.*

---

[30] The Superior Court addressed this issue in the context of Simmons's claim that his appellate counsel was ineffective for failing to present an argument about the sufficiency of the evidence. *Commonwealth v. Simmons*, No. 1649 EDA 2017 at 16–18 (Pa. Super. Ct. Dec. 19, 2018).

Thus, there was nothing specific about the evidence surrounding T.I. that led to Simmons's conviction.

**IV.    CONCLUSION**

For the foregoing reasons, this Court should dismiss the petition with prejudice and without a hearing.

*/s/ Andrew Metzger*
Andrew Metzger
Assistant District Attorney
Federal Litigation Unit
Office of the District Attorney
3 South Penn Square
Philadelphia, PA 19107

*Counsel for Respondents*