# First Judicial District of Pennsylvania

*51CR00047732011*
*Johnnie Simmons*

---

*Voir Dire Volume 2*
*December 06, 2011*



---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 120611-^Simmons.txt, 243 Pages*
*CRS Catalog ID: 12071456*

Page 1

[1]    IN THE COURT OF COMMON PLEAS
[2]  FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]        CRIMINAL TRIAL DIVISION
[4]
            - - -
[5]
[6] COMMONWEALTH      : CP-51-CR-0004773-2011
                :
[7]   V.          :
                :
[8] JOHNNIE SIMMONS    :
[9]
            - - -
[10]
[11]    Courtroom 802, Criminal Justice Center
[11]      Philadelphia, Pennsylvania
[12]
[13]            - - -
[13]        December 6, 2011
[14]
[15]            - - -
[15]          Jury Trial
[16]          Volume I
[17]
[18]            - - -
[19] B E F O R E:  THE HONORABLE SANDY L. V. BYRD, J.
[20]
[21] APPEARANCES:
[22]    STACY FORCHETTI, ESQUIRE
[22]      Assistant District Attorney
[23]      For the Commonwealth
[24]    VINCENT LORUSSO, ESQUIRE
[24]      Counsel for the Defendant
[25]
            Jaclyne Wilson

Page 2

[1]          COMMONWEALTH'S EVIDENCE
[2]
WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
[3]
P.O. RICHARD ALEXANDER  82    93    102    --
[4]
GERALD WRIGHT      104   126   133   137
[5]
DET. JAMES SLOAN     136   --    --     --
[6]
CHARLES TALBERT     150   --    --     --
[7]
DET. MICHAEL ACERENZA  212   --    --     --
[8]
[9] EXHIBIT        DESCRIPTION        PAGE
[10] C-1        Photo          86
[11] C-2        Photo          89
[12] C-3        Statement (PO Alexander)  91
[13] C-4        Photo          114
[14] C-5        Photo          114
[15] C-6        Photo          114
[16] C-7        Photo          114
[17] C-8        Statement (Wright)    117
[18] C-9        Statement (Talbert)    153
[19] C-10       Photo Array        158
[20] C-11       Notes of Testimony    177
[21] C-12       Letter          201
[22] C-13       Search Warrant      231
[23] C-14       Property Receipt     236
[24] C-15       Property Receipt     237
[25]
        Jaclyne Wilson

Page 3

[1]      DEFENDANT'S EVIDENCE
[2]
WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
[3]
  (None presented.)
[4]
[5] EXHIBIT      DESCRIPTION       PAGE
[6] D-1      Map         96
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
        Jaclyne Wilson

Page 4

[1]    **THE COURT**:  We're on the record in our
[2] trial case, Commonwealth vs. Johnnie Simmons,
[3] CP-51-CR-0004773-2011.  Mr. Simmons is here with his
[4] attorney, Mr. Lorusso.  The Commonwealth by
[5] Ms. Forchetti.
[6]      Ms. Forchetti, it's now 9:15.  We've been
[7] at this for two days.  You've managed to be late
[8] both days.  This is the last case you'll try here.
[9] If you'll late again tomorrow, you'll be fined
[10] $1,000 and a contempt proceeding.  Advise one of
[11] your colleagues to be ready to represent you.
[12]    **MS. FORCHETTI**:  Your Honor, I understand
[13] your frustration with me.  I left my house at 7:40.
[14]    **THE COURT**:  I don't want to hear it,
[15] ma'am.  I have not held you in contempt today.
[16] There's no reason to explain.  If you have an
[17] explanation tomorrow, you can practice it and give
[18] it to me tomorrow.
[19] (Jury panel enters the courtroom at 9:40 a.m.)
[20]    **THE COURT**:  Good morning.
[21]    (Jury panel sworn.)
[22]    **THE COURT**:  Ladies and gentlemen,
[23] welcome.  I'm Judge Byrd.
[24]      You've been summoned here this morning to
[25] participate as jurors in the trial of a criminal
        Jaclyne Wilson

Page 5

[1] case. This is the case of Commonwealth of
[2] Pennsylvania vs. Johnnie Simmons. I shall say more
[3] about this particular case in short order. But I
[4] must instruct you regarding your role as jurors.
[5] And preliminarily let me tell all of you something
[6] that you already know, and that is jury service is
[7] one of the most important responsibilities in
[8] citizenship. Indeed it has been characterized by
[9] legal scholars in terms of its importance to our
[10] democracy as second only to service in the military
[11] during periods of conflict. So, please, bear that
[12] in mind and understand that no one can be excused,
[13] no one will be excused except for a most serious of
[14] reasons.
[15]         Ladies and gentlemen, our Constitution
[16] governs the trial of criminal cases in these United
[17] States. And what I'm about to do is to outline for
[18] you the constitutional dimensions of a criminal
[19] trial. Bear in mind that this case will proceed
[20] utilizing the rules that have been in effect since
[21] this country was founded. Every case tried in these
[22] United States has been tried pursuant to these rules
[23] which are mandated by our Constitution. So the
[24] instructions I give you now with regards to the
[25] constitutional dimensions of a jury trial are in
                    Jaclyne Wilson

Page 6

[1] effect here in Pennsylvania and all of our sister
[2] states and in the federal system.
[3]         Defendants in criminal cases are presumed
[4] innocent and that presumption remains unless and
[5] until the Commonwealth proves guilt beyond a
[6] reasonable doubt. So a defendant has no obligation
[7] to prove his innocence. It's the Commonwealth's
[8] burden to prove guilt beyond a reasonable doubt.
[9]         It follows then that an arrest is not
[10] evidence of guilt. The evidence in criminal cases
[11] unfolds in the courtroom for the edification of the
[12] ladies and gentlemen of the jury. Now, our
[13] Constitution having afforded defendants a
[14] presumption of innocence and concluded that it is
[15] the Commonwealth's burden to prove guilt and that
[16] the defendant has no obligation to prove his
[17] innocence has extended to every defendant a right of
[18] silence at trial.
[19]         Defendants have no obligation to testify,
[20] and if a defendant elects not to testify, you may
[21] not hold it against him for exercising a
[22] constitutional right. You may not draw an inference
[23] of guilt or any other adverse inference from the
[24] decision to exercise that right. In such an event
[25] the obligation of the jury is to determine from the
                    Jaclyne Wilson

Page 7

[1] evidence you've heard whether or not the
[2] Commonwealth proved guilt beyond a reasonable doubt.
[3]         Now, it's still early by Philadelphia
[4] standards. It's quarter to 10:00. I know that you have been here since at
[5] know a good number of you have been here since at
[6] least 8:00, 8:15 this morning. I know that you've
[7] already answered a series of questions because I
[8] have your questionnaires. I do not intend to ask
[9] again the questions you've already answered. It
[10] will be necessary for me to ask some additional
[11] questions and I want you to bear in mind that these
[12] questions are not designed to embarrass you or to
[13] invade your privacy. This is a routine aspect of
[14] jury selection. So if you continue to answer the
[15] questions honestly and with candor, we shall from
[16] your midst conclude jury selection and start this
[17] case this morning.
[18]         Each of you has been given a numbered
[19] card. In the course of my instructions, comments,
[20] and/or questions to you, if something I say applies
[21] to you, it's important that you bring that to our
[22] attention by raising your hand. You should be sure
[23] to have that card in your hand and if the question
[24] applies to you, raise your hand, make sure the card
[25] that is the numbered side of the card faces me,
                    Jaclyne Wilson

Page 8

[1] raise the card high, keep it raised until such time
[2] as your number is called out. After which you may
[3] lower the card again.
[4]         Please don't blurt out any answers to any
[5] questions I ask of you. If you're not sure whether
[6] or not the question applies to you, raise your hand
[7] any way and we'll sort it when I speak to you
[8] individually. I shall speak to each of you,
[9] obviously in the presence of these two attorneys,
[10] individually during the course of this jury
[11] selection process.
[12]         Before I address this particular case,
[13] the Commonwealth vs. Simmons, it's important in
[14] light of my recitation of the constitutional
[15] guarantees that I bring two questions to your
[16] attention that appear in the questionnaire. One
[17] question asks would you be more likely to believe
[18] the testimony of a police officer or other law
[19] enforcement agent simply because of his or her job.
[20] The other asks would you be less likely to believe
[21] the testimony of a police officer or other law
[22] enforcement agent simply because of his or her job.
[23]         You are all intelligent people so you can
[24] appreciate that the law is very clear on this. No
[25] one comes before a jury with an entitlement to be
                    Jaclyne Wilson

Page 9

[1] believed or disbelieved for that matter. Every
[2] witness who takes the witness stand is to have his
[3] or her attorney -- strike that.
[4]          Is to have his or her testimony evaluated
[5] in the very same way. You may not give any greater
[6] weight to the testimony of a police officer or other
[7] law enforcement agent simply because of his or her
[8] job. You may not give any less weight to the
[9] testimony of a police officer or other law
[10] enforcement agent simply because of his or her job.
[11] A police officer's testimony is to be evaluated in
[12] the same way you would that of say an astronaut or a
[13] gardner, a dentist or a truck driver.
[14]          Everyone is to have his or her testimony
[15] evaluated in the very same way. You can not remove
[16] the burden of deciding the facts in a criminal case
[17] by saying oh, that was a police officer testifying.
[18] I would never believe a police officer. Or, oh,
[19] that was a police officer testifying. I'll always
[20] believe a police officer.
[21]          This has absolutely nothing to do with
[22] whether or not you respect the job that's done by
[23] law enforcement agents. What this has to do with is
[24] whether or not you respect the law sufficiently that
[25] you will apply it in the way that it is designed to
                    Jaclyne Wilson

Page 10

[1] be applied.
[2]          Now, I started off by saying that those
[3] of you selected would be fact finders. That's the
[4] role of a juror. A juror has an obligation to
[5] present himself or herself with a desire to give
[6] this matter complete attention. During that period
[7] of time listen to the evidence because you will be
[8] called upon thereafter collectively to decide from
[9] that evidence what the facts are. Jurors have an
[10] obligation to accept the law from the presiding
[11] judge. They must then apply that law to the facts
[12] as they determine the facts to be. And, thereafter,
[13] to decide whether the Commonwealth has or has not
[14] met its burden proving guilt beyond a reasonable
[15] doubt.
[16]          So those of you selected will be called
[17] upon to decide credibility. And by credibility I
[18] mean truthfulness and/or accuracy. So you will
[19] evaluate the witnesses, each witness, and decide
[20] whether you believe some, all, or none of their
[21] testimony. That's the role of a juror.
[22]          I started off by advising you, ladies and
[23] gentlemen, that this was the case of the
[24] Commonwealth of Pennsylvania vs. Johnnie Simmons.
[25] As you can plainly see both sides are represented.
                    Jaclyne Wilson

Page 11

[1] Commonwealth has an attorney and the defendant has
[2] an attorney.
[3]          In this case the defendant has been
[4] charged with the following offenses. He has been
[5] charged with attempted murder, aggravated assault,
[6] carrying a firearms without a license, possession of
[7] an instrument of crime, and criminal conspiracy.
[8]          The charges against this defendant are
[9] the result of the following allegations. The
[10] Commonwealth alleges that on or about February the
[11] 4th, 2011, in the 1300 block of Johnson Street here
[12] in Philadelphia the defendant, the Commonwealth
[13] alleges, Johnnie Simmons, while acting in concert
[14] with others, shot the complainant, Charles Talbert,
[15] multiple times resulting in the complainant being
[16] hospitalized as Einstein.
[17]          So my first question is do any of you
[18] know something or anything at all about the
[19] allegations that gave rise to the charges against
[20] this defendant? If so, please raise your hand.
[21]     **COURT CRIER**: No response, Your Honor.
[22]     **THE COURT**: With your permission I shall
[23] now introduce you to the principles in this case.
[24] And I'll start from my left and work my way across
[25] the room. Typically I ask the individual I've
                    Jaclyne Wilson

Page 12

[1] introduced to stand, but we're all on eye level here
[2] and unless you tell me otherwise, I believe you can
[3] see the three people before you without their having
[4] to stand. So I'm simply going to introduce them.
[5] And if anybody can not see them, raise your hand and
[6] at that junction I'll ask them to stand.
[7]          Starting from my left, the first person I
[8] shall introduce you to is a member of the District
[9] Attorney's Office. She represents the Commonwealth
[10] in this case. Stacey Forchetti, Esquire.
[11]     **MS. FORCHETTI**: Good morning.
[12]     **THE COURT**: Going across the room, the
[13] next person I shall introduce you to is a member of
[14] the defense bar. He represents the defendant.
[15] Vincent Lorusso, Esquire.
[16]     **MR. LORUSSO**: Good morning, ladies and
[17] gentlemen.
[18]     **THE COURT**: And to his right is the
[19] defendant in this case, Johnnie Simmons.
[20]     **THE DEFENDANT**: Good morning.
[21]     **THE COURT**: Do any of you know or have
[22] you had any association with or are you related by
[23] blood or marriage to either the assistant district
[24] attorney Ms. Forchetti, defense counsel Mr. Lorusso,
[25] the defendant Johnnie Simmons, or me, I'm Judge
                    Jaclyne Wilson

Page 13

[1] Byrd? If so, please raise your hand.
[2]      COURT CRIER: Response, Your Honor, on
[3] No. 11.
[4]      No further responses.
[5]      THE COURT: Please, ladies and gentlemen,
[6] look about the courtroom and you can see we have a
[7] full staff. We have a court reporter who's taking
[8] down an official transcription of these proceedings.
[9] We have a court clerk who's keeping an official
[10] record of these proceedings. We have a court crier
[11] and court officer whom you've met. And we have a
[12] deputy sheriff.
[13]      Same question, do any of you know or have
[14] you had any association with or are you related by
[15] blood or marriage to any of the persons who makes up
[16] the court staff? If so, please raise your hand.
[17]      COURT CRIER: No response, Your Honor.
[18]      THE COURT: You, ladies and gentlemen,
[19] are all well aware that in the trial of a criminal
[20] case witnesses will be called. And I have a list of
[21] potential witnesses. I use that phrase potential
[22] witnesses advisedly because although some of the
[23] persons on this list will undoubtedly be called as
[24] witnesses, others may simply be mentioned by those
[25] testifying, and still others may merely be in and/or
            Jaclyne Wilson

Page 14

[1] about the courtroom during the course of the trial.
[2]      So listen carefully. I'm going to read
[3] off the list of potential witnesses and should you
[4] recognize any of these persons, raise your hand.
[5]      The witness list includes the following
[6] individuals. The first three are all residents of
[7] the East Mt. Airy section of Philadelphia. They
[8] include the aforementioned complainant in this case,
[9] Charles Talbert, T-A-L-B-E-R-T, Michael Bell,
[10] B-E-L-L, and Kyle Holman, H-O-L-M-A-N.
[11]      In addition, Terrell Pollard,
[12] P-O-L-L-A-R-D, from Logan and Gerald Wright,
[13] W-R-I-G-H-T, from North Philadelphia.
[14]      In addition to that a medic from the 18th
[15] District Michael Donohue, D-O-N-O-H-U-E, and the
[16] **following police officers**: Police Officer Richard
[17] Anderson from the 6th Police District, Police
[18] Officer James Edmiston, from the 14th Police
[19] District, and also from the 14th Police District
[20] Police Officer Michael Long and Police Officer Allen
[21] Carroll.
[22]      In addition the following detectives, all
[23] from Northwest Detective Division, Michael Acerenza,
[24] A-C-E-R-E-N-Z-A, Detective Robert Hassel,
[25] H-A-S-S-E-L, Detective Steven Grace, G-R-A-C-E,
            Jaclyne Wilson

Page 15

[1] Detective Donald Suchinsky, S-U-C-H-I-N-S-K-Y,
[2] Detective Timothy Hartman, H-A-R-T-M-A-N, Detective
[3] James Sloan, S-L-O-A-N, and Detective John
[4] Geleibter, G-E-L-E-I-B-T-E-R, all from Northeast
[5] Detectives Division.
[6]      In addition Leland Kent, K-E-N-T, an
[7] employee of the District Attorney's Office and
[8] Dr. Mark Kaplan, a physician at Albert Einstein
[9] Medical Center.
[10]      Same question, ladies and gentlemen, do
[11] any of you know or have you had any association with
[12] or are you related by blood or marriage to any of
[13] the persons just named? If so, please raise your
[14] hand.
[15]      COURT CRIER: No response, Your Honor.
[16]      THE COURT: I have already, ladies and
[17] gentlemen, instructed you regarding the
[18] constitutional guarantees afforded a defendant in a
[19] criminal trial. Nevertheless, let me ask the
[20] following questions.
[21]      Does anyone here have a fixed opinion
[22] about the guilt or innocence of this defendant to
[23] any of the charges made against him? If so, please
[24] raise your hand.
[25]      COURT CRIER: No response, Your Honor.
            Jaclyne Wilson

Page 16

[1]      THE COURT: Do any of you know of any
[2] reason why if you were selected to serve on this
[3] jury you would not be able to give both sides, the
[4] defendant and the Commonwealth, a fair trial?
[5]      COURT CRIER: No response, Your Honor.
[6]      THE COURT: Now, ladies and gentlemen, as
[7] I said earlier, we expect to start testimony in this
[8] case in short order. We expect that the testimony
[9] will consume all of today and all of tomorrow.
[10]      For reasons outside of our control there
[11] will be no court on Thursday and Friday. So closing
[12] arguments and the charge of this Court is expected
[13] to take place on Monday and, thereafter, the case
[14] will be yours for deliberations. That is our best
[15] estimate based on our collective experience in
[16] matters of this sort. We have on occasion over
[17] estimated the length of time a case will last. We
[18] have on occasion underestimated the length of time a
[19] case will last. We think we've got it just about
[20] right.
[21]      There are some things I can tell you with
[22] certainly. This is not a death penalty case. Nor
[23] will the jury be sequestered. No one will be asked
[24] to bring an overnight bag and be put up in some
[25] Center City hotel. What you can expect is that we
            Jaclyne Wilson

Page 17

[1] work business hours here. I'm on the bench every
[2] morning at nine o'clock. So I expect to get
[3] underway at least by 9:30. We work through the
[4] morning. We take breaks as the jury requires
[5] breaks. We have an hour for lunch. We come back in
[6] the afternoon and we work till 4:30.
[7]         If it appears at some point this morning
[8] that we're falling behind, I will invite you to come
[9] down so that we can start testimony at 9:00 and
[10] we'll work till 5:00. So you can see the hours are
[11] not onerous. The hours are much like those you keep
[12] in your places of employment every day. Is jury
[13] service an inconvenience? It is, but it is a small
[14] price to pay for the perpetuation of our judicial
[15] system.
[16]         Now, I want you to bear in mind
[17] everything I just said and based there on is there
[18] anyone here for whom jury service would constitute a
[19] real, serious hardship, not an inconvenience, but a
[20] hardship? If you have a hardship, raise your hand.
[21]         COURT CRIER: Response, Your Honor, from
[22] Juror No. 1 and 4.
[23]         No further responses.
[24]         THE COURT: Ladies and gentlemen, from
[25] this point forward you may not discuss this case in
        Jaclyne Wilson

Page 18

[1] any fashion with anyone. Now, I want you to
[2] appreciate there must be a million things you can
[3] talk about with each other. One of the things you
[4] can not talk about in any fashion is this case.
[5] Please don't discuss the case amongst yourselves.
[6] Don't discuss the case with anyone else. And don't
[7] permit anyone else to discuss the case with you.
[8]         The only time you may discuss this case
[9] is after you've heard all of the evidence, the
[10] attorneys have made their speeches, I have
[11] instructed you on the law, and the first 12 selected
[12] are in the room deliberating, because prior there to
[13] you will not know what you need to know about both
[14] the evidence and the law to intelligently discuss
[15] the case. So, please, don't discuss it with anyone.
[16]         There are obviously certain persons with
[17] whom you should have absolutely no contact. You
[18] should not have any contact with witnesses in this
[19] case. Nor should you have any contact with the
[20] defendant. Nor should you have any contact with
[21] these attorneys. Nor should you have any contact
[22] with this judge.
[23]         I hasten to add, however, if there is any
[24] matter you wish to bring to my attention, you should
[25] not hesitate to do so. The way you do that is you
        Jaclyne Wilson

Page 19

[1] bring it to the attention of the court crier or the
[2] court officer. He will bring it to my attention and
[3] I will address your concern in the presence of these
[4] two attorneys.
[5]         You've seen how this building is laid
[6] out. So it's possible, probable that you will see
[7] one or perhaps both of the attorneys in the
[8] corridor, for instance, and you will observe that
[9] they will not engage you. Do not hold it against
[10] them. Ladies and gentlemen, do not hold it against
[11] them. They're not being rude. They simply
[12] understand the need to avoid even the appearance of
[13] an impropriety.
[14]         Now that essentially concludes my
[15] preliminary instructions. I trust that you have
[16] listened carefully and that you will follow them to
[17] the letter.
[18]         Ms. Forchetti, Mr. Lorusso, is there
[19] anything else you wish me to bring to the attention
[20] of this jury panel?
[21]         MS. FORCHETTI: No, Your Honor.
[22]         MR. LORUSSO: No, Your Honor.
[23]         THE COURT: Ladies and gentlemen, if
[24] you'd be so kind as to follow the instructions of
[25] our court crier and/or our court officer. We will
        Jaclyne Wilson

Page 20

[1] proceed to part two of this jury selection process.
[2] (Jury panel exits the courtroom at 10:03 a.m.)
[3]         THE COURT: Let the record reflect the
[4] jurors have all left the room. You may resume your
[5] position.
[6]         (Pause.)
[7]         THE COURT: Good morning. This is a
[8] public courtroom so you're all welcome. There are,
[9] however, rules. They'll be no waving at the
[10] defendant. No talking out. The defendant will not
[11] wave or speak to you. And we're going to send
[12] around a pad. You'll put your name and address on
[13] the pad. If you have a phone, take your phone out.
[14] They'll be no pictures taken. They'll be no
[15] recordings. And we'll all conduct ourselves in a
[16] civil fashion.
[17]         Mr. Lorusso, Ms. Forchetti, are you
[18] ready?
[19]         MR. LORUSSO: Yes, Your Honor.
[20]         MS. FORCHETTI: Yes, Your Honor.
[21]         THE COURT: Bring out the first
[22] prospective juror.
[23]         COURT CRIER: Yes, Your Honor.
[24]         (Prospective Juror No. 1 enters.)
[25]         PROSPECTIVE JUROR NUMBER ONE: Allison
        Jaclyne Wilson

**Page 21**

[1] Ramsey.

[2] **THE COURT**: Tell us what you do for a

[3] living, please.

[4] **PROSPECTIVE JUROR NUMBER ONE**: I'm an

[5] account executive. I solve marketing and

[6] advertising sales.

[7] **THE COURT**: How long have you been in

[8] your job?

[9] **PROSPECTIVE JUROR NUMBER ONE**: A

[10] year-and-a-half.

[11] **THE COURT**: What kind of work did you do

[12] before that?

[13] **PROSPECTIVE JUROR NUMBER ONE**:

[14] Pharmaceutical sales.

[15] **THE COURT**: How long were you in

[16] pharmaceutical sales?

[17] **PROSPECTIVE JUROR NUMBER ONE**: Over a

[18] year and then I was laid off.

[19] **THE COURT**: You checked off you or

[20] someone close to you, a friend or family member, was

[21] an eyewitness to a crime?

[22] **PROSPECTIVE JUROR NUMBER ONE**: I was

[23] personally mugged and my roommate was a witness.

[24] **THE COURT**: How long ago was that?

[25] **PROSPECTIVE JUROR NUMBER ONE**: Roughly

Jaclyne Wilson

**Page 22**

[1] two years ago.

[2] **THE COURT**: Have you or anyone close to

[3] you, friend or family, ever worked in law

[4] enforcement?

[5] **PROSPECTIVE JUROR NUMBER ONE**: No.

[6] **THE COURT**: I'm sorry?

[7] **PROSPECTIVE JUROR NUMBER ONE**: No.

[8] **THE COURT**: That expands the definition

[9] to include prosecutors, public defenders, private

[10] defense lawyers, detectives, correctional

[11] officers --

[12] **PROSPECTIVE JUROR NUMBER ONE**: Both of my

[13] God parents are attorneys in Central Pennsylvania.

[14] **THE COURT**: What kind of law do they

[15] practice?

[16] **PROSPECTIVE JUROR NUMBER ONE**: My God

[17] mother is like I think just for like wills and so

[18] forth, and my Uncle Dan I don't know what kind of

[19] law he practices.

[20] **THE COURT**: If you were selected to serve

[21] on this jury, would you give both sides, the

[22] defendant and the Commonwealth, a fair trial?

[23] **PROSPECTIVE JUROR NUMBER ONE**:

[24] Absolutely.

[25] **THE COURT**: Did you raise your hand that

Jaclyne Wilson

**Page 23**

[1] jury service would be a hardship?

[2] **PROSPECTIVE JUROR NUMBER ONE**: I did.

[3] **THE COURT**: What's the nature of your

[4] hardship?

[5] **PROSPECTIVE JUROR NUMBER ONE**: I believe

[6] it constitutes a hardship because I'm in sales and

[7] there's no one to cover my territory. I have a

[8] quota for the month and if I didn't hit that quota,

[9] I can lose my job potentially. If it's going on a

[10] week of service, it might effect the numbers that I

[11] can hit for the month.

[12] **THE COURT**: You should know that citizens

[13] are protected from adverse action by their employer

[14] for jury service.

[15] **PROSPECTIVE JUROR NUMBER ONE**: Okay. I

[16] wasn't certain.

[17] **THE COURT**: All right. Thank you, ma'am.

[18] Wait for us on the other side of the door. We'll be

[19] with you momentarily.

[20] (Prospective Juror No. 1 exits.)

[21] **THE COURT**: It's not a hardship, counsel.

[22] Hardship is denied.

[23] Pass the pad.

[24] **COURT CRIER**: Your Honor, Juror No. 1

[25] will be Juror No. 12.

Jaclyne Wilson

**Page 24**

[1] **THE COURT**: We have our 12 jurors,

[2] counsel. We must now impanel two alternates.

[3] (Prospective Juror No. 2 enters.)

[4] **PROSPECTIVE JUROR NUMBER TWO**: Adolphus

[5] Brown.

[6] **THE COURT**: Mr. Brown, I see here that

[7] you are retired.

[8] Is that correct, sir?

[9] **PROSPECTIVE JUROR NUMBER TWO**: Yes, sir.

[10] **THE COURT**: And how long have you been

[11] retired?

[12] **PROSPECTIVE JUROR NUMBER TWO**: Three

[13] years.

[14] **THE COURT**: Tell us what you did for

[15] living before your retirement.

[16] **PROSPECTIVE JUROR NUMBER TWO**: I was a

[17] dental technician.

[18] **THE COURT**: How long did you work in that

[19] trade?

[20] **PROSPECTIVE JUROR NUMBER TWO**: Twelve

[21] years.

[22] **THE COURT**: Have you personally or anyone

[23] close to you, such as a friend or family member,

[24] ever been the victim of a crime?

[25] **PROSPECTIVE JUROR NUMBER TWO**: No, sir.

Jaclyne Wilson

Page 25

[1] THE COURT: Have you personally or anyone
[2] close to you, such as a friend or family member,
[3] ever been arrested or charged with a crime?
[4] PROSPECTIVE JUROR NUMBER TWO: No, sir.
[5] THE COURT: If you were selected to serve
[6] on this jury, would you give both sides, the
[7] defendant and the Commonwealth, a fair trial?
[8] PROSPECTIVE JUROR NUMBER TWO: Yes, sir.
[9] THE COURT: Would you be so kind to wait
[10] for us on the other side of that door. We'll be
[11] with you momentarily.
[12] (Prospective Juror No. 2 exits.)
[13] COURT CRIER: Your Honor, we have our
[14] first alternate, Juror No. 13.
[15] (Prospective Juror No. 3 enters.)
[16] PROSPECTIVE JUROR NUMBER THREE: Linda
[17] Atkinson.
[18] THE COURT: Tell us what you do for a
[19] living, please.
[20] PROSPECTIVE JUROR NUMBER THREE: I work
[21] in the taxpayer advocate service in the Internal
[22] Revenue Service.
[23] THE COURT: In the course of a typical
[24] day what does your job consist of?
[25] PROSPECTIVE JUROR NUMBER THREE: I assist

Jaclyne Wilson

Page 26

[1] taxpayers who have problems with the IRS.
[2] THE COURT: How long have you been in
[3] your job?
[4] PROSPECTIVE JUROR NUMBER THREE: I worked
[5] for the IRS for 25 years. I've been in taxpayer
[6] advocate service for ten.
[7] THE COURT: Have you personally or anyone
[8] close to you, such as a friend or family member,
[9] ever been the victim of a crime?
[10] PROSPECTIVE JUROR NUMBER THREE: No.
[11] THE COURT: Have you personally or anyone
[12] close to you, such as a friend or family member,
[13] ever been arrested or charged with a crime?
[14] PROSPECTIVE JUROR NUMBER THREE: Yes.
[15] THE COURT: What relationship is that
[16] person or those persons to you?
[17] PROSPECTIVE JUROR NUMBER THREE: My
[18] brother.
[19] THE COURT: What was your brother charged
[20] with?
[21] PROSPECTIVE JUROR NUMBER THREE: Drug
[22] related charge.
[23] THE COURT: Was he charged with
[24] possessing drugs to sell to others or possessing
[25] drugs for his own use?

Jaclyne Wilson

Page 27

[1] PROSPECTIVE JUROR NUMBER THREE:
[2] Manufacturing.
[3] THE COURT: How long ago was that?
[4] PROSPECTIVE JUROR NUMBER THREE: Over 20
[5] years.
[6] THE COURT: Was it here in Philadelphia?
[7] PROSPECTIVE JUROR NUMBER THREE: No.
[8] THE COURT: Where was it?
[9] PROSPECTIVE JUROR NUMBER THREE: Bucks
[10] County.
[11] THE COURT: Did you attend his trial?
[12] PROSPECTIVE JUROR NUMBER THREE: Portions
[13] of it, yes.
[14] THE COURT: Do you have an opinion as to
[15] whether he was treated fair or unfair?
[16] PROSPECTIVE JUROR NUMBER THREE: He was
[17] guilty.
[18] THE COURT: Is there anything about his
[19] case which would effect your ability to be a fair
[20] juror in this case?
[21] PROSPECTIVE JUROR NUMBER THREE: No.
[22] THE COURT: You also checked off that you
[23] know people in law enforcement; is that right?
[24] PROSPECTIVE JUROR NUMBER THREE: My
[25] son-in-law.

Jaclyne Wilson

Page 28

[1] THE COURT: Let me remind you that
[2] earlier this morning I said that you may give no
[3] greater or lesser weight to the testimony of a
[4] police officer or other law enforcement agents
[5] simply because of his or her job. A police officer
[6] is to have his or her testimony evaluated in the
[7] same way you would that of any other witnesses.
[8] Would you accept and apply that
[9] instruction?
[10] PROSPECTIVE JUROR NUMBER THREE: I would.
[11] THE COURT: What relationship is the law
[12] enforcement?
[13] PROSPECTIVE JUROR NUMBER THREE: My
[14] son-in-law.
[15] THE COURT: What does he do for a living?
[16] PROSPECTIVE JUROR NUMBER THREE: He's a
[17] police officer. I think --
[18] THE COURT: Here in Philadelphia?
[19] PROSPECTIVE JUROR NUMBER THREE: Yes.
[20] THE COURT: Did you know any of the
[21] officers on the list that I read off?
[22] PROSPECTIVE JUROR NUMBER THREE: No.
[23] THE COURT: If you were selected to serve
[24] on this jury, would you give both sides, the
[25] defendant and the Commonwealth, a fair trial?

Jaclyne Wilson

Page 29

[1] **PROSPECTIVE JUROR NUMBER THREE**: Yes.

[2] **THE COURT**: Thank you, ma'am. Collect

[3] your belongings, please. Wait for us on the other

[4] side of the door to your left. We'll be with you

[5] momentarily.

[6] (Prospective Juror No. 3 exits.)

[7] **COURT CRIER**: Your Honor, Juror No. 3

[8] first alternate strike for defense.

[9] (Prospective Juror No. 4 enters.)

[10] **PROSPECTIVE JUROR NUMBER FOUR**: Edmond

[11] Gleaves.

[12] **THE COURT**: Tell us what you do for a

[13] living, please.

[14] **PROSPECTIVE JUROR NUMBER FOUR**: Well, I'm

[15] a contractor.

[16] **THE COURT**: How long have you been in

[17] that line of work?

[18] **PROSPECTIVE JUROR NUMBER FOUR**: I've been

[19] in there for the last 30 years.

[20] **THE COURT**: You checked off that there is

[21] a reason or reasons you could not be fair, correct?

[22] **PROSPECTIVE JUROR NUMBER FOUR**: Yes, sir.

[23] **THE COURT**: What are your reasons?

[24] **PROSPECTIVE JUROR NUMBER FOUR**: I have a

[25] medical condition right now, Your Honor.

Jaclyne Wilson

Page 30

[1] **THE COURT**: And that would effect your

[2] ability to be a fair juror?

[3] **PROSPECTIVE JUROR NUMBER FOUR**: Yes.

[4] **THE COURT**: You checked off that it would

[5] prevent you from serving; is that right?

[6] **PROSPECTIVE JUROR NUMBER FOUR**: Yes, sir.

[7] **THE COURT**: All right. Collect your

[8] belongings. Wait for us on the other side of the

[9] door to your left.

[10] **PROSPECTIVE JUROR NUMBER FOUR**: Thank you

[11] very much for your time.

[12] **THE COURT**: Did you also check off that

[13] this would be a hardship?

[14] **PROSPECTIVE JUROR NUMBER FOUR**: Yes, sir.

[15] **THE COURT**: Thank you, sir. Wait for us

[16] on the other side of the door.

[17] (Prospective Juror No. 4 exits.)

[18] **THE COURT**: I'll grant his hardship.

[19] (Prospective Juror No. 5 enters.)

[20] **PROSPECTIVE JUROR NUMBER FIVE**: Quentin

[21] Nixon.

[22] **THE COURT**: What do you do for a living,

[23] Mr. Nixon?

[24] **PROSPECTIVE JUROR NUMBER FIVE**: I work at

[25] a supermarket.

Jaclyne Wilson

Page 31

[1] **THE COURT**: How long have you worked at a

[2] supermarket?

[3] **PROSPECTIVE JUROR NUMBER FIVE**: Five

[4] years.

[5] **THE COURT**: What do you do there?

[6] **PROSPECTIVE JUROR NUMBER FIVE**: Produce.

[7] **THE COURT**: You work in the produce

[8] section of the supermarket?

[9] **PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.

[10] **THE COURT**: Have you ever served on a

[11] jury before?

[12] **PROSPECTIVE JUROR NUMBER FIVE**: No.

[13] **THE COURT**: Have you personally or anyone

[14] close to you, such as a friend or family member,

[15] ever been the victim of a crime?

[16] **PROSPECTIVE JUROR NUMBER FIVE**: Yes.

[17] **THE COURT**: What relationship is that

[18] person or those persons to you?

[19] **PROSPECTIVE JUROR NUMBER FIVE**: My

[20] brother.

[21] **THE COURT**: What happened to your

[22] brother?

[23] **PROSPECTIVE JUROR NUMBER FIVE**:

[24] Counterfeit money charge.

[25] **THE COURT**: He was charged with

Jaclyne Wilson

Page 32

[1] possessing or distributing counterfeit money?

[2] **PROSPECTIVE JUROR NUMBER FIVE**:

[3] Possessing.

[4] **THE COURT**: The question was have you or

[5] anyone close to you ever been the victim of a crime?

[6] **PROSPECTIVE JUROR NUMBER FIVE**: Victim?

[7] No, sir.

[8] **THE COURT**: Do you believe your brother

[9] because he was charged with a crime was a victim?

[10] **PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.

[11] **THE COURT**: Why is that?

[12] **PROSPECTIVE JUROR NUMBER FIVE**: Because

[13] he didn't know it was counterfeit.

[14] **THE COURT**: All right. Let's go to the

[15] next question.

[16] Have you personally or anyone close to

[17] you, friend or family member, ever been arrested or

[18] charged with a crime?

[19] **PROSPECTIVE JUROR NUMBER FIVE**: Yes.

[20] **THE COURT**: And what relationship is that

[21] person or those persons to you?

[22] **PROSPECTIVE JUROR NUMBER FIVE**: Myself.

[23] **THE COURT**: What were you charged with?

[24] **PROSPECTIVE JUROR NUMBER FIVE**: Armed

[25] robbery.

Jaclyne Wilson

[1] **THE COURT**: How long ago was that?
[2] **PROSPECTIVE JUROR NUMBER FIVE**: Seven
[3] years.
[4] **THE COURT**: And did you go to court on
[5] that case?
[6] **PROSPECTIVE JUROR NUMBER FIVE**: Yeah.
[7] **THE COURT**: And what happened?
[8] **PROSPECTIVE JUROR NUMBER FIVE**:
[9] Dismissed.
[10] **THE COURT**: How many times were you
[11] arrested for armed robbery?
[12] **PROSPECTIVE JUROR NUMBER FIVE**: Once.
[13] **THE COURT**: Is that the only time you've
[14] ever been arrested?
[15] **PROSPECTIVE JUROR NUMBER FIVE**: Yes.
[16] **THE COURT**: What year was the arrest?
[17] **PROSPECTIVE JUROR NUMBER FIVE**: '03.
[18] **THE COURT**: What were the circumstances
[19] surrounding the dismissal?
[20] **PROSPECTIVE JUROR NUMBER FIVE**: The
[21] witnesses that were there said I wasn't there, which
[22] I wasn't. So it was dismissed.
[23] **THE COURT**: Did you have a preliminary
[24] hearing?
[25] **PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.
      Jaclyne Wilson

[1] **THE COURT**: It did not get past a
[2] preliminary hearing?
[3] **PROSPECTIVE JUROR NUMBER FIVE**: It got
[4] past the preliminary hearing.
[5] **THE COURT**: It went to trial?
[6] **PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.
[7] **THE COURT**: At the preliminary hearing
[8] you were held for court and then it went to trial
[9] and you were found not guilty?
[10] **PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.
[11] Not guilty.
[12] **THE COURT**: Was it dismissed or were you
[13] found not guilty?
[14] **PROSPECTIVE JUROR NUMBER FIVE**: I don't
[15] know if they're the same or not, but it was
[16] dismissed.
[17] **THE COURT**: Was there a jury trial?
[18] **PROSPECTIVE JUROR NUMBER FIVE**: A judge.
[19] **THE COURT**: So was there evidence
[20] presented at the trial?
[21] **PROSPECTIVE JUROR NUMBER FIVE**: Just a
[22] witness testimony.
[23] **THE COURT**: The witness testified and the
[24] judge made a decision?
[25] **PROSPECTIVE JUROR NUMBER FIVE**: It was
      Jaclyne Wilson

[1] two different witnesses. One witness said I was
[2] there and a couple of other witnesses said I wasn't.
[3] So I guess he found in favor of the other way.
[4] **THE COURT**: Ultimately the judge made a
[5] decision?
[6] **PROSPECTIVE JUROR NUMBER FIVE**: He did.
[7] **THE COURT**: Did he say not guilty?
[8] **PROSPECTIVE JUROR NUMBER FIVE**: Not
[9] guilty.
[10] **THE COURT**: What's your date of birth?
[11] **PROSPECTIVE JUROR NUMBER FIVE**: September
[12] the 5th, 1985.
[13] **THE COURT**: You started off by telling us
[14] your brother was arrested and charged with a crime?
[15] **PROSPECTIVE JUROR NUMBER FIVE**: He was.
[16] **THE COURT**: And he was charged with
[17] possessing counterfeit money?
[18] **PROSPECTIVE JUROR NUMBER FIVE**:
[19] Possession, yes.
[20] **THE COURT**: Is that -- was he arrested by
[21] local authorities or by the federal authorities?
[22] **PROSPECTIVE JUROR NUMBER FIVE**: Local.
[23] **THE COURT**: What happened to his case?
[24] **PROSPECTIVE JUROR NUMBER FIVE**: Actually
[25] I don't even know.
      Jaclyne Wilson

[1] **THE COURT**: Is it still open?
[2] **PROSPECTIVE JUROR NUMBER FIVE**: No, sir.
[3] It's over with.
[4] **THE COURT**: When was he arrested? What
[5] year?
[6] **PROSPECTIVE JUROR NUMBER FIVE**: '01, '02.
[7] **THE COURT**: And you don't know whether it
[8] was dismissed, whether he went to trial and was
[9] convicted, whether he went to trial and was
[10] acquited?
[11] **PROSPECTIVE JUROR NUMBER FIVE**: Wasn't
[12] convicted.
[13] **THE COURT**: Does he live with you?
[14] **PROSPECTIVE JUROR NUMBER FIVE**: No. He
[15] stays in Virginia.
[16] **THE COURT**: Was this case here in
[17] Philadelphia?
[18] **PROSPECTIVE JUROR NUMBER FIVE**: It was in
[19] Virginia.
[20] **THE COURT**: Is there anything about your
[21] arrest and subsequent trial which would effect your
[22] ability to be a fair juror in this case?
[23] **PROSPECTIVE JUROR NUMBER FIVE**: I don't
[24] believe so.
[25] **THE COURT**: Is there anything about your
      Jaclyne Wilson

## Page 37

[1] brother's arrest which would effect your ability to

[2] be a fair juror in this case?

[3] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: No, sir.

[4] 　　　**THE COURT**: Do you hold it against the

[5] Commonwealth that you were arrested?

[6] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: It wasn't

[7] even the Commonwealth's fault.

[8] 　　　**THE COURT**: Do you hold it against law

[9] enforcement generally?

[10] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: They were

[11] doing their job. I hold it against the witness.

[12] 　　　**THE COURT**: You also -- would that in any

[13] way effect your ability to objectively evaluate

[14] witnesses' testimony in this case?

[15] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: No, sir.

[16] 　　　**THE COURT**: You also checked off that you

[17] or someone close to you was an eyewitness to a

[18] crime.

[19] 　　　Is that something we already discussed or

[20] something else?

[21] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: Something

[22] that --

[23] 　　　**THE COURT**: Same thing?

[24] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.

[25] 　　　**THE COURT**: And, finally, you said that
　　　　　　　Jaclyne Wilson

## Page 38

[1] you know people in law enforcement, correct?

[2] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.

[3] 　　　**THE COURT**: What relationship are they to

[4] you?

[5] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: My cousin

[6] is a probation officer down in Virginia.

[7] 　　　**THE COURT**: Would the fact that you know

[8] people in law enforcement in any way

[9] effect your ability to be a fair juror in this case?

[10] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: No, sir.

[11] 　　　**THE COURT**: If you were selected to serve

[12] on this jury, would you give both sides, the

[13] defendant and the Commonwealth, a fair trial?

[14] 　　　**PROSPECTIVE JUROR NUMBER FIVE**: Yes, sir.

[15] 　　　**THE COURT**: Thank you, sir. Collect your

[16] belongings. Wait for us on the other side of the

[17] door to your left. We'll be with you in a second.

[18] 　　(Prospective Juror No 5 exits.)

[19] 　　　**COURT CRIER**: Your Honor, Juror No. 5 is

[20] strike -- alternate strike for Commonwealth.

[21] 　　　Both parties are out of strikes now, Your

[22] Honor.

[23] 　　(Prospective Juror No. 6 enters.)

[24] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Chereese

[25] Martin.
　　　　　　　Jaclyne Wilson

## Page 39

[1] 　　　**THE COURT**: Tell us what you do for a

[2] living, please.

[3] 　　　**PROSPECTIVE JUROR NUMBER SIX**: I'm a

[4] human resource director for University of Penn, the

[5] Department of Facilities and Real Estate Services.

[6] 　　　**THE COURT**: How long have you been in

[7] your job?

[8] 　　　**PROSPECTIVE JUROR NUMBER SIX**: I've been

[9] in there since January, 2009.

[10] 　　　**THE COURT**: What did you do before that?

[11] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Human

[12] resources manager for Saint Christopher's Hospital

[13] for Children.

[14] 　　　**THE COURT**: All toll how long have you

[15] worked in human resources?

[16] 　　　**PROSPECTIVE JUROR NUMBER SIX**: For a

[17] total of 20 years.

[18] 　　　**THE COURT**: Have you personally or anyone

[19] close to you, such as a friend or family member,

[20] ever been the victim of a crime?

[21] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Yes.

[22] 　　　**THE COURT**: What relationship is that

[23] person or those persons to you?

[24] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Cousin.

[25] 　　　**THE COURT**: More than one or one cousin?
　　　　　　　Jaclyne Wilson

## Page 40

[1] 　　　**PROSPECTIVE JUROR NUMBER SIX**: More than

[2] one.

[3] 　　　**THE COURT**: How many?

[4] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Two.

[5] 　　　**THE COURT**: First cousin, male or female?

[6] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Male.

[7] 　　　**THE COURT**: What happened to him?

[8] 　　　**PROSPECTIVE JUROR NUMBER SIX**: He was

[9] shot.

[10] 　　　**THE COURT**: Sorry to hear that.

[11] Did he recover?

[12] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Yes.

[13] 　　　**THE COURT**: And was anyone arrested?

[14] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Yes.

[15] 　　　**THE COURT**: Second cousin, male or

[16] female?

[17] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Male.

[18] 　　　**THE COURT**: What happened to him?

[19] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Assault.

[20] 　　　**THE COURT**: Did he recover?

[21] 　　　**PROSPECTIVE JUROR NUMBER SIX**: Yes.

[22] 　　　**THE COURT**: Was anyone arrested?

[23] 　　　**PROSPECTIVE JUROR NUMBER SIX**: No.

[24] 　　　**THE COURT**: If you were selected to serve

[25] on this jury, could you set those occurrences aside
　　　　　　　Jaclyne Wilson

**Page 41**

[1] and judge this case based on the evidence and the
[2] law?
[3]      **PROSPECTIVE JUROR NUMBER SIX:** Yes, sir.
[4]      **THE COURT:** Have you personally, ma'am,
[5] or anyone close to you, such as a friend or family
[6] member, ever been arrested or charged with a crime?
[7]      **PROSPECTIVE JUROR NUMBER SIX:** Yes.
[8]      **THE COURT:** What relationship is that
[9] person or those persons to you?
[10]      **PROSPECTIVE JUROR NUMBER SIX:** Cousin.
[11]      **THE COURT:** How many?
[12]      **PROSPECTIVE JUROR NUMBER SIX:** Three.
[13]      **THE COURT:** First cousin, male or female?
[14]      **PROSPECTIVE JUROR NUMBER SIX:** Cousin,
[15] male.
[16]      **THE COURT:** What was he charged with?
[17]      **PROSPECTIVE JUROR NUMBER SIX:** Assault
[18] and gun charges.
[19]      **THE COURT:** How long ago was that arrest?
[20]      **PROSPECTIVE JUROR NUMBER SIX:** Fifteen
[21] years ago.
[22]      **THE COURT:** Did you attend his trial?
[23]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[24]      **THE COURT:** Do you have an opinion as to
[25] whether he was treated fair or unfair?
            Jaclyne Wilson

**Page 42**

[1]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[2]      **THE COURT:** Second cousin, is he male or
[3] female?
[4]      **PROSPECTIVE JUROR NUMBER SIX:** Male.
[5]      **THE COURT:** Is that cousin a male or
[6] female?
[7]      **PROSPECTIVE JUROR NUMBER SIX:** Male.
[8]      **THE COURT:** What was that cousin charged
[9] with?
[10]      **PROSPECTIVE JUROR NUMBER SIX:** Assault.
[11]      **THE COURT:** How long ago?
[12]      **PROSPECTIVE JUROR NUMBER SIX:** A year
[13] ago.
[14]      **THE COURT:** Is that case still open?
[15]      **PROSPECTIVE JUROR NUMBER SIX:** Yes.
[16]      **THE COURT:** Do you have an opinion as to
[17] whether your cousin thus far has been treated fair
[18] or unfair?
[19]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[20]      **THE COURT:** And the third cousin, male or
[21] female?
[22]      **PROSPECTIVE JUROR NUMBER SIX:** Male.
[23]      **THE COURT:** What was he charged with?
[24]      **PROSPECTIVE JUROR NUMBER SIX:**
[25] Attempted -- I think attempted murder.
            Jaclyne Wilson

**Page 43**

[1]      **THE COURT:** And how long ago was his
[2] arrest?
[3]      **PROSPECTIVE JUROR NUMBER SIX:** Six years
[4] ago.
[5]      **THE COURT:** And did you attend his trial?
[6]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[7]      **THE COURT:** Do you have an opinion as to
[8] whether he was treated fair or unfair?
[9]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[10]      **THE COURT:** Is there anything about any
[11] of these occurrences which would effect your ability
[12] to be a fair juror in this case?
[13]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[14]      **THE COURT:** Do you hold it against the
[15] Commonwealth that your cousins were arrested?
[16]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[17]      **THE COURT:** You checked off that you or
[18] someone close to you was an eyewitness to a crime.
[19]      Is that something we've already discussed
[20] or something else?
[21]      **PROSPECTIVE JUROR NUMBER SIX:** I'm sorry.
[22] Can you repeat that?
[23]      **THE COURT:** You also checked off on this
[24] form that either you or someone close to you was an
[25] eyewitness to a crime and I wanted to know if that
            Jaclyne Wilson

**Page 44**

[1] was something we've already discussed or if it's
[2] something else.
[3]      **PROSPECTIVE JUROR NUMBER SIX:** It was
[4] something else.
[5]      **THE COURT:** Who made the observations?
[6] Who was the witness?
[7]      **PROSPECTIVE JUROR NUMBER SIX:** It was a
[8] male cousin.
[9]      **THE COURT:** What did he see?
[10]      **PROSPECTIVE JUROR NUMBER SIX:** He
[11] witnessed someone being robbed.
[12]      **THE COURT:** Is there anything about what
[13] he saw which would effect your ability to be a fair
[14] juror?
[15]      **PROSPECTIVE JUROR NUMBER SIX:** No.
[16]      **THE COURT:** Finally, ma'am, you checked
[17] off that you know people in law enforcement.
[18]      Is that right?
[19]      **PROSPECTIVE JUROR NUMBER SIX:** Yes.
[20]      **THE COURT:** What relationship are they to
[21] you?
[22]      **PROSPECTIVE JUROR NUMBER SIX:** Uncle and
[23] aunt.
[24]      **THE COURT:** Tell us what your uncle does
[25] and tell us what your aunt does.
            Jaclyne Wilson

Page 45

[1]         PROSPECTIVE JUROR NUMBER SIX: I have an
[2] uncle who is a police officer.  My aunt was a judge.
[3]         THE COURT:  What's your aunt's name?
[4]         PROSPECTIVE JUROR NUMBER SIX:  Kathryn
[5] Streeter Lewis.
[6]         THE COURT:  Would the fact that you know
[7] people in law enforcement, would that in any way
[8] effect your ability to be a fair juror?
[9]         PROSPECTIVE JUROR NUMBER SIX:  No.
[10]        THE COURT:  If you were selected to serve
[11] on this jury, would you give both sides a fair
[12] trial, the defendant and the Commonwealth?
[13]        PROSPECTIVE JUROR NUMBER SIX:  Yes.
[14]        THE COURT:  Thank you, ma'am.  Wait for
[15] us, please, on the other side of the door to your
[16] left.  We'll be with you momentarily.
[17]     (Prospective Juror No. 6 exits.)
[18]        COURT CRIER:  Juror No. 6 is Juror
[19] No. 14, Your Honor.  We have our 14.
[20]        THE COURT:  All right.  Counsel, is there
[21] any need to impanel any additional jurors?
[22]        MR. LORUSSO:  No.
[23]        THE COURT:  Ms. Forchetti?
[24]        MS. FORCHETTI:  I don't see one,
[25] Your Honor.

Jaclyne Wilson

Page 46

[1]         THE COURT:  Mr. Lorusso, I'm sorry?
[2]         MR. LORUSSO:  No, Your Honor.
[3]         THE COURT:  All right.  So we have our
[4] jury of 12, plus 2.  I suppose you need to get them
[5] organized and get the other people up here.
[6]         In the interim, is there anything we need
[7] to address?
[8]         MR. LORUSSO:  No, Your Honor.
[9]         MS. FORCHETTI:  No, Your Honor.
[10]        THE COURT:  All right.  May we release
[11] the additional panel members?
[12]        MR. LORUSSO:  Yes, Your Honor.
[13]        THE COURT:  I was going to bring to your
[14] attention that if the two of you were fortunate
[15] enough and we got to No. 11, she's formally my law
[16] clerk.
[17]        MS. FORCHETTI:  I recognized her.
[18]        THE COURT:  But we didn't get there.
[19]        (Short recess.)
[20]        MR. LORUSSO:  This is in regards to
[21] potential identification testimony of witnesses.
[22] I've just spoken with Ms. Forchetti and she has
[23] indicated that in speaking with her witnesses, none
[24] of them are -- they have told her that they will not
[25] make an identification.  Is that correct?  And my

Jaclyne Wilson

Page 47

[1] concern is simply that I don't want a witness to
[2] come in and then make an identification.
[3]         THE COURT:  I understand.
[4]         MR. LORUSSO:  So I would ask the Court
[5] since that's the representation, I don't know how to
[6] get around it, frankly.  I was going to suggest
[7] maybe an out of the jury scenario but then because,
[8] of course, if he makes an identification under those
[9] circumstances or she, whoever the witness is, then
[10] that happens.  I don't see that there's any
[11] indication in any of the discovery that any of these
[12] witnesses was in any position to make an
[13] identification although one says he thinks he could.
[14]        MS. FORCHETTI:  Your Honor, if I can
[15] address it?
[16]        THE COURT:  Go ahead.
[17]        MS. FORCHETTI:  In speaking with the
[18] other civilian witnesses who were present at the
[19] scene of the shooting, none of whom represented that
[20] they could make an identification.  The only
[21] exception being Kyle Holman who saw the alleged
[22] shooter run past his driveway shortly after the
[23] shooting.  However, he was interviewed after this
[24] defendant was already arrested.  So he was not shown
[25] a photo array or subject to any identification

Jaclyne Wilson

Page 48

[1] procedures.  In speaking with him last night, it did
[2] not appear that he felt he could make an
[3] identification.
[4]         MR. LORUSSO:  So my only request under
[5] those circumstances would be either to A, preclude
[6] him from making an identification or B, order a
[7] line-up unless he says that I wouldn't know anybody
[8] on the record.
[9]         THE COURT:  Why wasn't a request for a
[10] line-up made previously?
[11]        MR. LORUSSO:  It should have been and
[12] I --
[13]        THE COURT:  It's kind of unrealistic to
[14] expect that on the second day of trial in a case
[15] that we are recessing for two days to accommodate
[16] your schedule, that we can order a line-up at 9:30
[17] a.m., which is the time now, and have that matter
[18] resolved before we are obliged to complete selecting
[19] the jury and commence evidence in the case.
[20]        This case has been around for a long,
[21] long time.  If there was a motion for a line-up and
[22] witnesses didn't appear, then I could order
[23] preclusion, but how could I in good faith say to Mr.
[24] Holman, You will be precluding from identifying the
[25] defendant because defense counsel didn't make a

Jaclyne Wilson

Page 49

[1] request for a line-up?
[2]      MR. LORUSSO: I understand.
[3]      THE COURT: All right.
[4]      (Pause.)
[5]      THE COURT: This is case of Commonwealth
[6] vs. Johnnie Simmons, CP-51-CR-0004773-2011.
[7] Mr. Simmons is here with his attorney, Mr. Lorusso.
[8] The Commonwealth by Ms. Forchetti.
[9]      Let's have the defendant sworn, please.
[10]      ...JOHNNIE SIMMONS, after having been
[11] first duly sworn, was examined and testified as
[12] **follows:**
[13]      _ _ _
[14]      COURT CRIER: State your name for the
[15] record and spell your last name.
[16]      THE DEFENDANT: Johnnie Simmons,
[17] S-I-M-M-O-N-S.
[18]      THE COURT: Now, would you state for the
[19] record, ma'am, the charges you're moving on, the
[20] count number, the offense and the grading, please.
[21]      MS. FORCHETTI: Sure. Your Honor, the
[22] Commonwealth is moving on Count 1, attempted murder,
[23] graded generally as a felony.
[24]      Count 2, aggravated assault as a felony
[25] of the first degree.

                    Jaclyne Wilson

Page 50

[1]      Count 3, criminal conspiracy as a felony
[2] of the first degree with the criminal objective
[3] being aggravated assault and/or attempted murder.
[4]      Count 4, possession of a firearm by a
[5] prohibited person as a felony of the second degree.
[6] I might suggest to the Court that we arraign the
[7] defendant on that charge outside the presence of the
[8] jury before we proceed.
[9]      Count 5, firearms not to be carried
[10] without a license as a felony of the third degree.
[11]      Count 7, possession of an instrument of
[12] crime as a misdemeanor of the first degree.
[13]      THE COURT: Mr. Lorusso, are you moving
[14] to sever 6105?
[15]      MR. LORUSSO: Yes, Your Honor.
[16]      THE COURT: Motion is granted.
[17]      Now, Ms. Forchetti has suggested
[18] arraigning the defendant outside the presence of the
[19] jury on 6105. Obviously, if you're moving to sever
[20] and I granted it, we can hole off on arraignment
[21] until after the verdict on the underlying offenses.
[22] However, if you so request you will waive any right
[23] to allege a Campana violation or double jeopardy.
[24]      Do you understand that?
[25]      MR. LORUSSO: Yes, Your Honor.

                    Jaclyne Wilson

Page 51

[1]      THE COURT: What's your pleasure?
[2]      MR. LORUSSO: I would ask Your Honor to
[3] forgo arraignment on that charge until after the
[4] verdict.
[5]      THE COURT: Understanding full well that
[6] the failure to do so will not give rise to double
[7] jeopardy?
[8]      MR. LORUSSO: Yes, Your Honor.
[9]      THE COURT: Will not create a Campana
[10] problem?
[11]      MR. LORUSSO: Yes, Your Honor.
[12]      THE COURT: Do you have any objection to
[13] that procedure, ma'am?
[14]      MS. FORCHETTI: No, Your Honor.
[15]      THE COURT: All right. The 6105 is
[16] severed. We'll take a short recess. Mr. Lorusso,
[17] please go over the arraignment process with your
[18] client because it will be done in front of the jury.
[19] Please advise how you wish the defendant to be
[20] arraigned and make sure the charges are the ones
[21] that you want him arraigned on.
[22]      Take a short recess.
[23]      (Pause.)
[24]      THE COURT: We are back in session with
[25] our trial case. Mr. Simmons is here with his

                    Jaclyne Wilson

Page 52

[1] attorney, Mr. Lorusso. Ms. Forchetti for the
[2] Commonwealth.
[3]      Counsel, after we selected Juror No. 12
[4] and two alternates this morning and after we
[5] released the remaining panel members, Juror No. 14
[6] advised Mr. Menna that she has a medical procedure
[7] scheduled for ten o'clock on Monday. That is after
[8] I pointed out to them that we would be in recess on
[9] Thursday and Friday and we would resume the case on
[10] Monday. One would think she would have brought this
[11] to our attention during the voir dire. She did not.
[12]      So I'm open to suggestions as to how you
[13] wish to deal with this.
[14]      MR. LORUSSO: Whatever the Court's
[15] pleasure from my end. If Your Honor wants to just
[16] use 13, it's fine. If you want to voir dire an
[17] additional juror, that's fine. If you want to
[18] recess until Monday afternoon or Tuesday, that's
[19] fine. Whatever the Court's pleasure.
[20]      MS. FORCHETTI: I'm fine with proceeding
[21] with just 13. I don't see it as being a fairly long
[22] case. I suppose there is an outside chance that
[23] with a recess of two days we may lose someone over
[24] the weekend.
[25]      THE COURT: I'm of the mind that if this

                    Jaclyne Wilson

Page 53

[1] was of some importance to her she would have brought
[2] it our attention during voir dire. She did not. I
[3] don't intend to excuse her now after she's been
[4] selected. We will go with 14 and we will resume on
[5] Monday morning at nine o'clock.
[6]     If, in fact, she has not been able to
[7] reschedule the matter, I'll decide then whether or
[8] not she'll be released to keep her ten o'clock
[9] appointment. I cannot imagine I would not release
[10] her if she can't reschedule it. But it's just so
[11] frustrating that she would see fit to bring it to
[12] the court officer's attention after she had been
[13] selected and after everybody else has been released
[14] and not during the process when she was here being
[15] examined.
[16]     We'll take it up again at the end of the
[17] day before we recess on Wednesday.
[18]     All right. Are you ready, Ms. Forchetti?
[19]     **MS. FORCHETTI**: Yes.
[20]     **THE COURT**: Mr. Lorusso?
[21]     **MR. LORUSSO**: Yes, Your Honor.
[22]     **THE COURT**: Have you --
[23]     **MR. LORUSSO**: I've discussed the
[24] procedure in terms of arraignment with Mr. Simmons.
[25]     **THE COURT**: All right. Since the case

Jaclyne Wilson

Page 54

[1] will last three to four days or the jurors will take
[2] notes, however, the note taking will commence after
[3] the speeches, your opening, rather.
[4]     You've discussed the arraignment,
[5] Ms. Forchetti?
[6]     **MS. FORCHETTI**: Yes.
[7]     **THE COURT**: All right. So are we ready
[8] to bring the jurors out?
[9]     **MR. LORUSSO**: Yes, Your Honor.
[10]     **THE COURT**: We'll bring the jurors out.
[11] We'll swear in the jury and then we'll arraign the
[12] defendant.
[13]     Did you make a decision, Mr. Lorusso?
[14] Will you be following the prosecutor?
[15]     **MR. LORUSSO**: Yes, Your Honor.
[16]     **THE COURT**: Okay.
[17] (Jury enters the courtroom at 11:22 a.m.)
[18]     **THE COURT**: Good morning, ladies and
[19] gentlemen.
[20]     Shall we have the jury sworn in?
[21]     **COURT CRIER**: Yes, Your Honor.
[22]     (Jury panel sworn.)
[23]     **COURT CRIER**: Will the defendant please
[24] rise.
[25]     State your name for the record.

Jaclyne Wilson

Page 55

[1]     **THE DEFENDANT**: Johnnie Simmons,
[2] S-I-M-M-O-N-S.
[3]     **COURT CRIER**: Johnnie Simmons, to this
[4] docket number, CP-51-CR-0004773-2011, you're being
[5] charged with criminal attempted murder, how do you
[6] pled, sir, guilty or not guilty?
[7]     **THE DEFENDANT**: Not guilty.
[8]     **COURT CRIER**: To the same document
[9] number, you're being charged with aggravated
[10] assault, how do you plead, sir, guilty or not
[11] guilty?
[12]     **THE DEFENDANT**: Not guilty.
[13]     **COURT CRIER**: To the same docket number,
[14] sir, you're being charged with conspiracy, how do
[15] you plead, sir, guilty or not guilty?
[16]     **THE DEFENDANT**: Not guilty.
[17]     **THE COURT**: To the same document number,
[18] you're being charged with firearms not to be carried
[19] without a license, how do you plead, sir, guilty or
[20] not guilty?
[21]     **THE DEFENDANT**: Not guilty.
[22]     **COURT CRIER**: To the same document
[23] number, yo're being charged with possession of an
[24] instrument of crime, how do you plead, sir, guilty
[25] or not guilty?

Jaclyne Wilson

Page 56

[1]     **THE DEFENDANT**: Not guilty.
[2]     **COURT CRIER**: Sir, after pleading not
[3] guilty, how do you wish to be tried, by a jury of
[4] your peers or by the Honorable Judge?
[5]     **THE DEFENDANT**: By a jury.
[6]     **COURT CRIER**: Your Honor, defendant has
[7] pled not guilty to all charges and wishes to be
[8] tried by a jury of his peers, sir.
[9]     **THE COURT**: Thank you, sir.
[10]     Ladies and gentlemen, you may be seated.
[11]     Members of the jury, I must now give you
[12] some preliminary instructions and I shall give
[13] continuing instructions throughout the case as they
[14] may be needed. You must understand that a
[15] fundamental principle of our system of criminal law
[16] is that the defendant is presumed to be innocent.
[17] So the fact that Johnnie Simmons was arrested and is
[18] charged with crimes is not evidence against him.
[19] Further, for the defendant is presumed innocent
[20] throughout the trial and it continues unless and
[21] until you conclude based on the evidence that the
[22] Commonwealth has proven his guilt beyond a
[23] reasonable doubt.
[24]     So a defendant has no burden to prove
[25] that he is not guilty. Instead it is the

Jaclyne Wilson

Page 57

[1]   Commonwealth that has the burden of proving each and
[2]   every element of the crimes charged and that the
[3]   defendant is guilty of those crimes beyond a
[4]   reasonable doubt.  And, finally, defendants are
[5]   accorded a right of silence at trial.  So you must
[6]   not hold it against the defendant.  You may not draw
[7]   an inference of guilt from the fact that he does not
[8]   testify, should he elect to invoke his right of
[9]   silence.
[10]         Members of the jury, you are about to
[11]  perform one of the most serious duties of
[12]  citizenship.  You are going to decide whether the
[13]  defendant, Johnnie Simmons, is or is not guilty of
[14]  the charges lodged against him by the Commonwealth
[15]  of Pennsylvania.  So it is most important that you
[16]  appreciate that this is a matter of great importance
[17]  for both sides.  To that end, bear in mind that the
[18]  way you ladies and gentlemen perform your duty as
[19]  the jury is as important to the administration of
[20]  justice as the way I perform my duty as judge, the
[21]  way Ms. Forchetti performs her duty as prosecutor
[22]  and the way Mr. Lorusso performs his duty as defense
[23]  counsel.  So, please, ladies and gentlemen, be
[24]  mindful of your and pay close attention to
[25]  everything that is said and done in this courtroom
            Jaclyne Wilson

Page 58

[1]   so you, ladies and gentlemen, can well perform your
[2]   duty as fact finders.
[3]         I shall now describe for you in a general
[4]   way what will take place during the course of this
[5]   trial.  Now, after I conclude these preliminary
[6]   instructions, the assistant district attorney whom I
[7]   shall from time to time refer to as the
[8]   Commonwealth's attorney, Ms. Forchetti, will make
[9]   what's called an opening statement to you in which
[10]  she will outline for you the Commonwealth's case
[11]  against the defendant.  Thereafter, Mr. Lorusso,
[12]  defendant's attorney, may make an opening statement
[13]  either immediately following the prosecutor's
[14]  remarks or later in the trial.
[15]         After these statements have been made,
[16]  the assistant district attorney will commence the
[17]  presentation of evidence.  Now, she may call
[18]  witnesses to testify and, if appropriate, offer
[19]  physical exhibits.  Mr. Lorusso as counsel for the
[20]  defendant has a right to cross-examine any witness
[21]  called by the assistant district attorney in order
[22]  to test the truthfulness and/or accuracy of that
[23]  witness's testimony.
[24]         After the assistant district attorney has
[25]  concluded presentation of the Commonwealth's case,
            Jaclyne Wilson

Page 59

[1]   defense counsel may present evidence for the
[2]   defendant.  But you should keep in mind the
[3]   defendant has no obligation to offer evidence or to
[4]   testify himself.  The assistant district attorney,
[5]   of course, has the right to cross-examine any
[6]   witness that might be called by the defense.
[7]         After all the evidence has been
[8]   presented, the attorneys for both sides will then be
[9]   afforded an opportunity to make closing arguments to
[10]  you.  After which I shall give you my final charge
[11]  which will include instructions on the rules of law
[12]  that apply to this case and whatever additional
[13]  legal guidance I think you will need for your
[14]  deliberations.  You will then retire as a body to
[15]  the jury room to deliberate and to decide what your
[16]  verdict will be.
[17]         Please, ladies and gentlemen, bear in
[18]  mind that there is a division of responsibility in a
[19]  trial.  I've outlined to you the prosecutor's role
[20]  and defense counsel's role.  It is my responsibility
[21]  during the course of this trial to decide all
[22]  questions of law and you must on your oath both
[23]  accept and follow my rulings with regards to the law
[24]  whether or not you agree with them.  I am
[25]  not -- however, I am not the judge of the facts of
            Jaclyne Wilson

Page 60

[1]   this case.  So it is not for me to decide what the
[2]   facts are concerning the charges against this
[3]   defendant.  You jurors, the jury is the sole judge
[4]   of the facts.  So it will be your responsibility at
[5]   the end of this trial when you retire to deliberate
[6]   to evaluate the evidence and from that evidence
[7]   determine what the facts are.
[8]         You have an obligation as aforementioned
[9]   to accept and apply the rules of law which I shall
[10]  give you to those facts and then you must decide
[11]  whether the defendant has or has not been proven
[12]  guilty beyond a reasonable doubt to the charges made
[13]  against him.
[14]         Now, in order to decide the facts of this
[15]  case, you will be called upon to judge credibility.
[16]  By that I mean accuracy and the truthfulness of the
[17]  testimony and you will be called upon to weigh the
[18]  testimony of each witness and any other evidence
[19]  presented.  So, again, by credibility I mean
[20]  truthfulness and accuracy.
[21]         When you judge credibility and weight to
[22]  a witness's testimony, you will decide whether you
[23]  believe some, all or none of his or her testimony
[24]  and you will also decide how important that
[25]  testimony is to the resolution of the issues before
            Jaclyne Wilson

[1] you.  So, please, ladies and gentlemen, use your
[2] understanding of human nature and your own common
[3] **sense to this end**:  Observe each witness as he or
[4] she testifies and be alert to anything in the
[5] testimony of the witness or the behavior of the
[6] witness which will assist you in assessing
[7] truthfulness, accuracy and what weight to assign
[8] that testimony and the other evidence in the case.
[9]        Now, under the rules of court you have
[10] each been distributed note pads and pens in the
[11] event you wish to take notes during this trial.  You
[12] may not access that material until the first witness
[13] is called and I remind you that you are under no
[14] obligation to take notes during the trial.  It is
[15] entirely up to you if you wish to take notes to help
[16] you remember what witnesses said and to use during
[17] your deliberations.
[18]        If you do take notes, remember that one
[19] of your responsibilities as a juror is to observe
[20] the demeanor of witnesses to help you assess their
[21] credibility.  So do not become so involved with note
[22] taking that it interferes with your ability to
[23] observe a witness as he or she testifies or
[24] distracts you from hearing questions asked of the
[25] witnesses or the answers given by the witnesses.

                        Jaclyne Wilson

[1]        Your notes may help you refresh your recollection as
[2] to what the testimony was and should, therefore, be
[3] treated as a supplement to rather than a substitute
[4] for your memory.  Your notes are only to be used as
[5] memory aids and should not take precedence over your
[6] independent recollection of the evidence.
[7]        Those of you who do not take notes should
[8] not be overly influenced by the notes of other
[9] jurors.  It is just as easy to write something down
[10] incorrectly as it is to remember it incorrectly and
[11] your fellow jurors' notes are entitled to no greater
[12] weight than each juror's independent recollection of
[13] the evidence.
[14]        Although you may refer to your notes
[15] during you deliberations, give no more or no less
[16] weight to the view of a fellow juror just because
[17] that juror did or did not take notes.  Finally, you
[18] are permitted to use your notes for your
[19] deliberations.  The only notes you may use are the
[20] ones you write in this courtroom during these
[21] proceedings on the materials that have been
[22] distributed by the court staff.
[23]        Each time we recess or adjourn, your
[24] notes will be collected and secured by the court
[25] staff.  Bear in mind, however, that your notes are

                        Jaclyne Wilson

[1] completely confidential and neither I, nor the
[2] attorneys, nor anyone else will ever read your notes
[3] now or in the future.  In fact, after you reached
[4] your verdict in this case, your notes will be
[5] immediately destroyed.
[6]        We do have, ladies and gentlemen, as you
[7] can plainly see a court reporter who's taking down
[8] an official transcription of these proceedings.  So
[9] if you should miss a question as it's asked or an
[10] and as it's given, please, raise your hand
[11] immediately and we can have her read back whatever
[12] it is you may have just missed.
[13]        Each of you on your oath must keep an
[14] open mind throughout this trial.  So you should
[15] avoid forming opinions about any disputed questions
[16] until the trial is over and you commence your
[17] deliberations.  Do not talk with each other about
[18] the evidence or any matter relating to whether or
[19] not the defendant has or has not been proven guilty
[20] beyond a reasonable doubt until I send you to the
[21] jury room to deliberate on your verdict.  See, only
[22] then will you know what you need to know about both
[23] the evidence and the law.  So only then will you be
[24] in a position to discuss the case fairly and
[25] intelligently.

                        Jaclyne Wilson

[1]        When you deliberate on your verdict, the
[2] law allows you to consider only the evidence, the
[3] arguments and the instructions that were properly
[4] presented to you.  So you must avoid anything that
[5] might result in your being exposed to outside
[6] information or influence.  Specifically, jurors, do
[7] not discuss this case with anyone.  Don't discuss it
[8] with your friends, your family members.  Don't
[9] discuss it with other people at home.  Don't discuss
[10] it with your business associates.  Please, don't
[11] discuss the case.
[12]        Now, we do not expect there to be any
[13] media coverage of this case.  Nevertheless, I give
[14] **you the following instructions**:  Please, do not
[15] read, listen to or watch anything that might be
[16] in the media about the case.  Do not try to get
[17] information relevant to this case on your own.
[18] Don't go to the scene.  Don't conduct your own
[19] investigation.  Don't do any research.  Don't
[20] perform any experiments.  Ladies and gentlemen, with
[21] great importance, please, don't consult the
[22] internet.  You see, it is most important that the
[23] only information you have when you retire to
[24] deliberate is the same information that we all saw
[25] and heard here together during these proceedings in

                        Jaclyne Wilson

Page 65

[1] this courtroom.
[2]         Now, if you should be approached by
[3] someone, anyone or if you should see or hear
[4] something you think you should not have seen or
[5] heard, please, notify one of the court officers or
[6] the court crier about it immediately and he will
[7] then bring it to my attention and I will address you
[8] in the presence of these two attorneys.
[9]         Jurors, if you think you saw or heard
[10] something that you should not have seen or heard,
[11] please, don't go back to the jury room and tell your
[12] fellow jurors what it is you may have seen or heard
[13] because if after I question you it becomes necessary
[14] to excuse you, hopefully we can continue in your
[15] absence without having to start all over again.
[16]         Members of the jury, statements made by
[17] the attorneys do not constitute evidence, so they
[18] are not binding on you.  In fact, the questions
[19] which the attorneys ask of the witnesses are not
[20] themselves evidence.  Rather, it is the witness's
[21] answers which constitutes the evidence for your
[22] consideration.
[23]         Sometimes there will be objections.  One
[24] attorney will object to a question asked by the
[25] other attorney.  If I overruled the objection to the
                     Jaclyne Wilson

Page 66

[1] question, then you may consider the answer.
[2] However, if I sustained the objection to the
[3] question, I will not allow an answer to be given and
[4] if one has already been given, I will most likely
[5] direct you to disregard it and you must do so.
[6]         It is possible, ladies and gentlemen,
[7] that I might question a witness myself.  Any such
[8] question will not reflect and is not intended to
[9] reflect any opinion on my part  about that witness
[10] or this case.  The only purpose for which I would
[11] ask a question of a witness would be to clarify a
[12] matter for you, ladies and gentlemen of the jury.
[13]         Now, the attorneys and I from time to
[14] time will have to take up matters outside of your
[15] presence.  So, please, don't speculate as to why we
[16] have these sidebars, as they're call.  I'll tell you
[17] **now**:  The only reason I take up issues with the
[18] attorneys outside the hearing of the jury is to
[19] ensure you receive evidence in a fair and impartial
[20] manner.  These sidebars will take one of three
[21] **forms**:  I will either invite the attorneys to the
[22] bench, my right side or my left side.  On occasion
[23] the two of them will accompany me to the anteroom,
[24] on occasion with the reporter, sometimes without the
[25] reporter, and we'll address the matter there.  If it
                     Jaclyne Wilson

Page 67

[1] appears that the issue is one that will consume some
[2] time, I will invite you, ladies and gentlemen, to go
[3] into the jury room where you can be comfortable and
[4] the attorneys and I will take up the issue here in
[5] open court.
[6]         I remind you that there are persons with
[7] whom you should not have any contact.  You should
[8] not have any contact with witnesses in this case.
[9] Nor should you have any contact with the defendant.
[10] Nor should you have any contact with the attorneys
[11] nor should you have any contact with this judge.
[12]         As aforementioned, let me add that if at
[13] any time as a matter you wish to bring to my
[14] attention, the way you do that is to bring it to the
[15] attention of the court officer or court crier.  He
[16] will bring it to my attention and I will address
[17] your concern in the presence of these two attorneys.
[18] I repeat that you have observed how this building is
[19] laid out and I remind you that it's probable that
[20] you will see one or perhaps both of the attorneys
[21] in the corridor and be advised they will not engage
[22] you.  Again, do not hold it against them.  They're
[23] not being rude.  They simply understand the need to
[24] avoid even an appearance of an impropriety.
[25]         Ladies and gentlemen, your comfort is of
                     Jaclyne Wilson

Page 68

[1] great importance to us.  So if at any time during
[2] this trial you need to break, you need to stand, you
[3] need to stretch, you need a tissue, you need a glass
[4] of water, you need to visit the facilities, do not
[5] hesitate to raise your hand and bring it to our
[6] attention so that we can accommodate you.
[7]         Now, that concludes my preliminary
[8] instructions.  I trust that you have listened
[9] carefully and that you will follow my instructions
[10] to the letter.  The next step is for the attorneys
[11] to make their opening statements.
[12]         Are you ready to proceed, Mr. Lorusso?
[13]     **MR. LORUSSO**:  Yes, Your Honor.
[14]     **THE COURT**:  Ms. Forchetti?
[15]     **MS. FORCHETTI**:  Yes, Your Honor.
[16]     **THE COURT**:  I shall call first on you,
[17] ma'am.
[18]     **MS. FORCHETTI**:  Thank you.
[19]         Good morning, everyone.  My name is Stacy
[20] Forchetti.  I am the assistant district attorney
[21] assigned to this case.  This case concerning code of
[22] the streets.  What happened out on the streets of
[23] February 4th, 2011, at about two o'clock in the
[24] afternoon.
[25]         Charles Talbert, having recently been
                     Jaclyne Wilson

Page 69

[1]     released on parole, was out catching up on business.
[2]     He was getting a new cell phone for himself, buy
[3]     some new clothes, and people came looking for him.
[4]     Johnnie Simmons, the defendant in this case came
[5]     looking for him.  Charles Talbert had been marked.
[6]     The reasons you may never hear.  Someone had
[7]     business, unfinished business, with Charles Talbert.
[8]     And Johnnie Simmons shot him out on the street in
[9]     broad daylight and left him to die in the middle of
[10]    the 1300 block of Johnson Street.
[11]            Also out on the street that day were an
[12]    off-duty police officer who heard the gunshots and
[13]    immediately came running out and went to Charles
[14]    Talbert's aid.  Charles Talbert at that time was
[15]    fearful that his life was about to end and wanted to
[16]    get to the hospital as soon as possible.
[17]            The shooter ran away.  Ran off.  There
[18]    were other witnesses out on the street.  You may be
[19]    surprised or you may not be surprised to hear that
[20]    they didn't want to particularly get involved.  Some
[21]    of them needed a little coaxing to come down to the
[22]    police station to talk about what they had seen.
[23]    But they talk about the shooting that happened right
[24]    in broad daylight and that the shooter ran off with
[25]    his accomplice.
                        Jaclyne Wilson

Page 70

[1]             That accomplice is not part of this
[2]     trial.  You will not hear from him in this trial.
[3]     You are here to determine the actions of Johnnie
[4]     Simmons.
[5]             When this investigation began the
[6]     detectives and the police officers didn't know
[7]     Charles Talbert.  Didn't know Johnnie Simmons.  They
[8]     are just trying to get to the bottom of this
[9]     evidence.  And when they are able finally to talk to
[10]    Charles Talbert, four days after he had been shot,
[11]    in Intensive Care Unit of Albert Einstein Medical
[12]    Center.
[13]            He gives them a description of the person
[14]    that had shot him and is shown a photographic array.
[15]    When the detectives and officers begin investigating
[16]    the shooting, there was a lot of word on the street.
[17]    People that didn't necessarily want to come foward,
[18]    but everyone in the neighborhood knew that little
[19]    Johnnie was the shooter.
[20]            MR. LORUSSO:  Objection.  Can we see
[21]    Your Honor at sidebar?
[22]            THE COURT:  Overruled.
[23]            MS. FORCHETTI:  So Johnnie Simmons was
[24]    placed in a photo array with seven other males that
[25]    looked like him.  When Charles Talbert is shown that
                        Jaclyne Wilson

Page 71

[1]     photo array, he picks him out.  That's him.  Circles
[2]     the photo.  And then is struck again by that fear.
[3]     That fear that pointing him out is going to have
[4]     consequences for him.  So he tells the detective
[5]     he's scared, but he comes to court and he testifies,
[6]     Charles Talbert, and identifies Johnnie Simmons as
[7]     the person who shot him.
[8]             Our office had to relocate Charles
[9]     Talbert to protect him.  But then Charles Talbert
[10]    had to go and get himself in trouble again.  Charles
[11]    Talbert will come to you and testify in this
[12]    courtroom while in custody awaiting trial on his own
[13]    charges.  For you see that day Charles Talbert was
[14]    selling drugs again.  You will hear about that and
[15]    I'm going to rely on you to judge the evidence in
[16]    this case.  To not judge the people because you see,
[17]    you don't deserve to get shot just for selling weed.
[18]    Just shooting a drug dealer isn't an excusable
[19]    offense.  You won't hear that that's a valid defense
[20]    in any courtroom in this building.  That it's okay.
[21]    He was a drug dealer.  It's okay to shoot him.  It
[22]    doesn't matter.
[23]            Charles Talbert is a victim.  Same as any
[24]    of the other victims in this courthouse today
[25]    because the law protects all of us.  And you were
                        Jaclyne Wilson

Page 72

[1]     all selected for your common sense to judge the
[2]     evidence in this case.
[3]             Now, keep in mind that when Charles
[4]     Talbert testifies, he has to face the person who
[5]     shot him and that requires quite a bit of courage.
[6]     This isn't Law and Order.  This isn't a TV show.
[7]     Charles Talbert is not an actor.  I'm not an actor.
[8]     No one is following a script.  So I can't tell you
[9]     right now what Charles Talbert will say.  Will he
[10]    come out and identify the shooter?  Or will that
[11]    fear set in?  I can't tell you that.
[12]            But what I can tell you is that the law
[13]    recognizes that people get scared sometimes.  And
[14]    that courage may fail them.  And that what he has
[15]    said before carries as much weight as if he's saying
[16]    it again to you.
[17]            The other evidence in this case will help
[18]    verify what Charles Talbert said when he identified
[19]    Johnnie Simmons as the shooter.  You will hear from
[20]    the course of the investigatin that Johnnie Simmons
[21]    lives in the neighborhood where this shooting
[22]    happened.  That he was stopped a short time after
[23]    the shooting in the same area.  You will hear that
[24]    the description given by the other witnesses matches
[25]    up with Johnnie Simmons, the person we have sitting
                        Jaclyne Wilson

Page 73

[1] in this courtroom today.
[2] So when I come and talk to you at the end
[3] of this case, we'll talk about what Charles Talbert
[4] did. How he seemed to you. Did he seem afraid.
[5] He's feeling a little vulnerable right now. But
[6] does that in any way discount the power of that
[7] identification that he made in that hospital bed
[8] thinking that might be the last time he got to talk
[9] to the police.
[10] So I will count on you to use your good
[11] judgement and common sense and judge the evidence in
[12] this case. Because the law does protect us all.
[13] The law protects Charles Talbert just as the law is
[14] protecting the rights of Johnnie Simmons. But once
[15] all of the evidence is in, that presumption of
[16] innocence will have been stripped away and you will
[17] see Johnnie Simmons for who he is, a cold-blooded
[18] shooter who left Charles Talbert to die in the
[19] middle of the street.
[20] Thank you very much for your attention.
[21] **THE COURT**: Thank you, Ms. Forchetti.
[22] Mr. Lorusso, do you wish to address the
[23] jury, sir?
[24] **MR. LORUSSO**: I do. May we see
[25] Your Honor at sidebar first?

Jaclyne Wilson

Page 74

[1] **THE COURT**: Come up, sir.
[2] (Sidebar held off the record.)
[3] **THE COURT**: Mr. Lorusso?
[4] **MR. LORUSSO**: Your Honor, Mr. Forchetti,
[5] ladies and gentlemen of the jury, good morning.
[6] My name is Vincent Lorusso. Again, I
[7] represent Johnnie Simmons. I want to initially
[8] thank all of you for taking time out from your daily
[9] routines and schedules to sit here and participate
[10] in what His Honor has clearly indicated is in line
[11] and of the utmost importance as an individual in
[12] combat. Thank you, personally and on behalf of
[13] Johnnie Simmons.
[14] I have an opportunity to tell you now
[15] what it is that I suggest the evidence is going to
[16] show or not going to show in this case. Clearly the
[17] evidence will indicate that Charles Talbert was shot
[18] multiple times back in February 4th of this year in
[19] the area of Stenton and Johnson Streets. Clearly it
[20] will indicate that Mr. Talbert was transported to
[21] the hospital. That some four days later he was
[22] shown a photographic array and the clarity of what
[23] will occur after that I suggest is not so clear.
[24] Because the evidence will indicate that in making an
[25] identification, if there was one made and that

Jaclyne Wilson

Page 75

[1] remains to be seen based upon Mr. Talbert's
[2] testimony.
[3] Mr. Talbert at least two photographs were
[4] circled in the array of eight people. One of the
[5] photographs circled was of Johnnie Simmons and the
[6] evidence will also show in that vain that at some
[7] point in time there was a focus for some reason on
[8] Johnnie Simmons and Johnnie Simmons was actually
[9] taken into custody a couple of hours after this
[10] shooting, taken to the detective division and
[11] photographed, and this is the photograph that was
[12] used in that array. And I'm going to suggest to you
[13] that when you hear Charles Talbert's testimony and
[14] this first statement that he made, one of the first
[15] questions that he's asked is, do you know -- had you
[16] ever seen the person who shot you? Before his
[17] response was no.
[18] You'll see as the evidence proceeds that
[19] at some point there's reference to this photo array
[20] again and this photo array by the detective and
[21] actually I think the evidence will show there were
[22] three detectives in the room.
[23] Suddenly from a response of, no, I never
[24] saw this shooter before. Not only have I never seen
[25] him before, now it progresses to, oh, yes. I know

Jaclyne Wilson

Page 76

[1] Johnnie. I've known him for years. He's around the
[2] street and this is him. I think that Mr. Talbert
[3] and I don't know what he'll say today, but I can
[4] tell you that subsequently under oath he said that I
[5] didn't even make that identification. That it
[6] wasn't this person Johnnie Simmons who shot me.
[7] That I think it was the other person who shot me,
[8] but that the police were all focused on Johnnie
[9] Simmons and that's how that all came about that I
[10] said at one point that Johnnie Simmons was the
[11] shooter.
[12] And I'm going to suggest to you that that
[13] evidence is going to show to you from a defense
[14] perspective that the mentality and the focus of the
[15] police department as it relates to clearing this
[16] offense and finding somebody to charge and convict
[17] with this shooting was not unlike that of Admiral
[18] Farragut in the Battle of Mobile Bay when he said,
[19] damn the torpedoes. Full speed ahead. In this
[20] instance the police said, damn the evidence. Full
[21] speed ahead. And that's how we wind up with the
[22] focus on Johnnie Simmons and that's how we wind up
[23] subsequently with Charles Talbert.
[24] This is the first that I'm hearing this,
[25] ladies and gentlemen, in terms of a relocation of

Jaclyne Wilson

[1] Mr. Talbert. So I'm going to ask you as fact
[2] finders when you see Mr. Talbert and you have the
[3] opportunity to observe him, to make your own
[4] determination in terms of how much he needs
[5] relocation or how much fear he has for anything in
[6] this world and accord the weight due to that comment
[7] and potential evidence about him having been
[8] relocated because I'm going to suggest to you that
[9] Charles Talbert at least my having seen him for the
[10] first time doesn't create an impression of being
[11] someone who is timid and fearful. To the contrary,
[12] I'll suggest to you.
[13] And I'm going to suggest to you also that
[14] when Mr. Talbert comes up here, assuming that he
[15] does, again, for the second time, says under oath
[16] that Johnnie Simmons is not the person who shot me.
[17] That I don't want to see an innocent man convicted
[18] of these crimes. I'm going to suggest to you that
[19] there's a ring of truth to that and I'm going to
[20] certainly suggest to you that the evidence presented
[21] by the Commonwealth in and of itself is going to
[22] raise a reasonable doubt in your mind. And His
[23] Honor will instruct the jury later on on the
[24] definition of reasonable doubt and the definitions
[25] of various crimes that are charged.

Jaclyne Wilson

[1] At the conclusion of the Commonwealth's
[2] case, Johnnie Simmons may or may not testify.
[3] That's a determination that we'll make after
[4] discussing the evidence presented by the
[5] Commonwealth. But you've already heard Johnnie
[6] Simmons plead not guilty to these charges before you
[7] and in the event that he doesn't, I'll suggest to
[8] you later on that that's something you should
[9] consider as it relates to his position on these
[10] charges.
[11] I want to thank you, again. I'm
[12] confidential that you'll demonstrate the same degree
[13] of attention that you've so far demonstrated not
[14] only throughout the trial but through your
[15] deliberations, through the Court's charge, and into
[16] deliberations.
[17] And, again, thank you.
[18] **THE COURT**: Thank you, Mr. Lorusso.
[19] Ladies and gentlemen, we're going to take
[20] a very short break after which the presentation of
[21] evidence will commence.
[22] Would you be so kind to take the jurors
[23] out?
[24] (Jury exits the courtroom at 11:58 a.m.)
[25] **THE COURT**: Let the record reflect the

Jaclyne Wilson

[1] jurors have left the room. This is at your request,
[2] Mr. Lorusso?
[3] **MR. LORUSSO**: Thank you, Your Honor.
[4] If the Court please, I would make a
[5] motion for a mistrial, in the alternative request a
[6] cautionary instruction based upon the comments by
[7] Ms. Forchetti that specifically everyone on the
[8] street knew Johnnie Simmons was the shooter. That
[9] puts the defense in a position of the suggestion
[10] that there's evidence in this case that won't be
[11] presented in this court but that it's evidence
[12] that's detrimental to my client and I have no
[13] opportunity to confront or challenge that evidence
[14] and yet that's what the jury has heard and I would
[15] submit the only remedy for that is a mistrial.
[16] **THE COURT**: Ms. Forchetti?
[17] **MS. FORCHETTI**: Your Honor, in the arrest
[18] memo of Officer Michael Long he states that based on
[19] an anonymous phone call given to his supervisor that
[20] they are asked to go out and apprehend Johnnie
[21] Simmons on the same day of the shooting. That is
[22] based on what anonymous witnesses are saying in the
[23] neighborhood. So that is when this defendant is
[24] brought into Northwest Detectives, as Mr. Lorusso
[25] mentioned in his opening, and a photograph is taken

Jaclyne Wilson

[1] of him. That photograph is then used to construct a
[2] photograph array that is shown to the complainant in
[3] the case four days later.
[4] **THE COURT**: You may have a witness
[5] describe the course of the investigation. You may
[6] not have the witness state that everybody in the
[7] neighborhood knew that Mr. Simmons was the shooter
[8] unless everybody will be called to testify and
[9] subject to cross-examination.
[10] **MS. FORCHETTI**: Yes, Your Honor.
[11] **THE COURT**: What is the cautionary
[12] instruction you seek?
[13] **MR. LORUSSO**: I'd ask Your Honor to
[14] instruct the jury to disregard that comment about
[15] everybody -- disregard the comment concerning who
[16] may have suggested that Johnnie Simmons was the
[17] shooter and instruct them that the only evidence is
[18] from the witness stand again.
[19] **THE COURT**: All right. The motion for a
[20] mistrial is denied. I will give a cautionary
[21] instruction.
[22] Are we ready to proceed?
[23] **MS. FORCHETTI**: Yes, Your Honor.
[24] **MR. LORUSSO**: Perhaps, you know,
[25] peremptorily I can address that issue of the

Jaclyne Wilson

Page 81

[1] anonymous call. I mean, I would object to a police
[2] officer testifying about receiving an anonymous call
[3] to go pick up Johnnie Simmons also.
[4]     **THE COURT**: He can testify that in the
[5] course of the investigation we developed information
[6] to think it prudent to bring in Mr. Simmons, words
[7] to that effect.
[8]     Do you have any objection to that?
[9]     **MR. LORUSSO**: No.
[10]     **THE COURT**: Okay. But if you're going to
[11] talk about what an anonymous tipster says, that
[12] violates the rule against admission of hearsay.
[13]     **MS. FORCHETTI**: Yes, Your Honor.
[14]     **THE COURT**: All right.
[15] (Jury enters the courtroom at 12:04 p.m.)
[16]     **THE COURT**: Ladies and gentlemen, I
[17] remind you of the instruction I gave earlier that
[18] statements made by the attorneys do not constitute
[19] evidence. And, specifically, I instruct you to
[20] disregard the comment by the assistant district
[21] attorney that everybody in the neighborhood knew
[22] that Johnnie Simmons was the shooter.
[23]     Now, you may, if you wish, access the
[24] pads and pens under your chair and it's entirely up
[25] to each of you whether or not you take notes.

Jaclyne Wilson

Page 82

[1]     You may call your first witness,
[2] Ms. Forchetti
[3]     **MS. FORCHETTI**: Thank you, Your Honor.
[4]     Your Honor, at this time the Commonwealth
[5] calls Police Officer Richard Alexander.
[6]     ...POLICE OFFICER RICHARD ALEXANDER,
[7] after having been first duly sworn, was examined and
[8] **testified as follows**:
[9]     _ _ _
[10]     **COURT CRIER**: State your name, badge
[11] number for the record and spell your last name.
[12]     **THE WITNESS**: Police Officer Richard
[13] Alexander, A-L-E-X-A-N-D-E-R, Badge No. 1707, 6th
[14] District.
[15]     **THE COURT**: You may proceed.
[16]     **MS. FORCHETTI**: Thank you, Your Honor.
[17]     _ _ _
[18]     COMMONWEALTH'S EVIDENCE
[19]     _ _ _
[20]     DIRECT EXAMINATION
[21]     _ _ _
[22] **BY MS. FORCHETTI**:
[23] **Q.**   Good afternoon, officer.
[24] **A.**   Good afternoon, ma'am.
[25] **Q.**   Officer, how long have you been with the Philadelphia

Jaclyne Wilson

Page 83

[1] police?
[2] **A.**   Nine years.
[3] **Q.**   Where have you been assigned?
[4] **A.**   The 6th District, Center City, Philadelphia.
[5] **Q.**   Okay. Have you spent your entire career assigned to
[6] the Center City District?
[7] **A.**   Yes.
[8] **Q.**   Were you on duty on February 4th, 2011, at about two
[9] o'clock in the afternoon?
[10] **A.**   Actually I was off duty.
[11] **Q.**   And what were you doing off duty?
[12] **A.**   I was at the Genesis eyeglass place getting my glasses
[13] fixed.
[14] **Q.**   Where is that located?
[15] **A.**   That's at Stenton and Johnson Street. On Stenton and
[16] Johnson.
[17] **Q.**   And were you with anyone?
[18] **A.**   No.
[19] **Q.**   Were you in uniform as you are today?
[20] **A.**   No. I was in my -- I had my uniform pants on and a
[21] regular jacket.
[22] **Q.**   Okay. Were you on your way to work?
[23] **A.**   Yes.
[24] Q.   Okay. Were you working a 4:00 to 12:00 shift?
[25] **A.**   Yes.

Jaclyne Wilson

Page 84

[1] **Q.**   Okay. But you needed your glasses fixed before you
[2] went in?
[3] **A.**   Yes.
[4] **Q.**   Okay. Now, while you were at this eyeglass located in
[5] the area of Stenton and Johnson Street, did anything happen
[6] that was unusual?
[7] **A.**   Yes. I was at the counter. The lady had gave me back
[8] my glasses and I heard four gunshots, four to five gunshots
[9] actually.
[10] **Q.**   And did you immediately recognize that sound of being
[11] of gunshots?
[12] **A.**   Yes.
[13] **Q.**   Had you heard gunshots before in the course of your
[14] career?
[15] **A.**   Yes.
[16] **Q.**   And what did do upon hearing those gunshots?
[17] **A.**   Once I heard the gunshots, I turned around. I had my
[18] service weapon on me. I drew my service weapon and I drew my
[19] badge out because I was in civilian clothes and I ran to the
[20] intersection of 1300 Johnson Street.
[21] **Q.**   Okay. Why did you run to that intersection?
[22] **A.**   Because there I saw a male shot several times in his
[23] stomach area lying on the ground.
[24] **Q.**   Okay. And how did you know that this male had been
[25] shot?

Jaclyne Wilson

Page 85

[1] **A.** I approached the male. He told me he's been shot. I

[2] asked the male what happened. He said, Take me to the

[3] hospital. Take me to the hospital.

[4] **Q.** Okay. Did you observe anything about the male's

[5] physical condition?

[6] **A.** Yes. I noticed that he was shot several times.

[7] **Q.** Okay. And by saying that you observed that he was

[8] shot, did you notice him bleeding from anywhere?

[9] **A.** Yes. He was bleeding right around his stomach area.

[10] He had a brown jacket on so you could see that blood was

[11] coming out around his stomach area.

[12] **Q.** And upon this male asking you to take him to the

[13] hospital, what did you then do?

[14] **A.** I asked the male who shot him. I asked the male

[15] several times, Who shot you? Who shot you? He responded,

[16] Take me to the hospital. Take me to the hospital. And then I

[17] asked -- it was another gentlemen standing there and I asked

[18] the gentlemen who shot him and he said the guy's running right

[19] down that alleyway. He pointed down towards an alleyway.

[20] **Q.** And where was the alleyway located in reference to

[21] where you were?

[22] **A.** I was -- the male was in like the middle of the block,

[23] of the 1300 block of Johnson Street. There's a sneaker store

[24] on your right-hand side. There's a deli on your left-hand

[25] side and in between the deli and apartment building there's

Jaclyne Wilson

---

Page 86

[1] like a little alleyway, like a walkway. The male was running

[2] down that walkway behind the deli and the apartment complex.

[3]       **MS. FORCHETTI**: Your Honor, I would at

[4] this time ask that this photograph be marked as

[5] Commonwealth Exhibit 1.

[6]       **THE COURT**: It may be marked.

[7]       (Photograph marked Commonwealth Exhibit

[8] C-1 for identification.)

[9]       **COURT CRIER**: Your Honor, C-1 so marked.

[10] **BY MS. FORCHETTI**:

[11] **Q.** Officer, you're being shown a photograph that's been

[12] marked as Commonwealth Exhibit 1.

[13]       Do you recognize the area depicted in that

[14] photograph?

[15] **A.** Yes.

[16] **Q.** Okay. What area is that?

[17] **A.** This is the 1300 block of Johnson Street.

[18] **Q.** And what area were you in when you approached the

[19] shooting victim?

[20]       **THE WITNESS**: May I turn it, sir?

[21]       **THE COURT**: Yes, of course.

[22]       **THE WITNESS**: I approached the shooting

[23] victim, he was laying around right here.

[24] **BY MS. FORCHETTI**:

[25] **Q.** Okay. Officer, if you would be so kind as to mark

Jaclyne Wilson

---

Page 87

[1] where the victim was with a V. I'm handing you a pen right

[2] now.

[3] **A.** (Witness complies.)

[4] **Q.** Okay. Now, did you observe anyone going down that

[5] alleyway once another witness had pointed that out to you?

[6] **A.** Yes.

[7] **Q.** And what did you do at that time?

[8] **A.** Well, after the male had told me -- it was a male

[9] standing right here repairing his car. He was stuck in the

[10] ice. Once the male told me --

[11] **Q.** I'm sorry to interrupt you, officer.

[12]       You're pointing the white Lexus depicted in the

[13] photograph?

[14] **A.** Yes. There was a male standing require there. His car

[15] was stuck in the ice due to the weather. Once he told me the

[16] male was running down the street, I proceeded to chase the

[17] male down this icy little roadway but the male turned the

[18] corner. Once the male turned the corner, I couldn't chase him

[19] no further because I ain't have a vest on. So I went back to

[20] the victim.

[21] **Q.** Officer, you did or did not have a vest on?

[22] **A.** Once he turned the corner, I ran down this alley. He

[23] turned. That's when I stopped chasing the male.

[24] **Q.** Okay. You're pointing to the right of the photograph?

[25] **A.** Yes.

Jaclyne Wilson

---

Page 88

[1] **Q.** Is that correct, officer?

[2] **A.** Yes. He was running right down this alleyway right

[3] here. And he turned. Once he got to like Washington Lane and

[4] Stenton, he turned and that's a corner right there so I

[5] stopped chasing him once he turned the corner.

[6] **Q.** And why is that? Why did you stop chasing him?

[7] **A.** Because I ain't have the proper gear on. I ain't have

[8] my bulletproof vest on and I didn't want him to turn the

[9] corner and him to be waiting for me around the corner.

[10] **Q.** So you were concerned for your safety at that time?

[11] **A.** Yes.

[12] **Q.** After you ended your pursuit, what did you then do?

[13] **A.** I immediately went back to the victim and I was with

[14] the victim until other uniform police officers arrived.

[15] **Q.** And how did the victim seem to you at that time?

[16] **A.** He was -- of course, he was shot and he was sweating a

[17] little bit. He had the blood coming out. He was just saying,

[18] Take me to the hospital. I want to go to the hospital.

[19] **Q.** And how long were you with the victim before medics

[20] arrived?

[21] **A.** I say around one to two minutes I was with the victim

[22] before medics arrived.

[23] **Q.** Were there a lot of other people out on the street?

[24] **A.** Yes. There were about -- had to be about five to seven

[25] people out there on the street that day.

Jaclyne Wilson

Page 89

[1] **Q.**   Did anyone at that time offer you any information with
[2] respect to the identity of the shooter?
[3] **A.**   Yes.  The gentlemen who was fixing his Lexus vehicle.
[4] It was also a couple people -- it's not on this picture but
[5] there's a store, a sneaker store like right here.  It's not on
[6] this picture, and one of the other guys at the sneaker store
[7] he did as well.
[8]        **MS. FORCHETTI**:  Your Honor, I would ask
[9]    that this photograph be marked as Commonwealth
[10]   Exhibit 2?
[11]        **THE COURT**:  It may be.
[12]        (Photograph marked Commonwealth Exhibit
[13]    C-2 for identification.)
[14]        **COURT CRIER**:  C-2 so marked, Your Honor.
[15] **BY MS. FORCHETTI**:
[16] **Q.**   Officer, you're being shown an exhibit that's been
[17] marked as Commonwealth Exhibit 2.
[18]        Do you recognize that photograph?
[19] **A.**   Yes.
[20] **Q.**   Okay.  What area is depicted in that photograph?
[21] **A.**   This is Stenton Avenue here.  This is the sneaker store
[22] that I was referring to earlier where the man -- as they were
[23] standing here, there was a crowd of people standing right here
[24] shovelling the snow out from the sidewalk.  So there was a
[25] bunch of people standing right in front of this silver car

                  Jaclyne Wilson

Page 91

[1]        **MS. FORCHETTI**:  Your Honor, I would ask
[2]    to mark this document as Commonwealth Exhibit 3.  It
[3]    is a two-page document.
[4]        **THE COURT**:  Yes.
[5]        (Statement (PO Alexander) marked
[6]    Commonwealth Exhibit C-3 for identification.)
[7]        **COURT CRIER**:  C-3 so marked, Your Honor.
[8] **BY MS. FORCHETTI**:
[9] **Q.**   Officer, you're being shown a two-page statement.
[10]        Do you recognize that statement?
[11] **A.**   Yes.
[12] **Q.**   And whose statement is that?
[13] **A.**   This is my statement that I gave to the detective at
[14] the time of the incident.
[15] **Q.**   And how soon after the shooting did you give this
[16] statement?
[17] A.   It had to be -- the shooting took place around 2:00
[18] something.  I gave a statement at 3:05.  Probably within 20 to
[19] 30 minutes of the shooting.
[20] **Q.**   Now, you described pursuing the person that was pointed
[21] out to you as being the shooter.
[22]        About how close did you get to that person?
[23] **A.**   Probably from this courtroom to the elevators.
[24] **Q.**   So quite a distance?
[25] **A.**   Yeah.  He had a good head start on me.

                  Jaclyne Wilson

Page 90

[1] here.  That's where the other male gave the description of the
[2] male who supposedly shot the victim.
[3] **Q.**   And, officer, what did you do with that information?
[4] **A.**   I immediately told the 14th District officers, uniform
[5] officers who came on location but I also held the male who
[6] gave me the information until uniform police came so they
[7] could take the male in for questioning.
[8] **Q.**   Okay.  And that male who gave you that information,
[9] what was his demeanor?
[10] **A.**   He was very calm.  He was just like, The boy who shot
[11] him, he ran down there, and just told me the information.  He
[12] had a very calm demeanor.
[13] **Q.**   Was he cooperative with the police?
[14] **A.**   Well, at first he wasn't cooperative.  I talked to him
[15] some more and then he became cooperative once uniform
[16] personnel got on location.
[17] **Q.**   Okay.  Now, officer, once the uniform 14th District
[18] police officers arrived, did you remain on the scene?
[19] **A.**   Yes.  I talked to the captain but then I left the scene
[20] then I had to go to Northwest Detectives.
[21] **Q.**   Okay.  Why did you go to Northwest Detectives?
[22] **A.**   To give a statement on what happened.
[23] **Q.**   And with whom did you speak?
[24] **A.**   I forget the detective but it was a northwest
[25] detective.

                  Jaclyne Wilson

Page 92

[1] **Q.**   Okay.  And did you ever see that person from the front?
[2] **A.**   No.
[3] **Q.**   Okay.  You only ever saw the back?
[4] **A.**   Yes.
[5] **Q.**   Okay.  So were you ever able to give a description of
[6] that person's face or hair?
[7] **A.**   No.
[8] **Q.**   Okay.  What was the best description you were able to
[9] give the officers?
[10] **A.**   The best description I gave them I said the male was
[11] around 6 feet, he had on a black hoody and black jeans or
[12] jacket.  That's the best description I gave them.
[13] **Q.**   Okay.
[14] **A.**   At the time of the incident.
[15] **Q.**   Were you able to tell that person's build?
[16] **A.**   No.
[17] **Q.**   Were you able to tell that person's race?
[18] **A.**   No.
[19] **Q.**   Okay.  Were you able to tell the sex of that person?
[20] Whether it was a male or female?
[21] **A.**   Going by what the witnesses say, he said it was a male.
[22] **Q.**   Now, officer, was this the extent of your role in this
[23] investigation?
[24] **A.**   Yes.  After I gave my statement, yes.  Then I returned
[25] to the 6th District.

                  Jaclyne Wilson

Page 93

[1] Q.    Okay.  Were you late for work that day?

[2] A.    Yes.

[3] Q.    Now, did you prepare any other paperwork in connection

[4] with what you saw that day?

[5] A.    No, ma'am.

[6] Q.    Okay.  And did you sign your statement?

[7] A.    Yes.

[8] Q.    Did Detective Acerenza give you a chance to review it

[9] and look it over before you signed it?

[10] A.    Yes.

[11] Q.    And was the detective typing it as you were talking to

[12] him?

[13] A.    Yes, ma'am.

[14] Q.    Thank you.

[15]       MS. FORCHETTI:  I don't have anymore

[16]    questions.

[17]       THE COURT:  Mr. Lorusso, you may

[18]    cross-examine.

[19]       MR. LORUSSO:  Thank you, Your Honor.

[20]          _ _ _

[21]       CROSS - EXAMINATION

[22]          _ _ _

[23] BY MR. LORUSSO:

[24] Q.    Good afternoon, officer.

[25] A.    Good afternoon, sir.

Jaclyne Wilson

Page 94

[1] Q.    I take it from your testimony you didn't see the actual

[2] shooting.  You just heard shots; is that correct?

[3] A.    That is correct.

[4] Q.    And when you proceeded Genesis Eyewear would be on the

[5] north side of Stenton Avenue?

[6] A.    That is correct.

[7] Q.    And Philly Locker Room that's depicted in the

[8] photographs would be across the street, south side, correct?

[9] A.    That's correct.

[10] Q.    Caddy corner from each other?

[11] A.    Yes, sir.

[12] Q.    Okay.  And the person who we've later come to learn was

[13] Charles Talbert was situated basically in front of the area

[14] where the Lexus is on C-1, the photograph?

[15] A.    Yes, sir.

[16] Q.    Okay.  And you run directly across Stenton from Genesis

[17] into that area because I assume that you see a figure lying

[18] in the street?

[19] A.    Yes, sir.

[20] Q.    Okay.  And that's when you -- strike that.

[21]       He doesn't -- Mr. Talbert doesn't give you any

[22] description.  He's just concerned with going to the hospital,

[23] correct?

[24] A.    That's correct, sir.

[25] Q.    There's another individual present that you get this

Jaclyne Wilson

Page 95

[1] description from; is that correct?

[2] A.    Yes, sir.

[3] Q.    And that individual, do you know his name?

[4] A.    No, sir.

[5] Q.    He was, however, transported to Northwest Detectives

[6] Division?

[7] A.    Yes, sir.

[8] Q.    Okay.  And that individual directed your attention,

[9] this witness, in response to your question who did the

[10] shooting or words to that effect who was the shooter, is that

[11] what you asked him?

[12] A.    Yes, sir.

[13] Q.    And this other witness said he's running down the

[14] alleyway here?

[15] A.    That's correct, sir.

[16] Q.    Okay.  And the alleyway is that -- which is also

[17] depicted in C-1 -- the driveway with all of snow and ice; is

[18] that correct?

[19] A.    That's correct, sir.

[20] Q.    All right.  So you chase him down and I think you said

[21] that would be running toward Broad Street, correct?

[22] A.    Yes, sorry.

[23] Q.    So that would be running, fair to say, eastbound?

[24] A.    Yes.

[25] Q.    Okay.  And you said that when he got to the corner, do

Jaclyne Wilson

Page 96

[1] I take that to mean that was the first corner that one would

[2] come across in that area?

[3] A.    I believe.  I'm not sure.  I believe that's Washington

[4] Lane but I'm not sure.

[5] Q.    Okay.  If I told you it was actually Duval Street,

[6] would that refresh your recollection at all?

[7] A.    I didn't see a street sign so I'm not really sure

[8] because it was in the back in between the buildings so I never

[9] saw the street sign.

[10] Q.    Okay.

[11]       MR. LORUSSO:  I'll ask this be marked as

[12]    D-1 for identification.

[13]       THE COURT:  It may be.

[14]       (Map marked Defense Exhibit D-1 for

[15]    identification.)

[16]       COURT CRIER:  So marked D-1, Your Honor.

[17] BY MR. LORUSSO:

[18] Q.    By the way, officer, you were shown a map actually when

[19] you were in Northwest Detectives Division, correct?

[20] A.    Yes.

[21] Q.    Okay.  And was the map similar to what's been marked as

[22] D-1?

[23] A.    I'm not really sure, sir, it was the same exact map.

[24] Q.    Okay.  Looking at D-1, do you see the intersection

[25] there of Stenton and Johnson where the "A" is?

Jaclyne Wilson

Page 97

[1] A.  Yes.

[2] Q.  Okay.  And the next street east of Johnson on that map

[3] at Stenton would be what?

[4] A.  Is Barringer Street.

[5] Q.  I'm sorry.  Going the direction toward Washington Lane,

[6] toward Broad Street.

[7]     Do you see Washington Lane there?

[8] A.  Yes, I see Washington Lane.

[9] Q.  Is there a street that intersects Stenton Avenue

[10] between Washington Lane and Johnson, Duval Street?

[11] A.  Yes.

[12] Q.  Okay.  Would that be the street or if that was the

[13] street at the end of this driveway first before Washington

[14] Lane, would that be the street that you observed the person

[15] identified as the shooter going south on?

[16] A.  Yes, that would be the street.

[17] Q.  Okay.  And he was going south.

[18]     He was going toward Chew Street or in that

[19] direction, correct?

[20] A.  Correct.

[21] Q.  Okay.  So he was going east through the driveway

[22] parallel with Stenton Avenue and then he made a right turn

[23] going toward Center City, correct, as opposed to going toward

[24] Cheltenham Avenue?

[25] A.  Correct.

Jaclyne Wilson

Page 98

[1] Q.  Okay.  Now, I know you've said that you weren't able to

[2] give a facial description of this person but would I be

[3] correct in saying that you were given a description by the

[4] witness who directed your attention to this person?  Would

[5] that be fair to say?

[6] A.  No.  Actually the witness said, He's running down

[7] there.

[8] Q.  Okay.  So the description that you gave in your

[9] interview would be based upon your observations, correct?

[10] A.  Yes, sir.

[11] Q.  Okay.  And that description would be -- referring to

[12] what's been marked as C-3, your statement -- you said that

[13] this person that you saw running, previously identified as the

[14] shooter, was about 6 feet tall; is that correct?

[15] A.  That is correct.

[16] Q.  How tall are you, officer?

[17] A.  I'm 5'10.

[18] Q.  Okay.  So from your vantage point the person you were

[19] chasing before he made that turn was almost your height; is

[20] that fair to say?  I assume you thought he was a little bit

[21] taller if you described him as 6 foot?

[22] A.  I gave that brief description from a distance so I

[23] wasn't sure.

[24] Q.  I understand.

[25]     But being a police officer for nine years you can

Jaclyne Wilson

Page 99

[1] certainly appreciate the significance of physical descriptions

[2] and characteristics as you're giving them particularly in a

[3] shooting investigation, correct?

[4] A.  That is correct, sir.

[5] Q.  It wasn't some, you know, shot in the dark kind of

[6] identification or ballpark height that you gave.  It was to

[7] the best of your vantage point and your experience you

[8] believed the person to be, approximately, 6 feet tall; is that

[9] correct?

[10] A.  That's correct, sir.

[11] Q.  And this person had on a black hoody and black pants

[12] according to your statement, correct?

[13] A.  Yes.

[14] Q.  Now, I don't see, and maybe I misunderstood you,

[15] because I thought you said something about wearing jeans.

[16]     Did you testify that the person was wearing jeans?

[17] A.  I said black pants, black jeans.  Yes, I said black

[18] jeans.

[19] Q.  Black jeans.

[20]     That's what you testified to?

[21] A.  Yes.

[22] Q.  Right.  That's not what a half hour after the incident

[23] what you said to the police though, right, because it just

[24] says black pants?

[25] A.  That's correct.  I said black pants.

Jaclyne Wilson

Page 100

[1] Q.  Okay.  And you draw a distinction between pants and

[2] jeans, I mean, in your own mind?

[3] A.  From the distance that I was at, it could have been

[4] jeans, it could have been pants.

[5] Q.  Okay.  So then you don't know whether it was jeans or

[6] pants, correct?

[7] A.  I mean, you can probably say they were pants or jeans.

[8] It was black belongings.  Maybe that's a more accurate

[9] statement.

[10] Q.  And, officer, I don't mean to be difficult, the only

[11] reason I'm bringing this up is because as I look at your

[12] statement it says that the person was wearing black pants and

[13] then I thought I heard you say today that it was black jeans.

[14]     And you don't know whether it was jeans or pants, is

[15] that basically what we're saying, except that they were black?

[16] A.  Well, going by my written statement of the day that it

[17] actually happened, they were black pants.

[18] Q.  Pants?

[19] A.  It happened in February.

[20] Q.  I appreciate that.  But, again, the statement you just

[21] made in terms of distance when you said I wasn't sure.  I

[22] couldn't tell if it was black pants or jeans but it was black

[23] belongings or words to the effect, are you just relying on the

[24] fact now that you did see at the time and you did accurately

[25] record what type of pants they were that the person was

Jaclyne Wilson

Page 101

[1] wearing?

[2] **A.**  Yes.  At that time, yes, I did.

[3] **Q.**  So you don't have a present recollection of it, it's

[4] just you're saying as I look at my statement and if I said

[5] black pants instead of black jeans, that's what I saw,

[6] correct?

[7] **A.**  That's correct.

[8] **Q.**  Okay.  And --

[9]            **MR. LORUSSO**:  Court's indulgence.

[10]                (Pause.)

[11] **BY MR. LORUSSO**:

[12] **Q.**  You gave, I assume, this information to the first

[13] police officer who arrived on the scene in response to the

[14] call?

[15] **A.**  Yes.  That's correct.

[16] **Q.**  Officer Edmiston, was it?

[17] **A.**  Yes.

[18] **Q.**  Okay.  And he prepared an incident report with your

[19] information on it?

[20] **A.**  I believe so.  I never saw his report.

[21] **Q.**  Okay.  Was there anyone -- strike that.

[22]            **MR. LORUSSO**:  I have nothing further.

[23] Thank you.

[24]            **THE COURT**:  Do you have any redirect?

[25]            **MS. FORCHETTI**:  Just a little,

Jaclyne Wilson

---

Page 102

[1]            Your Honor.

[2]                – – –

[3]            REDIRECT EXAMINATION

[4]                – – –

[5] **BY MS. FORCHETTI**:

[6] **Q.**  Officer, how far would you say it is from here to the

[7] elevators?

[8] **A.**  Maybe 20, 30 feet.  He had a good lead on me.  Probably

[9] about 20 feet.

[10] **Q.**  So you're saying you got as close as 20 feet to this

[11] person?

[12] **A.**  Correct.

[13] **Q.**  Okay.  And the best description you were able to give

[14] police is a black male, all in black?

[15] **A.**  That is correct.

[16] **Q.**  As what it says in your statement?

[17] **A.**  Yes, ma'am.

[18] **Q.**  Okay.  And you estimated his height to be,

[19] approximately, 6 feet tall?

[20] **A.**  Yes.

[21] **Q.**  Okay.  Thank you.

[22]            **MS. FORCHETTI**:  I have nothing further.

[23]            **THE COURT**:  Any recross?

[24]            **MR. LORUSSO**:  No, Your Honor.

[25]            **THE COURT**:  You may step down.

Jaclyne Wilson

---

Page 103

[1]            (Witness excused.)

[2]            **THE COURT**:  Ladies and gentlemen, it's

[3] now 12:30.  We'll talk our luncheon recess.  We'll

[4] be in recess for an hour.

[5]            Everyone in the courtroom remain in place

[6] until the jurors have let the floor.

[7]            (Jury exits the courtroom at 12:32 p.m.)

[8]            (Luncheon recess.)

[9]            **THE COURT**:  All right.  We're back on the

[10] record.  Mr. Simmons is here with his attorney,

[11] Mr. Lorusso.  The Commonwealth by Ms. Forchetti.

[12]            Are we ready to proceed, ma'am?

[13]            **MS. FORCHETTI**:  We are, Your Honor.

[14]            **MR. LORUSSO**:  Yes, Your Honor.

[15]            **THE COURT**:  Who will be your next

[16] witness?

[17]            **MS. FORCHETTI**:  My next witness will be

[18] Gerald Wright.

[19]            **THE COURT**:  Is he in custody?

[20]            **MS. FORCHETTI**:  No, he's not.

[21]            **THE COURT**:  Okay.

[22]            (Jury enters the courtroom at 1:51 p.m.)

[23]            **THE COURT**:  Good afternoon, ladies and

[24] gentlemen.

[25]            Counsel, you may call your next witness.

Jaclyne Wilson

---

Page 104

[1]            **MS. FORCHETTI**:  Thank you.

[2]            Your Honor, at this time the Commonwealth

[3] calls Gerald Wright.

[4]            ...GERALD WRIGHT, after having been first

[5] duly sworn, was examined and testified as follows:

[6]                – – –

[7]            **COURT CRIER**:  State your name for the

[8] record and spell your last name.

[9]            **THE WITNESS**:  Gerald Wright, W-R-I-G-H-T.

[10]            **THE COURT**:  You may proceed.

[11]                – – –

[12]            DIRECT EXAMINATION

[13]                – – –

[14] **BY MS. FORCHETTI**:

[15] **Q.**  Good afternoon, Mr. Wright.

[16] **A.**  Good afternoon.

[17] **Q.**  Mr. Wright, back in February of this year, 2011, how

[18] were you employed?

[19] **A.**  I worked at a sneaker store.

[20] **Q.**  Where is that sneaker store located?

[21] **A.**  Stenton and Johnson.

[22] **Q.**  And how long had you worked there?

[23] **A.**  At that particular location, probably about eight, nine

[24] years.

[25] **Q.**  And do you currently work there?

Jaclyne Wilson

Page 105

[1] **A.**  No.

[2] **Q.**  Where do you currently work?  You don't have to tell us
[3] the location.

[4] **A.**  It's a cleaning company.  It's not there.  They
[5] actually went out of business.

[6] **Q.**  The sneaker store did?

[7] **A.**  Yes.

[8] **Q.**  Okay.  And when did that happen?

[9] **A.**  The end of February.

[10] **Q.**  Okay.  And were you the only employee at that sneaker
[11] store?

[12] **A.**  Yes.

[13] **Q.**  Did you also work with a woman named Michele at the
[14] sneaker store?

[15] **A.**  Yes.

[16] **Q.**  Okay.  So there were other employees at the store?

[17] **A.**  Well, she's my boss.  She's the boss's, you know, the
[18] boss's wife.  So she's the boss.  It's just me and her in
[19] there.

[20] **Q.**  Okay.  Do you remember the day of February 4th of this
[21] year, 2011?

[22] **A.**  Pretty much.

[23] **Q.**  Were you working at the sneaker store on that day?

[24] **A.**  Yes.

[25] **Q.**  And about what time did you get to work that day?

Jaclyne Wilson

Page 106

[1] **A.**  I get there everyday about 9:30.

[2] **Q.**  And what time does the store open?

[3] **A.**  Probably ten o'clock.

[4] **Q.**  And do you remember having any contact with a person
[5] about a cell phone?

[6] **A.**  Yes.  Numerous people, to be honest.  We sell cell
[7] phones.

[8] **Q.**  Okay.  Do you remember coming into contact with a
[9] person who was later shot that day?

[10] **A.**  Yeah.

[11] **Q.**  Okay.

[12] **A.**  He came in to purchase a cell phone.

[13] **Q.**  All right.  Have you ever seen him before?

[14] **A.**  Yes.

[15] **Q.**  When was the last time you had seen him prior to the
[16] day of the shooting?

[17] **A.**  It had to be a couple days earlier.  He came in and
[18] inquired about a cell phone and he came back and he purchased
[19] it.

[20] **Q.**  And had you ever seen that person around the
[21] neighborhood before?

[22] **A.**  I mean, he frequents the neighborhood.  I mean, I'm
[23] around there.  I see everybody around there but, you know.

[24] **Q.**  Okay.  And what happened when the person came back in
[25] to buy his cell phone?

Jaclyne Wilson

Page 107

[1] **A.**  He came in, he purchased a cell phone, he purchased a
[2] shirt.  That was it pretty much.

[3] **Q.**  And while you were there inside the store, did you
[4] notice anyone have any contact with that person?

[5] **A.**  Well, I was waiting on customers at the back of the
[6] store.  A customer came in.  Like I said, I really couldn't
[7] view the customer because we have what you call clothes racks
[8] all the way through the store.  The store is maybe -- it's
[9] pretty long.  I was at the back of the store.  A customer came
[10] in, went right to the counter, purchased a shirt, left right
[11] out.  That was the extent of that.  I really didn't get a look
[12] at the customer because I was taking care of another customer.

[13] **Q.**  Okay.  Did you notice what that person was wearing?

[14] **A.**  Black.  That's all I can tell you is it was black.  He
[15] had a black jacket on.  I don't know if it was a black jacket
[16] or a black hoody.

[17] **Q.**  Did you notice how tall he was?

[18] **A.**  Everybody to me is short, being honest.  I'm 6'9.  I
[19] got to be honest with you.  So I really can't pinpoint a
[20] height, you know what I mean?  I just know he wasn't my
[21] height, so he was short, you know?   I can't pinpoint height.
[22] Everybody is short to me.

[23] **Q.**  Could you tell how tall he was in relation to the
[24] clothing racks that were there?

[25] **A.**  Being honest, the settings on the clothing racks are,

Jaclyne Wilson

Page 108

[1] you know, I would have to pretty much stand to show you.

[2] **Q.**  You may do so, Mr. Wright.

[3] **A.**  Well, the clothing racks are about yay high because
[4] they hold jeans and stuff like that.  So anybody comes in they
[5] around, that's average height to me.  So anybody that comes
[6] in, I really couldn't say short, tall.  That's all average
[7] height to me.

[8] **Q.**  Okay.

[9]           **MR. LORUSSO**:  Can we, for the record --
[10]           **THE COURT**:  Can the two of you can agree
[11]      on an estimate.

[12] **BY MS. FORCHETTI**:

[13] **Q.**  Can you do that again for us, Mr. Wright?

[14] **A.**  Well, like I said, the clothing racks are about here
[15] and if they have signs on top of them too so it's, you know,
[16] like a clothing rack is here.  There's a little pole and then
[17] we have what you call sales signs sticking on each one of the
[18] racks so it would be even higher with the cloth signs.

[19]           **THE COURT**:  All right.  Let's try to get
[20]      some dimensions.
[21]           Stand up again, sir.  You say the rack is
[22]      about here, put your hand up.

[23]           **THE WITNESS**:  About right.

[24]           **THE COURT**:  Can the two of you agree?

[25]           **MR. LORUSSO**:  Top of the clothing rack,

Jaclyne Wilson

[1]     if you're 6'9, I would say probably 5'9, 5'8.

[2]          **THE COURT**: You agree with that?

[3]          **MS. FORCHETTI**: Well --

[4]          **THE WITNESS**: Like I said there's also --

[5]          **THE COURT**: Just a second.

[6]          Can we agree on where his hand is now?

[7]          **MS. FORCHETTI**: I need to move a little

[8]     closer because I'm bad at estimating height.

[9]          **THE COURT**: It appears to be about 5'10

[10]    to this Court. The jurors can make their own

[11]    determination as to the height.

[12]         What's your next statement that there's

[13]    something above that?

[14]         **THE WITNESS**: Yes. They have --

[15]         **THE COURT**: And put your hand out to show

[16]    us.

[17]         **THE WITNESS**: The sales signs pretty

[18]    bring it to about here.

[19]         **THE COURT**: This Court's estimate is

[20]    about 6'7 or there abouts. Now, the two of you may

[21]    state your own estimates for the record.

[22]         **MS. FORCHETTI**: No, that sounds pretty

[23]    accurate.

[24]         **MR. LORUSSO**: I agree.

[25]         **THE COURT**: Okay. Please continue.

                    Jaclyne Wilson

[1]   **BY MS. FORCHETTI**:

[2]   **Q.**   Mr. Wright, how tall was that person in relation to the

[3]   clothing racks?

[4]   **A.**   Really, I see -- just glancing, I really couldn't see

[5]   him over the clothing racks but, you know, you can see the

[6]   person come in. Like I said, it's hard for me to gage a

[7]   height.

[8]   **Q.**   Okay. Would you say he was taller or shorter than the

[9]   clothing racks?

[10]  **A.**   Well, he wasn't taller. If he was taller than the

[11]  clothing racks, he would be my height, you know what I mean?

[12]  The clothing racks are pretty tall. It's really -- I'm being

[13]  honest, it's really hard for me to gage height, you know what

[14]  I mean, by me being so tall and seeing people that's average

[15]  everyday.

[16]  **Q.**   And did you observe that person have any interaction

[17]  with the person who was there buying a cell phone?

[18]  **A.**   No. I didn't observe any actions. Like I said, I was

[19]  in the back of the store. When the person came in, I turned

[20]  around, you know, just to see if he needed any help but before

[21]  I got a chance to help the person, he grabbed a shirt, went to

[22]  the front counter, paid for it and left out.

[23]  **Q.**   Okay. Do you remember giving a statement to the

[24]  police?

[25]  **A.**   Yeah, I gave a statement.

                    Jaclyne Wilson

[1]   **Q.**   Okay. Do you remember in that statement saying that

[2]   you observed that shorter guy ask the shooting victim, Can I

[3]   Holler at you?

[4]   **A.**   Well, what I said was in a sense of maybe he was asking

[5]   for a cigarette or something, you know what I mean? When two

[6]   people come in contact with each other, you know, a guy might

[7]   say, Let me get a cigarette. Let me holler at you. But to my

[8]   knowledge, somebody came in, you know, Let me holler at you,

[9]   and they walked out. They walked out the store and once they

[10]  walked out the store --

[11]  **Q.**   So you did see that interaction?

[12]  **A.**   No. It's not like I saw the interaction. Like I said,

[13]  when the customer paid for his shirt as he was walking out the

[14]  store, he said, Let me holler at you.

[15]  **Q.**   You heard it?

[16]  **A.**   He wasn't talking to me. I assume he said, Let me

[17]  holler at you, you know what I mean? Because when he turned

[18]  to make the remark, the boy that was there paying for his

[19]  phone left out with him

[20]  **Q.**   Okay. What happened after that?

[21]  **A.**   Well, after that I really couldn't tell you. I got a

[22]  phone call from my wife. As I walked to the front of the

[23]  store, we were activating a person's phone and when I looked

[24]  out the store, the lady -- the customer I was waiting on, she

[25]  was going back to her job. I looked out the store. I saw a

                    Jaclyne Wilson

[1]   black guy running down the street with a gun out. I backed up

[2]   into the store. I had no knowledge of what was going on. I

[3]   backed up into the store.

[4]        The next very thing I did I waited a couple minute

[5]   until I seen all these cops. When I walked outside, I saw a

[6]   guy laying on the ground. My first reaction was, you know,

[7]   when I saw his face I thought he maybe stole something out our

[8]   store.

[9]   **Q.**   Who was that guy laying on the ground?

[10]  **A.**   I don't really know the guy's name. It's the person

[11]  that actually paid for the phone. He had purchased a phone

[12]  and he had left his phone in there to be activated. So when I

[13]  saw him on the ground, I saw the cops around him. I though

[14]  they were locking him up for doing something. I had no idea

[15]  he had been shot because I didn't hear no gunshot or anything,

[16]  you know what I mean? I had no idea that nothing went on

[17]  outside. All I know is when I see the cop run down the

[18]  street, I backed up into the store.

[19]  **Q.**   Okay. Do you play music inside of your store?

[20]  **A.**   Yes, we do. We have a radio inside the store for

[21]  customers.

[22]  **Q.**   Were you playing music that day?

[23]  **A.**   Yes. The radio is always on.

[24]  **Q.**   Okay. After you saw the shooting victim on the ground,

[25]  you duck back inside the store, is that what you did?

                    Jaclyne Wilson

Page 113

[1] **A.**   No.  Actually when I saw him on the ground, after I saw
[2] the cops, I came back in the store.  When I seen the cop run
[3] down the street, you know what I mean, that's when I ducked
[4] back in the store.  Once all the police came, that's when I
[5] actually walked out the store, you know what I mean, and felt
[6] a little safer.  I didn't know what was going on.  You see a
[7] guy running down the street with a gun out, you don't just run
[8] out there into the action.  You kind of back up from it.  So
[9] that's what I did.  I had no idea what was going on.

[10] **Q.**   So, Mr. Wright, after you see the police arrive on the
[11] scene, you come back outside of the store, what do you do at
[12] the point?

[13] **A.**   Only thing I do is just ask the officer -- you know, I
[14] didn't even ask the officer.  When I saw the victim on the
[15] ground, I just, you know, I realized he was shot when I saw
[16] the blood.  Once I saw the blood, my first reaction was I
[17] didn't know anybody had got shot.  I actually ran back in the
[18] store and asked my boss did he steal anything because I though
[19] maybe he stole a shirt and ran out the store, you know?  Once
[20] the cops had him on the ground and what not I just came out
[21] and I told the cop he has a cell phone in his jacket, you
[22] know?  I gave him his cell phone in the jacket, his property
[23] that he had paid for.

[24] **Q.**   Did the police then come and collect the victim's
[25] things from inside your store?

Jaclyne Wilson

Page 114

[1] **A.**   Yes.

[2] **Q.**   Okay.

[3]          **MS. FORCHETTI**:  Your Honor, I have four
[4]    photographs that I would ask to mark at this time as
[5]    C-4, C-5, C-6 and C-7.

[6]          **THE COURT**:  They may be marked.

[7]          **MS. FORCHETTI**:  Thank you.

[8]          (Photographs marked Commonwealth Exhibits
[9]    C-4, C-5, C-6 and C-7 for identification.)

[10]          **COURT CRIER**:  So marked C-4, C-5, C-6 and
[11]    C-7.

[12] **BY MS. FORCHETTI**:

[13] **Q.**   Mr. Wright, you have four photographs in front of you
[14] that have been marked C-4, C-5, C-6 and C-7.

[15]    If you could do me a favor and start with the first
[16] photograph that's been marked Commonwealth Exhibit 4.  Do you
[17] recognize what is in that photograph?

[18] **A.**   Yes.  It's a picture of the sneaker store.

[19] **Q.**   Is that the same sneaker store where you were on
[20] February 4th of this year, 2011?

[21] **A.**   Yes.

[22] **Q.**   And the doorway that's depicted on the store, upon
[23] which street does that doorway face?

[24] **A.**   Would be Johnson, I guess.  Coming out towards Johnson.

[25] **Q.**   And where was the shooting victim in relation to that

Jaclyne Wilson

Page 115

[1] doorway?

[2] **A.**   You're asking me where he was?

[3] **Q.**   Yes.  When you saw him out on the street?

[4] **A.**   When I saw him, on the side, around the side in the
[5] back near to, what do you want to call it back there?  Where
[6] the dumpster is at.

[7] **Q.**   So, Mr. Wright, how far away from your doorway would
[8] you say you saw the shooting victim when you peeked outside?

[9] **A.**   I don't know how you gage the back of the store.  Maybe
[10] a hundred feet.  I don't know.  From the front of the store to
[11] the back of the store.  I mean, I really ain't -- I would
[12] say -- I don't know.  Maybe 50, 70, 80 feet.  I guess if
[13] that's how you measure the store because it was actually
[14] in the back of the store.

[15] **Q.**   Okay.  Now, Mr. Wright, if you could take a look at the
[16] next photograph that's been marked as Commonwealth Exhibit 5.

[17] **A.**   That would be this one?

[18] **Q.**   Yes.

[19]    Can you tell us what is shown in that photograph
[20] that has been marked as C-5?

[21] **A.**   A cell phone and a shirt.

[22] **Q.**   Whose cell phone and shirt was that?

[23] **A.**   That's the cell phone that the guy purchased.

[24] **Q.**   Which guy?

[25] **A.**   Well, I mean, like I said, I don't really know these

Jaclyne Wilson

Page 116

[1] guys' names.  The guy that was on the ground outside.  That's
[2] the cell phone that he purchased.

[3] **Q.**   Okay.  The man who was shot?

[4] **A.**   Yes.

[5] **Q.**   Okay.  Now, prior to the day -- a few days before this
[6] when that guy came in asking about buying a cell phone, had
[7] you ever seen him around the neighborhood before that?

[8] **A.**   Yeah.  I mean, he frequents the neighborhood.

[9] **Q.**   Okay.  Did you have a conversation with him that first
[10] time that he came in?

[11] **A.**   Strictly about purchasing a cell phone.  He came in and
[12] he inquired about the cell phone.  He said he would come back.
[13] He came back a couple days later and purchased it.

[14] **Q.**   Okay.  Now, if you could take a look at the next
[15] photograph that's been marked Commonwealth Exhibit 6.

[16] **A.**   Okay.

[17] **Q.**   What's shown in that photograph?

[18] **A.**   That's the guy's jacket that he took off in the store.

[19] **Q.**   Okay.  The victim's jacket?

[20] **A.**   Yeah.

[21] **Q.**   Okay.  That's where he left it when he left the store?

[22] **A.**   Yes.

[23] **Q.**   Okay.  Now, if you could take a look at the final
[24] photograph that's been marked as Commonwealth Exhibit 7.

[25] **A.**   Okay.

Jaclyne Wilson

Page 117

[1] Q.   Can you tell us what's shown in that photograph?

[2] A.   Just our display racks. That's basically our display.
[3] It's nothing really standing out about this. It's just
[4] clothes and sneakers.

[5] Q.   Okay. That shows the layout of the store?

[6] A.   Yes.

[7] Q.   Is that right?

[8] A.   Yes.

[9] Q.   Okay. Does that photograph show pretty accurately how
[10] tall the clothing racks were on that day?

[11] A.   Pretty much. I mean, with the signs on top, like I
[12] said, some of them push it up to pretty tall with the sign on
[13] top, but, yeah, that's pretty much it.

[14]            MS. FORCHETTI: Your Honor, I would ask
[15]    to mark Mr. Wright's 75-483 as Commonwealth Exhibit
[16]    8.

[17]            THE COURT: It may be marked.

[18]            (Statement (Wright) marked Exhibit C-8
[19]    for identification.)

[20]            COURT CRIER: Your Honor, so marked C-8.

[21] BY MS. FORCHETTI:

[22] Q.   Mr. Wright, you have a document in front of you that's
[23] been marked as Commonwealth Exhibit 8.

[24]    Do you recognize that document?

[25] A.   Yes.

                    Jaclyne Wilson

Page 118

[1] Q.   What is that?

[2] A.   This is the statement that they took.

[3] Q.   Okay. When did you give that statement to Detective
[4] Sloan?

[5] A.   Couple hours, maybe about an hour or so after the
[6] incident happened.

[7] Q.   So on the same day of the shooting?

[8] A.   Yes.

[9] Q.   Okay. And did anyone have to force you to talk to the
[10] detective in this case?

[11] A.   No, no one forced me.

[12] Q.   And so you talked to the detective of your own free
[13] will; is that right?

[14] A.   I'm not going to say own free will, but did I have a
[15] choice? That's what you want to ask me, Did I have a choice,
[16] you know what I mean?

[17] Q.   So you weren't too exited about getting involved in
[18] this investigation?

[19] A.   No. Honestly, I don't know why I'm involved in this,
[20] you know what I mean?

[21] Q.   After you gave your statement to the detective, did he
[22] gave you a chance to look it over?

[23] A.   Yes, I looked it over.

[24] Q.   Okay. And after you looked it over, were you given a
[25] chance to make any corrections?

                    Jaclyne Wilson

Page 119

[1] A.   Yeah. He asked me if everything was correct that I
[2] spoke on, yes.

[3] Q.   Okay. And was everything correct that you had spoke
[4] on?

[5] A.   Yeah. Everything is pretty much correct. Everything
[6] is what I said it was.

[7] Q.   Okay. Then did you sign it at the bottom of that
[8] statement?

[9] A.   Yes, I did.

[10] Q.   And so in your statement, Mr. Wright, the detective
[11] asked you to tell him what you know about the shooting that
[12] happened outside your store.

[13]    Do you see that question there?

[14] A.   What question would be -- how many times have you seen
[15] the guy who was shot before?

[16] Q.   No. The very first question, Mr. Wright, under all
[17] your biographical information at the top of the page. It has
[18] your name. It has your address. It has where you work,
[19] how old you are.

[20] A.   Okay.

[21] Q.   And then it says, Mr. Wright, my name is Detective
[22] James Sloan. Please tell me what you know about the shooting
[23] that occurred outside your store.

[24]    Do you see that?

[25] A.   Yes.

                    Jaclyne Wilson

Page 120

[1] Q.   And then there's a long narrative paragraph; is that
[2] right?

[3] A.   Yes.

[4] Q.   And you tell the detective the story of what happened
[5] that day; is that right?

[6] A.   I tell him what happened inside the store.

[7] Q.   Right.

[8] A.   You understand? That's as far, that's the extent that
[9] I can tell you. I had no knowledge of what was going on
[10] outside of the store.

[11] Q.   Okay. And you see where you said, I was in the store
[12] helping a woman with a sneaker purchase?

[13] A.   Right.

[14] Q.   A guy who comes in the store once in a while came in.

[15] A.   Right.

[16] Q.   This guy came in a few days ago and was asking about a
[17] prepaid phone and said he would be back.

[18] A.   Right.

[19] Q.   He came in and went to a shirt display.

[20] A.   Okay.

[21] Q.   he took his jacket off and tried on a shirt. I told
[22] Michele, my boss, to ring him up. The guy paid for the shirt
[23] and Michele was working on activating the prepaid phone for
[24] him. About five minutes after he came in, a second shorter
[25] guy came walking in.

                    Jaclyne Wilson

Page 121

[1]      Do you see that?

[2] **A.**    Yes.

[3] **Q.**    Okay. That's what you told the detective?

[4] **A.**    Yes.

[5] **Q.**    The guy walked over to the shirt display and grabbed [6] the same exact shirt as the first but a different color. I [7] didn't pay him much mind because I was helping the woman and [8] this guy came right in and grabbed the shirt and went to the [9] counter.

[10]      Do you see that?

[11] **A.**    Yes.

[12] **Q.**    I figure he didn't need any help, that he had what he [13] wanted. I told Michele to take care of the guy. Michele [14] stopped working on activating the phone and walked over and [15] rang the guy up for the shirt then want back to working on the [16] phone.

[17]      Is that what you told the detectives?

[18] **A.**    Yes.

[19] **Q.**    I heard the shorter ask, Can I holler at you, to the [20] first guy.

[21]      Is that what you told Detective Sloan?

[22] **A.**    Yes.

[23] **Q.**    I thought he was going to ask for a cigarette or [24] something. They both went outside.

[25] **A.**    And that's what happened.

         Jaclyne Wilson

Page 122

[1] **Q.**    The first guy, victim, left his jacket and his shirt [2] in the store and walked out with the guy.

[3] **A.**    Right.

[4] **Q.**    Okay. The lady was leaving out, the lady you were [5] helping with the sneakers?

[6] **A.**    Yes.

[7] **Q.**    And my wife called me. I was talking to her and I [8] looked out the door and saw this guy who was stuck in the [9] driveway.

[10] **A.**    Yeah.

[11] **Q.**    There was a black guy running down the driveway. I saw [12] him stop by the car. He pulled out a gun. I saw his pants [13] and realized he was a cop.

[14]      Is that what happened?

[15] **A.**    Yes.

[16] **Q.**    He then ran back towards Stenton then towards [17] Washington Lane. When I saw the cop disappear, I backed up [18] into the store.

[19] **A.**    Right.

[20] **Q.**    Okay. Then the detective asked you, How many times [21] have you seen the guy who was shot before?

[22] **A.**    Okay.

[23] **Q.**    Do you remember him asking you that?

[24] **A.**    Yes, he did.

[25] **Q.**    And you said, I would say about five times or so. The

         Jaclyne Wilson

Page 123

[1] last time was a couple days ago when he told me he had just [2] gotten out of jail and was asking about a phone. He knows my [3] nickname, Bones.

[4] **A.**    Yes.

[5] **Q.**    But I don't know his name.

[6] **A.**    No.

[7] **Q.**    Okay. You had seen the man who had been shot several [8] times before this time?

[9] **A.**    I said that earlier when you asked me.

[10] **Q.**    Okay. And then Detective Sloan asked you, Have you [11] ever seen the guy who came in after him before?

[12] **A.**    Right.

[13] **Q.**    And you said, No, I didn't really look at him. I [14] glanced at him. I know he was kind of short. He was shorter [15] than the guy who was shot. He was like my complexion, brown [16] skinned. He was darker than the guy who got shot.

[17] **A.**    Yes.

[18] **Q.**    All I saw was that the guy had on a black coat. The [19] guy wasn't much taller than the clothes racks. Like I said, [20] the guy came right in and went straight to the rack, grabbed [21] the shirt then to the counter so I really didn't look at him.

[22]      Did you talk to any of the people on the street [23] afterwards after the shooting?

[24] **A.**    No. I have no reason to.

[25] **Q.**    Okay. You didn't want to get involved?

         Jaclyne Wilson

Page 124

[1] **A.**    No. I mean, I'm up there to work. I take care of my [2] family. It's a 9:00 to 5:00 for me. I see people, you know? [3] I been working up there for ten years. So it's not a face I [4] really wouldn't notice up here. I mean, you have a hundred [5] guys up there that know Bones but Bones don't know any of [6] these guys unless I just see their face and speak. That's how [7] it goes.

[8] **Q.**    Okay. So you weren't really friendly with the shooting [9] victim; is that right?

[10] **A.**    No, I'm not -- you know, like I said, he's a guy that [11] frequents the store. I know he's from -- I don't know if he's [12] from the neighborhood but I've seen him before. I saw him a [13] couple days. He said he was coming in to get a phone. I told [14] him I'll hook him up, a nice price, and he came back and I [15] hooked him up. That's what I do.

[16] **Q.**    Right. So you told the police to the best of your [17] knowledge about the guy who had come in and said, Can I holler [18] at you?

[19] **A.**    Yes. To the best of my knowledge, it was just me [20] hearing it. I assume that's what he was saying because they [21] walked out together. A lot of people come in the store, you [22] got cigarettes, you got this, you know what I mean? There's [23] no smoking in the store, you know what I mean, so they'll step [24] outside. But, you know, to my knowledge, it was real quick, [25] you know what I mean?

         Jaclyne Wilson

Page 125

[1] Q.  Okay.  So the guy who got shot, he was light-skinned?

[2] A.  Yes.  He's light-skinned.

[3] Q.  Okay.  And how much time passed between when you saw

[4] them leave the store and you looked outside and saw the guy

[5] who got shot on the ground?

[6] A.  Being honest, just guessing, it couldn't have been no

[7] more than five to ten minutes because like a phone takes about

[8] 20 minutes to activate.  The purpose of him taking his jacket

[9] off, was he had a few minutes to wait around so he was trying

[10] some stuff on the store.  He wind up purchasing the shirt

[11] while he was waiting.  So with him walking out the store, I

[12] figure it was a quick cigarette break, you know what I mean,

[13] until his phone would be ready.  It would had been about five,

[14] ten minutes.

[15] Q.  Okay.  Now, Mr. Wright, was that the extent of your

[16] role --

[17] A.  That's it.

[18] Q.  -- in witnessing whatever happened that day?

[19] A.  I can't say I witnessed whatever happened outside the

[20] store.  I can on tell you my role inside the store.  I have no

[21] knowledge of what went on outside.

[22] Q.  Okay.  Thank you.

[23]        MS. FORCHETTI:  I don't have anymore

[24] questions.

[25]        THE COURT:  Mr. Lorusso, you may

Jaclyne Wilson

Page 126

[1] cross-examine.

[2]        MR. LORUSSO:  Thank you, Your Honor.

[3]                   _ _ _

[4]          CROSS - EXAMINATION

[5]                   _ _ _

[6] BY MR. LORUSSO:

[7] Q.  Good afternoon.

[8] A.  Good afternoon.

[9] Q.  Mr. Wright, I'm going to ask you to take a look at the

[10] photograph that's been marked C-6 for identification.

[11] A.  Okay.

[12] Q.  It depicts clothing racks that were inside the store;

[13] is that right?

[14] A.  Yes.

[15] Q.  It would appear to me the clothing rack on the left

[16] side of the photograph is significantly taller than the one of

[17] the right side; is that right?

[18] A.  Yes.

[19] Q.  Referring to that photograph on the left side, the one

[20] that it seems to be taller, can you estimate how tall that

[21] would be in relation to you?

[22] A.  To me, well, with these hoody racks, like I said these

[23] right here, you look at the top of it that will push it -- I

[24] don't know -- a lot of those come up to about right here

[25] because I find myself twisting them on.

Jaclyne Wilson

Page 127

[1] Q.  To your shoulders?

[2] A.  Maybe to my shoulder.  A little higher.

[3] Q.  Higher than your shoulders.

[4]        And you're 6'9?

[5] A.  Yes.

[6] Q.  Okay.  And so when you were referring to your statement

[7] to the police about the person being -- let me see.  What did

[8] you say?

[9]        MR. LORUSSO:  Court, indulge me.

[10]        (Pause.)

[11] BY MR. LORUSSO:

[12] Q.  Wasn't much taller than the clothes racks, were you

[13] referring to the racks with the signs on them, if you know, or

[14] just the --

[15] A.  Being honest, when I said that, I was in general

[16] stating the actual height.  Like I said, if a person comes in

[17] and they're my height, I can actually see them.

[18] Q.  Okay.

[19] A.  But to me anybody that comes in there, I'm looking at

[20] racks before I see them because the racks are about yay high

[21] and they're average height to me.  So when I say shorter than

[22] the racks, meaning it can be anywhere -- you know, I really

[23] can't gage the height because it's shorter than the racks.

[24] Q.  Less than 6'4 or 6'5; is that what you're saying?

[25] A.  Yes, somewhere around there.

Jaclyne Wilson

Page 128

[1] Q.  Now, let me ask you another question because you said,

[2] I believe, that the person was wearing a black coat or black

[3] hoody?

[4] A.  Yeah.  I knew he had on black.  I'm not sure if it was

[5] a hoody or jacket.

[6] Q.  I'm going to direct your attention to the statement

[7] that you gave.  Looks like you were taken in at 3:30 that same

[8] day.

[9]        If you'd be so kind to look at the second question

[10] down there where you're asked, Have you seen the guy before

[11] who came in after him?  Do you see that?

[12] A.  Yes.

[13] Q.  Do you see where the second line of your answer it

[14] says, All I can say was that the guy had on a black coat?

[15] A.  Yes.

[16] Q.  And you, I assume, draw a distinction between a black

[17] coat versus a black hoody; is that correct?

[18] A.  Well, being honest, when I said black coat, it was just

[19] black coat.  I didn't know if it was a hoody or black jacket.

[20] Q.  Okay.  So you're not sure what it was, you just

[21] referred to it as a black coat?

[22] A.  Yeah.  He had on black.

[23] Q.  I follow you.

[24]        Now, you also described that day when you were at

[25] the detective division the complexion of this second person

Jaclyne Wilson

Page 129

[1] who came into the store; is that correct?

[2] A. Yes.

[3] Q. And you described him as being like your complexion; is

[4] that correct?

[5] A. He's a dark-skinned. It was a dark-skinned person.

[6] Q. Okay. Looking at my client, how would you describe his

[7] complexion?

[8]        MS. FORCHETTI: Objection, Your Honor.

[9]        THE COURT: Overruled.

[10] BY MR. LORUSSO:

[11] Q. If you were to give a description of my client's

[12] complexion, how would you describe him?

[13] A. It wouldn't be considered dark-skinned.

[14] Q. Would it been considered like your complexion?

[15] A. No.

[16] Q. How would you describe his complexion?

[17] A. I probably medium, light-skinned.

[18] Q. Okay. Let me ask you this: After you were transported

[19] to Broad and Champlost, the detective division, and you were

[20] interviewed and gave that statement that has been marked as

[21] C-8, were you subsequently transported back to the store?

[22] A. Yes, I was.

[23] Q. And do you know about what time you got back to the

[24] store?

[25] A. Man, I don't know. Maybe an hour before closing. We

                          Jaclyne Wilson

Page 130

[1] normally close about 6:00. So maybe about 5:00. Maybe a

[2] little before 5:00. I'm not really sure.

[3] Q. Okay. When you got back to the store after being

[4] interviewed --

[5] A. Okay.

[6] Q. -- did police ever transport anybody to the store for

[7] you to view?

[8] A. Yeah. They tried to.

[9] Q. And how many times did that occur?

[10] A. It happened once.

[11] Q. One time. Okay.

[12]        And tell us the circumstances surrounding that?

[13] A. Well, basically, once they dropped me back off at the

[14] store, I was talking to -- the detective came in. I seen the

[15] car pull up. The detective came in and said, We have somebody

[16] we want you to identify. I told the detective, No need to

[17] bringing anybody in here because I couldn't identify anybody.

[18] I mean, you can bring in ten short guys. I couldn't tell you

[19] one from the other.

[20] Q. So the detective said, We have somebody we want you to

[21] identify?

[22] A. Right.

[23] Q. And was there a police car that was at the location

[24] when the detective said that?

[25] A. No. It was what you call a Ford Taurus, a detective

                          Jaclyne Wilson

Page 131

[1] car.

[2] Q. Okay. So did you see somebody situated in that car

[3] when the detective came and told you that?

[4] A. Yes. The detective, they had somebody in custody.

[5] Q. Okay. And how long after you got back -- and I

[6] understand that you don't have a, you know, you weren't really

[7] cognizant of specific times, but how long after you got back

[8] from Broad and Champlost did this incident occur where the

[9] detectives said we have somebody we want you to identify?

[10] A. It wasn't too long after I got back. Maybe, I don't

[11] know. I can't gage but it wasn't that long, you now? Because

[12] when we came back to the store, we stayed about an hour later

[13] and then we left for the evening.

[14] Q. Okay. Did you look out and see this person that was

[15] in the vehicle?

[16] A. No. They actually tried to bring him into the store.

[17] Q. And that's when you said basically don't waste your

[18] time because I can't identify --

[19] A. I told them, don't waste your time because I didn't

[20] see, you know, I told them from the gate, there's no need of

[21] bringing nobody in this store and implementing that because I

[22] didn't see who it was. I couldn't tell you one short guy from

[23] another short guy if you lined them up in front of me.

[24] Q. Okay. Well, where are you making a reference of a

[25] short guy? Where does that come from?

                          Jaclyne Wilson

Page 132

[1] A. Basically just from my height. When I say "short",

[2] anybody that comes in my presence is pretty much short unless

[3] their average height is 6'3, 6'4. That's the type of people I

[4] hang around, you know, basketball players. When I see

[5] somebody that's not in that 6'3, 6'4 range, to me that's

[6] average height for everybody. So when I say short, I mean

[7] shorter than me and like I said I'm 6'9.

[8] Q. Other than the black coat that you identified which now

[9] you're saying you don't know whether it was black hoody or

[10] black coat or jacket, whatever, do you recall whether that

[11] person who came in the second time was wearing a hat?

[12] A. I really don't know. I really can't say he was wearing

[13] a hat. I know he had a black jacket or hoody but I don't know

[14] if he had a hat on or not.

[15] Q. Okay. Thank you, Mr. Wright.

[16]        MR. LORUSSO: I have nothing further.

[17]        THE COURT: Do you have any redirect?

[18]        MR. LORUSSO: I'm sorry. I have one

[19]     question, if I may?

[20]        THE COURT: Go ahead.

[21]        MR. LORUSSO: Thank you.

[22] BY MR. LORUSSO:

[23] Q. The detective who came to your store when he wanted you

[24] to make an identification, do you know who that detective was?

[25] A. No. It was maybe three or four of them in the store,

                          Jaclyne Wilson

[1] you know what I mean?  So I think one -- I really couldn't
[2] place him.  He told me he wanted me to identify somebody and
[3] when he pulled up and started to bring somebody in, I cut him
[4] off from the gate, don't bring somebody in the store because I
[5] have -- there's no reason for bringing somebody in and me
[6] saying yay or nay when I didn't see who the culprit was.  So I
[7] told him from the gate don't bring nobody into the store and
[8] he took the person and put him back in the car and left.
[9] **Q.**   Can you describe who that person was, who that
[10] detective was?  What he looked like?
[11] **A.**   I really can't.  It was maybe four or five of them at
[12] the store at the time.  I don't know which one specifically
[13] asked me to, you know, identify the person but --
[14] **Q.**   Okay.  Thank you.
[15]           **MR. LORUSSO**: I have nothing further.
[16]           **THE COURT**: Do you have any redirect?
[17]           **MS. FORCHETTI**: A little bit.
[18]                 _ _ _
[19]           REDIRECT EXAMINATION
[20]                 _ _ _
[21] **BY MS. FORCHETTI**:
[22] **Q.**   Mr. Wright, you told the detectives that the second
[23] person who came in to speak to the victim was darker than the
[24] victim; is that right?
[25] **A.**   Yeah, considering the victim is real light-skinned.

Jaclyne Wilson

[1] **Q.**   And you're fairly dark-skinned, would you say so, sir?
[2] **A.**   I'm black, if you want to ask me.  I'm what you call
[3] black, chocolate, if you want to say that, but I'm black.
[4] **Q.**   So that second person was lighter skinned than you
[5] were?
[6] **A.**   He wasn't light-skinned like the guy that got shot, you
[7] know what I mean?  He was considered brown-skinned.
[8] Brown-skinned to me is maybe a shade lighter to me, you know
[9] what I mean?  But I consider myself a dark-skinned person and
[10] the person that came in, if you ask me to state his
[11] complexion, he was a dark-skinned guy.  He wasn't a
[12] light-skinned guy, you know.
[13] **Q.**   Okay.  You described him to Detective Sloan as
[14] brown-skinned?
[15] **A.**   Brown-skinned, yeah.  Like I said A shade lighter than
[16] me.  I'm considered black or chocolate, if you wish.  So A
[17] shade lighter than me.
[18] **Q.**   So did -- Mr. Wright, when you returned from being
[19] interviewed --
[20] **A.**   Yes.
[21] **Q.**   -- you didn't wish to look at anyone for purposes of
[22] identification; is that right?
[23] **A.**   Well, it's not that I wish.  It's why would I look at
[24] somebody and implicate somebody when I have no knowledge of
[25] what's going.  I'm not going to sit there and point out a guy

Jaclyne Wilson

[1] if I definitely didn't see what was going on.  I didn't see
[2] what went down outside so to me it was why would you bring him
[3] to my store?  If that incident happened in the store, yeah, I
[4] guess I could identify somebody.  But everything took place
[5] outside the store.  So why would you bring a person back into
[6] my store and ask me to identify somebody that I never saw from
[7] the get go.  They had witnesses outside the store.  If you
[8] have witnesses outside the store, you handle it outside the
[9] store.  I can only tell you what I saw inside the store.  Once
[10] the people left the store, I have no knowledge of what went on
[11] outside.  Cigarette smoke.  They could have been smoking an L
[12] for all I know.  It happened outside the store.
[13] **Q.**   Okay.  So because the shooting happened outside of the
[14] store, outside of your presence, you didn't want to identify
[15] anyone who could have been in your store before it happened?
[16] **A.**   It has nothing to do with identifying.  I identified
[17] the person who got shot that was in the store.  If I had
[18] recollection and I knew who the person was that came in, I can
[19] identify him, I'm not a guy that's going to say I'm turning my
[20] back but I couldn't identify the second person that came in
[21] the store.  It's not a person that I've seen before.
[22] **Q.**   Okay.
[23] **A.**   Like I said, the guy that got shot, I seen his face
[24] before.  He frequents the neighborhood, you know what I mean?
[25] Everybody's face -- I got a lot of faces in my head from the

Jaclyne Wilson

[1] neighborhood.  I know everybody in the neighborhood.  Whether
[2] they know me or not, I know their faces, you know?  Like I
[3] said, the second guy that came in, I barely -- you now, I just
[4] glanced at him because he came in the store and we have a
[5] chime.  Once the chime sound, I turn around, I look.  The guy
[6] walks right over, grabs a shirt.  I'm waiting on a customer.
[7] All I did was, Michele, go ahead and ring him up.  He paid for
[8] his shirt and he left out.
[9] **Q.**   Okay.  Now, Mr. Wright, you had told us earlier that
[10] there might be a lot of people in the neighborhood who know
[11] you but you wouldn't necessarily know them?
[12] **A.**   By name, yeah.  Like everybody knows Bones.  Everybody
[13] in the neighborhood knows Bones at the sneaker store, you know
[14] what I mean?  Like I said, I look a lot of people faces and
[15] know them but, you know, I don't put names with faces because
[16] I don't interact with a lot of guys like that, you know what I
[17] mean?  It's just a job for me.
[18] **Q.**   Okay.  Thank you, Mr. Wright.
[19]           **MS. FORCHETTI**: I don't have anymore
[20] questions.
[21]           **MR. LORUSSO**: I have one redirect.
[22]           **THE COURT**: Do you have additional
[23] questions?
[24]           **MR. LORUSSO**: I do, Your Honor.  Thank
[25] you.

Jaclyne Wilson

Page 137

[1]      **THE COURT**: You may proceed.

[2]      _ _ _

[3]      RECROSS - EXAMINATION

[4]      _ _ _

[5] **BY MR. LORUSSO**:

[6] **Q.**   Mr. Wright, at Northwest Detectives Division when you

[7] were taken in right after that, did you tell the detective who

[8] was interviewing you, No, I really didn't look at him. I

[9] glanced at him, referring to the second person that came in

[10] the store?

[11] **A.**   Yeah, the complainants.

[12] **Q.**   Thank you.

[13]      **MR. LORUSSO**: I have nothing further.

[14]      **THE COURT**: You may step down.

[15]      (Witness excused.)

[16]      **THE COURT**: Call your next witness.

[17]      **MS. FORCHETTI**: Your Honor, at this time

[18] the Commonwealth calls Detective James Sloan.

[19]      **MR. LORUSSO**: Can I see Your Honor

[20] briefly at sidebar?

[21]      **THE COURT**: Yes. Come over here.

[22]      (Sidebar held off the record.)

[23]

[24]

[25]

Jaclyne Wilson

Page 138

[1]      ...DETECTIVE JAMES SLOAN, after having

[2] been first duly sworn, was examined and testified as

[3] **follows**:

[4]      _ _ _

[5]      **COURT CRIER**: State your name, badge

[6] number for the record and spell your last name.

[7]      **THE WITNESS**: Detective James Sloan,

[8] S-L-O-A-N, Badge No. 891, assigned to Northwest

[9] Detectives.

[10]      **THE COURT**: You may proceed.

[11]      **MS. FORCHETTI**: Thank you.

[12]

[13]      DIRECT EXAMINATION

[14]      _ _ _

[15] **BY MS. FORCHETTI**:

[16] **Q.**   Good afternoon, detective.

[17] **A.**   Good afternoon.

[18] **Q.**   Detective, how long have you been with the Philadelphia

[19] police?

[20] **A.**   Nineteen years.

[21] **Q.**   And how long have you been assigned to Northwest

[22] Detectives?

[23] **A.**   Thirteen.

[24] **Q.**   How many shootings would you say you've investigated

[25] over the course of your career?

Jaclyne Wilson

Page 139

[1] **A.**   Hundreds, unfortunately.

[2] **Q.**   Have -- were you one of the detectives responding to a

[3] shooting that had occurred in the 1300 block of Johnson Street

[4] on February 4th of this year, 2011, at about two o'clock

[5] in the afternoon?

[6] **A.**   Yes.

[7] **Q.**   Were you working with anyone that day?

[8] **A.**   My partner, Detective Gelieber.

[9] **Q.**   Okay. And how soon after you received information that

[10] there was a shooting at that location did you go to that

[11] location?

[12] **A.**   Timewise it was shortly thereafter. I can't give you

[13] an exact time.

[14] **Q.**   Okay. When you arrived, detective, what did you see?

[15] **A.**   There was police officers already there guarding the

[16] scene. There was a white vehicle that was on Johnson Street,

[17] appeared to be stuck in the snow. There was a piece of

[18] clothing that was either a towel or a shirt and there was some

[19] blood on the highway.

[20] **Q.**   Okay. Now, what did you and your partner do when you

[21] arrived at the seen?

[22] **A.**   We did a couple things. First is we walked the scene

[23] looking to see if there was any other evidence out there. See

[24] if we would find any ballistics evidence. Walked around

[25] seeing if there was any witnesses. We didn't find any

Jaclyne Wilson

Page 140

[1] witnesses. We didn't find any ballistics evidence out there.

[2]      Went inside to the sneaker store. I spoke with the

[3] gentleman who just testified. Talked with him briefly, had

[4] him brought up to northwest. Shortly thereafter I resumed

[5] from the scene and went to Northwest Detectives and I later

[6] interviewed him.

[7] **Q.**   Okay. Now, detective, when you say "ballistics

[8] evidence", do you mean fired cartridge casings, projectiles or

[9] bullets?

[10] **A.**   When I say "ballistics", I'm saying handguns, fired

[11] cartridge casings, projectiles, fragments, anything that could

[12] indicate that a shooting happened out there.

[13] **Q.**   And you were not able to find it?

[14] **A.**   No.

[15] **Q.**   Okay. Did any of the people that were around come

[16] forward and offer themselves as eyewitnesses?

[17] **A.**   Nobody witnessed the actually shooting, no. But,

[18] again, the gentleman who just testified had some knowledge of

[19] the complainant. So if you want to call him a witness, I

[20] interviewed him.

[21] **Q.**   Okay. And was he the only civilian you interviewed in

[22] connection with this case?

[23] **A.**   I believe so, yes.

[24] **Q.**   Okay. Were you present when the victim was interviewed

[25] in this case?

Jaclyne Wilson

Page 141

[1]  **A.**  Yes, I was.

[2]  **Q.**  Okay.  And where did that interview take place?

[3]  **A.**  At Einstein.

[4]  **Q.**  And in what condition was the victim when you saw him?

[5]  **A.**  I don't recall.  I don't recall his condition.  I know

[6] we talked with him but this investigation was not mine.  So it

[7] sounds cold but every shooting you don't remember every part

[8] of it.

[9]  **Q.**  Okay.  Were you present when a photographic array was

[10] shown to this victim?

[11]  **A.**  I was in the room.  Again, I do not remember it though.

[12]  **Q.**  Okay.  Do you remember asking the victim any questions?

[13]  **A.**  I know I asked the victim a question, yes.  The final

[14] question of the interview.

[15]  **Q.**  What did you ask him?

[16]  **A.**  Something to the effect of, How do you feel now or

[17] something to that effect because I want to see -- I want to

[18] get the way their mind set is at the time of the interview.  I

[19] had a DA tell me you should really ask that question just in

[20] case the person passes way.  So around that time, that was the

[21] kick that I kept on saying that.  So after Detective Acerenza

[22] concluded his interview, I asked that question and he wrote it

[23] down.

[24]  **Q.**  Detective Acerenza is the assigned investigator?

[25]  **A.**  Yes.

Jaclyne Wilson

Page 142

[1]  **Q.**  And you assisted him in this investigation?

[2]  **A.**  To an extent, yes.

[3]  **Q.**  Okay.  Did you perform any other parts of the

[4] investigation?

[5]  **A.**  I assisted in obtaining two search warrants.

[6]  **Q.**  Okay.  For what were those search warrants?

[7]  **A.**  One was for CCI records which are 911 calls.  We have

[8] to get a search warrant to go into the database to see who

[9] called 911.  The other one was for the defendant's address.

[10] If I may look at my notes?  It was 1528 East Johnson.  I

[11] helped prepare that search warrant.

[12]  **Q.**  And, detective, where is 1538 East Johnson in relation

[13] to Stenton and Johnson?

[14]  **A.**  I believe it's like a block and a half away.

[15]  **Q.**  Okay.  And, detective, did other detectives actually

[16] execute that search warrant?

[17]  **A.**  Yes.

[18]  **Q.**  And which detectives were those?

[19]  **A.**  I believe it was Detective Grace and Suchinsky.

[20]  **Q.**  Also assigned to Northwest?

[21]  **A.**  Yes.

[22]  **Q.**  Now, detective, how would you describe Mr. Wright's

[23] demeanor when you interviews him?

[24]  **A.**  His demeanor?  He was forthcoming.

[25]  **Q.**  Okay.  Were there any other employees at the sneaker

Jaclyne Wilson

Page 143

[1] store?

[2]  **A.**  I believe there was an Asian gentleman and an Asian

[3] female.

[4]  **Q.**  Were you able to interview those individuals?

[5]  **A.**  I didn't interview either of them, no.

[6]  **Q.**  And did you look into whether or not the sneaker store

[7] had any video footage?

[8]  **A.**  Yes.  I looked into it.  The store was in the process

[9] of being closed down.  The camera system was off.

[10]  **Q.**  And, detective, was that the extent of your role in

[11] this investigation?

[12]  **A.**  Yes.

[13]  **Q.**  Okay.  Now, so you did not collect any evidence from

[14] this scene; is that right?

[15]  **A.**  No.

[16]  **Q.**  Okay.  And when you say you walked the scene, what area

[17] did you walk?

[18]  **A.**  Walked from Stenton and Johnson, down Johnson both

[19] sides of the street, around the bar, went up on some of the

[20] steps.  Basically three quarters of the block, I would say.

[21]  **Q.**  Okay.

[22]  **A.**  Including the alleyway behind -- across the street from

[23] the sneaker store.  There's an alleyway.  We went back there

[24] looking also.

[25]  **Q.**  Why did you look in that alleyway?

Jaclyne Wilson

Page 144

[1]  **A.**  We were just looking for any ballistics evidence.  I

[2] don't know where he was shot at.  I just know where there's

[3] blood, in the street.

[4]  **Q.**  Now, detective, was your partner, Detective Geliebter,

[5] with you when you went with Detective Acerenza to the hospital

[6] to interview the victim?

[7]  **A.**  Yes.

[8]  **Q.**  And was it the three of you detectives that were

[9] present with Mr. Talbert, the victim in this case?

[10]  **A.**  Yes.

[11]  **Q.**  Were there any other people there that you remember?

[12]  **A.**  Not that I recall.

[13]  **Q.**  Other than the interview of Mr. Wright and the two

[14] search warrants that you mentioned, did you prepare any other

[15] paperwork in connection with this case?

[16]  **A.**  I do not believe so.

[17]  **Q.**  Thank you, detective.

[18]        **MS. FORCHETTI**:  I don't have anymore

[19]    questions.

[20]        **THE COURT**:  You may cross-examine.

[21]        **MR. LORUSSO**:  I have no questions of

[22]    Detective Sloan.

[23]        **THE COURT**:  Thank you, sir.  You may step

[24]    down.

[25]        (Witness excused.)

Jaclyne Wilson

Page 145

[1]     THE COURT:  Ladies and gentlemen, we'll
[2]  take a very short recess.
[3]         Everybody remain in place until the
[4]  jurors have left the courtroom, please.
[5]     (Jury exits the courtroom at 2:43 p.m.)
[6]     THE COURT:  Let the record reflect the
[7]  jurors have left the room.
[8]        How much time will you need, ma'am?
[9]     MS. FORCHETTI:  Fifteen minutes.
[10]     THE COURT:  Start up again at five
[11]  minutes to 3:00.
[12]     MS. FORCHETTI:  Okay.
[13]      (Short recess.)
[14]     THE COURT:  All right.  We're back on the
[15]  record in our trial case.  The case of Commonwealth
[16]  vs. Johnnie Simmons, CP-51-CR-0004773-2011.
[17]  Mr. Simmons is here with his attorney, Mr. Lorusso.
[18]  The Commonwealth by Ms. Forchetti.
[19]        Yes, ma'am.
[20]     MS. FORCHETTI:  Your Honor, there's a
[21]  matter I wish to bring to the Court's attention at
[22]  this time.
[23]     THE COURT:  Go ahead.
[24]     MS. FORCHETTI:  When witness Mr. Gerald
[25]  Wright left the stand, he was observed by Officers
             Jaclyne Wilson

Page 146

[1]  Long and Alexander outside in the hallway of this
[2]  Courtroom 802 hugging the defendant's mother and
[3]  telling her, Don't worry.  It will be all right.
[4]     THE COURT:  Okay.
[5]     MS. FORCHETTI:  I would like the
[6]  opportunity to bring Mr. Wright back tomorrow and
[7]  ask him about that.
[8]     THE COURT:  You don't need my permission
[9]  for that.
[10]     MS. FORCHETTI:  Okay.
[11]     THE COURT:  Where's Mr. Wright?
[12]     MS. FORCHETTI:  He left the courtroom.
[13]     THE COURT:  Is he in the hall?
[14]     COURT CRIER:  No.  I believe he left for
[15]  the day.
[16]     THE COURT:  All right.  Well, have him
[17]  subpoenaed.  If he doesn't show up, I'll issue a
[18]  bench warrant.
[19]     MS. FORCHETTI:  Okay.  I would also like
[20]  the opportunity when Officer Long testifies to ask
[21]  him about what he witnessed in the hallway.
[22]     MR. LORUSSO:  Well, I'm going to object
[23]  to that, Your Honor.
[24]     THE COURT:  Why?
[25]     MR. LORUSSO:  I'm not sure what the
             Jaclyne Wilson

Page 147

[1]  relevance of that is.
[2]     THE COURT:  Is it relevant?
[3]     MS. FORCHETTI:  It shows the bias of that
[4]  witness.  The witness was uncooperative and had to
[5]  be confronted with his own statement and changed his
[6]  testimony when he testified.  Now, that conduct help
[7]  gives a reason.  He testified that he did not know
[8]  the defendant.
[9]     THE COURT:  It's my recollection.
[10]     MR. LORUSSO:  That's not my recollection
[11]  that he didn't know him.  I don't recall that he was
[12]  ever even asked if he knew about this defendant.  I
[13]  think the question was in the statement that --
[14]     THE COURT:  Hold on for a second.
[15]        There's a  conversation going on here.
[16]  Can you just give us a moment?  What happened to
[17]  simple courtesy in the city.
[18]     THE DEFENDANT:  He asked me a question.
[19]     THE COURT:  It's like we're in the wild,
[20]  wild west.  I'm having a conversation and you're
[21]  speaking in my ear.  Can you just hold on for a
[22]  second?
[23]        Would you continue, please.
[24]     MR. LORUSSO:  I'm sorry, Your Honor.  My
[25]  recollection is in terms of his statement and that's
             Jaclyne Wilson

Page 148

[1]  why I'm objecting to Officer Long.  The question
[2]  was, Have you seen the guy who came in after him
[3]  before?  The answer was, No.  I really didn't look
[4]  at him.  I glanced at him, which is, you know, the
[5]  implication and contrary to Detective Sloan's
[6]  characterization of him being forthcoming,
[7]  Mr. Wright, he testified to everything that was
[8]  in the statement.
[9]     THE COURT:  It's not prejudicial.  It's
[10]  relevant.  I will permit it.  You have an objection.
[11]     MR. LORUSSO:  Thank you.
[12]     THE COURT:  Can we go forward?
[13]     MR. LORUSSO:  Then that basically puts me
[14]  in a position of having to call Mr. Wright to
[15]  explain something that --
[16]     THE COURT:  You don't have to call any
[17]  witnesses.
[18]     MR. LORUSSO:  No.  No.  I understand
[19]  but --
[20]     THE COURT:  All right.
[21]     MR. LORUSSO:  Okay.  Thank you.
[22]     THE COURT:  Are we ready to proceed?
[23]     MS. FORCHETTI:  Yes, Your Honor.
[24]     MR. LORUSSO:  I'm sorry.
[25]     THE COURT:  Go right ahead.
             Jaclyne Wilson

[1]     **MR. LORUSSO**:  I guess I may have to call
[2] eventually the defendant's mother to inquire as far
[3] as that's concerned.  So perhaps I should ask her to
[4] leave the courtroom.
[5]     **THE COURT**:  That's entirely up to you.
[6]         Is there anything else before we bring
[7] the jury out?
[8]     **MS. FORCHETTI**:  No, Your Honor.
[9] (Jury enters the courtroom at 3:06 p.m.)
[10]     **THE COURT**:  Please call your next
[11] witness.
[12]     **MS. FORCHETTI**:  Your Honor, at this time
[13] the Commonwealth calls Charles Talbert.
[14]     **THE COURT**:  Let's have Mr. Talbert sworn
[15] in, please.
[16]     ...CHARLES TALBERT, after having been
[17] first duly sworn, was examined and testified as
[18] **follows**:
[19]         _ _ _
[20]     **COURT CRIER**:  State your name for the
[21] record and spell your last name.
[22]     **THE DEFENDANT**:  Charles Talbert,
[23] T-A-L-B-E-R-T.
[24]     **THE COURT**:  You may proceed.
[25]     **MS. FORCHETTI**:  Thank you.
                    Jaclyne Wilson

[1]         _ _ _
[2]         DIRECT EXAMINATION
[3]         _ _ _
[4] **BY MS. FORCHETTI**:
[5]  **Q.**   Good afternoon, Mr. Talbert.
[6]  **A.**   How are you doing?
[7]  **Q.**   I'm fine.  Thank you.
[8]         How are you today?
[9]  **A.**   I'm trying to get this over with.  I'm just in that
[10] mood.  That's how I feel.
[11]     **THE COURT**:  Ask your next question,
[12]     please.
[13]     **MS. FORCHETTI**:  Yes.
[14] **BY MS. FORCHETTI**:
[15]  **Q.**   Mr. Talbert, you don't want to be here today, do you?
[16]  **A.**   No, I don't.
[17]  **Q.**   Okay.  You have told me that you do not wish to testify
[18] in this case; is that right?
[19]  **A.**   Yes.
[20]  **Q.**   Okay.  Why is that?
[21]  **A.**   Because I'm not going to send an innocent person to
[22] jail for nothing.
[23]  **Q.**   Okay.
[24]  **A.**   That's not -- like, I never been intimidated.  We're
[25] going to get this on the record.  I never been intimidated in
                    Jaclyne Wilson

[1] my life, you know?  I'm from the streets just like everybody
[2] else, you now?  I Me getting on the stand and testifying against
[3] anybody in the world, that's not me, you know?
[4]  **Q.**   Okay.  Mr. Talbert, you were shot on February 4th of
[5] 2011; is that right?
[6]  **A.**   Yes.
[7]  **Q.**   How many times were you shot?
[8]  **A.**   I don't even know.
[9]  **Q.**   More than once?
[10]  **A.**   Yeah.
[11]  **Q.**   More than twice?
[12]  **A.**   Yeah.
[13]  **Q.**   Where were you shot?
[14]  **A.**   Where?  What you mean?
[15]  **Q.**   Where on your body were you shot?
[16]  **A.**   My stomach, my arms, ain't nothing major.  I took that
[17] and ate it.
[18]  **Q.**   You took that, I'm sorry?
[19]  **A.**   I took it and swallowed it.  I'm still here.  I'm still
[20] breathing.
[21]  **Q.**   All right.  You were shot on February 4th.  You went to
[22] Albert Einstein Medical Center?
[23]  **A.**   Yeah.
[24]  **Q.**   You stayed there until February 22nd of this year,
[25] 2011; is that right?
                    Jaclyne Wilson

[1]  **A.**   Yes.
[2]  **Q.**   You had to undergo several surgeries, correct?
[3]  **A.**   Yes.
[4]  **Q.**   Okay.  And you are still recovering from that in that
[5] you still have a colostomy bag; is that correct?
[6]  **A.**   Yes, I have a colostomy bag and it would have been
[7] reversed by Monday but unfortunately I got to keep coming back
[8] down here to keep coming to court for you to pressure me into
[9] saying something that's not true.
[10]  **Q.**   Okay.
[11]  **A.**   And I can go to the hospital and get this reversed
[12] already before I get infected and I can die that way.
[13]  **Q.**   All right.  You're irritated by the inconvenience of
[14] having to come in and testify in this shooting; is that right?
[15]  **A.**   This is really inconvenient because it's a medical
[16] issue.  This is really inconvenient for me.
[17]  **Q.**   Okay.  Now, do you remember speaking to the detectives
[18] a few days after you were shot?
[19]  **A.**   I don't even remember honestly because I was so
[20] medicated.  They was in my -- I don't even know.
[21]  **Q.**   Okay.
[22]     **MS. FORCHETTI**:  Your Honor, I would ask
[23]     to mark this six-page statement as Commonwealth
[24]     Exhibit 9.
[25]     **THE COURT**:  It may be marked.
                    Jaclyne Wilson

Page 153

[1]         (Statement (Talbert) marked Commonwealth
[2]    Exhibit C-9 for identification.)
[3]         **COURT CRIER**: So marked C-9.
[4] **BY MS. FORCHETTI**:
[5] **Q.**    Mr. Talbert, you have a six-page statement in front of
[6] you.
[7]         Do you want to tell me whose name appears at the
[8] top?
[9] **A.**    That's my name.
[10] **Q.**    Okay.  Do you want to tell me whose signature appears
[11] on the bottom of the first page?
[12] **A.**    That look like scribble scrabble to me.
[13] **Q.**    Okay.  Is that your signature, sir?
[14] **A.**    It looks like scribble scrabble.
[15] **Q.**    Okay.  You're denying that that's your signature?
[16] **A.**    This looks like scribble scrabble, Miss.
[17] **Q.**    Okay.  You want to turn to the second page of that
[18] statement, Mr. Talbert.
[19]         Can you tell me whose name appears at the top?
[20] **A.**    That's my name again.
[21] **Q.**    Okay.  Do you see the signature at the bottom of the
[22] page?
[23] **A.**    Again, it looks like scribble scrabble.
[24] **Q.**    Turn to the third page of the statement, Mr. Talbert.
[25] **A.**    Yeah.

                    Jaclyne Wilson

Page 154

[1] **Q.**    Can you tell me whose name appears at the top?
[2] **A.**    That's my name again.
[3] **Q.**    Okay.  Can you -- do you see the signature at the
[4] bottom of the page?
[5] **A.**    It looks like scribble scrabble.
[6] **Q.**    Mr. Talbert, please turn to the forth page of the
[7] statement.
[8]         Do you see your name at the top?
[9] **A.**    Yeah, I see my name.
[10] **Q.**    Do you see a signature at the bottom of the page?
[11] **A.**    It look like my daughter wrote it.
[12] **Q.**    Did your daughter sign this statement, sir?
[13] **A.**    It look like scribble scrabble.  I didn't write that.
[14] Listen, you can tell this is not a signature.
[15] **Q.**    Okay.
[16] **A.**    This is scribble scrabble.  Seriously, look at it.  It's
[17] scribble scrabble.
[18] **Q.**    All right.  Turn to page 5 of your statement.
[19]         Do you see your name at the top of the page?
[20] **A.**    Yeah, I see my name.
[21] **Q.**    Okay.  Do you see the signature at the bottom of the
[22] page?
[23] **A.**    Once again, it looks like scribble scrabble.
[24] **Q.**    All right.  Turn to the last page, page 6.
[25]         Do you see that?

                    Jaclyne Wilson

Page 155

[1] **A.**    Yeah, I see it.
[2] **Q.**    Do you see your name at the top?
[3] **A.**    I see my name.
[4] **Q.**    Do you see what you refer to as scribble scrabble at
[5] the bottom of the last question?
[6] **A.**    That's scribble scrabble.  You know it look like
[7] scribble scrabble.
[8] **Q.**    Okay.  Is that your statement, Mr. Talbert?
[9] **A.**    I don't know.  This is all scribble scrabble.  That's
[10] not my signature.
[11] **Q.**    Okay.  At the time of the shooting, did you live on
[12] 1219 Barringer Street?
[13] **A.**    Yes.
[14] **Q.**    Is your date of birth --
[15] **A.**    Well, actually, no, I don't live there.  I used to live
[16] there but I don't live there no more.  I been gone from that
[17] address.  I been out of that house since the age of 13.
[18] **Q.**    Okay.  Did you tell the police that was your address at
[19] the time of the shooting?
[20] **A.**    I did, yes, because I was locked up too, you know?  I
[21] had -- I was, you know, I was locked up.  I had drugs.  I was
[22] being charged for intent to deliver and all that, so yeah.
[23] **Q.**    At the of the shooting, right?
[24] **A.**    Right.  I was guilty of what I had on me so I had to
[25] lie.

                    Jaclyne Wilson

Page 156

[1] **Q.**    Okay.  You had marijuana on you, correct?
[2] **A.**    Right.  I had $195 worth.  It wasn't something small.
[3] **Q.**    You have had $250 cash on you?
[4] **A.**    I had cash, yeah.
[5] **Q.**    Okay.  And you were charged with possession with intent
[6] to deliver that marijuana; is that right?
[7] **A.**    No.  It got thrown out.
[8] **Q.**    You were charged at the time, correct?
[9] **A.**    Yeah.
[10] **Q.**    That case is no longer open?
[11] **A.**    It's no longer open.
[12] **Q.**    You're in custody related to different other open
[13] charges; is that right?
[14] **A.**    Right.
[15] **Q.**    Okay.  Is your date of birth March 27th, 1981?
[16] **A.**    Yes.
[17] **Q.**    And who is Ms. Clara Massey to you?
[18] **A.**    That's my grandma.
[19] **Q.**    Did you give the police her name and address?
[20] **A.**    Yeah because that's -- I always do that.
[21] **Q.**    Okay.
[22] **A.**    You know, in case I go on the run, they just go there
[23] because I'm not going to be there.
[24] **Q.**    Okay.  So do you remember talking to the police in the
[25] hospital on February 8th of 2011, four days after the

                    Jaclyne Wilson

Page 157

[1] shooting?

[2] **A.**    Do I remember what?

[3] **Q.**    Do you remember talking to the police four days after

[4] the shooting on February 8th in the hospital?

[5] **A.**    I don't even remember talking to them.  I just remember

[6] being there and being harassed by them.  That's all I

[7] remember.  That's all they kept -- like I'm -- my hands

[8] handcuffed to the building.  My leg handcuffed to the other

[9] joint, you know what I'm saying?  Till my girl paid my bail.

[10] They harassed me in the situation like that like.  I just

[11] wanted them out of my room.  They kept harassing me, like, you

[12] know, they kept harassing me.  I just wanted them out of my

[13] room so I just said anything.  Just go.

[14] **Q.**    Okay.  Three detectives came to visit you; is that

[15] right?

[16] **A.**    Yeah.  Three, four.  I don't know.  I was medicated.  I

[17] was high.

[18] **Q.**    You were high in the hospital?

[19] **A.**    I was high.  I was high.  Every time my girl came up I

[20] would go in the parking lot and smoke weed.

[21] **Q.**    I though you just said you were handcuffed to the bed?

[22] **A.**    No.  When she paid my bail.  After she paid my bail, I

[23] went out and smoke weed in the parking lot.  Everyday.

[24] **Q.**    While you were in intensive care in the hospital?

[25] **A.**    Yeah.  She rolled me out.  Rolled me out in the

Jaclyne Wilson

---

Page 158

[1] wheelchair, go right in the parking lot, smoke some weed.

[2] Seriously.  You think I'm playing.

[3] **Q.**    Okay.

[4]         **MS. FORCHETTI**:  Your Honor, I would ask

[5]     to mark this document as Commonwealth Exhibit 10.

[6]         **THE COURT**:  Go right ahead.

[7]         (Photo array marked Commonwealth Exhibit

[8]     C-10 for identification.)

[9]         **COURT CRIER**:  So marked C-10.

[10] BY MS. FORCHETTI:

[11] **Q.**    Mr. Talbert, you're being shown what's been marked as

[12] Commonwealth Exhibit 10.

[13]     Do you recognize that?

[14] **A.**    I recognize the person I circled up here, yes, up top.

[15] **Q.**    Right.  So that's who you circled?

[16] **A.**    Right here.

[17] **Q.**    Okay.  You signed next to who you circled, right?

[18] **A.**    Up here, yeah.

[19] **Q.**    And then you signed next to the other person who you

[20] circled; is that right?

[21] **A.**    The detective circled that.

[22] **Q.**    Okay.

[23] **A.**    I didn't circle that.  The detective circled that.

[24] **Q.**    Do you see your signature?

[25] **A.**    That's scribble scrabble.

Jaclyne Wilson

---

Page 159

[1] **Q.**    Scribble scrabble.

[2]     The same scribble scrabble that's on all six pages

[3] of you statement?

[4] **A.**    Yeah.  That's scribble scrabble.  That's scribble

[5] scrabble.  I don't see nothing else where it signed at up top.

[6] Scribble scrabble.

[7]         **MR. LORUSSO**:  Can the record reflect the

[8]     defendant is referring or the witness is referring

[9]     to the photograph at the top part as having been

[10]     circled by him and the photograph on the bottom row

[11]     has having been circled by the detective.

[12]         **THE COURT**:  I don't know that, sir.  I

[13]     can't see it from my vantage point.  But you'll be

[14]     afforded an opportunity to cross-examine him and if

[15]     that is, in fact, the case, we can point it out.

[16]         **MR. LORUSSO**:  Thank you.

[17] BY MS. FORCHETTI:

[18] **Q.**    All right.  So, Mr. Talbert, you're telling us that the

[19] fourth picture in the photo array you circled and signed,

[20] right?

[21] **A.**    I didn't sign anything.  I circled it.  I circled.  I

[22] didn't sign anything.  I put a circle around

[23] whoever this guy is right here.  I circled it.  That I ain't

[24] circle, the second circle and put scribble scrabble underneath

[25] it.

Jaclyne Wilson

---

Page 160

[1] **Q.**    Okay.  So the sixth picture of the photo array you

[2] didn't circle and that's not your signature; is that right?

[3] **A.**    No, it ain't.

[4] **Q.**    And the signature next to fourth picture, that's not

[5] yours either?

[6] **A.**    The circle or the signature?

[7] **Q.**    Is signature?

[8] **A.**    The signature is not mine.

[9] **Q.**    There's a signature next to both pictures.

[10] **A.**    This is scribble scrabble.  I don't sign my name like

[11] that.  I don't sign my name like that.  I got a high school

[12] diploma.  That's scribble scrabble.

[13] **Q.**    Now, you told us already that you were selling weed

[14] that day?

[15] **A.**    I'm a drug dealer.

[16] **Q.**    On February 4th, the day you were shoot, right?

[17] **A.**    Yeah.  I'm a drug dealer.

[18] **Q.**    You're a drug dealer.  You're a criminal.  You told us

[19] that, right?

[20] **A.**    Yeah.

[21] **Q.**    Okay.

[22] **A.**    So how can my word be valid on the stand?

[23] **Q.**    Okay.  You told Detective Acerenza that you walked down

[24] Stenton Avenue to the sneaker store at Stenton and Johnson; do

[25] you remember saying that?

Jaclyne Wilson

Page 161

[1] **A.** Say that again?

[2] **Q.** I walked down Stenton Avenue to the sneaker store at
[3] Stenton and Johnson.

[4] **A.** Honestly, I don't remember saying anything. I keep
[5] telling you I was medicated. I wanted them detectives out of
[6] my room.

[7] **Q.** Okay.

[8] **A.** They was bothering me. I was shot up. I'm shot up.
[9] They asking me all these questions. I'm just telling them
[10] anything to brush them off. Get out my room because they kept
[11] bothering me. So I don't remember anything.

[12] **Q.** Okay.

[13] **A.** If I said anything, whatever you have in these
[14] statements, I don't remember anything I said.

[15] **Q.** All right. Now, then you said, On my way to the
[16] sneaker store a young boy asked me if I had weed for sale.

[17]     Do you remember saying that?

[18] **A.** I don't remember saying that.

[19] **Q.** He had glasses on. I told time that I didn't sell weed
[20] no more.

[21]     Do you remember saying?

[22] **A.** I don't remember saying it.

[23] **Q.** Okay. I told him that I would sell it to him based on
[24] his strength. I sold him a bag of weed. From there I walked
[25] to the sneaker store and brought a phone and a shirt.

Jaclyne Wilson

Page 163

[1] **Q.** I reached in my pocket and took out a bag of weed to
[2] exchange it.

[3]     Do you remember saying that?

[4] **A.** I don't remember saying that.

[5] **Q.** He took the bag of weed and left. While I'm waiting
[6] for my phone to get programmed, the original guy with the
[7] glasses came in.

[8]     Now we're on page 2 of your statement. Do you
[9] remember saying that?

[10] **A.** No.

[11] **Q.** He said that someone who wants to buy a bag of weed.
[12] He said that someone else wants to buy a bag of weed. I said,
[13] Look, I told you --

[14] **A.** That sound like a made up story, doesn't it?

[15] **Q.** -- I told you I don't sell -- I told you before I don't
[16] sell weed. He said that someone across the street wants to
[17] buy weed.

[18]     Do you remember saying that?

[19] **A.** I don't remember saying that.

[20] **Q.** I told him that I would see who it is and decide if I
[21] would to sell it to him. I left my phone and stuff in the
[22] store and walked across the street.

[23]     Do you remember saying that?

[24] **A.** No, I don't.

[25] **Q.** I saw the same guy that I talked to about the exchange.

Jaclyne Wilson

Page 162

[1]     Do you remember saying that?

[2] **A.** I don't remember saying that.

[3] **Q.** Okay. Did you buy a phone and a shirt that day?

[4] **A.** Yeah, I brought a phone.

[5] **Q.** Okay. Did you buy a shirt that day?

[6] **A.** I think I did. I can't remember.

[7] **Q.** All right. While I was in the store, the guy that shot
[8] me came in.

[9]     Do you remember saying that?

[10] **A.** I don't remember saying nothing like that.

[11] **Q.** Okay.

[12] **A.** I remember buying a shirt and a phone though.

[13] **Q.** He told he that the bag of weed I sold the guy was too
[14] small.

[15]     Do you remember saying that?

[16] **A.** No, I don't remember saying that.

[17] **Q.** All right. I reached in my pocket about took out a bag
[18] of weed.

[19] **A.** That's funny because all my bags of weed are big, you
[20] know what I'm saying? Ain't none of my bags of weed small.

[21] **Q.** Okay. You sell heavy bags; is that --

[22] **A.** Seriously.

[23] **Q.** Is this funny to you, Mr. Talbert?

[24] **A.** I'm being -- you asked me a question and we holding a
[25] conversation.

Jaclyne Wilson

Page 164

[1] So when I walked over there I said, What's up? As soon as I
[2] said, What's up, he pulled out and shot me in the stomach with
[3] a gray gun.

[4]     Do you remember saying that?

[5] **A.** No, I don't.

[6] **Q.** Once he shot me, he shot me again and crumbled to the
[7] street.

[8]     Do you remember saying that?

[9] **A.** I don't even use the word "crumbled". How a person
[10] going to crumble to the street?

[11] **Q.** I could be misreading this detective's handwriting. It
[12] may have said crawled to the street. We'll have to ask
[13] Detective Acerenza.

[14]     He shot me again. Do you remember saying that?

[15] **A.** No, I don't.

[16] **Q.** It sounded like he was trying to shot me again.

[17] **A.** It sounded like he was trying to shot me again? That
[18] doesn't even make sense.

[19] **Q.** Do you remember saying that?

[20] **A.** No. It don't even make sense.

[21] **Q.** Okay. I was just laying there crawling in the street
[22] asking for people to help me.

[23] **A.** Wasn't even nobody around. How am I going to ask
[24] somebody to help me if nobody's around.

[25] **Q.** I remember someone with a gun out. I think it was an

Jaclyne Wilson

Page 165

[1] undercover cop.

[2] A.    I was seeing stars.  I don't remember nothing.

[3] Q.    There was a guard from the sneaker store and a Muslim
[4] person over me.  I thought I was going to die out there.  I
[5] don't remember getting in an ambulance.

[6]        Do you remember saying that?

[7] A.    I don't remember saying none of that.

[8] Q.    Then Detective Acerenza asked you, Can you describe the
[9] male that shot you?

[10]       Do you remember saying, Slim, light skin, short,
[11] skinny face, small head, khaki set of cargos, tan or beige, no
[12] facial hair, 19 to 20 years?  Do you remember saying that?

[13] A.    Not at all.

[14] Q.    And then the detective asked you, Have you ever seen
[15] him before?

[16]       And your answer was, No.

[17]       Do you remember saying that?

[18] A.    I don't remember saying that.

[19] Q.    On page 3 Detective Acerenza asked you, Can you
[20] describe the gun?

[21]       Do you remember him asking you that?

[22] A.    No, I don't.

[23] Q.    Your answer was, Gray.  About 6 to 8 inches.  It had
[24] thing on the back but I couldn't tell if it was a
[25] semiautomatic or revolver.

Jaclyne Wilson

Page 166

[1]        Do you remember saying that?

[2] A.    No, I don't.

[3] Q.    Then Detective Acerenza asked you, I showed you a photo
[4] array with eight photographs.  Did you see the person that
[5] shot you in the photo array?

[6] A.    Huh?  I ain't hear you.  Say that again?

[7] Q.    Can you pay attention please, Mr. Talbert?

[8] A.    I'm paying attention.

[9] Q.    I showed you a photo array with eight photographs.  Did
[10] see the person that shot you in that photo array?

[11] A.    Yes and I put -- I circled the top one, the top one
[12] right-hand corner here.

[13] Q.    Your answer was, Mr. Talbert --

[14] A.    It wasn't two people that shot me.  It's two circles
[15] around two different people.

[16] Q.    Mr. Talbert, why don't you take a look at page 3 and
[17] you'll see your response.  It's the third question, I'm sorry,
[18] the second question on the page.

[19]       I think the one on the bottom is the one that shot
[20] me.  Now that I think about it, his name is Johnnie.  I think
[21] he is the one that shot me.

[22] A.    I ain't even know his name.

[23] Q.    Do you see your response there?

[24] A.    I never knew his name.

[25] Q.    Okay.

Jaclyne Wilson

Page 167

[1] A.    I don't even know him.  Like, I don't even know him.

[2] Q.    Why did you circle a picture on top, Photograph No. 4?

[3] A.    Why did I circle the photo on top?

[4] Q.    Do you remember the detective asking you that at the
[5] time you took this interview?

[6] A.    I thought you were asking me that.

[7] Q.    I know you can't wait to tell the jury about how this
[8] isn't the guy that shot you but I'm asking you about this
[9] question.

[10] A.    I'm going -- I don't remember saying enon of this.

[11] Anything that you're saying, I don't remember.  I was in the
[12] hospital under medication.

[13] Q.    Mr. Talbert, there's no question pending.

[14]       Why did you circle a picture on top, No. 4?

[15]       Your answer was, I was scared.  I circled the one on
[16] the bottom first.

[17]       Do you remember saying that?

[18] A.    No, I don't.

[19] Q.    Then the detective asked you, Does the second
[20] photograph that you circled, No. 4, have anything to do with
[21] the shooting?

[22]       And your answer was, No.

[23]       Do you remember saying that?

[24] A.    I don't remember saying that.

[25] Q.    Then you were asked, Are you sure that the photo that

Jaclyne Wilson

Page 168

[1] you circled first, Photograph No. 6, is the person that shot
[2] you?

[3]        And your answer here on the bottom of page 3 is,
[4] Yes, I am sure.

[5]        Mr. Talbert, do you remember saying that?

[6] A.    No, I don't.

[7] Q.    Then you were asked, Do you know the male that you
[8] identified as shooting you?

[9]        Your answer was, I know him from the neighborhood.

[10]       Do you remember saying that?

[11] A.    No, I don't.

[12] Q.    Then he asked you, How long have you known him?

[13]       Your answer was, A few years.

[14]       Do you remember saying that?

[15] A.    No, I don't.

[16] Q.    Now we're on page 4 of your six-page statement.

[17]       And the detective asked you, Is there any reason
[18] that this male would want to shoot you?

[19]       And your answer was, He has ties to TI.  TI is a guy
[20] that I testified against about three or four years ago.  I
[21] ended up not testifying against him.

[22]       Do you remember saying that?

[23] A.    No, I don't.

[24] Q.    Okay.

[25] A.    I don't even know who TI is.  Who that?

Jaclyne Wilson

Page 169

[1] **Q.**   Then, Mr. Talbert, you were asked what was the nature
[2] of that incident?
[3]        And your answer was, He tried to run me over.  He
[4] got locked up for running me over but I didn't testify against
[5] him.  I got locked up then because I hit a woman.  He's
[6] probably being mad because of that whole situation.
[7]        Do you remember saying that?
[8] **A.**   Because I hit a woman?
[9] **Q.**   Hit or had.  Again, the handwriting is hard to
[10] decipher.
[11]           **MR. LORUSSO**:  Had a warrant.
[12]           **MS. FORCHETTI**:  I'm sorry.  You're right,
[13]      Mr. Lorusso.
[14] **BY MS. FORCHETTI**:
[15] **Q.**   Had a warrant.
[16] **A.**   No, I ain't say it.  I don't remember having a warrant.
[17] **Q.**   All right.  Then the detective asked you, Where and
[18] when did that incident occur?
[19]        And you answered, About four years ago at Stenton
[20] and Cliveden Street.
[21]        Do you remember saying that?
[22] **A.**   No.
[23] **Q.**   Can you sit up, please, Mr. Talbert?
[24]        Then you were asked, Why did you think your shooting
[25] had to do with that incident?

Jaclyne Wilson

Page 170

[1]        And your answer was, Because today my cousin Rachel
[2] told me that her friend Janae said that TI was calling from
[3] jail letting people know that I was home.  He maybe trying to
[4] have me set up.
[5]        Do you remember saying that?
[6] **A.**   No, I don't.
[7] **Q.**   Then you were asked, Have you seen the male you
[8] identified as Johnnie with TI in the past?
[9]        And your answer was, Yes.
[10]        Do you remember saying that?
[11] **A.**   No, I don't.
[12] **Q.**   Then you were asked, Do you know the other male with
[13] the glasses?
[14]        And your answer was, He looked kind of familiar,
[15] like someone from the neighborhood.  I don't know his name.
[16]        Do you remember saying that?
[17] **A.**   No, I don't.
[18] **Q.**   Now we're on page 5 of your statement, Mr. Talbert.
[19]        You were asked, where was the male with the glasses
[20] when you got shot?
[21]        Your answer was, He was about 15 to 20 feet from the
[22] sneaker store standing there.
[23]        Do you remember saying that?
[24] **A.**   No, I don't.
[25] **Q.**   You were asked, Can you describe the male with the

Jaclyne Wilson

Page 171

[1] glasses?
[2]        And you said, Skinny, light-skinned, taller than the
[3] other guy, low cut, 19 to 20 years, 125 to 130 pounds, a
[4] little mustache.  I can't remember what he was wearing.
[5]        Do you remember saying that?
[6] **A.**   No.
[7] **Q.**   Then the detective asked you, Did you see where the
[8] shooter and the male with the glasses went after the shooting?
[9]        And your answer was, No.  I was on the ground.  I
[10] keep having flashbacks though.
[11]        Do you remember saying that?
[12] **A.**   No, I don't.
[13] **Q.**   Then the detective asked you, Is there anything else
[14] that you can tell me about Johnnie?
[15]        And your answer was, I think he lives around Duval
[16] Street or Johnson Street.  His nickname the Mooch or Johnnie.
[17] **A.**   I don't even know him.
[18] **Q.**   Do you remember saying that?
[19] **A.**   No.
[20] **Q.**   Then you were asked, Were there any descriptive
[21] markings on Johnnie's clothing?
[22]        And your answer was, Beige or white khaki suit.
[23]        Do you remember saying that?
[24] **A.**   No.
[25] **Q.**   Then the detective asked you, Where are the items that

Jaclyne Wilson

Page 172

[1] you brought from the sneaker store?
[2]        Your answer was, They are still in the store.  I
[3] used my Muslim name for the phone, Kalil Zekoe.
[4] **A.**   That's not even my Muslim name.
[5] **Q.**   Do you remember saying that?
[6] **A.**   No.
[7] **Q.**   Then the detective asked you, Was anyone else in the
[8] area when you were shot?
[9]        Your Honor was, Not that I remember.
[10]        Do you remember saying that?
[11] **A.**   Nope.
[12] **Q.**   Finally on page 6, Detective Acerenza asked you, Is
[13] there anything else that you can add?
[14]        And your answer was, No.
[15]        Do you remember saying that?
[16] **A.**   No.  I don't know.  No.
[17] **Q.**   The last question of the interview, Mr. Talbert, was,
[18] Can you tell me how you feel at this time?
[19]        And your answer was, I'm afraid that I'm not going
[20] to make it.
[21] **A.**   I never said that because I already knew I was going to
[22] make it.
[23] **Q.**   Do you remember saying that?
[24] **A.**   No.
[25] **Q.**   Do you remember anything about this interview?

Jaclyne Wilson

[1] A.    No, I don't.  I remember being badgered and harassed by
[2] detectives over and over again about me having weed in my
[3] pocket.
[4] Q.    Okay.  Did you sign this interview?
[5] A.    That's scribble scrabble.  That's not mines.  The
[6] detectives is known to make up stories.
[7] Q.    Okay.  All right.  Now, when did you -- got out of the
[8] hospital on February 22nd to be exact; is that right?
[9] A.    Say that again?
[10] Q.    You got out of the hospital February 22nd of this year,
[11] 2011, correct?
[12] A.    I don't remember.  I can't remember the day.  I don't
[13] know the day.  I just know I left.
[14] Q.    Okay.  You left the hospital, right?
[15] A.    Yes.
[16] Q.    You still had an open wound in our abdomen?
[17] A.    Yes.
[18] Q.    You had to have a home health care aid help you change
[19] the dressings, correct?
[20] A.    Yes but we ended up going through something.  Me and
[21] her start arguing so I ended up taking care of it myself so,
[22] you know.
[23] Q.    You still had on open wound at the time you left the
[24] hospital, right?
[25] A.    Yeah but it been healed up.  I'm about to get it

Jaclyne Wilson

[1] reversed, you know, go the whole process.  It ain't nothing.
[2] Q.    You testified at the preliminary hearing in April about
[3] two months after you got out of the hospital.
[4]     Do you remember that?
[5] A.    You said I testified what?
[6] Q.    At a preliminary hearing in April?
[7] A.    See I'm bipolar, schizophrenic.  Some things I just
[8] can't remember and that's documented.  You can check my
[9] medical records since the age of 12.  I'm bipolar,
[10] schizophrenic.  Some things that I may say, some things I may
[11] do, I don't even mean.  Some things I may forget.  I may say
[12] something right now and tomorrow I'll forget it or I don't
[13] remember even saying it.  I'm bipolar, schizophrenic.  It's
[14] documented on paper.
[15] Q.    My question to you, Mr. Talbert, was, Do you remember
[16] coming to a preliminary hearing in April of this year, a few
[17] months ago?
[18] A.    I don't remember.
[19] Q.    Do you remember me being there?
[20] A.    I seen you a couple times.
[21] Q.    Right.  You've met me before this day, correct?
[22] A.    I seen you on the streets.
[23] Q.    You've met me before this day, correct?
[24] A.    In the streets, yeah.
[25] Q.    Do you remember meeting me for the first time at the

Jaclyne Wilson

[1] preliminary hearing?
[2] A.    I can't remember your face, no.
[3] Q.    Okay.  Do you remember waiting for me in my office when
[4] I got back from court the one day?
[5] A.    I was outside, yeah.
[6] Q.    Do you remember talking to me then?
[7] A.    Yeah.  I was asking you for some money.
[8] Q.    Right.  You wanted to be relocated, correct?
[9] A.    I wanted some money.
[10] Q.    You didn't want to go back to the same neighborhood
[11] where you were living, right?
[12] A.    I been living there.  I was staying there.  You ain't
[13] do nothing to help me.  So what?  You ain't give me no money.
[14] You ain't put me nowhere.  I stayed in the same neighborhood
[15] after I got shot.  So what was the point of even coming to you
[16] for help.
[17] Q.    Okay.  You came to my office for help.
[18]     Do you remember that?
[19] A.    But do you remember you helping me?  No.
[20] Q.    Do you remember talking to Leland Kent?
[21] A.    Did he help me?  No.
[22] Q.    Do you remember talking to Leland Kent, yes or no?
[23] A.    I talked to some guy.  I don't remember his name.
[24] Q.    Do you remember talking to Leland?
[25] A.    I remember talking to a guy.  I don't know his name.

Jaclyne Wilson

[1] Q.    Okay.  And he was trying to help you find somewhere to
[2] live, right?
[3] A.    No, he wasn't.
[4] Q.    That's why you were talking to him, so you could live
[5] somewhere else, right?
[6] A.    I was talking about getting some money because that's
[7] all I was really worried about because I stay in the
[8] neighborhood.  I was in the neighborhood after I got shot.
[9] They see me on Stenton Avenue.  They see me everywhere in the
[10] hood.  I ain't trying to hide.
[11] Q.    Do you remember testifying on April 26th of this year,
[12] 2011, right across the hall, Courtroom 803?
[13] A.    I can't remember testifying.  No, I can't.
[14] Q.    Okay.
[15] A.    I be taking medication a lot.  I'm on certain
[16] medication.  My mind be elsewhere.  I tell you I'm bipolar,
[17] schizophrenic.  I don't remember certain things.  I know I
[18] came down here for my cases.  I don't remember coming down
[19] here testifying against nobody, no.
[20] Q.    Okay.
[21]     MS. FORCHETTI:  Your Honor, I would ask
[22] the mark these notes of testimony as Commonwealth
[23] Exhibit 11.
[24]     THE COURT:  They may be marked.
[25]

Jaclyne Wilson

Page 177

[1]         (Notes of testimony marked Exhibit C-11
[2]    for identification.)
[3]         **COURT CRIER**: Your Honor, so marked C-11.
[4] **BY MS. FORCHETTI**:
[5] **Q.**    Okay. Now, back in April of this year, 2011, it was me
[6] as the district attorney and Mr. Fiore as the defense
[7] attorney.
[8]         Do you remember that?
[9] **A.**    No.
[10] **Q.**    Okay. Do you remember being sworn to testify to tell
[11] the truth on that day?
[12] **A.**    No.
[13]         **MS. FORCHETTI**: Counsel, on page 5.
[14]         **MR. LORUSSO**: Thank you.
[15] BY MS. FORCHETTI.
[16] **Q.**    Do you remember me asking you, Mr. Talbert, after
[17] directing your attention to February 4th of 2011, I asked you
[18] if you remember that day.
[19]         And your answer was, Yeah.
[20]         Do you remember that?
[21] **A.**    No.
[22] **Q.**    And then I asked you, At about two o'clock that
[23] afternoon were you in the area of 1300 Johnson Street here in
[24] Philadelphia?
[25]         And your answer was, Yes.
                Jaclyne Wilson

Page 178

[1]         Do you remember that?
[2] **A.**    No.
[3] **Q.**    Then I asked you, And what were you doing at that
[4] location on that day?
[5]         And your answer was, Well, I got off the bus and I
[6] was walking down Stenton Avenue when some young boy asked me
[7] if I has some weed on me, you know, marijuana, whatever. So I
[8] sold him a bag of weed. I went to the sneaker store on
[9] Stenton and Johnson.
[10]         Do you remember saying that?
[11] **A.**    No. I don't even call it weed.
[12] **Q.**    Okay. Then -- now we're on page 6 -- I next asked you,
[13] so, Mr. Talbert, you went into the sneaker store; is that
[14] right?
[15]         And your answer was, Yes.
[16]         Do you remember saying that?
[17] **A.**    No.
[18] **Q.**    Then I asked you, What happened while you were in
[19] there?
[20]         And on page 7 your answer was, I was buying a cell
[21] phone or whatever. I was waiting for my phone, you know, to
[22] get charged up or whatever. The guy over there came in the
[23] store talking about the bag of weed that I sold to the other
[24] guy that he was with. It was small. That it wasn't big
[25] enough. So what I did was give him another bag of weed and
                Jaclyne Wilson

Page 179

[1] exchanged it, you know what I'm saying, for another one. So
[2] we left out the store so.
[3]         And I interrupted you at that point and I said, That
[4] was this defendant; is that right?
[5] **A.**    No.
[6] **Q.**    And your answer was, Yes.
[7]         And I let the Court know, Indicating the defendant
[8] at the bar out of the court for the record.
[9]         Do you remember that?
[10] **A.**    No. You pointing at the wrong person because I ain't
[11] point at him.
[12] **Q.**    Okay. Then I asked you to continue.
[13]         And you said, So I'm still waiting for my cell phone
[14] to get charged up. The guy that I originally sold the first
[15] bag of weed to, he came from across the street by the
[16] apartment, wants something, some more weed.
[17]         Now on page 8 you said, I got out of the store and
[18] go across the street. The dude was over here. He was over
[19] there. I'm like, What's up. When I say, What's up, he pulled
[20] out, started shooting me.
[21]         Then I let the Court know again you were indicating
[22] the defendant, Johnnie Simmons, at the bar of the court for
[23] the record.
[24]         Do you remember that?
[25] **A.**    No. You keep pointing to somebody. I don't even know
                Jaclyne Wilson

Page 180

[1] him over there.
[2] **Q.**    Okay.
[3] **A.**    You pointing at the attorney or the person?
[4] **Q.**    When you testified in April --
[5] **A.**    Who you pointing to? You pointing over --
[6] **Q.**    I'm sorry. Mr. Talbert, I'm asking the questions.
[7]         In April when you came into this courtroom across
[8] the hall, Courtroom 803, you came into this courtroom, you
[9] swore to tell truth and you pointed out Johnnie Simmons as
[10] person who shot you. Not once but twice so far. We're only
[11] on page 8 on the notes of testimony.
[12] **A.**    I don't remember pointing to nobody.
[13] **Q.**    Okay. I asked you, How many times were you shot,
[14] Mr. Talbert?
[15]         And you said, About five, seven times.
[16]         Do you remember that?
[17] **A.**    Unh-unh.
[18] **Q.**    Okay. Then I asked you, What part of your body were
[19] you shot?
[20]         And you said, My stomach, my side, my back.
[21]         Do you remember that?
[22] **A.**    Unh-unh.
[23] **Q.**    Okay.
[24] **A.**    I wasn't shot in my back.
[25] **Q.**    I asked you, How close was the defendant to you when he
                Jaclyne Wilson

Page 181

[1] shot you?
[2]     Your answer was, Close.
[3]     Do you remember saying that?
[4] **A.** No, I don't.
[5] **Q.** Okay. So then the Court, the judge, not this judge but
[6] another judge asked you, In terms of distance?
[7]     And your answer was, Me and this lady was at.
[8]     That's what you said. Do you remember saying that?
[9] **A.** No, I don't.
[10] **Q.** And the judge asked you, The stenographer?
[11]     And your answer was, Yeah.
[12]     So the judge said, Approximately, two to three.
[13]     And your answer was, About 3 feet.
[14]     We're on page 9 now. And the Court said,
[15] Approximately, 3 feet.
[16]     Do you remember that?
[17] **A.** No, I don't.
[18] **Q.** Okay. Then I asked you, Did the defendant say anything
[19] to you while he was shooting at you?
[20]     And your answer was, No. Nope.
[21]     Do you remember that?
[22] **A.** I don't remember saying nothing.
[23] **Q.** Okay. Then I asked you, Did you remain standing for
[24] all five shots?
[25]     And your answer was, No. The first two was -- the
           Jaclyne Wilson

Page 182

[1] first one was in my stomach. Took my air out, you know what
[2] I'm saying? So I wasn't able to defend myself. So it kind of
[3] took my air out and I fell and he kept shooting.
[4]     Do you remember saying that?
[5] **A.** No.
[6] **Q.** You fell to the ground; is that right?
[7]     And you said, Yes.
[8] **A.** Say that again? Did I fall to the ground?
[9] **Q.** That's what I asked you and you said, Yes.
[10]     Do you remember that?
[11] **A.** I don't remember having this discussion.
[12] **Q.** Okay. Luckily for you there was a court reporter there
[13] that took down all your words that day.
[14]     Then you were asked , When you fell to the ground,
[15] were you seated on the ground or how was your body positioned?
[16]     And you told the Court, I was like lying on my side
[17] holding my stomach in like I was watching a movie and stuff.
[18] Like I was losing a lot of blood, you know? I was trying to
[19] hold my body but a lot of blood was leaking. Then I felt the
[20] blood come out of my mouth. Then I passed out and tried to
[21] stay conscious when the ambulance came.
[22]     Do you remember saying out.
[23] **A.** I don't remember passing out.
[24] **Q.** Okay. Then I asked you, on page 10, And while you were
[25] on the ground, did the defendant continue to shoot you?
           Jaclyne Wilson

Page 183

[1]     And your answer was, Yeah.
[2] **A.** I was on the ground. I ain't get shot no more.
[3] **Q.** Okay. And the Court said, I'm sorry. I didn't hear.
[4] And so you repeated again, Yes.
[5]     I asked you, Did you have a weapon on you that day?
[6]     And your answer was, No.
[7]     Then I asked you, After the defendant shot you, did
[8] he say anything to you before leaving?
[9]     And you said, No.
[10]     Do you remember that?
[11] **A.** No, I don't.
[12] **Q.** I asked you, Was there anyone else with him?
[13]     And you said, Originally, that other young boy was
[14] there but I don't even know -- but I don't even though who he
[15] was. I think that's supposed to me know. I know him but I
[16] don't know the other guy.
[17]     Do you remember saying that?
[18] **A.** No, I don't.
[19] **Q.** Now, I asked you, You know this defendant?
[20]     And your answer was, Yeah, I know him.
[21]     Do you remember saying that?
[22] **A.** I don't know him.
[23] **Q.** Okay. And I asked you, How do you know him?
[24]     And you said, Before I got locked up, he was like
[25] new to the area, coming outside, you know? Little young boy
           Jaclyne Wilson

Page 184

[1] coming out, you know what I mean? He was like 16, 17. I
[2] don't know how old he is. He's a young boy. We was already
[3] out there, you know what I'm saying?
[4]     Do you remember saying that?
[5] **A.** No, I don't.
[6] **Q.** Okay. On page 11 I said, You know him from the
[7] neighborhood?
[8]     And your answer was, Yeah.
[9]     Do you remember saying that?
[10] **A.** No, I don't.
[11] **Q.** And I asked you, And for how long have you known him?
[12]     And you said, I'd say a good year probably.
[13]     Do you remember saying that?
[14] **A.** No, I don't.
[15] **Q.** Okay. And I asked you, About a year?
[16]     And you said, Yeah, about a year.
[17]     Do you remember saying that?
[18] **A.** No, I don't.
[19] **Q.** Then I asked you, How certain are you that this person
[20] in court is the same person that shot you?
[21]     And your answer was, Quite sure. A hundred and nine
[22] percent sure. I don't forget faces.
[23]     Do you remember saying that?
[24] **A.** No. I remember seeing that top person in the corner
[25] shot me.
           Jaclyne Wilson

Page 185

[1] **Q.**   Okay.  Then the defense attorney said, I'm sorry.  I
[2] didn't hear what he said.
[3]        And I repeated your answer for the Court, A hundred
[4] and nine percent, I believe he said.
[5]        And we continued.  And I asked you, Do you know of
[6] any reason why this defendant would want to shoot you?
[7]        And your answer was, I don't even know honestly.
[8]        Do you remember saying that?
[9] **A.**   No, I don't remember saying that.
[10] **Q.**   Okay.  Then I asked you, Mr. Talbert, you said you were
[11] waiting for an ambulance to arrive.  Did you go to the
[12] hospital that day?
[13]        And your answer was, I went to Albert Einstein.
[14]        Do you remember saying that?
[15] **A.**   No.
[16] **Q.**   And I asked you, What did they do for you at the
[17] hospital?
[18]        And your answer was, They performed surgery.  They
[19] brought me back to life, you know?  I couldn't even breath.
[20] They had me on a breathing machine.
[21]        Do you remember saying that?
[22] **A.**   I don't remember saying that.
[23] **Q.**   All right.  We're on page 12 now.
[24]        And I asked you, How long were you in the hospital?
[25]        And you said, February 4th to about -- I'd say about

Jaclyne Wilson

Page 186

[1] three weeks.
[2]        Do you remember saying that?
[3] **A.**   No, I don't.
[4] **Q.**   And I asked you, And how are you feeling today
[5] physically?
[6]        And your answer was, I got a colonoscopy bag.  I got
[7] blockage in my stomach where sometimes it's hard to go to the
[8] bathroom, you know?  Chest pains a lot.
[9]        Do you remember saying that?
[10] **A.**   I don't get chest pains.
[11] **Q.**   Okay.  Then I finish my direct examination and the
[12] defense attorney cross-examines you.  And he asks you
[13] questions.
[14]        Do you remember that part of the testimony?
[15] **A.**   No, I don't.  I don't even remember none of this.
[16] **Q.**   Okay.  On page 12 Mr. Fiore started his
[17] cross-examination.  And he said to you, Good afternoon,
[18] Mr. Talbert.
[19]        You said, Yes.
[20]        And the defense attorney said, Mr. Talbert, the
[21] assistant district attorney asked you if this was February
[22] 4th, 2011, correct?
[23]        And your answer was, Yes.
[24]        Then he asked you, Do you recall what time of day it
[25] was?

Jaclyne Wilson

Page 187

[1]        And you said, No.  Around two o'clock sometime.
[2]        Then he asked you, So it's still light out, correct?
[3]        You said, Yes.
[4]        Then Mr. Fiore asked you, Now, you said you had
[5] known the person you identified as my client for about a year,
[6] correct?
[7]        And your answer was, Right.
[8]        Do you remember saying that?
[9] **A.**   No, I don't remember saying it.
[10] **Q.**   Okay.  On page 13 Mr. Fiore asked you, Had you had any
[11] other conversations or any other interactions with him in that
[12] year?
[13]        And your answer was, Yeah.
[14]        Do you remember that?
[15] **A.**   I don't remember that.
[16] **Q.**   Then Mr. Fiore asked you, And at any other time was
[17] there any problems between you and my client prior to that
[18] day?
[19]        And your answer was, The only time -- I don't recall
[20] a problem.  The boy said I sold him a bag of weed and he
[21] wanted his money back.  That was the only problem I ever
[22] recall that we had.
[23]        Do you remember saying that?
[24] **A.**   I never even met young boy before.
[25] **Q.**   Okay.  Then the defense attorney says, Now, when you

Jaclyne Wilson

Page 188

[1] say that, are you referring to that incident the same day or a
[2] prior incident about the light bag?  Do you understand my
[3] question?
[4]        And you said, Say that again?
[5]        So then Mr. Fiore repeats his question, Earlier you
[6] testified there was an issue about a possible light bag in
[7] that it was exchanged.  Is that what you were talking about or
[8] were you talking about another prior incident before February
[9] the 4th?
[10]        And then you asked him, You talking about the
[11] question she just asked me?
[12]        And the Court interrupts and says, Let me ask the
[13] question.  You just said that the only problem you ever had
[14] with him was a small bag.  Is it that day or another time?
[15]        And you asked the judge, Are you talking about when
[16] he wanted his money back?
[17]        And the Court said, Yes.
[18]        And your answer was, That was before the incident.
[19]        And the Court says, So that was another time.
[20]        So Mr. Fiore resumes his cross-examination on page
[21] 14 and he asks you, So the date of the incident, it was some
[22] other guy that a bag of weed was sold to, correct?
[23]        And your answer was, Yes.
[24]        Do you remember that?
[25] **A.**   No, I don't.

Jaclyne Wilson

Page 189

[1] **Q.**  And he asked you, When you were in -- is it Philly

[2] Locker Room is the name of the store you were in?

[3]  And you said, I don't recall the name of the store.

[4]  So Mr. Fiore asked you, You were in a store that

[5] sells some kind of sneakers?

[6]  Your answer was, Yes.

[7]  And then Mr. Fiore asked you, And was it my client

[8] who came in and exchanged the bag?

[9]  And your answer was, Yes.

[10]  Do you remember saying that?

[11] **A.**  I don't remember.

[12] **Q.**  Then he asked you, What did he hand the bag of

[13] marijuana to you and you just handed him another one?

[14]  And your answer was, Yes.

[15]  Do you remember that?

[16] **A.**  No, I don't.

[17] **Q.**  Now on page 15 Mr. Fiore asked you, How long after that

[18] did the shooting incident happen?

[19]  And your answer was, Maybe ten minutes.  Homey came

[20] in the store.  His homey basically lured me out the store to

[21] outside, you know, and told me somebody wanted some weed

[22] across the street.  So when I seen him across the street, I

[23] said, What's up?  Like I just sold something, what's up.

[24]  And Mr. Fiore said, Let me stop you there.  You said

[25] he was across the street.  Do you walk over across the street

Jaclyne Wilson

Page 190

[1] to him?

[2]  And your answer was, Yes.

[3]  Do you remember that?

[4] **A.**  No.

[5] **Q.**  So now you are face to face with him, correct?

[6]  And your answer was, Yes.

[7]  Do you remember that?

[8] **A.**  No.

[9] **Q.**  And did -- was there any exchange at that point for

[10] another bag of marijuana?

[11]  And your answer was, No.

[12]  Do you remember that?

[13]  **THE COURT**:  You have to answer, sir.

[14]  **THE WITNESS**:  No, I don't remember.  I

[15]  don't remember nothing.

[16]

[17] **BY MS. FORCHETTI**:

[18] **Q.**  You don't remember a single word of your sworn

[19] testimony; is that right?

[20] **A.**  No, I don't.  I don't.

[21] **Q.**  Okay.

[22] **A.**  I told you.  I'm bipolar, schizophrenic.

[23] **Q.**  All right.  Mr. Fiore says, So you asked him -- you

[24] said, What's up, because I just exchanged the bag for you,

[25] correct?

Jaclyne Wilson

Page 191

[1]  And you said, Say that again?

[2]  Mr. Fiore said, At that point you were wondering why

[3] he called you out across the street, correct?

[4]  And you said, Yeah.

[5]  So then Mr. Fiore asks you, Did you have a

[6] conversation with him about that?

[7]  And your answer was, There was no more conversation.

[8]  Do you remember that?

[9] **A.**  Unh-unh.

[10] **Q.**  Okay.  So you walked across the street -- we're on page

[11] 16 now -- and I believe you said, you said to him, What's up?

[12] I exchanged bags.

[13]  Your answer was, I said, What's up.  That's all I

[14] said.

[15]  Do you remember that?

[16] **A.**  No.

[17] **Q.**  Okay.  And at that point is when you saw the gun?

[18]  And your answer was, He pulled out and shot me.

[19]  Do you remember saying that?

[20] **A.**  I never see no gun.

[21] **Q.**  Okay.  And the counsel asked you, Do you know where the

[22] gun was taken from out?

[23]  And your anxious was, From the waist.

[24]  And he asked you, Waistband?

[25]  And you said, Yeah.

Jaclyne Wilson

Page 192

[1]  Do you remember saying that?

[2] **A.**  No.

[3] **Q.**  Okay.  You were asked, Can you describe the weapon?

[4]  And your answer was, I think it was silver.

[5]  Do you remember saying that?

[6] **A.**  No.

[7] **Q.**  Then he asked you, You're not a hundred percent sure

[8] though?

[9]  Your answer was, It was silver.

[10]  He asked you again, It was silver?

[11]  You said, Yes.

[12]  Do you remember saying that?

[13] **A.**  No.

[14] **Q.**  All right.  Then you were asked, Do you know if it was

[15] an automatic or revolver?

[16]  Do you remember him saying that?

[17] **A.**  No.

[18] **Q.**  All right.  He said that and you said, I don't know.  I

[19] just know I got shot several times.  I can't -- I don't think

[20] it was a revolver though.

[21]  Then he asked you, After you saw the gun, did you

[22] turn around and start to run?

[23]  Your answer was -- open your eyes please,

[24] Mr. Talbert.

[25]  Your answer was, I tried to but I was out of breath.

Jaclyne Wilson

Page 193

[1] I couldn't go nowhere.

[2]       We're on page 17 now.  Do you remember saying that?

[3] **A.**   No, I don't.

[4] **Q.**   Then you were asked, The first shot you said hit you

[5] in the stomach, correct?

[6]       Your answer was, Yeah.

[7]       Do you remember saying that?

[8] **A.**   No, I don't.

[9] **Q.**   Then you were asked, Did you actually see the gun being

[10] fired?

[11]       Your answer was, Yeah.

[12]       Then he asked, And where in your stomach did it hit

[13] you?

[14]       Your answer was, Right here.

[15]       And at that point, Mr. Talbert, do you remember

[16] pulling your shirt up and showing the Judge your open wound?

[17] **A.**   No, I don't.

[18] **Q.**   Do you remember doing that?

[19] **A.**   No.

[20] **Q.**   Okay.  And the Court says, And for the record -- and

[21] the defense attorney asks, May I approach just a little bit?

[22] And the Court says, Yes.

[23]       And the defense attorney asks you, Is it above or

[24] below your belly button?

[25]       And your answer was, My belly button is right here

Jaclyne Wilson

Page 194

[1] over on the side.

[2]       And I described what you showed the Court,

[3] Indicating, for the record, an open wound a few inches above

[4] the belly button, right in the center of the abdomen.

[5]       And the defense attorney said, That's fine.

[6]       Do you remember doing that?

[7] **A.**   No, I don't.

[8] **Q.**   Okay.  And the defense attorney asks you, You said you

[9] were shot other times; is that correct?

[10]       And your answer was, Yeah.

[11]       Do you remember saying that?

[12] **A.**   No, I don't.

[13] **Q.**   All right.  We're on page 18 now.  You were asked,

[14] After you passed out?

[15]       And your answer was, I didn't pass out just yet.  I

[16] was still on the ground.

[17]       Do you remember saying that?

[18] **A.**   No, I don't.

[19] **Q.**   You were asked, How many times were you shot?

[20]       And you said, The doctors don't even know how many

[21] times because the way I was shot.  Some looked like they were

[22] in and out.  I was grazed.  I was grazed up and shot.

[23]       And he says, Well, unfortunately, I'm going to have

[24] to go through them with you.  Where were you grazed at?

[25]       And you said, On my back, across my spine, along my

Jaclyne Wilson

Page 195

[1] back where it could have killed me.  If it was a little bit

[2] closer, it would have killed me.

[3]       Do you remember say that?

[4] **A.**   No.

[5] **Q.**   Okay.  You were asked, And were you shot in your back

[6] because you were on the ground on your stomach or because you

[7] had turned around?

[8]       And your answer was, I guess when I tried to turn

[9] around.

[10]       Do you remember that?

[11] **A.**   No, I don't.

[12] **Q.**   Okay.  And he asked you, At that point you tried to

[13] turn around and run?

[14]       And your answer was, Yeah.

[15]       So the only time you could actually see the gun

[16] fired was the first time when you were shot, correct?

[17]       And your answer was, When he shot me in my stomach.

[18]       Do you remember that?

[19] **A.**   No, I don't.  I don't even remember seeing the gun.

[20] **Q.**   Okay.  Besides the grazes on your back, was there

[21] anywhere else you were potentially grazed or shot?

[22]       Your answer was, Shot on my side.

[23]       We're on page 19 now.  And the defense attorney

[24] says, For the record, there's a scar on his left side.

[25] There's also a scar that looks like he's showing me on the

Jaclyne Wilson

Page 196

[1] right side, Judge.

[2]       Do you remember that?  Do you remember lifting up

[3] your shirt again?

[4] **A.**   No, I don't.

[5] **Q.**   Okay.  So then the defense attorney asks you, At some

[6] point do you lose consciousness?

[7]       And you said, Yeah.

[8]       Do you remember that?

[9] **A.**   No.

[10] **Q.**   Then the defense attorney asked you, At any point did

[11] the police bring anyone around to you to identify as a

[12] potential shooter?

[13]       And you said, Yeah, when I was in the hospital.

[14]       And he asked you, Was that my client?

[15]       And you said, Yes.

[16]       Do you remember that?

[17] **A.**   No.

[18] **Q.**   He asked you, At some point did you identify him that

[19] day as the person that shot you?

[20]       And your answer was, Yes.

[21]       Do you remember that?

[22] **A.**   No.

[23] **Q.**   He asked you, At some point did they bring somebody to

[24] you to identify?

[25]       And you said, No.

Jaclyne Wilson

Page 197

[1]     The guy seemed taller?

[2]     You asked, Seem taller?

[3]     And the defense attorney asked, Do you recall making
[4] a statement -- do you recall them bringing to you and saying
[5] no, that's not the guy, the guy seemed taller?

[6]     And then you asked on page 20, What do you mean
[7] bring them to me?

[8]     And he asked you again, Was there anyone they tried
[9] to bring to you to identify?

[10]    And you said, No. That's not the guy. And you
[11] said, No. They gave me like eight different photographs, you
[12] know what I'm saying, on a piece of paper with faces on there
[13] and I picked the person.

[14]    Do you remember saying that?

[15] **A.**  Yeah. I picked the top right-hand corner.

[16] **Q.**  You were asked, And then they brought somebody
[17] physically to you?

[18]    And you said, No. What do you mean physically?

[19]    And you were asked, When you were at the hospital
[20] they never brought -- and then you said, You talking about
[21] guys? No.

[22]    Mr. Fiore asked you, It was only through the photo?

[23]    And your answer was, Through the photo.

[24]    Then he said, So at no point did you ever make an
[25] identification or nonidentification of any one live person?

                    Jaclyne Wilson

Page 198

[1]     And your answer was, Not live, no.

[2]     Do you remember saying that?

[3] **A.**  No.

[4] **Q.**  Then you were asked, You said when you went across the
[5] street the person that asked you to come out of the store was
[6] no longer there; is that fair to say?

[7]     And your answer was, No. You talking about the
[8] person who lured me outside?

[9]     And he says, Correct.

[10]    On page 21 you said, He was standing outside the
[11] sneaker store when I walked past him to go to the other side
[12] of the street in the alleyway by the apartments.

[13]    Do you remember that?

[14] **A.**  No, I don't.

[15] **Q.**  He asked you, Were you there by yourself or were you
[16] with any friends?

[17]    And your answer was, I was coming from my pop's
[18] crib, walked down the street. I was down there by myself.

[19]    Do you remember saying that?

[20] **A.**  No.

[21] **Q.**  Then you were asked, Do you know if there were other
[22] people out there while the shooting occurred that may have
[23] been witnesses?

[24]    And your answer was, There were people out there. I
[25] know there were people out there but, you know, I don't know.

                    Jaclyne Wilson

Page 199

[1] It seemed like it wasn't nobody to come to my aid.

[2]     Do you remember saying that?

[3] **A.**  No, I don't.

[4] **Q.**  Then he asked you, When you initially -- when the
[5] police initially asked you who shot you, were you able to
[6] provide a name for them or did you say you just knew the
[7] person from the neighborhood?

[8]     And your answer was, I just knew the person. I
[9] never know his name.

[10]    And you were asked, You never knew his name?

[11]    And your answer was, He's too young.

[12]    Then you were asked, Did you give a description of
[13] the person who shot you on that day; do you recall?

[14]    And your answer was, Yeah.

[15]    Do you remember that?

[16] **A.**  No.

[17] **Q.**  And you were asked, Do you remember what the
[18] description was? If you don't, that's okay.

[19]    And your answer was, Light-skinned, braids.

[20]    Do you remember saying that?

[21] **A.**  No.

[22] **Q.**  Okay. That was the end of your testimony on April 26th
[23] of 2011 that ended the preliminary hearing.

[24]    You don't remember a single word of it?

[25] **A.**  No, I don't.

                    Jaclyne Wilson

Page 200

[1] **Q.**  You don't remember being there?

[2] **A.**  Only court appearances I remember is the situations I'm
[3] going through.

[4] **Q.**  Okay.

[5] **A.**  That's the only thing I'm really worried about. I
[6] never even paid this no mind. Like, I may forget about today
[7] tomorrow.

[8] **Q.**  Okay. So you don't remember Judge Charles Hayden being
[9] the judge at the preliminary hearing?

[10] **A.**  I don't even -- I didn't keep records of these judges I
[11] could care less.

[12] **Q.**  Okay. Do you remember sitting in front of a court
[13] reporter the same way you're sitting now?

[14] **A.**  No, I don't.

[15] **Q.**  Okay. Did you write a letter to the defendant in this
[16] case?

[17] **A.**  Excuse me?

[18] **Q.**  Did you write a letter to the defendant?

[19] **A.**  You said, Did I write a letter to the defendant?

[20] **Q.**  Yes.

[21] **A.**  I don't remember.

[22]    **MS. FORCHETTI**: Your Honor, I would ask
[23] to have this marked as Commonwealth Exhibit 12.

[24]    **THE COURT**: It may be marked.

[25]

                    Jaclyne Wilson

Page 201

[1]         (Letter marked Exhibit C-12 for
[2]     identification.)
[3]         COURT CRIER: So marked C-12, Your Honor.
[4]         MS. FORCHETTI: For the record, it's
[5]     three pages, Your Honor.
[6] BY MS. FORCHETTI:
[7] Q.   Mr. Talbert, are you reading over what's been marked
[8] Commonwealth Exhibit 12?
[9] A.   Yeah, I'm reading.
[10] Q.   Okay. You see your name at the top of the page?
[11] A.   Yeah.
[12] Q.   Okay. Do you see your photo identification number?
[13] A.   Yeah.
[14] Q.   Okay. Do you see your address?
[15] A.   Where my address at?
[16] Q.   You were residing on State Road at the time, correct?
[17] A.   Yeah. That's right here.
[18] Q.   Okay. You see the first two pages of the letter,
[19] correct?
[20] A.   Yeah.
[21] Q.   Okay. And you see the third page is the envelope,
[22] right, that's a photocopy of the envelope.
[23]         Do you see that?
[24] A.   Yes, I see it.
[25] Q.   You see the address on the envelope part is to Johnnie

Jaclyne Wilson

Page 202

[1] Simmons, correct?
[2] A.   Yeah.
[3] Q.   Okay. And in the upper left-hand corner there is the
[4] initial C-T, correct?
[5] A.   Yeah.
[6] Q.   And that's your photo identification number next to it,
[7] right?
[8] A.   Uh-huh.
[9] Q.   It's 810247, right?
[10] A.   Uh-huh.
[11] Q.   Okay. Is this the letter you wrote to the defendant?
[12] A.   That was a hate letter.
[13] Q.   That was a hate letter. You wrote it though, right?
[14] A.   I wrote it.
[15] Q.   Yeah. You wrote it in October?
[16] A.   I don't now when I wrote it.
[17] Q.   Well, look at page 3. See the postmark on it is
[18] October 13th of this year, 2011, right?
[19] A.   All right.
[20] Q.   Right?
[21] A.   All right. What's the point?
[22] Q.   Yes or no? Do you see the postmark?
[23] A.   Yes, I see it.
[24] Q.   Is it October 13th, 2011?
[25] A.   Yes, it was.

Jaclyne Wilson

Page 203

[1] Q.   Okay. And this is the letter you wrote to the
[2] defendant, right?
[3] A.   Right.
[4] Q.   And in the letter you offer to get up here and give the
[5] defendant his freedom, right?
[6] A.   Huh?
[7] Q.   Well, let's read the letter through, shall we?
[8]     Your name appears at the top, Charles Talbert,
[9] 810247, right?
[10] A.   Right.
[11] Q.   Look at me. Let me know if I read anything wrong.
[12] A.   I take your word for it.
[13] Q.   Okay. Look at it. You can read, right?
[14] A.   I can read. I got a high school diploma.
[15] Q.   Okay. Charles Talbert, 810247, 7901 State Road, right?
[16] A.   Yeah.
[17] Q.   Then you write, Get at me ASAP, correct?
[18] A.   Yeah.
[19] Q.   And you say, Yo, I'm a make this nice and clear for
[20] you, right?
[21] A.   I'm with you.
[22] Q.   Stop me if I get it wrong.
[23] A.   All right.
[24] Q.   For one, I'm a say that was some shit you did.
[25] A.   Some nut.

Jaclyne Wilson

Page 204

[1] Q.     Some nut shit you did. All I really want to know is
[2] who paid you or put the bug in your ear to shoot me? You
[3] thought you killed me, didn't you? Ha. Ha. Real niggas
[4] don't die, nigga. But anyway, I'm going to make a nice
[5] proposition for you. This can either go down two ways. The
[6] first option is the option that I hope you take because
[7] honestly getting on the stand ain't my twist. So option one
[8] is get to your mother, father or whoever to come and drop a
[9] thousand dollars in my account. If they come up here and do
[10] this, walahee -- and that's a Muslim swearing word, right, to
[11] say I promise?
[12] A.   I don't what that mean.
[13] Q.   Okay. Walahee, I won't testify on you in court.
[14]     You see that, right?
[15] A.   Yeah. I never got the thousand dollars so I'm not
[16] testifying in court so what does this letter mean? I never
[17] got a thousand --
[18] Q.   You wrote it.
[19] A.   I never got a thousand dollars and I never -- I'm not
[20] testifying in court. So what's this letter mean?
[21] Q.   All right. Walahee, I won't testify on you in court.
[22] I will let you back out and keep it street. I'm only saying
[23] this because a nigga needs some bread. You put six holes in
[24] me nigga. I know you ain't have beef with me so a nigga or a
[25] bitch you know must have paid you or sent you at me because

Jaclyne Wilson

[1] that was none of our beef. You want this shit up off you,
[2] then you need to be straight up with me, little nigga. I know
[3] you don't want to sit in jail but I can be a dickhead and keep
[4] you there. You want to be a killer, huh? Ha. Ha. Well,
[5] option No. 2 is you can turn down this offer and go to trial.
[6] I got a bullet in my back and my hip. I also got a colostomy
[7] bag. That's attempted murder. That's seven and a half to 15
[8] years easily. You shot me, nigga, so you got a choice. You
[9] either pass off that stack into my account by November 1st or
[10] you be doing years up state with niggas like short,
[11] brown-skinned niggas with long hair. I honestly don't give a
[12] fuck which one you chose. I'm just giving you a chance to
[13] make things right between us. You know you up against a nigga
[14] that don't give a fuck, right? I gave the options. I advise
[15] you jump on that prison phone over PICC and start doing
[16] numbers. Get your people's to come visit me and I'll tell
[17] them face-to-face that what I'm saying is real. Ask TI. When
[18] I came to court for him, I told the judge that I didn't know
[19] him. I can do the same for you because testifying ain't in my
[20] blood. Like I said, I lost drugs and money from the police
[21] when your dumb ass shot me. Look, you got until November 1st
[22] to get a stack put into my account and a letter stating who
[23] send you at me, and if you feel scary about what I'm asking,
[24] just give your lawyer the money and have him come up here with
[25] papers for me to change my statement. That's all I can do for

Jaclyne Wilson

[1] you. The choice is yours. But I'm a leave you with this,
[2] youngin', time is ticking. I know you want out of there. I
[3] want you out of there. I don't ever want to shoot you back.
[4] I just want to beat you the fuck up. But we'll handle that
[5] part later. Get me them two things and I promise that you
[6] will get your freedom back come December. I talk to my young
[7] boy. He asked about you too. I respect your work. But you
[8] going to respect this ass kicking I'm a give you when I get
[9] out. November 1st. Don't be a day late.
[10]        You wrote that?
[11] **A.**    What does that mean? I wrote it, yeah.
[12] **Q.**    You tell us, What does that mean?
[13] **A.**    It mean that -- all right he was locked up for this
[14] crime. I'm sitting in my cell broke. I ain't saying
[15] he -- I'm not actually going on the stand testifying that he
[16] did it. But since he locked up for it, I'm trying to get some
[17] money out of him. So I'm a swindler.
[18] **Q.**    You're a swindler, right?
[19] **A.**    I need some money. I'm a hustler. Like, if you locked
[20] up, I ain't saying he shot me.
[21] **Q.**    You said he shot you in this letter?
[22] **A.**    He's locked up for it.
[23] **Q.**    You said he shot you in this letter, Mr. Talbert, yes
[24] or no?
[25] **A.**    I'm not on this stand testifying that he shot me

Jaclyne Wilson

[1] because he didn't.
[2] **Q.**    You told us in this letter that he shot you?
[3] **A.**    He's just locked up for it.
[4] **Q.**    Did you tell us in this letter that he shot you?
[5] **A.**    I ain't tell you nothing. I wrote that to him.
[6] **Q.**    You sent it to the defendant?
[7] **A.**    I wrote it to him.
[8] **Q.**    And sent it to the defendant?
[9] **A.**    Yeah because he's locked up for this. I ain't saying
[10] he did it though.
[11] **Q.**    You told us he did it in this letter, right?
[12] **A.**    I told him to give me a stack and I won't come to
[13] court. I ain't get no thousand dollars and --
[14] **Q.**    Who paid you or put the bug in your ear to shoot me?
[15]        You write that, right?
[16] **A.**    I wrote the whole letter. I wrote it.
[17] **Q.**    Right. You never said in this letter that he didn't
[18] shoot you?
[19] **A.**    Huh?
[20] **Q.**    You never said in this letter that he wasn't the one
[21] that shot you, right?
[22] **A.**    I wrote the letter. I know he didn't shoot me. I know
[23] he didn't shoot me.
[24] **Q.**    You testified in court --
[25] **A.**    Only reason why I out that is just in case he tried to

Jaclyne Wilson

[1] use that against me. That's reason why I did that.
[2] **Q.**    Okay.
[3] **A.**    That's the reason I put that down just in case he tried
[4] to use that against me.
[5] **Q.**    You told us, I'm a say that was some nut shit you did.
[6]        Did you ever say in this letter, Mr. Talbert, that
[7] Johnnie Simmons wasn't the person that shot you?
[8] **A.**    You keep asking me about the letter. That letter is
[9] between me and him. He know he didn't shoot me. He's on
[10] trial. They took the --
[11] **Q.**    Mr. Talbert, answer my question.
[12] **A.**    I'm answering it.
[13] **Q.**    Did you ever say in that letter that he wasn't the
[14] person that shot you?
[15] **A.**    Like I wrote that letter to him.
[16] **Q.**    Yes or no?
[17] **A.**    No, I ain't say it. No.
[18] **Q.**    Okay. When you testified the first time in this case,
[19] you were cooperative, correct?
[20] **A.**    I don't remember testifying, Miss. I'm bipolar,
[21] schizophrenic. We can do it a psychiatrist background check.
[22] I'm bipolar, schizophrenic. You know what that means? I'm
[23] not in my right mind. I take medication in the jail that I'm
[24] at for this. I take medication on the streets for being
[25] bipolar, schizophrenic. You can't trust a person's words

Jaclyne Wilson

Page 209

[1] that's bipolar, schizophrenic. I get SSI checks.

[2] Q. But you've never been found incompetent, correct?

[3] A. Yes, I have been.

[4] Q. You've been found incompetent in your criminal cases?

[5] A. Mentally? Yes. Mentally.

[6] Q. The Commonwealth hasn't pursued charges against you

[7] because you're incompetent? You didn't understand what you

[8] were doing?

[9] A. No. They never press charges on that. You should have

[10] did a review first.

[11] Q. Mr. Talbert, there's no question pending.

[12] So you offered to let the defendant walk even though

[13] he shot you, right?

[14] A. He didn't shoot me.

[15] Q. Okay.

[16] A. I just told him to give me a thousand dollars and all

[17] this would be over with but he ain't give me no thousand

[18] dollars and I'm still trying to get this over because I'm not

[19] going to put something on somebody that didn't do nothing to

[20] me. You're trying to get me to say something that I'm not

[21] going to say. He did not shoot me.

[22] Q. All right. Mr. Talbert, you and I have had

[23] conversations in perpetration for this case, correct?

[24] A. I don't remember talking to you now, no.

[25] Q. Okay. You don't remember me coming the visit you and

Jaclyne Wilson

---

Page 210

[1] talking to you in the little booth before you testified?

[2] A. Nope.

[3] Q. You don't remember that?

[4] A. No.

[5] Q. You don't remember me coming to talk to you with

[6] Detective Grace and Detective Suchinsky? Do you remember

[7] that?

[8] A. No, I don't remember that.

[9] Q. Okay.

[10] A. Nope.

[11] Q. You don't but you remember coming to see me at my

[12] office, right?

[13] A. Only time I remember coming to see you is asking you

[14] for money. That's it.

[15] Q. Okay.

[16] A. Other than that.

[17] Q. Do you remember coming to see Leland Kent from my

[18] office?

[19] A. Asking for money.

[20] Q. Okay.

[21] A. That's it.

[22] Q. Do you remember tell Leland Kent that you felt scared

[23] about going back to the neighborhood?

[24] A. People done seen me on Stenton Avenue.

[25] Q. Yes or no?

Jaclyne Wilson

---

Page 211

[1] A. After I got shot.

[2] Q. Do you remember --

[3] A. No, I don't remember saying it Why would I be on

[4] Stenton Avenue if I was scared?

[5] Q. Okay. But you've decided, Mr. Talbert, today in this

[6] trial that you're no longer going to cooperate; is that right?

[7] A. I'm not -- first of all I wasn't ever going to

[8] cooperate. I'm not going to cooperate against putting

[9] somebody innocent in jail. I'm not going to have that bad

[10] karma on me. I might go to jail and somebody might lie on me.

[11] Q. Okay.

[12] MS. FORCHETTI: Your Honor, I have no

[13] further questions.

[14] THE COURT: You may cross-examine.

[15] MR. LORUSSO: No questions, Your Honor.

[16] THE COURT: Thank you. We'll take a

[17] short recess.

[18] Everybody stay in place until the jurors

[19] have left the room, please.

[20] (Jury exits the courtroom at 4:16 p.m.)

[21] THE COURT: Let the record reflect the

[22] jurors have all left the room.

[23] (Short recess.)

[24] (Jury enters the courtroom at 4:26 p.m.)

[25] THE COURT: You may call your next

Jaclyne Wilson

---

Page 212

[1] witness.

[2] MS. FORCHETTI: Your Honor, at this time

[3] the Commonwealth calls Detective Michael Acerenza.

[4] ...DETECTIVE MICHAEL ACERENZA, after

[5] having been first duly sworn, was examined and

[6] testified as follows:

[7]     – – –

[8] COURT CRIER: State your name, badge

[9] number for the record and spell your last name.

[10] THE WITNESS: Detective Michael Acerenza,

[11] A-C-E-R-E-N-Z-A, Badge No. 8153, I'm assigned to

[12] Northwest Detectives.

[13] THE COURT: You may proceed.

[14] MS. FORCHETTI: Thank you.

[15]

[16] DIRECT EXAMINATION

[17]     – – –

[18] BY MS. FORCHETTI:

[19] Q. Good afternoon, detective.

[20] A. Good afternoon.

[21] Q. Detective, how long have you been with the Philadelphia

[22] police?

[23] A. Since 1996.

[24] Q. And for how long have you been assigned to Northwest

[25] Detectives?

Jaclyne Wilson

Page 213

[1] **A.**    Since 2004.

[2] **Q.**    And during the time have you come to investigate many

[3] shootings?

[4] **A.**    Yes, hundreds.

[5] **Q.**    And have you ever had any issues with uncooperative

[6] witnesses before?

[7] **A.**    Yes. Most of the time. We investigate shootings, a

[8] lot of the time the victims don't want to cooperate. They

[9] don't went to tell us -- give us a full statement or sometimes

[10] even their name.

[11] **Q.**    Did you come to investigate a shooting that occurred on

[12] February 4th of 2011 in the area of the 1300 block of Johnson

[13] Street?

[14] **A.**    Yes, I did.

[15] **Q.**    How did you become assigned to that shooting?

[16] **A.**    I was assigned to Northwest Detectives at the time.

[17] I'm a shooting team. I was working with my partner, Detective

[18] Hassel, H-A-S-S-E-L. I was working day work. Sometime after

[19] two o'clock p.m. on February 4th I received a phone call, a

[20] notification from police officers that there was a shooting

[21] incident at 1300 East Johnson Street. At that time I

[22] responded to the hospital at Einstein Hospital on Broad Street

[23] to begin an investigation.

[24] **Q.**    So when you went to Einstein Hospital, did you see

[25] anyone there?

Jaclyne Wilson

Page 214

[1] **A.**    Yes. The shooting victim, Charles Talbert, was in the

[2] trauma unit at Einstein Hospital. I was not able to speak to

[3] him due to his condition. He was brought to the operating

[4] room.

[5] **Q.**    Did you continue your investigation?

[6] **A.**    Yes, I did. At the time I recovered the victim's

[7] clothing. Projectile was recovered from the trauma room from

[8] medical personnel and I went back the Northwest Detectives and

[9] began interviewing some of the witnesses.

[10] **Q.**    Who did you interview that day?

[11] **A.**    Police Officer Alexander, the off-duty officer.

[12] **Q.**    Okay. Did you come to speak to any other witnesses on

[13] that day?

[14] **A.**    I spoke to the other witnesses but they were formally

[15] interviewed by other detectives.

[16] **Q.**    And was there anyone making identifications at this

[17] time?

[18] **A.**    There were no identifications to be made. The victim

[19] was -- he was brought to the OR. He could not make an

[20] identification.

[21] **Q.**    So how did you continue your investigation in a search

[22] for the shooter?

[23] **A.**    I received information from my captain at Northwest

[24] Detectives, Captain Singletary. The information that I

[25] receive from him was that --

Jaclyne Wilson

Page 215

[1]    **MR. LORUSSO**: Objection.

[2]    **THE COURT**: Sustained.

[3]    **THE WITNESS**: I received information from

[4] Captain Singletary. After 4:30 p.m. or around that

[5] time I became aware that Police Officer Long from

[6] the 14th District had come into contact with the

[7] male and in the area of Stenton and Washington Lane.

[8] Police Officer Long transported that male to

[9] Northwest Detectives and I had a new photograph of

[10] the suspect, which at the time Johnnie Simmons

[11] seated next to counsel. I had a new photograph

[12] taken of Johnnie Simmons inside 35th district

[13] headquarters.

[14] **BY MS. FORCHETTI**:

[15] **Q.**    What did you do with that photograph?

[16] **A.**    With that photograph the next day I worked on February

[17] 8th. I prepared a photo array. I took the photograph that

[18] was taken on February 4th, placed it on a piece of paper

[19] in the computer database along with seven other photographs.

[20] I went to Albert Einstein Hospital and --

[21] **Q.**    Detective, I'm sorry. Just to interrupt you there, can

[22] you explain to the jury how a photo array is developed?

[23] **A.**    I took some of the biographical date, the height and

[24] weight, try to get the right skin tone and type of hair,

[25] similar photographs to the suspect, which in this case was

Jaclyne Wilson

Page 216

[1] Johnnie Simmons. I tried to match it up that not one

[2] photograph stands out from another.

[3] **Q.**    And Mr. Simmons, the defendant, was developed as a

[4] suspect at that time based on information you had received?

[5] **A.**    Yes.

[6] **Q.**    Okay. And so then why do you prepare the photo array

[7] with Mr. Simmons as the suspect?

[8] **A.**    Well, I wanted to take the photo array to the

[9] complainant to show the complainant to see if he could

[10] identify the person that shot him.

[11]    **MS. FORCHETTI**: Your Honor, I would ask

[12] the witness be shown Commonwealth Exhibit 10.

[13]    **THE COURT**: He may be shown C-10.

[14] **BY MS. FORCHETTI**:

[15] **Q.**    Detective, you're being shown an exhibit that's been

[16] marked as Commonwealth Exhibit C-10.

[17]    Do you recognize the exhibit?

[18] **A.**    I do recognize it. This is the photo array that I

[19] prepared with the photograph of the defendant, Johnnie

[20] Simmons, in the sixth spot.

[21] **Q.**    So as you explained to us, detective, the photo array

[22] is built around this suspect?

[23] **A.**    Yes. The first photo I use is the suspect's photograph

[24] and then I use the search by height and weight. I go up and

[25] below several inches. I try not to go too far off the weight

Jaclyne Wilson

Page 217

[1] so the build of the other people in the photo array are

[2] similar.

[3] **Q.** So you try to find people that look similar in

[4] appearance to the suspect?

[5] **A.** Yes.

[6] **Q.** Okay. And why is that important?

[7] **A.** To show that one person doesn't stand out from the

[8] other. To be fair.

[9] **Q.** Now, what did you with this photo array?

[10] **A.** I took the photo array to Einstein Hospital where the

[11] victim was being treated. I showed the -- I went to Einstein

[12] and met with Charles Talbert, the victim. I was also with two

[13] other detectives, Detective Geliebter and Detective Sloan.

[14] **Q.** Now, detective, did you speak to Mr. Talbert before

[15] showing him the photo array?

[16] **A.** I did. I spoke to him briefly. I identified myself.

[17] I didn't get a chance to speak to him the day he was shot so

[18] on February 8th when I walked in, I identified myself as a

[19] detective. I let him know I'm investigating the shooting.

[20] Asked him about his injuries. If he has any future surgeries

[21] or surgeries he has. How he feels. I had a brief

[22] conversation with him.

[23] At that time I told him I was going to show him a

[24] photo array and to let me know if he sees the person that shot

[25] him in the photo array. So I handed the photo array to

Jaclyne Wilson

Page 218

[1] Charles Talbert. He looked at the photo array for,

[2] approximately, ten seconds and pointed to the sixth photo

[3] which is the photograph of Johnnie Simmons. I handed the

[4] victim my pen and told him to circle the photograph that he

[5] identified. He circled the photograph of Johnnie Simmons and

[6] then he immediately circled a second photograph on the top

[7] right corner.

[8] I asked him why he did that? Why he circled this

[9] second photograph. He said -- from my recollection he said

[10] that I also know him or it could also be him and I confirmed,

[11] The person that you identified, is that the person that shot

[12] you? And he said, Yes. I told him to sign the photograph,

[13] which he did, and the date and time, which is February 8th,

[14] 2011, 9:50. I'm sorry, 9:50 p.m.

[15] At that time, 9:55, I conducted a full interview of

[16] Charles Talbert. I tried to get as detailed as I could with

[17] the story that happened when he was shot and also explain the

[18] identification.

[19] **Q.** Detective, why did you feel it was important to conduct

[20] a detailed interview with Mr. Talbert?

[21] **A.** I always try to get a detailed interview of the details

[22] of what actually happened when they were shot especially in

[23] this case when I never had anyone sign two photographs before,

[24] especially, they identify someone. That was unique to my

[25] experience. I wanted to explain that as best I could.

Jaclyne Wilson

Page 219

[1] **Q.** Were you surprised when Mr. Talbert circled the second

[2] photograph?

[3] **A.** Yes. He signed the second photo immediately. He

[4] signed the first photograph which he identified and then he

[5] signed the second photograph immediately.

[6] **Q.** Now, detective, prior to handing Mr. Talbert the pen,

[7] had he pointed to anyone in the array other than the

[8] defendant?

[9] **A.** No. He pointed with his finger to the photograph of

[10] Johnnie Simmons.

[11] **Q.** Did he say anything about any of other people in the

[12] photographic array?

[13] **A.** No.

[14] **Q.** When he pointed to the defendant's picture, did he say

[15] I'm not sure or anything qualifying?

[16] **A.** No. I asked him to tell me if he can identify the

[17] person that shot him and he pointed to the photograph of

[18] Johnnie Simmons.

[19] **MS. FORCHETTI:** Your Honor, I would ask

[20] the witness be shown what's been marked Commonwealth

[21] Exhibit 9.

[22] **THE COURT:** He may be shown C-9.

[23] **BY MS. FORCHETTI:**

[24] **Q.** Now, detective, you're being shown an exhibit that's

[25] been marked Commonwealth Exhibit 9.

Jaclyne Wilson

Page 220

[1] **A.** Yes.

[2] **Q.** Do you you recognize that?

[3] **A.** I do.

[4] **Q.** What is that?

[5] **A.** This is a copy of the interview record that I took of

[6] Charles Talbert February 8th, 2011, at 9:55 p.m. inside

[7] Einstein Hospital.

[8] **Q.** Now, is that typed or handwritten?

[9] **A.** It's handwritten.

[10] **Q.** Okay. Would you agree with me you do not have the

[11] clearest handwriting to read?

[12] **A.** Definitely.

[13] **Q.** And why was this interview handwritten?

[14] **A.** I don't have a typewriter or computer available at the

[15] hospital.

[16] **Q.** And, detective, when you were recording this interview,

[17] when did you record it in relation to Mr. Talbert's responses?

[18] **A.** I tried to go along -- as the person is telling me what

[19] happened I try to record it has the person is going along.

[20] That's why my handwriting is pretty sloppy. As the person was

[21] telling me the information, I try to write it down as they're

[22] telling me the information. If they go too far ahead, I have

[23] them go back and I try to keep a pretty current with what the

[24] person is telling me.

[25] **Q.** And how long did this interview take?

Jaclyne Wilson

Page 221

[1] A.  About an hour.

[2] Q.  Now, at the conclusion of the interview what do you do?

[3] A.  The person looked over each page and read over their

[4] own interview, let me know if they want to make any

[5] corrections or if anything is inaccurate.  After they're done

[6] reviewing each page, each single page, I have them sign the

[7] bottom of the page.

[8] Q.  Did you have Mr. Talbert do that in this case?

[9] A.  I did.

[10] Q.  Okay.  And was Mr. Talbert in a hospital bed when you

[11] were interviewing him?

[12] A.  Yes, he was.

[13] Q.  Was he restrained in anyway?

[14] A.  That I don't remember.  I don't believe he was.

[15] Q.  Okay.  Did he appear alert and oriented to you?

[16] A.  Yes.

[17] Q.  Did he appear under the influence of any narcotics?

[18] A.  No.  He was talking clearly.  He seemed cooperative.

[19] He was talking clearly and he was answering every question I

[20] had with no problem.

[21] Q.  Now, detective, over the course of your career, have

[22] you encountered people who have been under the influence of

[23] narcotics or alcohol?

[24] A.  Yes.

[25] Q.  Do you take interviews of witnesses that are

Jaclyne Wilson

Page 222

[1] intoxicated?

[2] A.  Depends on the circumstances.  If I feel I might not be

[3] able to interview them or in the case where if the person is

[4] going into surgery, I try to take an interview as much as I

[5] can before the person goes into the surgery if I'm able to do

[6] that.  I try to take an interview before they go into surgery

[7] when they're in the emergency room.  In this case --

[8] Q.  Under typical circumstances, detective, if someone

[9] appears to be under the influence of the alcohol or drugs, do

[10] you continue to interview that person?

[11] A.  No.  I would try to wait until the person is of clear

[12] mind.

[13] Q.  Did you observe any signs of Mr. Talbert that he was

[14] under the influence of any substance?

[15] A.  No.

[16] Q.  Now, the information, biographical information that

[17] appears at the top of page 1 of interview, from where did you

[18] get that?

[19] A.  Word of mouth.  I asked the victim, Charles Talbert,

[20] the information.  His name, address, date of birth, phone

[21] number.  It's all by word of mouth.  It's what Charles Talbert

[22] told me.

[23] Q.  All right.  So Charles Talbert gave you his address?

[24] A.  He did.

[25] Q.  Okay.  And he gave you how old he was?

Jaclyne Wilson

Page 223

[1] A.  Yes.

[2] Q.  And his date of birth?

[3] A.  Yes.

[4] Q.  Were you able to verify that information, his date of

[5] birth and his address?

[6] A.  Yes.  The information we had from the day the shooting

[7] happened, which I believe it was the same information.

[8] Q.  And did you ask Mr. Talbert to give you the name of a

[9] close relative?

[10] A.  Yes.

[11] Q.  And who did he give you?

[12] A.  He said Ms. Clara Massey, 1219 Barringer Street, which

[13] is same address he gave as his residence.

[14] Q.  Did he tell you what relationship that person had to

[15] him?

[16] A.  He may have.  I didn't document it.  I don't remember.

[17] Q.  Okay.  And did you tell Mr. Talbert why you were

[18] interviewing him?

[19] A.  Yes.  In reference to the shooting incident.

[20] Q.  Okay.  And what was Mr. Talbert's demeanor on the day

[21] you interviewed him?

[22] A.  His demeanor, after a first contact I really had with

[23] him was with the photo array and he seemed scared.  When I

[24] interviewed him, he cooperated with everything he was telling

[25] me.  He was cooperative as he was talking to me.  He

Jaclyne Wilson

Page 224

[1] wasn't -- didn't seem like he was lying or trying to hide

[2] anything.  Everything was accurate with what he was it telling

[3] me.  I had no reason to believe he was lying.

[4] Q.  So, detective, if you would be so kind as to read the

[5] interview that you took of Mr. Talbert?  I believe I may have

[6] misread some of your responses that you recorded.

[7] A.  Sure.  I asked Charles Talbert to explain to me what

[8] happened on the day of the shooting.

[9]        Charles Talbert responded, I walked down Stenton

[10] Avenue to the sneaker store at Stenton and Johnson.  On my way

[11] to the sneaker store a young boy asked me if I had weed for

[12] sale.  He had glasses on.  I told him that I don't sell weed

[13] no more.  I told him I would sell it to him based on his

[14] strength.  I sold him a bag of weed.  From then I walk to the

[15] sneaker store and bought a phone and a shirt.  While I was in

[16] the store, the guy that shot me came in.  He told me that the

[17] bag of weed I sold the guy was two small.  I reached in my

[18] pocket and I took out a bag of weed to exchange it.  He took

[19] the bag of weed and left.  While I'm waiting for my phone to

[20] get programmed, the original guy with the glasses came in.  He

[21] says someone wants to buy a bag of weed.  I said, Look, I told

[22] you before I don't sell weed.  He said that someone across the

[23] street wants to buy weed.  I told him I would see who it is

[24] and decided if I would sell it to him.  I left my phone and

[25] stuff in the store and walked across the street.  I saw the

Jaclyne Wilson

Page 225

[1] same guy that I talked to about the exchange. So when I
[2] walked over there I said, What's up? As soon as I said,
[3] What's up, he pulled out and shot me in the stomach with a
[4] gray gun. Once he shot me, he shot me again. I crawled up
[5] the street. He shot me again. It sounded like he was trying
[6] to shoot me again. I was just laying there, crawling in the
[7] street, asking for people to help me. I remember someone with
[8] a gun out. I think it was an undercover cop. There was a
[9] guard from the sneaker store and a Muslim praying over me. I
[10] thought I was going to die out there. I don't remember
[11] getting in any ambulance.
[12]      QUESTION: Can you describe the male that shot you?
[13]      ANSWER: Slim, light skin, short, skinny face, small
[14] head, khaki set or cargo set, tan or beige, no facial hair, 19
[15] to 20 years.
[16]      QUESTION: Have you ever seen him before?
[17]      ANSWER: No.
[18]      QUESTION: Can you describe the gun?
[19]      ANSWER: Gray, about 6 to 8 inches. It had a thing
[20] on the back but I couldn't tell if it was a semiautomatic or
[21] revolver.
[22]      QUESTION: I showed you a photo array with eight
[23] photographs. Did you see the person that shot you in the
[24] photo array?
[25]      ANSWER: I think the one on the bottom is the one
     Jaclyne Wilson

Page 226

[1] that shot me. Now that I think about it, his name is Johnnie.
[2] I think he's the one that shot me.
[3]      QUESTION: Why did you circle the picture on top,
[4] No. 4?
[5]      ANSWER: I was scared. I circled the one on the
[6] bottom first time.
[7]      QUESTION: Does the second photograph that you
[8] circled, No. 4, have anything to do with the shooting?
[9]      ANSWER: No.
[10]      QUESTION: Are you sure that the photo that you
[11] circled first, No. 6, is the person that shot you?
[12]      ANSWER: Yes, I am sure.
[13]      QUESTION: Do you know the male that you identified
[14] as shooting you?
[15]      ANSWER: I know him from the neighborhood.
[16]      QUESTION: How long have you known him?
[17]      ANSWER: A few years.
[18]      QUESTION: Is there any reason that this male would
[19] want to shoot you?
[20]      ANSWER: He has ties to TI. TI is a guy I testified
[21] against about three to four years ago. I ended up not
[22] testifying against him.
[23]      QUESTION: What was the nature of that incident?
[24]      ANSWER: He tried to run me over. He got locked up
[25] for running me over but I didn't testify against him. I got
     Jaclyne Wilson

Page 227

[1] locked up then because I had a warrant. He's probably mad
[2] because of that whole situation.
[3]      QUESTION: Where and when did that incident occur?
[4]      ANSWER: About four years ago at Stenton and
[5] Cliveden Street.
[6]      QUESTION: Why do you think your shooting has to do
[7] with that incident?
[8]      ANSWER: Because today my cousin Rachel told me that
[9] her friend Janae said TI was calling from jail letting people
[10] know I was home. He may be trying to have me set up.
[11]      QUESTION: Have you seen the male identified as
[12] Johnnie with TI in the past?
[13]      ANSWER: Yes.
[14]      QUESTION: Do you know the other male with the
[15] glasses?
[16]      ANSWER: He looked like kind of familiar. Like
[17] someone from the neighborhood. I don't know his name.
[18]      QUESTION: Where was the male with the glasses when
[19] you got shot?
[20]      ANSWER: He was about 15 to 20 feet in the sneaker
[21] store standing there.
[22]      QUESTION: Can you describe the male with the
[23] glasses?
[24]      ANSWER: Skinny, light-skinned, taller than the
[25] other guy, low cut, 19 to 20 years, 120 pounds to 130 pounds,
     Jaclyne Wilson

Page 228

[1] little mustache. I can't remember what he was wearing.
[2]      QUESTION: Did you see where the shooter and the
[3] male with the glasses went after the shooting?
[4]      ANSWER: No. I was on the ground. I keep having
[5] flashbacks though.
[6]      QUESTION: Is there anything else that you can tell
[7] me about Johnnie?
[8]      ANSWER: I think he lives around Duval Street or
[9] Johnson Street. His nickname is Mooch or Johnnie.
[10]      QUESTION: Were there any descriptive markings on
[11] Johnnie's clothing?
[12]      ANSWER: Beige or white khaki suit.
[13]      QUESTION: Where are the items you brought from the
[14] sneaker store?
[15]      ANSWER: They are still in the store. I used my
[16] Muslim name for the phone, Kalil Zekoe.
[17]      QUESTION: Is anyone else in the the area -- was
[18] anyone else in the area when you were shot?
[19]      ANSWER: Not that I remember.
[20]      QUESTION: Is there anything else you can add?
[21]      ANSWER: No.
[22]      QUESTION: Can you tell me how you feel at this
[23] time?
[24]      ANSWER: I'm afraid that I'm not going make it.
[25]      And then the interview concluded.
     Jaclyne Wilson

Page 229

[1] Q.   At the end of the interview did you have Mr. Talbert
[2] note the time?
[3] A.   Yes.  It was February 8th, 2011, 11:10 p.m.
[4] Q.   Now, prior to seeing Mr. Talbert in the hospital for
[5] the first time on February 4th and again on February 8th, had
[6] you ever met him before?
[7] A.   No, I have not.
[8] Q.   Did you know who he was talking about when he mentioned
[9] TI?
[10] A.   Not at the time.
[11] Q.   Prior to this investigation, did you know the
[12] defendant?
[13] A.   No.
[14] Q.   If Mr. Talbert had told you he wasn't sure who shot
[15] him, what would have happened to this investigation?
[16] A.   We would have to continue to investigate.  I would
[17] explain that in the interview as he told me that.
[18] Q.   Did you have Mr. Talbert review his interview?
[19] A.   Yes, I did.
[20] Q.   Did he sign his interview?
[21] A.   Yes.
[22] Q.   Did he sign each page?
[23] A.   Yes, he did.
[24] Q.   Was Mr. Talbert given the chance to make any
[25] corrections?

Jaclyne Wilson

Page 230

[1] A.   Yes.  Before I had the person sign the interview, I let
[2] him know to review everything, including everything up top,
[3] the biographical information, the spelling of their name,
[4] phone number, date of birth and then review the entire
[5] statement.  If there is anything they want to change or they
[6] think is inaccurate, then let me know and we can change it and
[7] he did not make any changes.
[8] Q.   He didn't?
[9] A.   He did not.
[10] Q.   Did he ever at any time recant his statement?
[11] A.   No.
[12] Q.   Has Mr. Talbert contacted you since he gave that
[13] statement?
[14] A.   No.
[15] Q.   Has he at any time told you that you arrested the wrong
[16] person?
[17] A.   No.
[18] Q.   Have you received any information from any other source
[19] about anyone else being the shooter?
[20] A.   No.
[21] Q.   Once Mr. Talbert identified the defendant as the person
[22] who shot him, how dos the investigation continue?
[23] A.   I went back to Northwest Detectives headquarters.  I
[24] spoke to the Assistant District Attorney's Office Charging
[25] Unit.  I reviewed the facts of the case.  I believe I

Jaclyne Wilson

Page 231

[1] forwarded the paperwork to them.  I prepared an affidavit and
[2] an arrest warrant for the defendant, Johnnie Simmons.  And
[3] other detectives, Detective Sloan and Geliebter, prepared a
[4] search warrant for the defendant's residence.
[5] Q.   Okay.  And for what location was that residence?
[6] A.   I believe it was 1528 East Johnson Street.
[7] Q.   Was anything recovered from that location?
[8] A.   Detective Grace and Detective Suchinsky recovered
[9] clothing.  They were placed on a property receipt.
[10]        MS. FORCHETTI:  Your Honor, I would ask
[11] to mark this document, three pages in length, as
[12] Commonwealth Exhibit 13.
[13]        THE COURT:  You may.
[14]        MS. FORCHETTI:  For the record, it is
[15] Search Warrant No. 154765.
[16]        (Search warrant marked Commonwealth
[17]        Exhibit C-13 for identification.)
[18]        COURT CRIER:  So marked C-13, Your Honor.
[19] BY MS. FORCHETTI:
[20] Q.   Detective, you have a three-page document in front of
[21] you.
[22]      Do you recognize that document?
[23] A.   Yes, I do.
[24] Q.   Okay.  You affiant on that document?
[25] A.   Yes, myself and Detective Sloan are the affiants.

Jaclyne Wilson

Page 232

[1] Q.   Detective, just so jury's clear, what does it mean to
[2] be the affiant?
[3] A.   We're the law enforcement officers that were swearing
[4] to the facts that are contained in the search warrant.
[5] Q.   And what location is that search warrant?
[6] A.   It's a search warrant to search property of 1528 East
[7] Johnson Street.
[8] Q.   And why did you seek to search that residence?
[9] A.   To search for any handguns, any firearms, ballistics
[10] evidence and to search items that are listed in this search
[11] warrant which is gray-colored handgun, any ballistics
[12] evidence, tan or beige-colored type cargo set, proof of
[13] residency, items that may be related to the shooting.
[14] Q.   And on what date did you apply for that search warrant?
[15] A.   February 9th, 2011.
[16] Q.   Now, detective, why didn't you apply for the search
[17] warrant on the day of the shooting?
[18] A.   We didn't have an identification at that time.  We
[19] didn't have positive identification.  As soon as I get the
[20] positive identification on Johnnie Simmons, I contacted the
[21] District Attorney's Office, which was February the 8th and
[22] late in the evening.  We went back and immediately prepared
[23] the arrest warrant and search warrant.
[24] Q.   Did you recover any ballistics evidence from that
[25] location?

Jaclyne Wilson

Page 233

[1] **A.** I was not present at the time of the search. Two other
[2] detectives that were working in the morning actually executed
[3] the search warrant, Detective Grace and Detective Suchinsky.
[4] It was executed that next morning, February 9th, 2011 at 6:30
[5] a.m.
[6] **Q.** Detective, how was the defendant arrested?
[7] **A.** During the execution of the search warrant, the arrest
[8] warrant had already been issued and Detective Grace and
[9] Suchinsky arrested Johnnie Simmons inside the residence.
[10] **Q.** Now, how far is that location from the scene of the
[11] shooting?
[12] **A.** The scene of the shooting was 1300 East Johnson and the
[13] residence is 1500 East Johnson. So about two blocks.
[14] **Q.** Now, detective, do you get any kind of reward or
[15] incentive for arresting defendants on shootings?
[16] **A.** No, we don't.
[17] **Q.** Would your investigation continued if the defendant
[18] hadn't been identified on the 8th of February?
[19] **A.** It would have continued, yes, to look for the shooter.
[20] In this case we believed we had the shooter. The arrest
[21] warrant was approved and the investigation ended there.
[22] **Q.** Did you attempt to locate the person that had
[23] cooperated with the defendant?
[24] **A.** Yes, we did. There was another pedestrian
[25] investigation by Officer Nosik, N-O-S-I-K, 14th District

Jaclyne Wilson

Page 234

[1] police officer. That did meet with Charles Talbert, showed a
[2] photo array with that male's name. That name I don't remember
[3] at this time, and he said it was the person that -- with the
[4] glasses that he identified with the glasses on that day. We
[5] actually had contact with that male and interviewed him inside
[6] Northwest Detectives.
[7] **Q.** And what happened with respect to that investigation?
[8] **A.** The investigation stopped there.
[9] **Q.** Detective, since interviewing Mr. Talbert, have you had
[10] any further contact with him?
[11] **A.** No. We had contact with him when I showed the photo
[12] array inside to identify the male that had the glasses on. We
[13] did have contact with him then.
[14] **Q.** Detective, were you present at the preliminary hearing
[15] of April 26th, 2011, in Courtroom 803?
[16] **A.** Yes.
[17] **Q.** Did you testify at that preliminary hearing?
[18] **A.** No.
[19] **Q.** Did you at any time tell Mr. Talbert what to say?
[20] **A.** No.
[21] **Q.** Were you inside the courtroom while Mr. Talbert
[22] testified?
[23] **A.** No.
[24] **Q.** Why not?
[25] **A.** Well, I couldn't be inside the courtroom because I was

Jaclyne Wilson

Page 235

[1] involved in this investigation and I was told that I did not
[2] need to testify because he was cooperative.
[3] **Q.** Since this investigation in February of this year, are
[4] you still assigned at Northwest Detectives?
[5] **A.** Yes, I am.
[6] **Q.** Okay. Would Mr. Talbert have been able to get in
[7] contact with you at Northwest Detectives?
[8] **A.** Yes. There were actually phone calls, messages left
[9] for us at Northwest Detectives. I believe in reference to he
[10] wanted to make sure he was -- the witness protection, like the
[11] witness protection program. He wanted to make sure he was
[12] safe. That was the only messages and conversation we had.
[13] **Q.** And, detective, do you have anything to do with
[14] relocating witnesses?
[15] **A.** No. Information is referred to the another district
[16] attorney that handles that information.
[17] **Q.** And do you remember when you received those messages
[18] with respect to any intimidation?
[19] **MR. LORUSSO:** Objection.
[20] **THE COURT:** Sustained.
[21] **BY MS. FORCHETTI:**
[22] **Q.** Since you interviewed Mr. Talbert, have you had any
[23] further conversation with him other than the follow-up on the
[24] individual with the glasses?
[25] **A.** No.

Jaclyne Wilson

Page 236

[1] **MS. FORCHETTI:** Your Honor, I would ask
[2] to mark this document as Commonwealth Exhibit 14.
[3] **THE COURT:** You may.
[4] **MS. FORCHETTI:** For the record, it's
[5] Property Receipt No. 2955110.
[6] (Property receipt marked Commonwealth
[7] Exhibit C-14 for identification.)
[8] **COURT CRIER:** C-14 so marked, Your Honor.
[9] **BY MS. FORCHETTI:**
[10] **Q.** Detective, you're being shown a property receipt that's
[11] been marked as Commonwealth Exhibit 14.
[12] Do you recognize that property receipt?
[13] **A.** Yes, I do.
[14] **Q.** And what evidence was placed on that property receipt?
[15] **A.** The evidence that was recovered inside Albert Einstein
[16] Hospital inside the trauma room which was one silver
[17] projectile. It was in a clear container with a blue lid and
[18] it had the trauma number markings on it. It was the
[19] projectile that was recovered inside the trauma room.
[20] **Q.** Okay. Detective, how did you come to recover that
[21] projectile?
[22] **A.** When we went to the hospital, the medical personnel
[23] have the projectile inside the container and said it was on
[24] the bed of the victim when they were treating him.
[25] **Q.** I'm sorry. They said it was where?

Jaclyne Wilson

Page 237

[1] **A.** It was on the bed of the -- hospital bed of

[2] the -- where they were treating the victim.

[3] **Q.** What did you do with that projectile?

[4] **A.** I submitted it. We have a Firearms Investigation Unit.

[5] I submitted the projectile to them at 8th and Poplar.

[6] **Q.** Detective, were you able to have that projectile

[7] submitted for any type of comparison?

[8] **A.** Submitted for examination. They do tests. At this

[9] time there was nothing to compare it to. There was no other

[10] ballistics evidence recovered. There was no gun recovered so

[11] there was nothing to directly compare it to.

[12]      **MS. FORCHETTI:** And, Your Honor, I would

[13]      ask to mark this Property Receipt No. 2955123 as

[14]      Commonwealth Exhibit 15.

[15]      **THE COURT:** It may be marked.

[16]      (Property receipt marked Commonwealth

[17]      Exhibit C-15 for identification.)

[18]      **COURT CRIER:** So marked C-15.

[19] **BY MS. FORCHETTI:**

[20] **Q.** Detective, you're being shown a property receipt that's

[21] been marked as Commonwealth Exhibit 15.

[22]      Can you tell us what that is?

[23] **A.** That is a property receipt that I prepared for the

[24] bloody clothing that belonged to the victim. I recovered it

[25] from inside Einstein Hospital.

            Jaclyne Wilson

Page 238

[1] **Q.** And, detective, why is it important to prepare property

[2] receipts in connection to evidence recovered?

[3] **A.** For the chain of evidence. Proves we did recover that

[4] clothing. We had it in our custody. We submitted it to our

[5] evidence custodian.

[6] **Q.** Now, detective, did you submit that clothing for any

[7] type of forensic testing?

[8] **A.** I did not.

[9] **Q.** Okay. And why not?

[10] **A.** In this case there was no reason to. It was the

[11] victim's bloody clothing. It's just evidence of the crime.

[12] There is nothing to compare it to as far as blood. We had no

[13] comparisons to be made.

[14] **Q.** Now, detective, at the time you talked to Mr. Talbert,

[15] were you aware that he was under arrest?

[16] **A.** Yes. He was placed under arrest at the hospital.

[17] **Q.** And how did you become aware of that?

[18] **A.** Another police officer. I believe it was for narcotics

[19] violation.

[20] **Q.** Did that effect your investigation at all?

[21] **A.** No. That is just basically a separate incident. A

[22] police officer processed that arrest separate from our

[23] investigation.

[24] **Q.** Does that change how you treat Mr. Talbert?

[25] **A.** No.

            Jaclyne Wilson

Page 239

[1] **Q.** And are you involved in the narcotics case connected to

[2] Mr. Talbert?

[3] **A.** No, I'm not. The police officers who arrested

[4] Mr. Talbert processed that arrest and it was separate from my

[5] investigation.

[6] **Q.** Now, did you promise or threaten Mr. Talbert with

[7] anything when you talked to him in the hospital room four days

[8] later?

[9] **A.** No.

[10] **Q.** Were you aware of the status of his open case?

[11] **A.** No. I actually wasn't concerned with it.

[12] **Q.** Why were you not concerned with it?

[13] **A.** I was investigating the shooting. I had nothing to do

[14] with the narcotics arrest. I wasn't concerned. I was trying

[15] to find out who shot him. That was my most concern.

[16] **Q.** And, detective, how many times did you talk to

[17] Mr. Talbert on February 8th before you took an interview from

[18] him?

[19] **A.** That was the first time. I wasn't able to speak to him

[20] on the day he was shot because of his condition. He went

[21] right into the operating room.

[22] **Q.** Thank you.

[23]      **MS. FORCHETTI:** I don't have any further

[24]      questions.

[25]      **THE COURT:** Ladies and gentlemen, we are

            Jaclyne Wilson

Page 240

[1] going to recess now, and I remind you to keep an

[2] open mind. Don't discuss the case amongst

[3] yourselves and don't permit anyone to discuss it

[4] with you.

[5]      We are going to resume tomorrow morning

[6] promptly at nine o'clock. Let me advise you that we

[7] cannot get started until everyone is in place. One

[8] person is late, then we cannot get started. So

[9] please. We'll start tomorrow morning at 9:00.

[10] Enjoy your evening. We'll see you all back here

[11] tomorrow.

[12]      Ladies and gentlemen, please remain in

[13] your places until such time as the jurors have

[14] cleared the floor.

[15]      Enjoy your evening, ladies and gentlemen.

[16] The court officers and/or crier will tell you how to

[17] deliver your note pads to them.

[18] (Jury exits the courtroom at 5:08 p.m.)

[19]      **THE COURT:** Let the record reflect the

[20] jurors have left the room.

[21]      Would you please call your people and

[22] tell them I expect to start at nine o'clock, to

[23] please have someone here at nine o'clock. I don't

[24] know why it's necessary for me to have to call and

[25] beg for a sheriff to come up. I start ever morning

            Jaclyne Wilson

Page 241

[1] at nine o'clock. If you could tell them, if
[2] someone, if one of the two of you would get on the
[3] phone and tell them I will start tomorrow at 9:00, I
[4] will greatly appreciate it.
[5]       THE SHERIFF: I will convey that,
[6] Your Honor.
[7]       THE COURT: We will be starting tomorrow
[8] at 9:00, counsel. Not 9:05, but nine o'clock.
[9]       Is that clear?
[10]       MS. FORCHETTI: Yes, Your Honor.
[11]       MR. LORUSSO: May I address another
[12] matter?
[13]       THE COURT: Yes.
[14]       MR. LORUSSO: Based upon this detective's
[15] testimony, I gather that there is an interview of
[16] this person identified as having worn glasses and
[17] there was an identification made. I have absolutely
[18] nothing dealing with that, and I would ask that I be
[19] provided with all of that documentation presently
[20] and I would move for a mistrial based upon the fact
[21] that there may be a witness that I have not had any
[22] knowledge of up until this point that may render
[23] exculpatory information for my client.
[24]       THE COURT: You may respond.
[25]       MS. FORCHETTI: Your Honor, there is no
           Jaclyne Wilson

Page 242

[1] codefendant in this case. I don't see how this
[2] person was exculpatory. The investigation
[3] terminated upon --
[4]       THE COURT: Do you have an interview from
[5] somebody that you didn't turn over?
[6]       MS. FORCHETTI: No.
[7]       THE COURT: That's what he just said. He
[8] learned from the detective that there was an
[9] interview and it hasn't been turned over to him.
[10] Ask the detective for the interview.
[11]       MS. FORCHETTI: That was news to me. I
[12] will get it and we will give it to counsel.
[13]       THE COURT: That was news to you?
[14]       MR. LORUSSO: Can we --
[15]       THE COURT: You asked about the interview
[16] without ever having --
[17]       MR. LORUSSO: Can we have detective come
[18] back in?
[19]       THE COURT: Why is he leaving?
[20]       COURT CRIER: I thought you were done
[21] him, Your Honor.
[22]       THE COURT: I'm not done with him.
[23] Do you have an interview?
[24]       MS. FORCHETTI: I don't believe I do.
[25]       THE COURT: Well, ask your detective. He
           Jaclyne Wilson

Page 243

[1] just said he took and interview. He doesn't have to
[2] get on the stand.
[3]       Find the interview and bring it back in.
[4]       MS. FORCHETTI: Okay.
[5]       (Hearing adjourned at 5:11 p.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
           Jaclyne Wilson

Page 244

[1]       CERTIFICATE
[2]
[3] I HEREBY CERTIFY THAT THE PROCEEDINGS AND EVIDENCE ARE
[4] CONTAINED FULLY AND ACCURATELY IN THE NOTES TAKEN BY ME ON THE
[5] TRIAL OF THE ABOVE CAUSE, AND THIS COPY IS A CORRECT
[6] TRANSCRIPT OF THE SAME.
[7]
[8]
[9]
[10]
[11]       JACLYNE A. CRAIGHEAD
[12]       OFFICIAL COURT REPORTER
[13]
[14]
[15]
[16]
[17] (THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY
[18] TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE
[19] DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING REPORTER.)
[20]
[21]
[22]
[23]
[24]
[25]
           Jaclyne Wilson

Lawyer's Notes

