# First Judicial District of Pennsylvania

*51CR00047732011*
*Johnnie Simmons*

---

*Trial (Jury) Volume 2*
*December 07, 2011*



---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 120711^Simmons.txt, 166 Pages*
*CRS Catalog ID: 12071456*

## Page 1

[1]        IN THE COURT OF COMMON PLEAS
[2]    FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]           CRIMINAL TRIAL DIVISION
[4]
                    - - -
[5]
[6] COMMONWEALTH        : CP-51-CR-0004773-2011
                        :
[7]    V.               :
                        :
[8] JOHNNIE SIMMONS     :
[9]
                    - - -
[10]
[11]   Courtroom 802, Criminal Justice Center
[12]      Philadelphia, Pennsylvania
[13]
                    - - -
[14]      December 7, 2011
[15]
                    - - -
[16]          Jury Trial
[17]          Volume  II
[18]
                    - - -
[19] B E F O R E:  THE HONORABLE SANDY L. V. BYRD, J.
[20]
[21] APPEARANCES:
[22]    STACY FORCHETTI, ESQUIRE
          Assistant District Attorney
[23]      For the Commonwealth
[24]    VINCENT LORUSSO, ESQUIRE
          Counsel for the Defendant
[25]

                    Jaclyne Wilson

## Page 2

[1]              COMMONWEALTH'S EVIDENCE
[2]
    WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
[3]
    DET. MICHAEL ACERENZA    --    7    36    41
[4]
    P.O. JAMES EDMISTON   43    53    --    --
[5]
    P.O. MICHAEL LONG    58    73    86    89
[6]
    KYLE HOLMAN    120    129    138    --
[7]
    DET. ROBERT HASSEL   143    --    --    --
[8]
    DET. STEPHEN GRACE   151    159    --    --
[9]
    P.O. RICHARD ALEXANDER   162    164    --    --
[10]
[11] EXHIBIT          DESCRIPTION          PAGE
[12] C-16        75-48                47
[13] C-17        75-48 A              60
[14] C-18        Statement (PO Long)  66
[15] C-19        Statement (Holman)   125
[16] C-20        Search Warrant       145
[17] C-21        Property Receipt     156
[18] C-22        Clothing             156
[19]
[20]
[21]
[22]
[23]
[24]
[25]
                    Jaclyne Wilson

## Page 3

[1]            DEFENDANT'S EVIDENCE
[2]
[3] WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
[4] (None presented.)
[5]
    EXHIBIT          DESCRIPTION          PAGE
[6] D-2        75-49                80
[7]
    D-3        Statement (Collins)  8
[8]
    D-4        75-48 A              8
[9]
    D-5        Photo Array          8
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
                    Jaclyne Wilson

## Page 4

[1]    THE COURT:  We're back on the record in
[2] our trial case, Commonwealth vs. Johnnie Simmons,
[3] CP-51-CR-0004773-2011.  Mr. Simmons is here with his
[4] attorney, Mr. Lorusso.  The Commonwealth by
[5] Ms. Forchetti.
[6]        On yesterday at the end of the day
[7] Commonwealth witness on direct, Detective Acerenza,
[8] made a reference to a statement by a person later
[9] identified as Khalif Collins.  The statement was
[10] produced by the Commonwealth, presented to
[11] Mr. Lorusso, who then read it in court.
[12] Unfortunately, by that time is was 5:15 or
[13] thereabouts and we had recessed.  Our reporter had
[14] gone home.  So I am going to reproduce what happened
[15] at that juncture.  If either one of you have any
[16] objection to my comments, then you make them.
[17]        After the statement was produced and read
[18] by Mr. Lorusso, I inquired of Mr. Lorusso if he
[19] needed the Court's intervention in any fashion.  If
[20] he wanted Mr. Collins brought in, if he needed
[21] additional time, if there was anything that he
[22] wanted in light of the late disclosure of the
[23] statement.  His reply was, No, I do not need this
[24] person subpoena.  Nor do I need more time.  I will,
[25] however, cross-examine the detective about this.
                    Jaclyne Wilson

Page 5

[1]      Is that a fair statement, Mr. Lorusso?

[2]      **MR. LORUSSO**: It is, Your Honor.

[3]      **THE COURT**: All right. Are we ready to

[4] proceed, Ms. Forchetti?

[5]      **MS. FORCHETTI**: We are, Your Honor. I

[6] did have --

[7]      **THE COURT**: All right. Have your witness

[8] take the stand.

[9]      **MS. FORCHETTI**: Okay.

[10]      **THE COURT**: What is it that you want to

[11] say?

[12]      **MS. FORCHETTI**: I did ask Mr. Lorusso

[13] last night if I could call Mr. Leland Kent from my

[14] office out of turn because he had several other

[15] engagements this morning, but Mr. Kent has not

[16] arrived yet so it's really a moot point.

[17]      **THE COURT**: Why should he? It's only the

[18] Court asking if he can be here at 9:00. Why should

[19] Mr. Kent be different from anybody else?

[20]      **MS. FORCHETTI**: I spoke to him this

[21] morning right before 8:30 and he told me he was on

[22] his way over but I haven't seen him.

[23]      **THE COURT**: Bring in the witness from

[24] yesterday. If you have -- if you subpoena Mr. Kent

[25] for a time certain, and he's not here and you have a

Jaclyne Wilson

Page 6

[1] motion, I will take the appropriate actions.

[2]      Bring in the detective from yesterday.

[3]      **MS. FORCHETTI**: Okay.

[4]      **THE COURT**: All right. We're bringing

[5] out the jurors.

[6]      (Jury enters the courtroom at 9:20 a.m.)

[7]      **THE COURT**: Good morning, ladies and

[8] gentlemen.

[9]      ...DETECTIVE MICHAEL ACERENZA, after

[10] having been first duly sworn, was examined and

[11] **testified as follows**:

[12]      _ _ _

[13]      **COURT CRIER**: State your name, badge

[14] number for the record and spell your last name.

[15]      **THE WITNESS**: Detective Michael Acerenza,

[16] A-C-E-R-E-N-Z-A, Badge No. 8153, assigned to

[17] Northwest Detectives.

[18]      **THE COURT**: Ladies and gentlemen, you

[19] will recall that on yesterday Detective Acerenza was

[20] on direct examination. We will commence this

[21] morning with cross.

[22]      Are you ready to proceed, Mr. Lorusso?

[23]      **MR. LORUSSO**: Yes, Your Honor.

[24]      **THE COURT**: You may.

[25]

Jaclyne Wilson

Page 7

[1]      _ _ _

[2]      CROSS - EXAMINATION

[3]      _ _ _

[4] BY MR. LORUSSO:

[5] **Q.**   Good morning, Detective Acerenza.

[6] **A.**   Good morning.

[7] **Q.**   Detective, being the assigned detective in this case,

[8] you are responsible for the entire investigation of this

[9] shooting; is that correct?

[10] **A.**   Yes.

[11] **Q.**   And how long have you been a detective?

[12] **A.**   Since 2004.

[13] **Q.**   In how many cases since 2004 have you been assigned to

[14] investigations, be they shootings, robberies, any crimes?

[15] **A.**   Since 2004.

[16] **Q.**   How many times between 2004 and February 4th of 2011,

[17] if you can approximate?

[18] **A.**   Hundreds.

[19] **Q.**   Hundreds.

[20]      Are you familiar with the rules of discovery with

[21] regards to statements and photographs of witnesses that are

[22] obtained by you?

[23] **A.**   Yes.

[24] **Q.**   And what is your understanding of those rules?

[25] **A.**   That that information has to be submitted and to be

Jaclyne Wilson

Page 8

[1] made available to the attorneys.

[2] **Q.**   Okay. And did you submit all of the statements or

[3] identification evidence in this case pursuant to those rules?

[4] **A.**   I believe I did.

[5] **Q.**   You believe you did.

[6]      **MR. LORUSSO**: I'm going to ask that this

[7] be marked D-3, D-4 and D-5 for identification.

[8]      (Statement (Collins) marked Defense

[9] Exhibit D-3 for identification.)

[10]      (75-48A marked Defense Exhibit D-4 for

[11] identification.)

[12]      (Photo array marked Defense Exhibit D-5

[13] for identification.)

[14]      **COURT CRIER**: Your Honor, so marked D-3,

[15] D-4 and D-5.

[16] BY MR. LORUSSO:

[17] **Q.**   Would you identify to the jury what those exhibits

[18] consist of, detective?

[19] **A.**   This is a copy of an interview that I took of Khalif

[20] Collins. This is an investigation of -- a pedestrian

[21] investigation report for that same male, Khalif Collins,

[22] prepared by a police officer in the 14th District, I believe

[23] 14th District. This is a photo array prepared with a

[24] photograph of the male, Khalif Collins, which was identified

[25] by Charles Talbert as the man with the glasses.

Jaclyne Wilson

---

**Page 9**

[1] Q.  Can you -- by the way, would you tell us which of those
[2] photographs is Khalif Collins?
[3] A.  The last photograph, lower right-hand corner.
[4] Q.  Last photograph on the right-hand corner.  Okay.
[5]  When is it that you believed that you turned that
[6] information over?
[7] A.  Was interviewed on May 19th, 2011, at four o'clock p.m.
[8] I scanned it into the police case report, I scanned it in the
[9] next day, the next day I was working.
[10] Q.  So the rules of discovery provide for you to give that
[11] information to the Commonwealth's attorney which then gets
[12] turned over to defense; is that correct?
[13] A.  Yup.  I scan my reports into the police internet system
[14] and it's made available to the attorneys.
[15] Q.  So that is your compliance with discovery, scanning
[16] items into the police internet system?
[17] A.  The internet system is made available to the attorneys,
[18] to the District Attorney's Office, and that is instead
[19] of -- in the old days when we used to take stacks of paperwork
[20] and mail it down, instead of faxing it, we scan it.
[21] Q.  And the first time that there was ever -- strike that.
[22]  You were part of or I guess the author for the most
[23] part of the 75-49 which is the summary of the overall
[24] investigation; is that correct?
[25] A.  Yes.

Jaclyne Wilson

---

**Page 10**

[1] Q.  Would it be fair to say -- and there's actually another
[2] form that the police department uses called a 75-52, I think,
[3] which would be a supplemental 75-49, correct?
[4] A.  Yes.
[5] Q.  Would it be fair to say that there was never any
[6] mention of a Khalif Collins or an identification made of
[7] Khalif Collins or a statement made of Khalif Collins in a
[8] 75-49?
[9] A.  That's correct.
[10] Q.  Would it be fair to say that there was never a
[11] supplemental 75-52 prepared after a statement was obtained
[12] from Khalif Collins and an identification procedure was
[13] revealed; would that be fair?
[14] A.  Yes.
[15] Q.  Okay.  And would it be fair to say also that the first
[16] time that you ever physically handed a copy of D-3, 4 and 5,
[17] the statement, the pedestrian stop and the photographic array,
[18] to the district attorney and to me was after court adjourned
[19] last night?
[20] A.  Yes.
[21] Q.  Okay.  And so I assume from your responses that the
[22] reason for that was your belief that scanning that information
[23] into the police computer on the internet and making it
[24] available satisfied the requirements of providing discovery
[25] information?

Jaclyne Wilson

---

**Page 11**

[1] A.  Yes.
[2] Q.  Okay.  Now, so looking at those records, it appears
[3] that Charles Talbert made an identification of an individual
[4] by the name of Khalif Collins; is that correct?
[5] A.  Yes.
[6] Q.  And where did that identification procedure occur?
[7] A.  In this building.  In the lower level.
[8] Q.  Okay.  And what did he identify Khalif Collins as
[9] doing, if anything?
[10] A.  I asked Charles Talbert if he could identify the male
[11] that he referred to with the glasses, that he had already
[12] referred to in his original interview, and he pointed to the
[13] lower right-hand corner of the photograph, Khalif Collins.
[14] Q.  What was the date of that?
[15] A.  April 26th, 2011.
[16] Q.  So that would have been the same day that he testified,
[17] Mr. Talbert did, at the preliminary hearing across the
[18] hallway, correct?
[19] A.  Yes.
[20] Q.  Okay.  So after he testifies then you interview him or
[21] you show him the photo array; is that correct?
[22] A.  Yes.
[23] Q.  Okay.  And subsequent to -- and by the way, that person
[24] that he testified to, we can basically or in summary refer to
[25] him as kind of the set up man, couldn't we?

Jaclyne Wilson

---

**Page 12**

[1] A.  If that's how you want to refer to him.
[2] Q.  Well, how would -- I would refer to him as an
[3] accomplice at worst, wouldn't you?  You know what an
[4] accomplice is, correct?
[5] A.  I do.  That would have to be argued at -- I wanted to
[6] find out who the male with the glasses was.  Police stopped
[7] the male in the area on February 9th that had glasses on.  The
[8] next contact I had with Charles Talbert was on the 26th.
[9] Q.  Police stopped a man in the area on February 9th that
[10] had glasses on.
[11]  Would you be kind enough to direct me to the
[12] discovery material that reflects that information?
[13] A.  The 75-48 A that the police officer prepared, the male
[14] matched the flash, black male, glasses, thin, 5'10, involved
[15] in shooting, 1300 it says Duval Street.
[16] Q.  What's the date on that, detective?
[17] A.  February 9th.
[18] Q.  So that pedestrian stop where they stopped an
[19] individual, does it actually have the name of Khalif Collins
[20] on it?
[21] A.  Yes.
[22] Q.  And that was prepared and that was in your file on
[23] February 9th?
[24] A.  We didn't have the information --
[25] Q.  No.  No.  I'm talking about the 75-483 that you just

Jaclyne Wilson

---

Page 13

[1] testified to. That was in your file on February 9th?

[2]          MS. FORCHETTI: Your Honor, objection.

[3]          D-5 is actually a 75-48 A.

[4] **BY MR. LORUSSO:**

[5] **Q.**   The 75-48 A, I'm sorry. Is that actually called a

[6] pedestrian stop?

[7] **A.**   Yes, it is.

[8] **Q.**   Okay. You had this information on February 9th of this

[9] year?

[10] **A.**   No. It took several days for police officers to

[11] forward that information to me.

[12] **Q.**   And why is it that I didn't get this information until

[13] the close of court yesterday?

[14] **A.**   I scanned the information into the police database and

[15] I thought that was sufficient.

[16] **Q.**   When did you scan in the 75-48 A dealing with the

[17] stopping of a Khalif Collins?

[18] **A.**   I faxed off the investigation report, the photo array

[19] and the interview all at the same time, the next day after

[20] Khalif Collins was interviewed.

[21] **Q.**   So that was February; is that right?

[22] **A.**   That was May 20th when I scanned it.

[23] **Q.**   May 20th when you scanned the report that you're saying

[24] was prepared on --

[25]          MR. LORUSSO: Court, indulge me.

                              Jaclyne Wilson

Page 14

[1]          (Pause.)

[2] **BY MR. LORUSSO:**

[3] **Q.**   Would you be kind enough to look at that 75-48 that is

[4] marked D-3 or 4?

[5] **A.**   The 48 A?

[6] **Q.**   D-5.

[7] **A.**   The 48 A I have as D-4.

[8] **Q.**   D-4. Would you be kind enough -- okay.

[9]          The report date, that was prepared on February 9th,

[10] correct?

[11] **A.**   Yes.

[12] **Q.**   And it wasn't provided physically other than you

[13] scanning some information on the internet in May to anyone

[14] until last night, correct?

[15] **A.**   Correct.

[16] **Q.**   And that information says that matched a flash

[17] description of a black male with glasses, thin, 5'10, involved

[18] in the shooting, correct?

[19] **A.**   Correct.

[20] **Q.**   That was when this person, Khalif Collins, was stopped

[21] on February 9th, five days after the shooting, correct?

[22] **A.**   Yes.

[23] **Q.**   This is the same Khalif Collins who you obtained a

[24] photograph of and showed what's been marked D-5 to Mr. Talbert

[25] after he testified on April 26th, correct?

                              Jaclyne Wilson

Page 15

[1] **A.**   Yes.

[2] **Q.**   And this is the same individual with the glasses who,

[3] according to the testimony and according to the statement of

[4] Charles Talbert, came in and told -- came into the store and

[5] told Mr. Talbert that there was somebody that wanted to buy

[6] weed from him, correct?

[7] **A.**   Yes.

[8] **Q.**   And that's when Mr. Talbert got shot by that person,

[9] correct?

[10] **A.**   Yes.

[11] **Q.**   And you've been a detective since 2004 and I'm sure

[12] that other than people that are specifically shooters, you've

[13] arrested people that are accomplices, people who aided and

[14] abeted a shooting; is that correct?

[15] **A.**   Yes.

[16] **Q.**   When did you arrest Khalif Collins in this case?

[17] **A.**   I did not.

[18] **Q.**   You did not.

[19]          And based on the testimony of Mr. Talbert and based

[20] on the statement made by Mr. Talbert with regard to this

[21] person identified as wearing glasses, a person who apparently

[22] fits the flash description of someone five days after the

[23] shooting, why did you not arrest this individual?

[24] **A.**   Because after the interviews were conducted, I reviewed

[25] the interviews that were conducted by Mr. Talbert and

                              Jaclyne Wilson

Page 16

[1] witnesses and I didn't feel there was enough evidence to show

[2] that Khalif Collins knew that a shooting was going to happen.

[3] I talked to the district attorneys about that information and

[4] I did not arrest that male.

[5] **Q.**   So let's look at the information that you had then

[6] because you -- I assume you were present in the courtroom; is

[7] that right? Well, maybe you weren't, when Mr. Talbert

[8] testified at the preliminary hearing. Were you?

[9] **A.**   No, I was not.

[10] **Q.**   You were not. Okay.

[11]          But you had the benefit of his statement, correct?

[12] The statement that you say that he gave you inside Einstein,

[13] correct, on February the 8th?

[14] **A.**   Yes.

[15] **Q.**   And --

[16]          MR. LORUSSO: Court indulgence.

[17]          (Pause.)

[18]          MR. LORUSSO: Has that been marked as

[19] C-9?

[20]          MS. FORCHETTI: That's correct.

[21]          MR. LORUSSO: May the witness be shown

[22] what has been marked C-9.

[23]          THE COURT: He may be shown C-9.

[24] **BY MR. LORUSSO:**

[25] **Q.**   So to summarize, the information that you made your

                              Jaclyne Wilson

Page 17

[1] determination on or part of which you made your determination
[2] on just not to arrest Mr. Collins, Mr. Talbert told you that
[3] he was approached to sell a bag of weed by this individual,
[4] right, the individual who we'll say had glasses on, right?
[5] **A.** Yes.
[6] **Q.** And he told you that subsequently the shooter came into
[7] the store and complained about the bag being small, correct?
[8] **A.** Yes.
[9] **Q.** The bag that he had just sold to the person wearing the
[10] glasses, correct?
[11] **A.** Yes.
[12] **Q.** And you also had information that that person with the
[13] glasses then came into the store and told Mr. Talbert that
[14] there's somebody outside who wants to buy a bag of weed,
[15] correct?
[16] **A.** Yes.
[17] **Q.** And you also had information from that statement that
[18] Mr. Talbert identified the person outside who eventually shot
[19] him as the person who had come into the store and said the bag
[20] of weed that you just sold this guy wearing the glasses was
[21] light, correct?
[22] **A.** Yes.
[23] **Q.** And you've been a detective, you investigate crimes,
[24] you didn't think that there was enough evidence there to make
[25] a connection between the two; is that what your testimony is?

Jaclyne Wilson

Page 18

[1] **A.** I believed that we identified the male that was
[2] referred to as glasses involved in the weed transaction. I
[3] did not have enough evidence to believe Khalif Collins knew
[4] that a shooting was going to happen. The whole conversation
[5] that Charles Talbert gave involving the male with the glasses
[6] was about weed.
[7] **Q.** Was about weed. Okay.
[8] And you took a statement from Mr. Collins; is that
[9] correct?
[10] **A.** Yes.
[11] **Q.** And that's been marked as D-3?
[12] **A.** That's correct.
[13] **Q.** Okay. So Mr. Collins comes in to Northwest Detectives
[14] Division in May of this year; is that right?
[15] **A.** Yes.
[16] **Q.** Okay. And you asked him about where he was when the
[17] shooting occurred on February 4th at, approximately, 2:11
[18] p.m., correct?
[19] **A.** Yes.
[20] **Q.** In the area of 1300 East Johnson, correct?
[21] **A.** Yes.
[22] **Q.** And where did he tell you that he lived at that time?
[23] **A.** I asked the question, Where were you living on February
[24] 4th, 2011?
[25] Answer is, At 1310 East Johnson Street, Apartment

Jaclyne Wilson

Page 19

[1] 209.
[2] **MR. LORUSSO**: May the witness be shown
[3] what's been marked as C-1 for identification?
[4] **THE COURT**: He may be shown C-1.
[5] **BY MR. LORUSSO**:
[6] **Q.** Referring to C-1, is that 1310 East Johnson Street,
[7] correct?
[8] **A.** I believe so, yes.
[9] **Q.** Okay. And Mr. Collins also told you that the location
[10] of the apartment where he was living fronted on Johnson
[11] Street; is that correct?
[12] **A.** Yes.
[13] **Q.** Told you it was Apartment 209.
[14] Do you know what floor of the building that would be
[15] on?
[16] **A.** I would assume it's the second floor.
[17] **Q.** I would assume it too but we don't know; is that right?
[18] **A.** Right.
[19] **Q.** Okay. So on this day in May when you had Mr. Collins
[20] in Northwest Detectives Division and took a statement from
[21] him, he knew what he was doing that day on February 4th about
[22] 2:11 p.m., correct?
[23] **A.** Yes.
[24] **Q.** He knew he was watching the baby then sitting there
[25] and --

Jaclyne Wilson

Page 20

[1] **MS. FORCHETTI**: Objection, Your Honor.
[2] Calls for hearsay.
[3] **THE COURT**: Overruled.
[4] **BY MR. LORUSSO**:
[5] **Q.** And watching TV; is that correct?
[6] **A.** That's what Khalif Collins told us.
[7] **Q.** Right. And he knew he didn't go outside, correct?
[8] **A.** Correct.
[9] **Q.** And this date in May, three and a half months after
[10] this shooting occurred, Mr. Collins even knew when he had
[11] gotten to the apartment the night before, what time it was; is
[12] that right?
[13] **A.** According to the answer that Khalif Collins gave us,
[14] yes.
[15] **Q.** According to that answer. Right.
[16] And he was aware of a shooting outside of -- in the
[17] 1300 block of Johnson Street because of a phone call that he
[18] received; is that right?
[19] **A.** That's what he told us, yes.
[20] **Q.** Right. But he lives in that apartment and he told you
[21] that he fronts Johnson Street but he didn't hear any gunshots.
[22] He didn't hear any sirens and he didn't see any police
[23] activity or any evidence of the shooting.
[24] Is that what he told you?
[25] **A.** That is what he told us, yes.

Jaclyne Wilson

Page 21

[1] Q.   Now, the district attorney asked you about getting
[2] awards and accommodations and I think you said you don't get
[3] those things for arresting somebody, correct?  So like when
[4] you arrest Johnnie Simmons, you don't get an accommodation or
[5] award for that, right?
[6] A.   There's awards given out for meritorious and brave acts
[7] but just the fact that I got an identification and made an
[8] arrest, I did not get an award for this.
[9] Q.   Right.  And you wouldn't certainly get an award for
[10] arresting Khalif Collins either, right?
[11] A.   Right.
[12] Q.   And you had Johnnie Simmons in custody in this from
[13] February and Khalif Collins didn't come to your attention
[14] until the middle of May, correct?
[15] A.   He came to my attention February 9th.  I met Khalif
[16] Collins May 19th.
[17] Q.   You never did any follow-up until May?
[18] A.   Correct.
[19] Q.   What was the reason for that?
[20] A.   The next contact I had with Charles Talbert wasn't
[21] until April 26th.
[22] Q.   I don't understand.  You had a statement from February
[23] 8th, right?
[24] A.   Yes but I didn't have Khalif Collins' name on February
[25] 8th.

Jaclyne Wilson

Page 22

[1] Q.   This investigation interview record that was prepared,
[2] pedestrian stop 75-48 A that's been marked as D-4 that says it
[3] was prepared on February 9th, you didn't have that in your
[4] file?
[5] A.   On February 8th?  No, I did not.
[6] Q.   No, not on February 8th.  You had it a couple days
[7] after February 9th I think you said, right?
[8] A.   Yes.
[9] Q.   Okay.  So my question to you is -- well, you knew where
[10] Mr. Talbert was during the period from February 8th until
[11] middle of May, correct?
[12] A.   I believe he was in New Jersey.  We didn't meet with
[13] him until April 26th.
[14] Q.   You knew he was in the hospital for three weeks, didn't
[15] you?
[16] A.   I'm not sure what date he got out of the hospital.
[17] Q.   Did you ever check again after February 8th?
[18] A.   I don't remember what day he got out of the hospital,
[19] sir.
[20] Q.   Well, if I tell you that he said he was in the hospital
[21] for about three weeks, my question to you is, Did you know
[22] that or no?
[23] A.   I don't know if I knew at the time or not.  I don't
[24] remember knowing when he got out of the hospital.
[25] Q.   Okay.  You were certainly able to show photographs to

Jaclyne Wilson

Page 23

[1] Mr. Talbert on February 8th when you say that he circled two
[2] photographs, correct?
[3] A.   Correct.
[4] Q.   And the reason that you never compiled a photographic
[5] array to show Mr. Talbert before April 26th, the date of the
[6] preliminary hearing, was because you just -- what is it?  Did
[7] you have other cases to deal with or something and you just
[8] didn't want to follow-up with Mr. Talbert until you came to
[9] court?
[10] A.   No.  Because there was still a question as to whether
[11] or not we believed Khalif Collins actually had something to do
[12] with the shooting.  That's actually why we didn't end up
[13] arresting him.
[14] Q.   So this again Khalif Collins, after you took that
[15] statement from him on May the 19th when he told you not only
[16] do I know what time I got to the apartment before, the day
[17] before, and not only do I know what I was doing at the time
[18] that the shooting occur and not only did I not see or hear
[19] anything that occurred outside of my apartment building, this
[20] person who also told you in response to your question, this is
[21] on page 2, Do you remember what you were wearing on February
[22] 4th, 2011, at, approximately, 2:11 p.m.?  And on May 19th he
[23] said to you, Gray and blue track sneakers, blue Adidas
[24] sweatpants with stripes on the side and I had on a black
[25] jacket.  It's a plain black nylon jacket.

Jaclyne Wilson

Page 24

[1]      That person who had recall of specifically what he
[2] was wearing at the time of the shooting didn't, in your
[3] investigative experience, cause you to pause or follow-up
[4] further or make an arrest under the circumstances; am I
[5] correct?
[6] A.   Correct.  I didn't arrest Khalif Collins.
[7] Q.   Did you think that that was strange that somebody would
[8] give you an identification of specifically what they were
[9] wearing at a point in time when there was no relevance in
[10] their life?
[11] A.   Yes.  As to whether or not Khalif Collins was telling
[12] me the truth or not, I can say I believe he may have been
[13] lying or making things up.  The information that I had in the
[14] investigation with the interviews I had, I did not believe I
[15] had enough evidence to arrest Khalif Collins.
[16] Q.   And looking at the photograph array that's been marked
[17] as D-5, was there a reason that no photograph was circled in
[18] that array by Mr. Talbert or by you?
[19] A.   I guess there was a glass in between us.  We didn't
[20] have physical contact.  Charles Talbert was in custody.  I
[21] didn't have direct contact.  It was through a glass.
[22] Q.   So -- I'm sorry.  That writing is that under his name
[23] or something or did you just know who that was?
[24] A.   I'm sorry?
[25] Q.   The writing -- can I see that exhibit?

Jaclyne Wilson

Page 25

[1]　　　So the writing on the bottom, that was your
[2] handwriting that said that Mr. Talbert identified the
[3] photograph of Khalif Omar Collins, correct?
[4] **A.**　Yes.  Charles Talbert identified a photo of Khalif
[5] Collins, the date and time and myself and my partner Detective
[6] Hassel, that's our signature.
[7] **Q.**　And you said that was the last person down on the right
[8] side of the page.  So going from the top, left to right it
[9] would be like No. 8?
[10] **A.**　Correct.
[11] **Q.**　Okay.  And you didn't circle that either, right?
[12] **A.**　No.
[13] **Q.**　Now, you get assigned to the case right after the
[14] shooting occurs; is that correct?
[15] **A.**　Yes.
[16] **Q.**　You go out to 1300 Johnson, Stenton and Johnson,
[17] correct?
[18] **A.**　No, I didn't go there.  I went to the hospital.
[19] **Q.**　You went to the hospital.  Okay.
[20]　　　You said you went to the hospital.  You weren't able
[21] to speak with Mr. Talbert because of his condition, right?
[22] **A.**　Yes.
[23] **Q.**　So then what do you do, go back to Northwest
[24] Detectives?
[25] **A.**　Yes.

Jaclyne Wilson

Page 26

[1] **Q.**　All right.  Talking about what, half a mile from the
[2] hospital to the detective division?
[3] **A.**　Yes.
[4] **Q.**　Okay.  And you get back there in sufficient time to see
[5] Johnnie Simmons brought in?
[6] **A.**　Yes.
[7] **Q.**　Okay.  And did you have anything to do with Johnnie
[8] Simmons brought in?
[9] **A.**　No.  Officer Long.
[10] **Q.**　Okay.  So Officer Long brings in Johnnie Simmons and
[11] you take a photograph of Johnnie Simmons; is that correct?
[12] **A.**　Other officers in the 35th District did.
[13] **A.**　I'm sorry.  Yeah.  A photograph and that photograph was
[14] what was eventually used in the photo array that you showed to
[15] Mr. Talbert, correct?
[16] **A.**　Yes.
[17] **Q.**　Okay.  And then Johnnie Simmons was released; is that
[18] right?
[19] **A.**　Yes.
[20] **Q.**　Okay.  And being the assigned investigator, you had
[21] with regard to Johnnie Simmons the pedestrian stop,
[22] investigation report which would be the same one that you had
[23] for Mr. Collins, correct?
[24] **A.**　Yes.
[25] **Q.**　Okay.  And do you recall what it was that Mr. -- excuse

Jaclyne Wilson

Page 27

[1] me.  I won't get into that because I think Officer Long is
[2] going to testify.
[3]　　　Do you see this procedure occur, I assume, or you're
[4] present when it occurs, this photographing of Johnnie Simmons
[5] inside Northwest Detectives.  He's released and then what do
[6] you do next with regard to the investigation?
[7] **A.**　The next day I came in, February 8th, is when I
[8] prepared the photo array and met with Charles Talbert.
[9] **Q.**　You don't see Charles Talbert until February 8th,
[10] correct?
[11] **A.**　Correct.
[12] **Q.**　Okay.  And that's inside the hospital.
[13]　　　And when you went in there, it was you and two
[14] other detectives, correct?
[15] **A.**　Correct.
[16] **Q.**　And the statement that you said you obtained from
[17] Charles Talbert, is that what was marked as C-9, is that it?
[18] **A.**　Yes.
[19] **Q.**　Okay.  That statement shows that it began, at least
[20] according to the writing or it says place of interview, 9:55
[21] p.m.; is that correct?
[22] **A.**　Yes.
[23] **Q.**　Now, the photographs that has the two circles on it,
[24] one of Johnnie Simmons' photograph that was taken on February
[25] 4th and another photograph that was circled, what's the time

Jaclyne Wilson

Page 28

[1] that's listed on that photographic array, that exhibit?
[2] A.　When was it identified?  I believe it was 9:50.
[3] Q.　When he was identified, 9:50.  Okay.  And -- I'm sorry.
[4]　　　**MR. LORUSSO**: May I have the exhibit
[5]　　　number for that photo array?
[6]　　　**MS. FORCHETTI**: It's C-10.
[7] **BY MR. LORUSSO**:
[8] **Q.**　Do you have C-10 in front of you?
[9] **A.**　No.
[10]　　　**MR. LORUSSO**: May he be shown C-10?
[11]　　　**THE COURT**: He may be.
[12] **BY MR. LORUSSO**:
[13] **Q.**　So the identification occurs five minutes before the
[14] interview starts; is that accurate?
[15] **A.**　Yes.
[16] **Q.**　Okay.  Prior to the identification occurring, what did
[17] you say to Mr. Talbert?
[18] **A.**　I asked Mr. Talbert to look at the photo array and let
[19] me know if he sees the person who shot him.
[20] **Q.**　Okay.  Did any other police personnel say anything to
[21] Mr. Talbert before or after you said that to him?
[22] **A.**　No.
[23] **Q.**　So he looked at the photographs and I believe your
[24] testimony is that in about ten seconds he pointed to Johnnie
[25] Simmons; is that correct?

Jaclyne Wilson

Page 29

[1] A.    Yes.

[2] Q.    And was that pointing immediately following up by him
[3] circling the photograph?

[4] A.    Yes.  After he pointed to the picture, I gave Charles
[5] Talbert my pen, asked him to circle the picture that he
[6] identified.

[7] Q.    And he circled not only that picture but a second
[8] picture, correct?

[9] A.    Yes.

[10] Q.    Do I recall your testimony yesterday that he made the
[11] comment to the effect that it may have been him too when you
[12] asked him why did he circle the other one?

[13] A.    Yes.

[14] Q.    He wasn't sure between the two people that he circled
[15] who was actually the person who he thought shot him; is that
[16] correct?

[17] A.    The question I ask him after that, Is the first person
[18] you identified, is that the person that shot you?  He said,
[19] Yes.

[20] Q.    So in one instance he says to you in response to the
[21] question, Why did you circle the second one, after you asked
[22] him that he says, Because he may have been the one that shot
[23] me.

[24]        Am I correct on that?

[25] A.    Can you repeat that?

Jaclyne Wilson

Page 30

[1] Q.    Yeah.  After he circles two pictures, you say to him,
[2] Why did you circle two; is that correct?

[3] A.    Yes.

[4] Q.    And his response was, Because he may have been the one
[5] that shot me too, meaning the other one, correct?

[6] A.    He said, It could also be him.

[7] Q.    It could also be him.  But I mean certainly he conveyed
[8] to you that he wasn't sure between the two individuals, before
[9] you further questioned him that is, who it was that shot him;
[10] is that correct?

[11] A.    Yes.

[12] Q.    Okay.  Now, look at, if you would be so kind,
[13] detective, C-9, I think is the statement of Mr. Talbert.

[14] A.    Yes.

[15] Q.    And if you would look at the bottom of page 2 which
[16] would be the second question from the bottom where there's a
[17] description, right?

[18] A.    Yes.

[19] Q.    You ask Mr. Talbert, Can you describe the male that
[20] shot you, correct?

[21] A.    Correct.

[22] Q.    The response was, Slim, light-skinned, short, skinny
[23] face, small head, khaki set or cargo set; is that correct?

[24] A.    Yes.

[25] Q.    Tan or beige, correct?

Jaclyne Wilson

Page 31

[1] A.    Yes.

[2] Q.    No facial hair, 19 to 20 years of age, correct?

[3] A.    Yes.

[4] Q.    Khaki set or cargo set.  What would that be?

[5] A.    Pants and top.

[6] Q.    That's what your mind's eye perceives when he says it's
[7] a set, that it's a uniform kind of thing; is that right?

[8] A.    Yes.

[9] Q.    Okay.  Now, after you got that description, the next
[10] question you ask Mr. Talbert was, Have you ever seen him
[11] before; is that correct?  Is that the next question you asked
[12] him?

[13] A.    Yes, I did.

[14] Q.    And Mr. Talbert, what was his answer?

[15] A.    He said, No.

[16] Q.    He said he never seen the person who he described as
[17] the shooter before; is that right?

[18] A.    Yes.

[19] Q.   And this interview starts at 9:55 according to your
[20] statement and whether what we'll say was a signature or
[21] purported signatures on the pages timed at 11:10 p.m.; is that
[22] correct?

[23] A.    Yes.

[24] Q.    And the interview consists of five and a half
[25] handwritten pages, correct?

Jaclyne Wilson

Page 32

[1] A.    Yes.

[2] Q.    And after on the second page in response to the
[3] question of Mr. Talbert, Have you ever seen him before, being
[4] the shooter, and his response being, No, you then asked him to
[5] describe the gun, correct?

[6] A.    Yes.

[7] Q.    And he tried to describe the gun for you, right?

[8] A.    Yes.

[9] Q.    Now, this would seem to me as I read it to be out of
[10] sequence but suddenly there's a question in there about, I
[11] showed you a photo array with eight photographs.  Did you see
[12] the person that shot you in the photo array, right?

[13]        So was that just a natural sequence of questioning?
[14] You went from him not -- saying that I didn't know -- I don't
[15] know who it was that shot me -- I never seen him before.  I'm
[16] sorry.  To describing the gun to then referring back to this
[17] photo array that you had showed him before, was that your
[18] natural sequence of events or was this --

[19] A.    I wanted to get his account of what happened.  So I did
[20] it on the first page and then I just ask follow-up questions.

[21] Q.    Okay.  He said, I think the one on the bottom is the
[22] one who shot me, right?

[23] A.    Yes.

[24] Q.    And then -- now, I'm assuming this, the top of page 3,
[25] this is the next question after the question, Have you ever

Jaclyne Wilson

## Page 33

[1] seen him before, and he says, No, and then suddenly you ask
[2] him the question about the gun and then we're back to the
[3] photo array.
[4]     And, now, I mean, questioning just goes like, you
[5] know, like I'm questioning you kind of so we're talking about,
[6] hey, ever seen him before?  Hey, what kind of gun is it?  Hey,
[7] have you seen the photo array?  Is that the kind of thing or
[8] is there any great pause or discussions in between these
[9] questions?
[10] **A.**  No.  I asked the questions and I try to write the
[11] answers down as they tell me.
[12] **Q.**  So suddenly he goes from saying, I never saw this
[13] person before to, Now that I think of it, his name is Johnnie
[14] I think he's the one who shot me, and then he proceeds to tell
[15] you how he knew Johnnie for years; is that right?
[16] **A.**  Yes.
[17] **Q.**  Was there any discussion about the other
[18] individual -- strike that.
[19]     Did you ever do anything with respect to follow-up
[20] on the other individual whose photograph was circled?
[21] **A.**  I have data information.  I believe his name is John
[22] Rivera from my recollection but I didn't do an extensive
[23] investigation.
[24] **Q.**  And I assume that's because within a matter of a minute
[25] or two suddenly Mr. Talbert had realized that the person who

                   Jaclyne Wilson

## Page 34

[1] shot him he had actually known for years as opposed to never
[2] having seen him before; is that right?
[3] **A.**  Well, the reason that male's photo is in the photo
[4] array is just based on the description and a similar photo.  I
[5] had no reason to believe that that male had anything to do
[6] with this incident.
[7] **Q.**  The search warrant that was executed for the home of
[8] Johnnie Simmons, you were the affiant on that search warrant?
[9] **A.**  Yes, myself and Detective Sloan.
[10] **Q.**  Okay.  And there was clothing that was recovered?
[11] **A.**  I believe so by Detective Grace and Detective
[12] Suchinsky.
[13] **Q.**  Is there an inventory of the search warrant that has
[14] been marked as an exhibit in this case reflecting what the
[15] results of the search were?
[16] **A.**  I believe there is.  I have to see it.
[17]       **MS. FORCHETTI**:  It's C-13.
[18]       **MR. LORUSSO**:  Thank you.
[19] **BY MR. LORUSSO**:
[20] **Q.**  You were privy to that information as the assigned
[21] detective; is that correct?
[22] **A.**  Yes.
[23] **Q.**  So part of your investigation, what was recovered from
[24] 1528 East Johnson Street?
[25] **A.**  Says property seized, clothing, tan pants, brown

                   Jaclyne Wilson

## Page 35

[1] jacket, identification in the name of Johnnie Simmons.
[2] **Q.**  Tan pants, brown?
[3] **A.**  Jacket.
[4] **Q.**  Jacket.
[5]     And going back to that description that Mr. Talbert
[6] gave you before suddenly he knew who the shooter was where he
[7] said the person was wearing tan set or cargo set, tan or
[8] beige, right?
[9] **A.**  Yes.
[10] **Q.**  Cargo, was that his words?
[11] **A.**  Cargo or -- I believe.
[12] **Q.**  I think it was both.
[13] **A.**  Khaki set or cargo set.
[14] **Q.**  So cargo, your mind's eye pictures pants, I mean, with
[15] baggie pockets or big pockets on them, that would be cargo
[16] pants?  Is that your thought on it?
[17] **A.**  Yes.
[18] **Q.**  The pants that were -- the tan pants that were
[19] recovered from 1528 East Johnson, were they cargo pants, that
[20] you know?
[21]       **MS. FORCHETTI**:  Objection, Your Honor.
[22]      This officer did not physically recover those items.
[23]       **THE COURT**:  Overruled.
[24]       **THE WITNESS**:  I don't remember.
[25]

                   Jaclyne Wilson

## Page 36

[1] **BY MR. LORUSSO**:
[2] **Q.**  You don't remember.  Okay.
[3]       **MR. LORUSSO**:  Court, indulge me.
[4]       (Pause.)
[5] **BY MR. LORUSSO**:
[6] **Q.**  Was there anything that -- strike that.
[7]     Thank you.
[8]       **MR. LORUSSO**:  I have nothing further of
[9] this detective.
[10]       **THE COURT**:  Do you have any redirect?
[11]       **MS. FORCHETTI**:  I do, Your Honor.
[12]       **THE COURT**:  Go ahead.
[13]          _ _ _
[14]      REDIRECT EXAMINATION
[15]          _ _ _
[16] **BY MS. FORCHETTI**:
[17] **Q.**  Detective, had any of the other witnesses with whom you
[18] spoke or any of your brother detectives spoke mention anything
[19] about a male with glasses?
[20] **A.**  I don't believe so.
[21] **Q.**  Did you have any other witnesses offering to identify a
[22] person in glasses?
[23] **A.**  Not at the time, no.
[24] **Q.**  Did your investigation find any connection between
[25] Khalif Collins and the defendant, Johnnie Simmons?

                   Jaclyne Wilson

Page 37

[1] A.    No.

[2] Q.    Did you have any evidence of any conspiracy there?

[3] A.    No.

[4] Q.    And so why did you feel that there wasn't sufficient

[5] evidence to arrest Khalif Collins after Charles Talbert

[6] identified him?

[7] A.    The only information I had against Khalif Collins was

[8] the interview that I took from Charles Talbert and that

[9] conversation was about a weed transaction.

[10] Q.    And in your investigations is it typical or have you

[11] often run into dead ends into investigating conspirators?

[12] A.    Yes.

[13] Q.    When Charles Talbert identified Khalif Collins and he

[14] wasn't able to circle him because there was glass separating

[15] the two of you, why didn't you circle the photograph?

[16] A.    I don't want to circle the photograph.  Usually every

[17] time I have someone identify someone in a photo array, I have

[18] them circle the photograph that they pointed to or identified.

[19] In this case he wasn't able to do that.  That's why I just

[20] wanted to document in writing that he identified that

[21] photograph and myself and my partner signed it.

[22] Q.    And, detective, is it your procedure when you first

[23] show a witness the array, to hand the array over without

[24] handing over a pen?

[25] A.    Yes.

Jaclyne Wilson

Page 38

[1] Q.    Why do you do it that why?

[2] A.    I don't want them to make any markings on the array.  I

[3] don't want anything to be in their focus.  I just want them to

[4] concentrate and look at the array and the photographs that

[5] they're looking at.

[6] Q.    And, detective, the interview that counsel was going

[7] over with you for Charles Talbert on February 8th, were you

[8] recording the answers at the same time you were asking the

[9] questions?

[10] A.    Yes.  I would write out the question, ask the question,

[11] and as he told me, I would write the answer.

[12] Q.    Did it surprise you when Charles Talbert said at first

[13] that he didn't know his shooter and then said that he did?

[14] A.    Yes.  That's why I tried to explain everything as best

[15] I could on the interview.

[16] Q.    And, detective, the search warrant that was in front of

[17] you marked as Commonwealth Exhibit 13, on what day was that

[18] executed?

[19] A.    February 9th, 2011, in the morning, 6:30 a.m.

[20] Q.    And I believe you told us on direct examination you

[21] prepared that after you spoke with Mr. Talbert the day before?

[22] A.    Yes.

[23] Q.    And, detective, the information that you received from

[24] Charles Talbert about TI, did you look into that?

[25] A.    I did.  I mentioned it to other detectives.  I believe

Jaclyne Wilson

Page 39

[1] Detective Grace and Suchinsky were the ones that served the

[2] search warrant --

[3]         MR. LORUSSO:  Objection.  Beyond the

[4]     scope of cross.

[5]         THE COURT:  Overruled.

[6]         THE WITNESS:  I believe Detective Grace

[7]     and Suchinsky had further information about that

[8]     individual.

[9] BY MS. FORCHETTI:

[10] Q.    Okay.  And when Charles Talbert mentions in the

[11] interview that he believes this shooting was connected to TI

[12] because of a phone call from his friend Janae, did you ever

[13] have any contact with Janae?

[14] A.    No.

[15] Q.    And, detective, when you're investigating a shooting

[16] and flash description is put out, are the officers stopping

[17] other people in the area who match that flash description?

[18] A.    Yes.

[19] Q.    Are you always aware of every person that gets stopped?

[20] A.    No.

[21] Q.    Why is that?

[22] A.    Because if it's negative results, if the person just

[23] happens to be wearing similar clothing, they might be

[24] investigated and released if they had nothing to do with the

[25] incident, if they were just walking in the area at the time.

Jaclyne Wilson

Page 40

[1] Q.    So just fitting the flash description, that's not

[2] enough to arrest anyone; is that right?

[3] A.    Correct.

[4] Q.    The witness interviews that were conducted with respect

[5] to this shooting, did any of the other witnesses interviewed

[6] say that they thought they could identify?

[7] A.    A male by the name of Kyle Holman wasn't interviewed

[8] until February 10th.  So that photo array was not shown to

[9] Kyle Holman.  I believe he did say he could identify a person

[10] with the information that he gave us.  He wasn't a witness to

[11] the shooting but witnessed a male walking in the area at the

[12] time.  I'm not sure of the exact contents of the interview.

[13] Q.    Okay.  Why wouldn't Mr. Holman be shown a photo array?

[14] A.    On February 10th is when he was interviewed.  The

[15] defendant was already in custody at that time so we didn't

[16] show him the photo array.

[17] Q.    Why don't you do that?  Why don't you show an interview

[18] once a suspect has been arrested and taken into custody?

[19] A.    I didn't want it to be prejudicial to the defendant

[20] being that he was already in custody for the incident.  I

[21] didn't want to continue to show his photograph, in court and

[22] they show line-ups.  There's other things district attorney's

[23] do but as far as my investigation goes, if the person is in

[24] custody, we don't show the photograph anymore.

[25] Q.    Thank you, detective.

Jaclyne Wilson

Page 41

[1]      MS. FORCHETTI: I don't have anything
[2] further.
[3]      THE COURT: Do you have any recross?
[4]      MR. LORUSSO: Just a couple, Your Honor.
[5]      _ _ _
[6]      RECROSS - EXAMINATION
[7]      _ _ _
[8] BY MR. LORUSSO:
[9] Q. You were just asked a question about not charging
[10] Khalif Collins in this matter, detective.
[11] I recall you testified yesterday about contacting
[12] the Charging Unit of the District Attorney's Office with
[13] regards to Johnnie Simmons. Is that the protocol?
[14] A. Yes.
[15] Q. Who files the charges, you or the District Attorney's
[16] Office?
[17] A. The District Attorney's Office approves the charges and
[18] then I submit the paperwork, the affidavit and the warrant.
[19] Q. Did you ever submit a suggestion to the District
[20] Attorney's Charging Unit concerning filing of charges against
[21] Khalif Collins?
[22] A. I had contact with ADA Forchetti in reference to the
[23] interview and the --
[24] Q. When was that in relation to when Johnnie Simmons got
[25] arrested?

     Jaclyne Wilson

Page 42

[1] A. Some time before the preliminary hearing that the male,
[2] Khalif Collins, that we had an investigation report of the
[3] male that matched the information and then we were in constant
[4] contact as to the photo array being that it happened in this
[5] building and the interview.
[6] Q. Okay. Thank you.
[7]      MR. LORUSSO: I have nothing further.
[8]      MS. FORCHETTI: Just to follow-up on
[9] that, Your Honor.
[10]      THE COURT: Go ahead.
[11]      _ _ _
[12]      REDIRECT EXAMINATION
[13]      _ _ _
[14] BY MS. FORCHETTI:
[15] Q. Detective, why didn't you contact the Charging Unit
[16] with respect to Khalif Collins?
[17] A. Since the case was already in court hearings, I just
[18] wanted to contact the district attorney that was already
[19] handling the court hearing for Johnnie Simmons.
[20] Q. Detective, in your opinion did you feel you had enough
[21] information to submit an arrest warrant for Khalif Collins?
[22] A. No.
[23] Q. Thank you.
[24]      THE COURT: Anything else?
[25]      MR. LORUSSO: I have nothing further,

     Jaclyne Wilson

Page 43

[1] Your Honor.
[2]      THE COURT: You may step down.
[3]      (Witness excused.)
[4]      THE COURT: You may call your next
[5] witness.
[6]      MS. FORCHETTI: Your Honor, at this time
[7] the Commonwealth will call Police Officer Edmiston.
[8]      ...POLICE OFFICER JAMES EDMISTON, after
[9] having been first duly sworn, was examined and
[10] testified as follows:
[11]      _ _ _
[12]      COURT CRIER: State your name, badge
[13] number for the record and spell your last name.
[14]      THE WITNESS: Police Officer James
[15] Edmiston, E-D-M-I-S-T-O-N, Badge No. 6770, 15th
[16] Police District.
[17]      THE COURT: You may proceed.
[18]      MS. FORCHETTI: Thank you.
[19]      _ _ _
[20]      DIRECT EXAMINATION
[21]      _ _ _
[22] BY MS. FORCHETTI:
[23] Q. Good morning, officer.
[24] A. Good morning.
[25] Q. Officer, how long have you been with the Philadelphia

     Jaclyne Wilson

Page 44

[1] police?
[2] A. Four years.
[3] Q. And have you spent your entire career assigned to the
[4] 14th District?
[5] A. No. Currently I'm at the 15th District.
[6] Q. On February of this year were you assigned to the 14th
[7] District?
[8] A. Yes.
[9] Q. And how long have you been assigned there?
[10] A. Three and a half years.
[11] Q. So this transfer to the 15th is recent?
[12] A. Yes.
[13] Q. Okay. And the 15th District is in the Northeast
[14] section of the city; is that correct?
[15] A. That's correct.
[16] Q. And the 14th District, can you explain to the members
[17] of the jury what section of the city that covers?
[18] A. Fourteenth District covers Chestnut Hill, Mt. Airy,
[19] east and west, and West Oak Lane and Germantown.
[20] Q. Were you on duty on February 4th of this year, 2011, at
[21] about two o'clock in the afternoon?
[22] A. Yes.
[23] Q. What was your assignment on that day?
[24] A. I was in Patrol Car 1415.
[25] Q. Okay. So that's a marked patrol vehicle; is that

     Jaclyne Wilson

Page 45

[1] right?

[2] **A.** Yes.

[3] **Q.** Were you in uniform as you are today?

[4] **A.** Yes.

[5] **Q.** Were you working by yourself or with a partner?

[6] **A.** Solo.

[7] **Q.** Okay. And what was your tour of duty that day?

[8] A. I was working 8:00 to 4:00, day work.

[9] **Q.** Day work?

[10] **A.** Yes.

[11] **Q.** Okay. And what, if any, assignment were you given when

[12] you were assigned to the patrol car?

[13] **A.** The particular assignment that came out? Is that what

[14] you're referring to?

[15] **Q.** I'm referring to that day, that day work, were you

[16] asked to patrol a particular sector?

[17] **A.** Yes, PSA 1.

[18] **Q.** Okay. What section of the 14th District does that

[19] sector cover?

[20] **A.** North of Chew Avenue -- sorry. It's east of Chew

[21] Avenue, west of Cheltenham, between Wister and Gorgas, I

[22] think.

[23] **Q.** Okay. So just explain to the jury, what is a sector?

[24] **A.** It's an area of patrol in which an officer patrols.

[25] **Q.** So when you reported to work that day, the 14th

Jaclyne Wilson

Page 46

[1] District is divided up into little chunks?

[2] **A.** Yes.

[3] **Q.** And you were given that chunk, PSA 1?

[4] **A.** Yes.

[5] **Q.** So did something happen in your little chunk of the

[6] 14th District that brought you to the area of the 1300 block

[7] of Johnson Street?

[8] **A.** Yes. There was a call for a shooting.

[9] **Q.** Okay. And how soon after you received that call did

[10] you arrive at that area?

[11] **A.** Maybe a minute. I was at Chew and Washington when it

[12] happened and that's about maybe a third of a mile where it

[13] happened from.

[14] **Q.** And you were in your vehicle?

[15] **A.** Yes.

[16] **Q.** So you drove there?

[17] **A.** Yes.

[18] **Q.** When you get to that area, what do you see?

[19] **A.** I see the complainant laying on the ground in the

[20] middle of the street and he had a towel on his chest.

[21] **Q.** Okay. Were there other people around?

[22] **A.** Yes.

[23] **Q.** What do you then do when you see the victim laying

[24] there on the ground? What's your first step?

[25] **A.** I saw that he was conscious and I told him, Don't move.

Jaclyne Wilson

Page 47

[1] Stay there. We're going to get medics to you right away.

[2] **Q.** And then what else do you do in terms of the scene or

[3] crowd control?

[4] **A.** I tell people to move away from the scene and I was

[5] trying to locate the off-duty officer who was in a foot

[6] pursuit because apparently there was a foot pursuit in

[7] reference to the shooting.

[8] **Q.** Okay. So were you involved in obtaining any

[9] information to put out over police radio?

[10] **A.** Yes.

[11] **Q.** And from whom do you get that information?

[12] **A.** From the off-duty officer I finally contacted.

[13] **Q.** Did you talk to the shooting victim or any of the

[14] witnesses on the scene?

[15] **A.** I talked to one witness. His name was Michael Bell.

[16]     **MS. FORCHETTI:** Your Honor, I would ask

[17] to mark this exhibit as Commonwealth Exhibit C-16 at

[18] this time?

[19]     **THE COURT:** It may be marked.

[20]     (75-48 marked Commonwealth Exhibit C-16

[21]     for identification.)

[22]     **COURT CRIER:** So marked C-16, Your Honor.

[23] **BY MS. FORCHETTI:**

[24] **Q.** Officer, you're being shown a document that's been

[25] marked as Commonwealth Exhibit 16.

Jaclyne Wilson

Page 48

[1]     Do you recognize that document?

[2] **A.** Yes.

[3] **Q.** And what is that?

[4] **A.** It's a 75-48 which is a police report.

[5] **Q.** Can you explain to the members of the jury what is a

[6] 75-48?

[7] **A.** A 75-48 is a report that documents the incident which

[8] happened and it lists the victim or the complainant and

[9] witnesses and items, if it's a robbery or a burglary, items

[10] which was taken.

[11] **Q.** Now, officer, if you would be so kind as to hold up

[12] that document that's been marked C-16.

[13]     Is that a photo copy of the original 75-48 A?

[14] **A.** Yes.

[15] **Q.** Okay. So the actual original doesn't occupy a whole

[16] space of a page, of an eight and a half by eleven typical

[17] piece of paper; is that correct?

[18] **A.** No. It's the size of which you see here.

[19] **Q.** More like a traffic ticket size?

[20] **A.** Yes.

[21] **Q.** Okay. And when do you prepare this document?

[22] **A.** I guess after the incident happens. That's when you

[23] write it up.

[24] **Q.** That same day?

[25] **A.** Yes.

Jaclyne Wilson

Page 49

[1] Q.  Okay.  And what sort of information do you place on the
[2] 75-48?
[3] A.  Pertinent information that's -- information that's
[4] pertinent to what's going on in the incident.
[5] Q.  Important information?
[6] A.  Yes.
[7] Q.  Okay.  Do you actually conduct any interviews, any
[8] formal interviews where you sit down and have the witness sign
[9] and all that?
[10] A.  No.
[11] Q.  Okay.  So what is your objective when you're trying to
[12] get information for this paperwork?
[13] A.  It's to give a basic story of what's going on at that
[14] time and then, I guess, further investigation would go through
[15] the detectives and stuff like that.  But it's an initial
[16] story.
[17] Q.  Now, this information that you're getting from the
[18] victim and from at least one witness, are you putting this
[19] information out over police radio also?
[20] A.  Yes.
[21] Q.  Okay.  What information did you put out over police
[22] radio?
[23] A.  I put out that it was -- that the off-duty told me that
[24] it was a short, black male, light skin, running southbound on
[25] Stenton.  And there was also another person, a taller black

Jaclyne Wilson

Page 50

[1] male that was an accomplice.
[2] Q.  And was flash information obtained and put out for both
[3] males?
[4] A.  Yes.  That was the flash information.
[5] Q.  And so we use the term "flash information", pretty
[6] common --
[7] A.  It's just a term used to give a description of a
[8] potential doer or something like that.  It gives height,
[9] weight, skin tone, race and so on and so forth.
[10] Q.  So this 75-48 that you have in front of you, at what
[11] time did you record this shooting as having occurred?
[12] A.  It says here time of occurrence about 2:10.
[13] Q.  Okay.  In the afternoon?
[14] A.  Yes.
[15] Q.  Okay.  And who was the victim?
[16] A.  The victim, Charles Talbert.
[17] Q.  Did he give you that name?
[18] A.  I don't believe he did.
[19] Q.  Okay.  How did you get that name?
[20] A.  I don't recall.
[21] Q.  Okay.
[22] A.  I don't recall.
[23] Q.  Did he give you his date of birth?
[24] A.  No.
[25] Q.  Okay.  And how did you get that information?  Do you

Jaclyne Wilson

Page 51

[1] remember that?
[2] A.  I believe another officer interviewed him when he was
[3] in the medic and it was relayed to me but I can't positively
[4] say.
[5] Q.  Okay.  But Mr. Talbert's name and date of birth appear
[6] under complainant on the section of the 75-48?
[7] A.  Yes.
[8] Q.  There's an address there as well?
[9] A.  Yes.
[10] Q.  Okay.  And then under the description of the incident,
[11] from whom did you get that information?
[12] A.  Primarily from the off-duty.
[13] Q.  And under the witness section you have a witness
[14] recorded there; is that right?
[15] A.  Yes.
[16] Q.  Okay.  And with which witness did you speak?
[17] A.  Michael Bell.
[18] Q.  Okay.  And did he give you his name and address?
[19] A.  I believe he did.
[20] Q.  Okay.  That's been redacted for purposes of court but
[21] he gave that to you?
[22] A.  Yes.
[23] Q.  Okay.  And is there a second witness also listed in
[24] that section?
[25] A.  Well, just the off-duty, Richard Alexander, is the

Jaclyne Wilson

Page 52

[1] second witness.
[2] Q.  Okay.  And so, officer, did you actually speak with the
[3] shooting victim in this case?
[4] A.  No.  Not in reference to what happened.  Just as far as
[5] his health, you know, Don't move.  He was still conscious.  So
[6] I felt best that he don't move.
[7] Q.  Okay.  And, officer, were there a lot of people around?
[8] A.  Yes.
[9] Q.  And where did you notice that this victim had been
[10] shot?  On what part of his body?
[11] A.  He was laying on his stomach so I couldn't see where he
[12] was shot but he told me he was shot multiple times.  It wasn't
[13] until he was transported to the medic where the medics relayed
[14] to me that he was shot about five times.
[15] Q.  Was this the only paperwork you prepared in connection
[16] with your role in this investigation?
[17] A.  Yes.
[18] Q.  Okay.  And for how long did you remain on the scene?
[19] A.  I would say till my report off time which is four
[20] o'clock.
[21] Q.  Okay.
[22] A.  And then I was relieved by another officer.
[23] Q.  And then the officer working the 4:00 to 12:00 shift
[24] would take over?
[25] A.  Yes.

Jaclyne Wilson

Page 53

[1] **Q.** Were you helping to preserve the scene?

[2] **A.** Yes.

[3] **Q.** What does that involve?

[4] **A.** Taping the scene, making sure nobody goes through the

[5] tape or anything like that.

[6] **Q.** And were there detectives present at this time while

[7] you were there?

[8] **A.** I don't recall.

[9] **Q.** Okay. Thank you.

[10]       **MS. FORCHETTI:** I don't have any further

[11]    questions.

[12]       **THE COURT:** Cross-examine?

[13]       **MR. LORUSSO:** Thank you.

[14]          _ _ _

[15]       CROSS - EXAMINATION

[16]          _ _ _

[17] **BY MR. LORUSSO:**

[18] **Q.** Good morning, officer.

[19] **A.** Good morning.

[20] **Q.** Refer, if you would, officer, to the 75-48 that you

[21] prepared in this matter, officer.

[22]     You said that the bulk of the information you

[23] received from the off-duty, Police Officer Alexander?

[24] **A.** Yes.

[25] **Q.** Do you have a present recollection of this matter?

Jaclyne Wilson

---

Page 54

[1] **A.** You mean talking to him?

[2] **Q.** Yeah. Generally, being there, seeing the complainant,

[3] speaking with the complainant, if you did at all?

[4] **A.** Yes.

[5] **Q.** Did you speak at all to the complainant other than, as

[6] you said, asking about his health or telling him to stay

[7] still?

[8] **A.** No.

[9] **Q.** Okay. Look at, if you would be so kind, the

[10] description of the incident where it says -- and you prepared

[11] this form, correct?

[12] **A.** Yes.

[13] **Q.** Okay. It says, Complainant states No. 1 below male

[14] shot him multiple times.

[15]     Do you see that?

[16] **A.** Yes.

[17] **Q.** And then No. 1 below male would be identified as, as

[18] I'm reading it, short, black male, light skin, dark hoody; is

[19] that correct?

[20] **A.** Yes.

[21] **Q.** Does that refresh your recollection as to where you got

[22] that information from?

[23] **A.** Yes.

[24] **Q.** And having had your recollection refreshed, did you get

[25] that information and that description from the person who was

Jaclyne Wilson

---

Page 55

[1] shot?

[2] **A.** I don't recall.

[3] **Q.** But that's what it says, correct?

[4] **A.** Yes, that's what it says.

[5] **Q.** Would you have written you got the information from the

[6] complainant if you had gotten it from someone else?

[7] **A.** No.

[8] **Q.** Okay. So can we rely on the fact that at least in

[9] terms of your practice that that information was obtained

[10] through the complainant himself by you in terms of the

[11] description?

[12] **A.** Yes.

[13] **Q.** Okay. Does this description say anything with regard

[14] to -- well, first of all, is there any mention of knowing the

[15] person who shot him?

[16] **A.** No.

[17] **Q.** Is there anything with regard to height that was given

[18] to you other than the word "short"?

[19] **A.** No.

[20] **Q.** Black male, light-skinned, dark hoody, correct?

[21] **A.** Yes.

[22] **Q.** Had you received any further descriptive information

[23] either of physical characteristics or of clothing, would it be

[24] fair to say you would have noted on the 75-48?

[25] **A.** Yes, I would.

Jaclyne Wilson

---

Page 56

[1] **Q.** Okay. And you received a second description of another

[2] male, tall, 6', 140 pounds, black male wearing all black

[3] clothing, correct?

[4] **A.** Yes.

[5] **Q.** Okay. So now as we discuss it and you think about it

[6] and look at your 48, do you not recall speaking with the

[7] complainant and getting this information from him?

[8] **A.** Tell you the truth, I don't remember speaking to the

[9] complainant about the description of the first doer.

[10] **Q.** Okay. And you put flash information out that, I

[11] assume, was the same as the information that is recorded on

[12] your incident report, correct?

[13] **A.** Yes.

[14] **Q.** And by flash information, I mean you contacted police

[15] radio and --

[16] **A.** That's correct.

[17] **Q.** -- and related the description of these two individuals

[18] as it's contained in your incident report, correct?

[19] **A.** Yes.

[20] **Q.** Thank you.

[21]       **MR. LORUSSO:** I have nothing further.

[22]       **THE COURT:** Do you have any redirect?

[23]       **MS. FORCHETTI:** No, Your Honor.

[24]       **THE COURT:** Thank you, sir. You may step

[25]    down.

Jaclyne Wilson

Page 57

[1]          (Witness excused.)
[2]          **THE COURT**:  You may call your next
[3]  witness.
[4]          **THE COURT**:  Your Honor, at this time the
[5]  Commonwealth seeks to recall Officer Alexander.
[6]          **THE COURT**:  You may.
[7]          **MR. LORUSSO**:  Court indulgence.
[8]          (Pause.)
[9]          **MS. FORCHETTI**:  Your Honor, it appears
[10]  that Officer Alexander may have gotten called to
[11]  another courtroom.  So at this time I would seek to
[12]  call Officer Long.
[13]          (Pause.)
[14]          **MS. FORCHETTI**:  Your Honor, may I take a
[15]  short break at this time?
[16]          **THE COURT**:  Ladies and gentlemen, we'll
[17]  take our morning recess.
[18]          (Jury exits the courtroom at 10:35 a.m.)
[19]          (Short recess.)
[20]          **THE COURT**:  Let's bring out the jury.
[21]          (Jury enters the courtroom at 11:30 a.m.)
[22]          **THE COURT**:  You may call your next
[23]  witness.
[24]          **MS. FORCHETTI**:  Thank you.  Your Honor,
[25]  at this time the Commonwealth calls Police Officer
                    Jaclyne Wilson

Page 58

[1]  Michael Long.
[2]          ...POLICE OFFICER MICHAEL LONG, after
[3]  having been first duly sworn, was examined and
[4]  **testified as follows**:
[5]          – – –
[6]          **COURT CRIER**:  State your name, badge
[7]  number for the record and spell your last name.
[8]          **THE WITNESS**:  Police Officer Michael
[9]  Long, L-O-N-G, Badge No. 5433, assigned to the 14th
[10]  District.
[11]          **THE COURT**:  You may proceed.
[12]          **MS. FORCHETTI**:  Thank you.
[13]          – – –
[14]          DIRECT EXAMINATION
[15]          – – –
[16]  BY MS. FORCHETTI:
[17]  **Q.**   Good morning, officer.
[18]  **A.**   Good morning.
[19]  **Q.**   Officer, where are you currently assigned?
[20]  **A.**   To the 14th District.
[21]  **Q.**   How long have you been a Philadelphia police officer?
[22]  **A.**   Over eight years.
[23]  **Q.**   Eight?
[24]  **A.**   Over eight, yes.
[25]  **Q.**   You spent your entire career in the 14th District?
                    Jaclyne Wilson

Page 59

[1]  **A.**   No.
[2]  **Q.**   How long have you been assigned to the 14th District?
[3]  **A.**   Just a little over a year now.
[4]  **Q.**   Okay.  And where were you before that?
[5]  **A.**   Before that I was working in the 18th District out West
[6]  Philadelphia.
[7]  **Q.**   Okay.  Were you working on February 4th of this year,
[8]  2011?
[9]  **A.**   Yes, I was.
[10]  **Q.**   Okay.  And did you become involved in this
[11]  investigation of the shooting that had occurred in the 1300
[12]  block of Johnson Street around two o'clock in the afternoon?
[13]  **A.**   Yes, ma'am, I did.
[14]  **Q.**   Officer, what was your role in this investigation?
[15]  **A.**   In that investigation from the information that was
[16]  received I arrested the defendant.
[17]  **Q.**   And how did you come into contact with the defendant?
[18]  **A.**   Based on information that was received, I observed the
[19]  defendant inside of a barbershop and when I seen him, I
[20]  arrested him.
[21]  **Q.**   Where was that?
[22]  **A.**   At Stenton and Washington Lane.
[23]  **Q.**   And how far is that from Stenton and Johnson Streets?
[24]  **A.**   Like, approximately, a block away from Stenton and
[25]  Johnson.
                    Jaclyne Wilson

Page 60

[1]  **Q.**   And at which time did you come into contact with the
[2]  defendant that day?
[3]  **A.**   If I may look at my notes?  I don't recall the exact
[4]  time.
[5]  **Q.**   By your notes, what do you mean?
[6]  **A.**   The time I don't recall.  I don't remember what time I
[7]  came into contact with him.  I don't know if it was three or
[8]  four o'clock.  I don't recall the exact time.
[9]  **Q.**   Okay.  Officer, did you prepare any paperwork in
[10]  connection with this case?
[11]  **A.**   Yes.  I prepared a 75-48 A.
[12]          **MS. FORCHETTI**:  Your Honor, I would ask
[13]  to mark this document as Commonwealth Exhibit 17?
[14]          **THE COURT**:  It may be marked.
[15]          (75-48 A marked Commonwealth Exhibit C-17
[16]  for identification.)
[17]          **COURT CRIER**:  So marked C-17, Your Honor.
[18]          **THE WITNESS**:  Okay.  I see and I remember
[19]  the time I came in contact with the defendant.  It
[20]  was, approximately, 4:30 p.m.
[21]  BY MS. FORCHETTI:
[22]  **Q.**   And on what day was that?
[23]  **A.**   February 4th, 2011.
[24]  **Q.**   Okay.  Were you in uniform as you are today?
[25]  **A.**   Yes, I was.
                    Jaclyne Wilson

Page 61

[1] **Q.** Okay. And, officer, what document did you look at to
[2] refresh your recollection as to the time?
[3] **A.** It's a 75-48 A which is used to or prepared for
[4] pedestrian investigation.
[5] **Q.** And when do you prepare that?
[6] **A.** Normally when you encounter someone, whether pedestrian
[7] stop or car stop, whenever you come in contact with someone,
[8] you prepare a 75-48 A.
[9] **Q.** When did you prepare this document that's been marked
[10] Commonwealth Exhibit 17?
[11] **A.** I prepared this document on that date, maybe a little
[12] bit after this time. It was maybe around 4:45.
[13] **Q.** Okay. Now, you said, officer, based on information you
[14] received you were directed to a barbershop that was located at
[15] Stenton and Washington Lane?
[16] **A.** Yes.
[17] **Q.** What happened when you went into the barbershop?
[18] **A.** When I went in, there was a lot of people. It was
[19] crowded. I observed the defendant based on the flash
[20] information that was received inside the barbershop. You
[21] know, as I approached the defendant, the defendant was very
[22] loud. He was cursing and he was yelling and, you know, it was
[23] control holds used to take the defendant down to the ground
[24] and he was then arrested and transported.
[25] **Q.** What do you mean he was very loud and cursing? What

Jaclyne Wilson

Page 62

[1] exactly was he doing?
[2] **A.** I don't recall. I know he was using a lot of
[3] profanity. He was loud. He was -- he seemed upset but I
[4] don't recall exactly what he was saying.
[5] **Q.** And when you approached the defendant, what, if
[6] anything, did you do or say?
[7] **A.** I didn't say anything to him in reference to what was
[8] going on. I just wanted to see if he would be IDed as the
[9] shooter but I didn't say anything about what was going on.
[10] **Q.** When you approached the defendant, did you direct the
[11] defendant to do anything?
[12] **A.** Yeah. As I approached him, I tried to cuff him and he
[13] resisted. Like, he would not put his hands behind his back.
[14] So that's when I had to use force to take the defendant into
[15] custody.
[16] **Q.** Okay. Before you attempted to place handcuffs on the
[17] defendant, did you say anything to him about why you were
[18] trying to handcuff him?
[19] **A.** No. I did not say anything at the time, no.
[20] **Q.** Were you with anyone else?
[21] **A.** Yes. I was with the captain of the 14th District.
[22] **Q.** Did your captain say anything to the defendant about
[23] why you two were approaching him?
[24] **A.** At the time, no, we did not say anything. There were a
[25] lot of people inside the barbershop. The main thing was to

Jaclyne Wilson

Page 63

[1] just get him outside of the barbershop.
[2] **Q.** Okay. When you say that you that you used forced to put
[3] handcuffs on the defendant, what did you do?
[4] **A.** More so I took him down to the ground because he
[5] wouldn't allow me to cuff him. So that way I was able to gain
[6] control so he would be cuffed.
[7] **Q.** Okay. And when you say the defendant fit the flash
[8] information --
[9] **A.** Yes.
[10] **Q.** -- from where did you get this information?
[11] **A.** The captain received that information and he received
[12] that information from a cell phone call. I don't know exactly
[13] who it was.
[14] **Q.** Okay. How much time passed between when you received
[15] the cell phone call and you went to this barbershop?
[16] **A.** I would say from when he received the call, maybe like
[17] it was within a few minutes maybe. Within three minutes, four
[18] minutes.
[19] **Q.** So you were close to that location at the time this
[20] call was received?
[21] **A.** Yes. We were in that area.
[22] **Q.** Prior to receiving this call, what were you and your
[23] captain doing in the area?
[24] **A.** Just riding around within the area seeing if there was
[25] anyone matching the flash description of the doer, the

Jaclyne Wilson

Page 64

[1] defendant or the shooter, to see if we can stop someone in
[2] reference to that.
[3] **Q.** So at the time were you investigating the shooting that
[4] had occurred at 1300 Johnson?
[5] **A.** Yes.
[6] **Q.** Once you were able to restrain the defendant, did you
[7] obtain information from him?
[8] **A.** No.
[9] **Q.** Okay. Did he provide information that you used to fill
[10] out your 75-48 A?
[11] **A.** His name, address, date of birth. That's really it.
[12] Like the general information.
[13] **Q.** Okay. Did the defendant tell you how tall he was?
[14] **A.** Yes.
[15] **Q.** And what height did he give you?
[16] **A.** I have 5'5.
[17] **Q.** Did the defendant tell you if he was known by any
[18] nicknames?
[19] **A.** He didn't tell me that, no.
[20] **Q.** Okay. Did you have information that the defendant was
[21] known by any nicknames?
[22] **A.** Yes.
[23] **Q.** What nickname was that?
[24] **A.** The information I received was Little Johnnie which is
[25] supposedly his nickname.

Jaclyne Wilson

Page 65

[1] Q.    Okay.  And did the defendant tell you, approximately,
[2] how much he weighed?
[3] A.    In my paperwork it states 140.  I believe he told me
[4] his exact weight.
[5] Q.    Did the defendant give you his address?
[6] A.    Yes.
[7] Q.    What address did he give?
[8] A.    All my paper it's listed as 1528 East Johnson Street.
[9] Q.    Okay.  And what was the defendant wearing at the time
[10] you stopped him?
[11] A.    If I may refer to my notes?  I can remember he was -- I
[12] wrote it down that he was wearing a blue and black hoody, blue
[13] jeans and blue boots.
[14] Q.    Now, officer, on your 75-48 A you have listed as your
[15] time out as 4:30 and your time in as five o'clock?
[16] A.    Yes.
[17] Q.    What do those two times mean?
[18] A.    Normally that's -- the time out is the time you
[19] received the job and the time in is when you put yourself back
[20] into service.  The time I was out was at 4:30 and then once I
[21] went back into service, I went back into service at five
[22] o'clock.
[23] Q.    Okay.  So from 4:30 to five o'clock you were busy with
[24] respect to stopping this defendant?
[25] A.    With stopping the defendant and writing up the

Jaclyne Wilson

Page 66

[1] paperwork and also him getting transported over to Northwest
[2] Detectives as well.
[3] Q.    Did you remain with the defendant when we was
[4] transported to Northwest Detectives?
[5] A.    Yes.  I don't remember if we took him over there or if
[6] we may have called for another unit to bring him over there.
[7] I don't remember.
[8] Q.    Is this 75-48 A the only paperwork you prepared in
[9] connection with this case?
[10] A.    Yes.
[11] Q.    Okay.  Were you also interviewed?
[12] A.    Yes, I was.
[13] Q.    With respect to your role in this investigation?
[14] A.    Yes.
[15] Q.    Okay.  Who interviewed you?
[16] A.    There was a detective who was handling the shooting
[17] incident.  He interviewed me.
[18] Q.    Detective Acerenza?
[19] A.    Yes.
[20]        MS. FORCHETTI:  Your Honor, I would ask
[21]    to mark this document as Commonwealth Exhibit 18?
[22]        THE COURT:  It may be marked.
[23]        MS. FORCHETTI:  Thank you.
[24]        (Statement (PO Long) marked Commonwealth
[25]    Exhibit C-18 for identification.)

Jaclyne Wilson

Page 67

[1]        COURT CRIER:  So marked C-18, Your Honor.
[2] BY MS. FORCHETTI:
[3] Q.    Officer, you're being shown a document that's been
[4] marked as Commonwealth Exhibit 18.
[5]        Do you recognize that document?
[6] A.    Yes.
[7] Q.    And what is that?
[8] A.    This is the investigation interview record.  So
[9] basically I was asked questions about the incident from the
[10] detective and I described to him what had happened.
[11] Q.    And when did Detective Acerenza interview you?
[12] A.    I got an interview from him on February the 24th at
[13] 12:40 p.m.
[14] Q.    Okay.  And why was there a delay between when this
[15] happened and --
[16] A.    I don't think he got arrested that day.  He was brought
[17] in for investigation.  I think he may have been released.  I
[18] assume he might have been identified as the shooter and they
[19] went back out and rearrested him.  So once they rearrested
[20] him, that's when I got interviewed.
[21] Q.    Okay.  Now, officer, once Detective Acerenza
[22] interviewed you, did you then have a chance to review your
[23] interview?
[24] A.    Yes.  I had the opportunity to look at the interview,
[25] yes.

Jaclyne Wilson

Page 68

[1] Q.    Okay.  Did the detective ask you to make any
[2] corrections or let him know if he got anything wrong?
[3] A.    Yes.  He asked me to and I told him I didn't need any
[4] corrections made.  There was nothing wrong.
[5] Q.    So after you were given a chance to look over your
[6] interview, did you then sign it?
[7] A.    Yes, I did.
[8] Q.    Is that your signature that appears at the bottom of
[9] the page?
[10] A.    Yes, it is.
[11] Q.    Okay.  At the time you saw the defendant, was the
[12] defendant with anyone else?
[13] A.    Inside of the barbershop?  I don't know if he was with
[14] anyone else because there was so many people inside the
[15] barbershop.  So I don't know if he was with anyone.
[16] Q.    Did you see the defendant at all that day before he
[17] entered the barbershop?
[18] A.    No.
[19] Q.    Was that the extent of your contact with the defendant
[20] on that day?
[21] A.    Yes.
[22] Q.    Okay.  Now, officer, had you stopped anyone else in the
[23] area who matched the flash description?
[24] A.    No.
[25] Q.    Thank you.

Jaclyne Wilson

Page 69

[1]          MS. FORCHETTI: I don't have anything
[2]     further.
[3]          THE COURT: Cross-examine.
[4]          MS. FORCHETTI: I'm sorry. There is
[5]     something else.
[6] BY MS. FORCHETTI:
[7] Q.    Officer, were you here yesterday awaiting your
[8] opportunity to testify in this case?
[9] A.    Yes, I was.
[10] Q.    And where were you when you were awaiting your
[11] opportunity to testify?
[12] A.    Outside sitting in the hallway.
[13] Q.    Okay. And while you were outside sitting in the
[14] hallway, did you observe anything that you thought you should
[15] bring to my attention?
[16] A.    Yes. I observed the defendant's -- I don't know if
[17] it's his mother or sister, I'm not sure. I observed the
[18] defendant's mother, I assume, and the witness engaged in
[19] conversation and hugging out in the hallway.
[20] Q.    Okay. Which witness was that?
[21] A.    The witness is sitting in the back with the purple
[22] shirt on.
[23] Q.    I thought she was sequestered. Okay.
[24]          THE COURT: Who are you referring to?
[25]          MS. FORCHETTI: He's pointing to the
                    Jaclyne Wilson

Page 70

[1]     woman seated ---
[2]          THE COURT: I don't know who he's -- who
[3]     are you referring to?
[4]          THE WITNESS: The woman in the second row
[5]     in the purple shirt.
[6]          THE COURT: Just point to her.
[7]          THE WITNESS: (Indicating.)
[8]          THE COURT: What's your name, ma'am?
[9]          DEFENDANT'S MOTHER: My name is Diana
[10]     Johnson.
[11]          THE COURT: All right. Go ahead.
[12] BY MS. FORCHETTI:
[13] Q.    And with whom did you see her in the conversation with?
[14] A.    With the witness in reference to the shooting. It was
[15] a tall gentlemen who's a witness in reference to this shooting
[16] incident.
[17] Q.    The witness who testified yesterday?
[18] A.    Yes.
[19] Q.    Okay. And you observed them engaged in conversation
[20] before or after this witness testified?
[21] A.    After the witness testified.
[22] Q.    And for how long did this conversation last?
[23] A.    I would say at least about five minutes they were out
[24] there in the hallway.
[25] Q.    Did you hear what, if anything, was said?
                    Jaclyne Wilson

Page 71

[1] A.    No.
[2] Q.    Was another officer with you?
[3] A.    Yes.
[4] Q.    Who else was that?
[5] A.    PO Alexander.
[6] Q.    Okay.
[7] A.    He was with me as well.
[8] Q.    And what happened at the end of this conversation?
[9] A.    The gentleman, he walked away and, you know, the woman,
[10] she walked away as well.
[11] Q.    Did you observe any contact between the two of them?
[12] A.    After that, no.
[13] Q.    Well, while they were talking was there any physical
[14] contact between the person?
[15] A.    I observed the witness give the defendant's mother a
[16] hug, yes.
[17] Q.    And this woman that you pointed out in the purple
[18] shirt, did you know her to be the defendant's mother?
[19] A.    No, I don't know.
[20] Q.    Do you know whether or not she has any relationship to
[21] the defendant?
[22] A.    No, I don't know.
[23]          MR. LORUSSO: I'll stipulate, for the
[24]     record, that's the defendant's mother to make things
[25]     easier.
                    Jaclyne Wilson

Page 72

[1] BY MS. FORCHETTI:
[2] Q.    Did you observe this woman that's been identified as
[3] the defendant's mother saying anything?
[4] A.    When I was sitting down, I couldn't hear what was said,
[5] no.
[6] Q.    Okay. At any point did you observe --
[7] A.    When I was leaving, I overheard her saying that she
[8] said she -- I'm going to say I don't know the male or
[9] something to that effect. I don't know him. I never seen him
[10] before. That was it.
[11] Q.    You heard her saying, I'm going to say that I don't
[12] know him?
[13] A.    She doesn't know him, yes.
[14] Q.    And when did you bring this to my and the Court's
[15] attention?
[16] A.    I brought it to your attention yesterday and I also
[17] brought it to your attention this morning as well.
[18] Q.    Okay. At the time you observed this interaction, was
[19] there testimony still going on?
[20] A.    I assume so but I'm not sure because I was outside of
[21] the room so I don't know what was going on. I really don't
[22] know.
[23] Q.    Was I still inside of the courtroom?
[24] A.    Yes, you were still inside.
[25] Q.    Was the defense attorney still inside of the courtroom?
                    Jaclyne Wilson

Page 73

[1] **A.**   Yes.

[2] **Q.**   And had you seen the jury leave?

[3] **A.**   I don't remember.

[4] **Q.**   Okay.  And at about what time did you see this

[5] interaction, if you remember?

[6] **A.**   It was sometime in the afternoon.  It was whatever time

[7] the witness got off of the stand.  It was around that time.

[8] **Q.**   And by the witness, you're talking about the tall --

[9] **A.**   The tall, dark skin gentleman, yes.

[10] **Q.**   When you observed this, officer, did you say anything

[11] to those two individuals, either the defendant's mother or the

[12] tall witness?

[13] **A.**   No.

[14] **Q.**   Okay.  Thank you.

[15]         **MS. FORCHETTI:**  I don't have anything

[16]    further.

[17]         **THE COURT:**  Cross-examine.

[18]             – – –

[19]         CROSS - EXAMINATION

[20]             – – –

[21] **BY MR. LORUSSO:**

[22] **Q.**   Just going back to that last episode, officer.

[23]       You were situated out in the hallway, I guess?

[24] **A.**   Yes.

[25] **Q.**   And you observed the person who's identified as my

Jaclyne Wilson

Page 74

[1] client's mother give a hug to the person who had just

[2] testified?

[3] **A.**   Yes.

[4] **Q.**   And you were in your uniform then, I guess?

[5] **A.**   Yes.

[6] **Q.**   Other police officers were out there in their uniform,

[7] I guess?

[8] **A.**   Yes.

[9] **Q.**   There was nothing covert or an attempt to hide the fact

[10] that she went out there to give him a hug, was there?

[11] **A.**   No.

[12] **Q.**   Okay.  And you didn't hear any words other than what

[13] you just said something about I'm not going to say that I know

[14] the man?

[15] **A.**   She was saying I don't know him or I'm going to

[16] say -- she was saying like she doesn't know the male.  That's

[17] what she was saying.

[18] **Q.**   She was saying she doesn't know him?

[19] **A.**   Correct.

[20] **Q.**   Okay.  Because I got the impression that you were

[21] suggesting that she was going to say she doesn't know him even

[22] though she knows him?

[23] **A.**   She was saying that she doesn't know him.

[24] **Q.**   Okay.  But she thanked him for his testimony; is that

[25] what you're saying?

Jaclyne Wilson

Page 75

[1] **A.**   I don't know.

[2] **Q.**   Okay.  But she's the person that came over and hugged

[3] him first, right?

[4] **A.**   I don't know if he hugged her or she hugged him.  I

[5] don't know.

[6] **Q.**   Okay.  Where were you situated when you made this

[7] observation?

[8] **A.**   I was sitting right outside on the bench and they were

[9] up almost I would say by the elevators, like in the

[10] midhallway.

[11] **Q.**   And from that distance you were able to hear her saying

[12] that, something about I don't know the man?

[13] **A.**   No.  As I was leaving, when I was going home, we were

[14] within a few feet.  I was getting on the elevator and that's

[15] when she said that.

[16] **Q.**   So did you see them -- Ms. Jackson embrace this person

[17] when you were a few feet from them or when you were sitting

[18] out here?

[19] **A.**   When I was sitting out here that's when they embraced

[20] one another.  When I heard her say what she said, that's when

[21] I was leaving to go home and we were within a few feet of one

[22] another.

[23] **Q.**   Okay.  Okay.  She embraced him out here?

[24] **A.**   Yes.  Yes, she did.

[25] **Q.**   Okay.  She walked down toward the elevator area; is

Jaclyne Wilson

Page 76

[1] that what happened?

[2] **A.**   No.  They were embraced where the elevator area is

[3] located and I was seated outside.

[4] **Q.**   Okay.  Let's get to February the 4th.

[5] **A.**   Okay.

[6] **Q.**   I'm going to ask you to look at the exhibit again, your

[7] 48 A, that's been marked C-17, right?

[8] **A.**   Yes.

[9] **Q.**   The height that's listed on there of Johnnie Simmons

[10] is 5'5.

[11]       Is that what he gave you or was that your

[12] observations?

[13] **A.**   I believe that's what he gave me, yes, 5'5.  That's why

[14] I wrote it down.

[15] **Q.**   Okay.  The description of the clothing, blue and black

[16] checked hoody, blue jeans and blue boots.

[17]       Was that from your observation of what he was

[18] wearing when you arrested him at 4:30 that day?

[19] **A.**   Yes.

[20] Q.   4:33 according to the report; is that right?

[21] **A.**   Yes.

[22]         **MS. FORCHETTI:**  Objection, Your Honor.  I

[23]    don't see the word "checked" anywhere.

[24] **BY MR. LORUSSO:**

[25] **Q.**   Blue and black, what does that "CK" stand for after

Jaclyne Wilson

Page 77

[1] hoody?

[2]　　　　　**MS. FORCHETTI**: I believe it's part of

[3]　　the word "black".

[4]　　　　　**THE WITNESS**: Yeah. Blue and black

[5]　　hoody.

[6] **BY MR. LORUSSO**:

[7] **Q.**　I'm sorry. Blue and black hoody?

[8] **A.**　Yes.

[9] **Q.**　I apologize.

[10]　　So it was two separate colors?

[11] **A.**　It was blue and black. It was two different colors. I

[12] think it was blue and black.

[13] **Q.**　Like the sleeves were black and the thing was blue or

[14] something like that? Is that what you mean?

[15] **A.**　Something to that effect, yeah.

[16] **Q.**　Okay. And blue jeans, that's dungarees, correct?

[17] **A.**　Yes. Blue jeans and blue boots.

[18] **Q.**　Okay. And the blue jeans, if they were black, blue

[19] jeans I assume in your description you would have said that,

[20] correct?

[21] **A.**　Yes.

[22] **Q.**　So these were like regular Wrangler blue jeans?

[23] **A.**　Yes.

[24] **Q.**　And blue boots?

[25] **A.**　Yes.

　　　　　Jaclyne Wilson

Page 78

[1] **Q.**　What -- there was ice and snow on the ground.

[2]　　Were these rubber boots?

[3] **A.**　I'm not sure. I know they were blue. I don't

[4] remember.

[5] **Q.**　Okay. Now, you said that the male, Johnnie Simmons, he

[6] fit the flash information; is that right?

[7] **A.**　Yes.

[8] **Q.**　The flash information would be the information that's

[9] broadcast over police radio, correct?

[10] **A.**　Yes.

[11] **Q.**　And the flash information that you have written on this

[12] report that you say that he fits, Johnnie Simmons, is correct

[13] me if I'm wrong, black male, short, long hair, medium

[14] complexion; is that right?

[15] **A.**　Yes.

[16] **Q.**　Okay. Next to where you said individual matches flash

[17] info, that's the flash information that you say he matched,

[18] correct?

[19] **A.**　Yes.

[20] **Q.**　So that would be the flash information that you

[21] received over a police radio broadcast; is that correct?

[22] **A.**　The flash I was referring to was received based on

[23] phone call.

[24] **Q.**　So there was a phone call that directed you to Johnnie

[25] Simmons; is that what you're saying?

　　　　　Jaclyne Wilson

Page 79

[1] **A.**　Yes.

[2] **Q.**　So it was actually Johnnie Simmons that you were

[3] looking for when you went into this barbershop; is that

[4] correct?

[5] **A.**　Yes.

[6] **Q.**　And this phone call was received by your captain?

[7] **A.**　Yes.

[8] **Q.**　Were you with your captain when he received this phone

[9] call?

[10] **A.**　Yes, I was.

[11] **Q.**　And was that while you were in the patrol car, you

[12] know, surveying the area?

[13] **A.**　Yes.

[14] **Q.**　And it was minutes before the -- you wound up at the

[15] barbershop at Washington and Stenton?

[16] **A.**　Yes.

[17] **Q.**　It wasn't in -- strike that.

[18]　　　　　**MR. LORUSSO**: I ask that this be marked

[19]　　as D-2 for identification.

[20]　　　　　**THE COURT**: Yes. Do we have a D-2

[21]　　already??

[22]　　　　　**MR. LORUSSO**: We don't.

[23]　　　　　**MS. FORCHETTI**: Your Honor, I would just

[24]　　object to this in terms of if counsel is attempting

[25]　　to introduce it for impeachment purposes because

　　　　　Jaclyne Wilson

Page 80

[1]　　it's not actually proper impeachment because the

[2]　　officer didn't prepare this document.

[3]　　　　　**MR. LORUSSO**: Clearly I don't intend to

[4]　　introduce it. I want to ask if it refreshes the

[5]　　officer's recollection and I'll bring the detective

[6]　　back to introduce it if I need to.

[7]　　　　　**THE COURT**: Let me see it.

[8]　　　　　(Pause.)

[9]　　　　　**THE COURT**: All right. Go ahead.

[10]　　　　　(75-49 marked Defense Exhibit D-2 for

[11]　　identification.)

[12]　　　　　**COURT CRIER**: Your Honor, so marked D-2.

[13] **BY MR. LORUSSO**:

[14] **Q.**　Are you familiar with the 75-49?

[15] **A.**　Yes.

[16] **Q.**　Summary of the investigation and the interviews made by

[17] the assigned detective?

[18] **A.**　Yes.

[19] **Q.**　Do you see with respect to that particular page of it

[20] where there's a paragraph attributed to you or a summary of

[21] your interview?

[22] **A.**　Yes, it is.

[23] **Q.**　Okay. I'm going to ask you to read that and tell me if

[24] it refreshes your recollection concerning where this phone

[25] call was received by your captain?

　　　　　Jaclyne Wilson

Page 81

[1] **A.**   Okay.  I read it.

[2] **Q.**   Having read what purports to be the summary of your
[3] interview, does that -- can you tell us now where it was that
[4] your captain received this telephone call?

[5] **A.**   Yeah.  We were within the area.  This is another
[6] captain, Captain Singletary.  I have Captain Dales.

[7] **Q.**   Okay.

[8] **A.**   Two different captains.

[9] **Q.**   All right.  So you're with Captain Dales and Captain
[10] Dales gets a phone call from Captain Singletary?

[11] **A.**   I don't know.

[12] **Q.**   Or he gets a phone call from somebody?

[13] **A.**   Correct.

[14] **Q.**   So the information that Captain Dales has, your
[15] captain, is at least second or third hand, correct?

[16] **A.**   I don't know that.

[17] **Q.**   You don't know that.  Okay.  I understand.

[18]      At any rate, you're told to go and arrest Johnnie
[19] Simmons at the barbershop; is that correct?

[20] **A.**   To go and bring him up, you know, to see if he's the
[21] shooter, yes.

[22] **Q.**   And do you normally handcuff people to go and bring up
[23] to see if they're a shooter?

[24] **A.**   If they're getting transported in the back of a police
[25] car, they have to be handcuffed.

Jaclyne Wilson

Page 82

[1] **Q.**   Okay.  When you approached him, did you tell him what
[2] you were attempting to handcuff him for?

[3] **A.**   At the time, no, I did not.

[4] **Q.**   Why not?

[5] **A.**   Because there was a lot of people in the barbershop.
[6] It was me and the captain.  So I just wanted to get him out of
[7] the area.

[8] **Q.**   Okay.  I'm looking at the report that you prepared.  It
[9] says that he refused hospital treatment.

[10]      What injuries did he sustain that that even was on
[11] the table?

[12] **A.**   I don't know.  Like when I took him down to the ground,
[13] I don't know if he received a cut to his face or his arms, but
[14] it was like, I don't know if it was a bruise or minor bleeding
[15] but, you know, I asked him if he wanted to get treated for
[16] that and he stated that he did not want to get treated.  So I
[17] wrote it up and I had him sign it.

[18] **Q.**   Okay.  So you're saying he may have gotten cuts from
[19] the fall on the ground?

[20] **A.**   Yes.

[21] **Q.**   Was he wearing clothes?

[22] **A.**   Yes.  I don't know if his like his face, I think it was
[23] like to his face.  So, yes, he had on clothes.

[24] **Q.**   And after you grabbed him and took him into -- you took
[25] him into your car, did you?

Jaclyne Wilson

Page 83

[1] **A.**   Yes.  We placed him into our car.

[2] **Q.**   And then you rode up the block to Philly -- to the shoe
[3] store, right?  To the Philly Locker?

[4] **A.**   We took him, yes, to the --

[5] **Q.**   To see if he could be identified by the --

[6] **A.**   By the witness.

[7] **Q.**   Yes.

[8] **A.**   Yes.

[9] **Q.**   That would be the same witness you say that my client's
[10] mother wrapped her arms around or embraced yesterday after he
[11] testified; is that correct?

[12] **A.**   Yes.

[13] **Q.**   That witness when you took Johnnie Simmons up to that
[14] location, there was no identification, was there?

[15] **A.**   No, there was not.

[16] **Q.**   What did he say, that that's not the person?

[17] **A.**   Yes.  He said that that was not the individual, yes.

[18] That's correct.

[19] **Q.**   That was Mr. Wright, the tall gentleman who when you
[20] brought Johnnie Simmons to his location at Johnson and Stenton
[21] Avenue said that he was not the person who was in the store;
[22] is that correct?

[23] **A.**   Yes.  That's correct.

[24] **Q.**   Okay.  Did you record that identification procedure
[25] anywhere on any paperwork either procedure and the lack of

Jaclyne Wilson

Page 84

[1] identification?

[2] **A.**   No, I did not.

[3] **Q.**   Why is it that this is the first time I'm hearing about
[4] its existence?

[5] **A.**   I'm not sure.  You asked and I answered.

[6] **Q.**   Wouldn't you indicate in a 48 or to the detective that
[7] you showed a witness or you showed a prospective suspect to a
[8] witness and that that witness said that he was not the person
[9] involved?  Wouldn't there be some writing memorializing that
[10] episode?

[11]      **MS. FORCHETTI**: Objection.

[12]      **THE COURT**: Overruled.

[13]      **THE WITNESS**: I mean, there's some
[14] writing, yes, but he was not the complainant.  So
[15] the complainant still didn't have the opportunity to
[16] see him yet.  So that's why I didn't.

[17] **BY MR. LORUSSO**:

[18] **Q.**   So you knew the complainant wasn't in the store when
[19] you took him up there to be identified, didn't you?

[20] **A.**   Yes.  I knew the complainant --

[21] **Q.**   So you didn't expect the complainant was going to be
[22] the person who was saying he's involved or he's not involved,
[23] did you?

[24] **A.**   I didn't know.

[25] **Q.**   You didn't know.

Jaclyne Wilson

Page 85

[1]      Well, how was he going to be the person who said
[2] that if he wasn't at the store where you just took him to?
[3] **A.**  I didn't know.
[4] **Q.**  No writing anywhere about the fact that Johnnie Simmons
[5] was shown to a person and that person said he's not the guy
[6] who was in the store; am I correct?  No writing anywhere to
[7] your knowledge; is that correct?
[8] **A.**  I didn't write anything.  That's correct.
[9] **Q.**  Who was present when this procedure occurred other than
[10] you, police personnel that is?
[11] **A.**  Me, the captain and there were a few other officers on
[12] the scene.  I really don't -- I don't know the exact officers
[13] who were on the scene but I know it was me and the captain
[14] absolutely.
[15] **Q.**  So you took Johnnie Simmons up to that store.
[16]      Was he taken out of the car?
[17] **A.**  No.  He was not taken out of the vehicle.
[18] **Q.**  Okay.
[19]      **MR. LORUSSO**: Court, indulge me.
[20]      (Pause.)
[21]      **MR. LORUSSO**: Thank you, officer.  I have
[22] nothing further.
[23]      **THE WITNESS**: You're welcome.
[24]      **THE COURT**: Do you have any redirect?
[25]      **MS. FORCHETTI**: I do, Your Honor.

Page 86

[1]      **THE COURT**: Go ahead.
[2]      _ _ _
[3]      REDIRECT EXAMINATION
[4]      _ _ _
[5] **BY MS. FORCHETTI**:
[6] **Q.**  Officer, what did you know about what the witness in
[7] the store had seen at the time you returned to the sneaker
[8] store with Johnnie Simmons?
[9] **A.**  I'm not sure exactly what the defendant seen.  I'm not
[10] sure exactly what he may or may not have seen.  I know in the
[11] beginning he was willing to cooperate but once they said he
[12] had to go and give a statement and talk to the detectives,
[13] then he no longer wanted to cooperate.
[14] **Q.**  And you're talking about the tall individual?
[15] **A.**  Yes.
[16] **Q.**  Okay.  Did you know at the time you went to the sneaker
[17] store following your stop of the defendant, did you know
[18] whether or not that witness was saying he had seen the
[19] shooting?
[20] **A.**  At this time, yeah.  He, you know, he stated he had
[21] seen the shooting prior to that, yes.
[22] **Q.**  That was your understanding at the time you went to the
[23] sneaker store?
[24] **A.**  Yes.
[25]      **MR. LORUSSO**: I object and move to strike

Page 87

[1] his understanding.
[2]      **THE COURT**: Sustained.
[3] **BY MS. FORCHETTI**:
[4] **Q.**  Why did you think it was important to take the
[5] defendant to the employee at the sneaker store?
[6] **A.**  Because I assumed that he observed the shooting going
[7] on.  I wanted to see if he knew if that was the -- if the
[8] defendant was the individual who committed the shooting.
[9] **Q.**  Had you spoken to that witness before you stopped the
[10] defendant?
[11] **A.**  No.
[12] **Q.**  Okay.  When you were out on the street with Captain
[13] Dales, were you speaking to witnesses in the neighborhood?
[14] **A.**  Yes.
[15] **Q.**  And how close were you to the barbershop when you were
[16] speaking to the witnesses in the neighborhood?
[17] **A.**  About a block away.
[18] **Q.**  Were any of those witnesses you spoke to outside of the
[19] barbershop willing to give you their names?
[20] **A.**  No.  Absolutely not.
[21] **Q.**  Have you encountered that often in your career?
[22]      **MR. LORUSSO**: Objection.  I object and
[23]      move to strike and ask Your Honor to instruct the
[24]      jury on the nonrelevance of witnesses' names.
[25]      **THE COURT**: Sustained.  Overruled.

Page 88

[1]      Go on and ask your next question.
[2] **BY MS. FORCHETTI**:
[3] **Q.**  Okay.  Other than a physical description, were you also
[4] given a name?
[5] **A.**  Yes, I was.
[6] **Q.**  And did that name come as a result of the phone call
[7] your captain had received?
[8] **A.**  It came as a result of the phone call.  Yes, it did.
[9] **Q.**  And this interaction you observed out in the hallway
[10] yesterday between that witness from the sneaker store and the
[11] defendant's mother, were you standing in the hallway or seated
[12] on the bench outside the courtroom?
[13] **A.**  I was seated on the bench outside the courtroom.
[14] **Q.**  Did you observe any -- either of those individuals make
[15] eye contact with you before engaging in conversation?
[16] **A.**  I'm not really sure if they looked at me or not.  I'm
[17] not sure.
[18] **Q.**  Did either of those individuals walk past you before
[19] their interaction?
[20] **A.**  No.  Before the interaction?  I know the mother -- I
[21] know she was out in the hallway as well but I don't know if
[22] she walked past me.  She was like seated directly across from
[23] me.  She was out in the hallway prior to that.
[24] **Q.**  And so some time had passed between when you saw this
[25] interaction and you heard the defendant's mother say something

Page 89

[1] about not knowing him?

[2] **A.** Yes. Some time had passed, yes.

[3] **Q.** Do you recall the exact words that you heard her say?

[4] **A.** I don't remember the exact words. She was just saying

[5] that she doesn't know him but the exact words I don't remember

[6] exactly what she said, no.

[7] **Q.** So whether or not she said I'm going to say I don't

[8] know him or I don't know him, you're not certain?

[9] **A.** Correct.

[10] **Q.** Thank you.

[11] **A.** You're welcome.

[12]     **THE COURT**: Do you have additional

[13]     questions?

[14]     **MR. LORUSSO**: I do, Your Honor.

[15]     – – –

[16]     RECROSS - EXAMINATION

[17]     – – –

[18] **BY MR. LORUSSO**:

[19] **Q.** So I understand now in response to one of the last

[20] questions that was asked to you, the information you said came

[21] from telephone through a captain; is that correct?

[22] **A.** I received from my captain. I don't know who he was

[23] talking to. I don't know.

[24] **Q.** Okay. So you weren't talking to anybody and got this

[25] information, correct?

Jaclyne Wilson

Page 90

[1] **A.** No. I was talking to my captain.

[2] **Q.** So you just followed your captain's instructions? You

[3] said, Hey, I got this phone call. Lock up this guy named

[4] Johnnie Simmons, right?

[5] **A.** Yes.

[6] **Q.** Bottom line; is that right?

[7] **A.** Yes.

[8] **Q.** Okay.

[9]     **MR. LORUSSO**: I'm going to ask that this

[10]     be marked as D-6 for identification and be shown to

[11]     the witness.

[12]     **THE COURT**: It may be

[13]     **MS. FORCHETTI**: What is it?

[14]     **MR. LORUSSO**: I apologize. C-18. It

[15]     doesn't need to be marked.

[16] **BY MR. LORUSSO**:

[17] **Q.** Referring to C-18, that's the statement of the

[18] interview you gave the assigned detective; is that right?

[19] **A.** Yes.

[20] **Q.** And I think you said that you read it, you signed it

[21] was accurate, you didn't need to make any changes, correct?

[22] **A.** Yes. Correct.

[23] **Q.** Do you see -- read through the first question and

[24] answer to yourself, if you would.

[25] **A.** Okay. Yes.

Jaclyne Wilson

Page 91

[1] **Q.** Have you done that?

[2] **A.** Yes, I did.

[3] **Q.** Is that different from what you just testified to in

[4] terms of where you got this information?

[5] **A.** Not necessarily, no.

[6] **Q.** No?

[7] **A.** No.

[8] **Q.** What part isn't necessarily different?

[9] **A.** From -- I don't think anything is really different from

[10] what I testified to.

[11] **Q.** Well, as I understood your testimony, you said the

[12] information about Johnnie Simmons came by way of telephone to

[13] some captain and the only thing you knew about was that your

[14] captain said to go lock him up, right?

[15] **A.** Yes. I received information from my captain, yes.

[16] **Q.** Okay. If I'm -- and your interview is correct. We've

[17] already established, right?

[18] **A.** Yes.

[19] **Q.** It's accurate. Okay.

[20]     So how do you identify a male who gave you a

[21] description of Johnnie Simmons -- how do you describe the male

[22] who gave this information about Johnnie Simmons to the

[23] detective if the only way -- if you know nothing about that

[24] person other than your captain got a phone call and told you

[25] to lock him up?

Jaclyne Wilson

Page 92

[1] **A.** Based on information from the captain, I asked, you

[2] know, the person when I give the name, so I asked if there's a

[3] description I can write and I wrote a description based on the

[4] information he received, whoever gave him that information.

[5] **Q.** So when I was asking you the question you had a

[6] description of somebody, correct?

[7] **A.** Yes.

[8] **Q.** Okay. Now, let's do it this way -- I'm sorry.

[9]     First question is, My name is Detective Acerenza.

[10] This is my partner, Detective Hassle. Can you tell me about

[11] the pedestrian investigation that you conducted on Johnnie

[12] Simmons, right?

[13] **A.** Yes.

[14] **Q.** You say, this is your answer, After the shooting

[15] occurred, myself and Captain Dales were in the area. We were

[16] talking to people and asking them about the shooting. A

[17] person that refused to give his name stated that, quote,

[18] Johnnie Simmons, also known as Little Johnnie, short guy with

[19] medium brown skin with a lot of hair, just walked into the

[20] barbershop. He said that Little Johnnie is the shooter from

[21] 1300 East Johnson Street. He said that Little Johnnie just

[22] walked into the barbershop. He pointed to the barbershop at

[23] Stenton and Washington Lane. The captain and I went into the

[24] barbershop and observed the male fitting the flash. Okay.

[25]     Now, when you say he pointed to the barbershop at

Jaclyne Wilson

Page 93

[1] Stenton and Washington Lane, who were you referring to if this
[2] person didn't exist?

[3] **A.** Not to that. I was referring to the captain. He, the
[4] captain.

[5] **Q.** He, oh.

[6] **A.** Pointed to the barbershop.

[7] **Q.** You were referring to the captain?

[8] **A.** Yes.

[9] **Q.** A person that refused to give his name stated Johnnie
[10] Simmons, et cetera, known as Little Johnnie, just walked into
[11] the barbershop. Next sentence, He said that Little Johnnie is
[12] the shooter.

[13] Does it say that the captain said that Little
[14] Johnnie was the shooter? It says he, the person that refused
[15] to give his name, right?

[16] **A.** Yeah, the person -- correct.

[17] **Q.** Okay. He said that Little Johnnie just walked into the
[18] barbershop, right?

[19] **A.** Correct.

[20] **Q.** That again would refer back to the person who refused
[21] to give his name, right?

[22] **A.** Yes.

[23] **Q.** He pointed to the barbershop at Stenton and Washington
[24] Lane.

[25] I'm assuming that would also refer to that same

Jaclyne Wilson

Page 94

[1] person, wouldn't it?

[2] **A.** No.

[3] **Q.** That was the captain then?

[4] **A.** Correct.

[5] **Q.** Well, then why does the next sentence begin, The
[6] captain and I went into the barbershop instead of saying the
[7] captain pointed to the barbershop and he and I went into the
[8] barbershop?

[9] **A.** I didn't type it so I couldn't tell you why.

[10] **Q.** Okay. And then you even give a description to this
[11] person who supposedly says that Johnnie Simmons was the
[12] shooter, right?

[13] **QUESTION**: Can you describe the male that gave you
[14] that information?

[15] **ANSWER**: Black male, late 30s to early 40s. No
[16] further information. He didn't want to get involved.

[17] Is that all fiction?

[18] **A.** No. That was based on the phone call. It was a
[19] description of whoever called in to the captain.

[20] **Q.** Well, he didn't give you that information, did he?

[21] **A.** Yeah. The captain did. That's correct.

[22] **Q.** No. You didn't describe the captain when the detective
[23] said, describe the male that gave you that information? You
[24] described a black male, correct?

[25] **A.** Yes.

Jaclyne Wilson

Page 95

[1] **Q.** So that was -- let me ask you this: Detective
[2] Acerenza, was he aware you were giving information that you
[3] had gotten from your captain? Because if I read this thing,
[4] I'm assuming that this is all information coming from you.

[5] **A.** I'm not sure to be honest with you.

[6] **Q.** Well, you'll agree with me that this reads as though
[7] you're the inception or you're the source of all of this
[8] information, right?

[9] **A.** Yes, but -- yes.

[10] **Q.** Did you once say to the detective, Hey, look, I'm
[11] giving you this description of the guy but I never saw him. I
[12] got this information from the captain? Somehow along the line
[13] the name Johnnie Simmons came up. Did you ever say that to
[14] Detective Acerenza?

[15] **A.** If it's not in my statement, no, I did not say it.

[16] **Q.** Thank you.

[17] **MR. LORUSSO**: I have nothing further.

[18] **THE COURT**: Anything else?

[19] **MS. FORCHETTI**: Yes.

[20] _ _ _

[21] REDIRECT EXAMINATION

[22] _ _ _

[23] **BY MS. FORCHETTI**:

[24] **Q.** Officer Long, were you present when this conversation
[25] took place with this person who refused to give his name?

Jaclyne Wilson

Page 96

[1] **A.** Yes.

[2] **Q.** And where did that happen?

[3] **A.** He was on the telephone. We were inside the car
[4] together.

[5] **Q.** Okay. And was that phone call to your captain, Captain
[6] Dales?

[7] **A.** Yes, it was.

[8] **Q.** Okay. And the document that has been marked as D-2,
[9] the third page of the 75-48, is that in front of you, officer?

[10] **A.** Yes, it is.

[11] **Q.** Does that talk about an anonymous phone call that went
[12] to Captain Singletary?

[13] **A.** Yes, it does.

[14] **Q.** Okay. So that's documented in the report that
[15] Detective Acerenza prepared; is that right?

[16] **A.** Yes.

[17] **Q.** Okay. Did I tell you prior to testifying that you
[18] weren't allowed to speak about what other people had told you
[19] as a result of the hearsay rule?

[20] **A.** Correct. Yes.

[21] **Q.** Okay. But when asked the question by defense, you're
[22] compelled to tell us the truth; is that right?

[23] **A.** Yes.

[24] **Q.** And so you told Detective Acerenza about the
[25] information that you had received from an anonymous person?

Jaclyne Wilson

Page 97

[1] A.    Yes.
[2] Q.    That's what you talk about in your interview with
[3] Detective Acerenza?
[4] A.    Yes.
[5] Q.    And you never spoken to the complainant in this case;
[6] is that right?
[7] A.    Never seen nor spoken to the complainant, no.
[8] Q.    Okay.  Thank you.
[9]         MS. FORCHETTI:  I have nothing further.
[10]        THE COURT:  Anything else?
[11]        MR. LORUSSO:  Yes, I do.
[12]            _ _ _
[13]        RECROSS - EXAMINATION
[14]            _ _ _
[15] BY MR. LORUSSO:
[16] Q.    Detective, referring to the bottom of your statement
[17] that would be a C exhibit?
[18] A.    Yes.
[19] Q.    Okay.  Well, first of all, we made reference to the
[20] summary in terms of anonymous information.
[21]        At no time did you tell the detective that all this
[22] information that you were saying in terms of can you describe
[23] the male that gave you the information, you never told him
[24] that came from an anonymous source, right?
[25] A.    I don't know whether I told him it came from an

Page 98

[1] anonymous source.  I try to say enough without actually
[2] putting that person in harm's way.
[3] Q.    Right.  Right.  And these hearsay rules and everything
[4] like that, they don't apply to when you're giving an interview
[5] to a detective, do they?  You give the detective facts, don't
[6] you?
[7] A.    I'm not sure.  I'm not going to put someone else in
[8] harm's way if they're giving me information.
[9] Q.    Okay.  So we can be sure and understand -- so I can be
[10] sure and understand, this person who you say gave the name
[11] Johnnie Simmons was not in the location of the barbershop,
[12] correct?
[13] A.    I can't --
[14] Q.    To your knowledge?
[15] A.    I don't know.
[16] Q.    Okay.
[17] A.    I just do not know.
[18] Q.    The last question from the bottom, the second question
[19] from the bottom in your statement, QUESTION:  Have you ever
[20] had previous contact with Johnnie Simmons?
[21]        ANSWER:  No.  I didn't know who he was when the male
[22] that gave us the information and pointed towards the
[23] barbershop, we saw the male fitting the flash walking into the
[24] barbershop with another male.
[25]        Right, that's your --

Page 99

[1] A.    Right.
[2] Q.    So in that sentence you said, When the male that gave
[3] us the information and pointed towards the barbershop, I'm
[4] assuming that means the same male that give you the
[5] information and pointed towards the barbershop was there?
[6] A.    No.
[7] Q.    No?
[8] A.    No.  The captain received information and he pointed
[9] towards the shop.
[10] Q.    Right.  But what you told the detective in the
[11] interview, When the male that was -- at least what the
[12] detective wrote in your interview is, When the male that gave
[13] us the information and pointed towards the barbershop, we saw
[14] the male fitting the description, right?  That's the
[15] information that the detective wrote down?
[16] A.    Yes, sir.
[17] Q.    And that's the information that you reviewed and signed
[18] off on, correct?
[19] A.    Yes.
[20] Q.    Thank you.
[21]        MR. LORUSSO:  I have nothing further.
[22]        THE COURT:  All right.  You may step
[23] down.
[24]        THE WITNESS:  Thanks.
[25]        (Witness excused.)

Page 100

[1]        THE COURT:  Ladies and gentlemen, we'll
[2] take our luncheon recess and resume at 1:30.  Please
[3] don't discuss the testimony.  Don't discuss this
[4] case with anyone.  Don't discuss it amongst
[5] yourselves.  Enjoy your lunch and we'll see you back
[6] here in an hour.
[7]        Everyone else remain in place until the
[8] jurors have left the floor, please.
[9]     (Jury exits the courtroom at 12:24 p.m.)
[10]        THE COURT:  Let the record reflect the
[11] jurors have left the room.
[12]        (Luncheon recess.)
[13]     (Sidebar held on the record as follows:)
[14]        THE COURT:  We are now in the anteroom
[15] outside the hearing of the jury.  We're here at the
[16] request of Ms. Forchetti.  She's here obviously as
[17] is Mr. Lorusso, counsel for the defendant.
[18]        This is prelude to the Commonwealth
[19] calling its next witness, Mr. Holman, is it?
[20]        MS. FORCHETTI:  Yes, Your Honor.
[21]        THE COURT:  Why don't you tell us why
[22] we're here?
[23]        MS. FORCHETTI:  Mr. Holman requested that
[24] the young males that are seated in the courtroom not
[25] be present while he testifies.  He recognizes

Jaclyne Wilson

Page 101

[1] several of those males from his neighborhood and
[2] fears retaliation because of his testimony.  He has
[3] not had any specific threats or any specific
[4] intimidating conduct directed at him but has
[5] overheard some talk in his local coffee shop and is
[6] familiar with several of the players in the
[7] neighborhood and fears for retaliation.
[8]      THE COURT:  There has been, I think
[9] you'll agree, Mr. Lorusso, anywhere between 10 and
[10] 20 young men in the court each day since this matter
[11] got underway.
[12]      Are those the individuals you're
[13] referring to?
[14]      MS. FORCHETTI:  Yes, Your Honor.
[15]      THE COURT:  What's your position,
[16] Mr. Lorusso?
[17]      MR. LORUSSO:  Your Honor, my position
[18] would be that this is a public courtroom.  This is
[19] my client on trial.  If these individuals are his
[20] friends or associates, they're certainly entitled to
[21] witness his trial and he is entitled to have them
[22] witness his trial, render whatever moral support
[23] that they can and barring any -- I mean, we've heard
[24] that there is no specific threats.  I still haven't
[25] even heard about general threats other than a
                Jaclyne Wilson

Page 102

[1] comment about something in a coffee shop but I don't
[2] know whether that's of a threatening nature or what
[3] that was, you know, supposed to communicate.  So
[4] under those circumstances, I would object to it.
[5]      THE COURT:  Well, the Court is mindful of
[6] the defendant's right to a public trial.  I have not
[7] ever given consideration to clearing a courtroom.  I
[8] think that under any circumstances members of the
[9] press as well as independent spectators should be
[10] allowed to remain in the courtroom to ensure that it
[11] is, in fact, a public forum, but there are instances
[12] when a balancing of the right to a public trial
[13] versus society's interest in having witnesses
[14] testify truthfully must be addressed.
[15]      Do you agree with that?
[16]      MR. LORUSSO:  I do.
[17]      THE COURT:  So I guess I'm called upon to
[18] hear from this witness and I'll make a determination
[19] based on what I hear as to whether or not excluding
[20] certain individuals is consistent with the interest
[21] of justice.
[22]      What's your witness's name?
[23]      MS. FORCHETTI:  Kyle Holman.
[24]      THE COURT:  How do you want to do this?
[25] Is there a detective who can bring him back here and
                Jaclyne Wilson

Page 103

[1] then leave?
[2]      MS. FORCHETTI:  Sure.
[3]      THE COURT:  All right.
[4]      (Pause.)
[5]      THE COURT:  Ms. Forchetti, Mr. Lorusso,
[6] we've been joined by two individuals.
[7]      Who's here, Ms. Forchetti?
[8]      MS. FORCHETTI:  Your Honor, Leland Kent
[9] from the District Attorney's Office is here as well
[10] as Kyle Holman.
[11]      THE COURT:  Which is your witness?
[12]      MS. FORCHETTI:  Kyle Holman is the
[13] eyewitness.
[14]      THE COURT:  Would you swear in
[15] Mr. Holman, Mr. Ferguson?
[16]      ...KYLE HOLMAN, after having been first
[17] duly sworn, was examined and testified as follows:
[18]      _ _ _
[19]      COURT CRIER:  State your name for the
[20] record and spell your last name.
[21]      COURT CRIER:  Kyle Holman, H-O-L-M-A-N.
[22]      THE COURT:  Go ahead.
[23]      MS. FORCHETTI:  Mr. Holman, we're here
[24] today to conduct a hearing in terms of your fear of
[25] testifying in an open courtroom.
                Jaclyne Wilson

Page 104

[1] Can you please explain to His Honor why
[2] that is?
[3]      THE WITNESS:  Your Honor, I noticed that
[4] certain gentlemen were in the courtroom that live
[5] in the area that I live in and are also on -- also
[6] hang out at the top of my block and I see these guys
[7] all the time.  I'm just fearful that if I testify
[8] and they have no regard for life, then there would
[9] be no regard for mine as well.  I just rather not
[10] testify and see them and come in contact with the
[11] individuals.
[12]      THE COURT:  Go ahead.
[13]      MS. FORCHETTI:  Since you witnessed this
[14] incident for what you saw on February 4th of this
[15] year, has anything happened to you as a result of
[16] you speaking to the police?
[17]      THE WITNESS:  No, ma'am.
[18]      MS. FORCHETTI:  Okay.  Upon what do you
[19] base this fear of testifying in front of these young
[20] men?
[21]      THE WITNESS:  We'll, I'm just going by
[22] knowing where they hang out and me coming in contact
[23] with the same individuals all the time.  I just
[24] don't speak to them.  I don't know them but I do see
[25] them.  If I recognize them, I'm sure they recognize
                Jaclyne Wilson

[1] me and I would just not rather not take that risk.

[2]     MS. FORCHETTI: Okay. Why do you worry

[3] that because you testify in this case that there may

[4] be a threat of intimidation or retaliation against

[5] you?

[6]     THE WITNESS: Well, I feel if the person

[7] has enough guts to shoot someone in broad daylight,

[8] they could do the same to me and have no regards for

[9] life.

[10]     MS. FORCHETTI: Is there anything

[11] specific about their conduct that makes you fearful?

[12]     THE WITNESS: They're thugs. I'm a

[13] family man. I have a nice house. I have kids. I

[14] don't want to be any part of it.

[15]     MS. FORCHETTI: Do you live in the

[16] neighborhood where this occurred?

[17]     THE WITNESS: Yes. I share a driveway

[18] where it occurred about 100 yards away.

[19]     MS. FORCHETTI: And some of those people

[20] that you've described as thugs, you recognize them

[21] as being present in the courtroom today?

[22]     THE WITNESS: Correct.

[23]     MS. FORCHETTI: Have any of them since

[24] you saw them in the courtroom today made any

[25] gestures or any sort of contact towards you?

    Jaclyne Wilson

[1]     THE WITNESS: No.

[2]     MS. FORCHETTI: Do you have any

[3] questions, Your Honor?

[4]     THE COURT: Go on.

[5]     MS. FORCHETTI: What specifically,

[6] Mr. Holman, are you afraid of happening?

[7]     THE WITNESS: His peers in general. I

[8] mean, I just don't want to take a chance of

[9] something happening to myself or my wife, my kids,

[10] property or any of that.

[11]     MS. FORCHETTI: And would their continued

[12] presence in the courtroom after your testimony?

[13]     THE WITNESS: Yes, it would.

[14]     MS. FORCHETTI: And how would it effect

[15] your testimony?

[16]     THE WITNESS: I would get on the stand

[17] and say nothing at all. I told the gentleman right

[18] there, I said, if they have to be in the courtroom,

[19] I have to come here, then I'm not coming in the

[20] courtroom. And if that's the case, then I want to

[21] see a lawyer because I'm not going to do it.

[22]     MS. FORCHETTI: You're that afraid of

[23] these individuals?

[24]     THE WITNESS: Yes, I am.

[25]     MS. FORCHETTI: Is that because of prior

    Jaclyne Wilson

[1] conduct of theirs that you have witnessed in your

[2] neighborhood?

[3]     THE WITNESS: Correct.

[4]     MS. FORCHETTI: And what conduct is that?

[5]     THE WITNESS: A shooting. That's not

[6] enough?

[7]     MS. FORCHETTI: You have seen these

[8] individuals involved in a shooting?

[9]     THE WITNESS: No, I didn't say I saw them

[10] but if they're involved in shootings, then I want no

[11] part of it. That's it. I want to sleep at night.

[12]     MS. FORCHETTI: Are you aware of the

[13] defendant that is charged in this case?

[14]     THE WITNESS: Am I aware of him?

[15]     MS. FORCHETTI: Yes.

[16]     THE WITNESS: Yes, I'm aware of him.

[17]     MS. FORCHETTI: Okay. Has he or anyone

[18] in his family made any sort of contact towards you?

[19]     THE WITNESS: No, ma'am.

[20]     MS. FORCHETTI: And are you aware of his

[21] relationship, if any, to your neighborhood?

[22]     THE WITNESS: Yes, I am.

[23]     MS. FORCHETTI: Okay. And how are you

[24] aware of that?

[25]     THE WITNESS: Well, from people that he

    Jaclyne Wilson

[1] socializes with as well. We all eat -- there's a

[2] restaurant that everyone goes to every morning. I'm

[3] there every morning and the same people know the

[4] same people.

[5]     MS. FORCHETTI: So you have heard talk

[6] about this incident in this neighborhood restaurant?

[7]     THE WITNESS: Correct. After the fact.

[8]     MS. FORCHETTI: And that talk is creating

[9] this fear in you?

[10]     MR. LORUSSO: Objection.

[11]     THE COURT: Overruled.

[12]     You may answer.

[13]     THE WITNESS: It's creating a fear?

[14]     MS. FORCHETTI: Is some of that talk that

[15] you're hearing in this neighborhood restaurant

[16] that's contributing to --

[17]     THE WITNESS: Ma'am, all I know is that

[18] if a person has the guts to shoot someone in broad

[19] daylight, that's all I know. I like my life. I

[20] like my family's life. You're going to go home

[21] after this. Walk your dog or do whatever you got to

[22] do. I see these people everyday. Walk past them

[23] everyday. They don't bother me. They do their own

[24] thing. They sell their drugs. They do their own

[25] thing. I'm okay with that.

    Jaclyne Wilson

## Page 109

[1]  MS. FORCHETTI:  You've seen some of the
[2] individuals in this courtroom selling drugs?
[3]  THE WITNESS:  I know what they do.  It
[4] doesn't take a rocket scientist.  Regardless --
[5]  MS. FORCHETTI:  Okay.
[6]  THE WITNESS:  I go past them everyday.
[7] They hang up on the corner CVS or at June's or the
[8] barbershop.  That's fine.  They don't bother me.  I
[9] don't bother you.
[10]  MS. FORCHETTI:  And you're worried that
[11] that will change?
[12]  THE WITNESS:  I know it's going to
[13] change.
[14]  MS. FORCHETTI:  And you're aware that no
[15] matter what happens as a result of this hearing, you
[16] will be testifying in front of the defendant?
[17]  THE WITNESS:  If I have to do my civil
[18] duty in that case, then so be it.  But I just know I
[19] rather take my chance with one individual that's
[20] locked up then people who I walk past everyday.  Not
[21] saying I like it one way or the other but --
[22]  MS. FORCHETTI:  All right.  Thank you,
[23] Mr. Holman.
[24]  MR. LORUSSO:  I have no questions.
[25]  THE COURT:  All right.  Sir, you made two
        Jaclyne Wilson

## Page 110

[1] references that I'd like to follow-up on.  You said
[2] that there are a number of young men in this
[3] courtroom whom you know from living in the
[4] neighborhood to be thugs.
[5]  Can you tell me what you mean when you
[6] say they are thugs?  What kind of conduct have you
[7] witnessed to lead you to that conclusion?
[8]  THE WITNESS:  Nonworking individuals,
[9] hanging on the corner, drinking at the top of my
[10] block, smoke, just riffraff so to speak.  The
[11] community doesn't want them there.
[12]  THE COURT:  These are the people that
[13] create the fear that you've articulated?
[14]  THE WITNESS:  Correct.
[15]  THE COURT:  You made a reference to CVS,
[16] to the barbershop and to a restaurant.  Give me some
[17] idea of what you've heard in the restaurant that
[18] contributes to your concern?
[19]  THE WITNESS:  That the individuals sell
[20] drugs.  That they're scum so to speak.
[21]  THE COURT:  And you are prepared to do
[22] your civic duty with respect to testifying knowing
[23] that the defendant has a right to be present so long
[24] as the individuals who have caused you this fear are
[25] excluded from the courtroom; is that right?
        Jaclyne Wilson

## Page 111

[1]  THE WITNESS:  That's correct.  I'm not
[2] saying I like it but I'm willing to go halfway.
[3]  THE COURT:  All right.  Either of you
[4] have any questions based on my questions?
[5]  MS. FORCHETTI:  No, Your Honor.
[6]  MR. LORUSSO:  No, Your Honor.
[7]  THE COURT:  Would you give us a moment,
[8] sir?  Would you accompany Mr. Ferguson back?
[9]  COURT CRIER:  I'll go to 801 in the jury
[10] room.  I can stay there with him.
[11]  THE WITNESS:  Thank you very much, sir.
[12]  THE COURT:  Yes, sir.  Thank you.
[13]  (Witness excused.)
[14]  THE COURT:  All right.  Counsel, I'm
[15] going to come out in a bit and make my findings.  It
[16] is imperative that if I rule in a fashion consistent
[17] with your request, that we do something to identify
[18] the individuals he characterized as his neapbors.
[19] I'm not going to issue -- I haven't decided yet what
[20] my ruling will be.  I certainly am not going to
[21] issue a blanket exclusion of witnesses from the
[22] courtroom.  So the three of you need to think about
[23] that, the two of you on the one hand and Mr. Lorusso
[24] on the other hand, and I'll be out in a moment
[25]  MS. FORCHETTI:  Okay.
        Jaclyne Wilson

## Page 112

[1]  (Short recess.)
[2]  THE COURT:  All right.  We're back on the
[3] record.  I'm here with Mr. Lorusso, counsel for the
[4] defendant.  And Ms. Forchetti, counsel for the
[5] Commonwealth.
[6]  I have just heard from Kyle Holman and
[7] the Court makes the following findings and issues
[8] the following conclusions:  One, this Court has
[9] called upon to exclude persons from the courtroom
[10] during the testimony of the witness Kyle Holman.
[11] Two -- I'm sorry.  Did either of you wish to make
[12] any argument before I do this?
[13]  MR. LORUSSO:  No, Your Honor.
[14]  THE COURT:  I'm certainly amenable to
[15] hearing additional arguments and I don't want to
[16] jump the gun here.
[17]  MR. LORUSSO:  I have no additional
[18] argument, Your Honor.
[19]  MS. FORCHETTI:  We've had discussion
[20] about this, Your Honor.  You know the Commonwealth's
[21] position.
[22]  THE COURT:  Okay.  Two, I am mindful of
[23] the Constitutional provisions which afford
[24] defendants the right to a public trial.
[25]  Three, however, there are instances where
        Jaclyne Wilson

Page 113

[1] conduct requires a balancing of defendant's right to
[2] a public trial and society's interest to have a
[3] witness testify truthfully without fear of
[4] repercussions.
[5]     Four, in this case the witness has
[6] expressed fear based on his knowledge of defendant's
[7] and more importantly defendant's friends and
[8] associates that he and his family will be harmed if
[9] certain persons see him testify truthfully in the
[10] courtroom.
[11]     Five, this Court finds the following to
[12] be evidence which supports barring certain persons
[13] **from the court**: A, defendant's associates live in
[14] the neighborhood where the witness and his family
[15] lives. B, The defendant's associates are mainly
[16] unemployed, young African-American males who
[17] routinely engage in nonproductive conduct such as
[18] assembling on the corners, drinking and partaking of
[19] drugs. C, defendant's associates are in some way,
[20] witness believes, engaged in drug dealing which is
[21] typically, although not always, a violent
[22] enterprise. D, defendant's associates, the witness
[23] believes, are violent as evidenced by what he
[24] characterizes as a shooting in broad daylight.
[25]     Six, this Court further finds the witness

Jaclyne Wilson

Page 114

[1] to be credible in expressing his fear. He is a
[2] family man who is petrified but who nevertheless is
[3] prepared to testify in open court in the defendant's
[4] presence so long as the defendant's associates are
[5] not in the courtroom during his testimony.
[6]     Seven, this Court has also considered
[7] alternatives to barring the young men from this
[8] **courtroom**: A, additional courtroom security will
[9] not address the concern because the witness is
[10] fearful of retaliation after he leaves this
[11] courtroom. B, criminal prosecution of any
[12] wrongdoing will not address his concern because no
[13] crime has yet been committed and to wait until one
[14] is committed would require that the Court sit idly
[15] by and allow harm to first come to the witness
[16] and/or his family.
[17]     Eight, further, this Court will not bar
[18] all spectators or close the courtroom. Neither will
[19] this Court bar members of the press or independent
[20] observers from this courtroom.
[21]     Nine, accordingly, in light of the
[22] foregoing, the following persons, all of whom have
[23] been here since this case started and who signed in
[24] as friends of the defendant, from being in the
[25] courtroom during the testimony of Mr. Holman. I'm

Jaclyne Wilson

Page 115

[1] reading from a sign-in sheet that we were called
[2] upon to prepare in light of this Court's experience
[3] with matters of this sort.
[4]     The persons barred during the testimony
[5] of Mr. Holman will be Andrew Martin, Stefan Noble,
[6] Rashad McIntyre, Eric Laws, Dalat Wilson, Bernard
[7] Franklin, Tim Montgomery, Gerald Joe and Isa
[8] Williams.
[9]     When we go out I will not mention in open
[10] court that we've had this in camera hearing. I will
[11] simply have court convened and before the witness is
[12] called in, I will ask that the aforenamed
[13] individuals excuse themselves until such time as
[14] they are allowed to return.
[15]     **MS. FORCHETTI**: Your Honor, may I call to
[16] the Court's attention at this time that Mr. Lorusso
[17] has informed these young males of why we were in the
[18] back having this hearing.
[19]     **THE COURT**: That's okay.
[20]     **MR. LORUSSO**: I would have been happy to
[21] do that had I had the opportunity before Ms.
[22] Forchetti decided to inform you.
[23]     May I also supplement the record by
[24] indicating there has been no press and there has
[25] been, to my knowledge, no other spectators other

Jaclyne Wilson

Page 116

[1] than the one's listed that the Court is barring from
[2] further presence in the courtroom during
[3] Mr. Holman's testimony and yes, I did intend to tell
[4] the Court that, and yes, that I did intend to tell
[5] the Court and I didn't see anything frankly wrong
[6] with telling these people that we're holding a
[7] hearing to determine whether or not they can remain
[8] in the courtroom since they may be ordered to leave
[9] the courtroom.
[10]     **THE COURT**: I don't have a problem with
[11] that. What I have a problem with is living in a
[12] society where we have to have these kind of concerns
[13] and it's not just this case. It's not your case.
[14] It's not your case. It's every case that comes down
[15] the pipe of late. And unless this is addressed in
[16] some systemic fashion, we're all doomed. Okay.
[17]     **MR. LORUSSO**: Note my objection for the
[18] record.
[19]     **THE COURT**: Yes, sir.
[20]     (Sidebar concluded.)
[21]     **THE COURT**: We're now on the record
[22] in the case of Commonwealth vs. Johnnie Simmons our
[23] trial case. The defendant is here with his
[24] attorney, Mr. Lorusso. The Commonwealth by
[25] Ms. Forchetti.

Jaclyne Wilson

Page 117

[1]      We're about to commence our afternoon

[2] session.  Before we do, the Court having ruled on a

[3] motion, I will start with the young man to the right

[4] of the defendant's mother.  Would you stand and tell

[5] us your name, please.

[6]      **DALAT WILSON**:  Dalat Wilson.

[7]      **THE COURT**:  Dalat Wilson?

[8]      **DALAT WILSON**:  Yes.

[9]      **THE COURT**:  And where do you live, sir?

[10]     **DALAT WILSON**:  At 1219 Johnson.

[11]     **THE COURT**:  Just remain standing.

[12]     The young man to your right, would you

[13] stand and tell us your name.

[14]     **STEFAN NOBLE**:  Stefan Noble.

[15]     **THE COURT**:  Where do you live, Mr. Noble?

[16]     **STEFAN NOBLE**:  7330 North 20th Street.

[17]     **THE COURT**:  And you, young man?

[18]     **ANDREW MARTIN**:  Andrew Martin, 1644

[19] Tulpehocken.

[20]     **THE COURT**:  And if we could go to the

[21] next row.

[22]     Young man, tell us your name?

[23]     **ISA WILLIAMS**:  Isa Williams.

[24]     **THE COURT**:  I-S-A?

[25]     **ISA WILLIAMS**:  Yes.

Jaclyne Wilson

Page 118

[1]      **THE COURT**:  Mr. Williams, where do you

[2] live, sir?

[3]      **ISA WILLIAMS**:  913 Slocum Street.

[4]      **THE COURT**:  Yes, sir?

[5]      **BERNARD FRANKLIN**:  Bernard Franklin, 2127

[6] Homer Street.

[7]      **THE COURT**:  Yes, sir?

[8]      **RASHAD McINTRYE**:  Rashad McIntrye.

[9]      **THE COURT**:  Where do you live, young man?

[10]     **RASHAD McINTYRE**:  923 Dorset Street.

[11]     **THE COURT**:  Are there two more young men

[12] or three?  How many more?

[13]     Young man, what's your name?

[14]     **GERALD JOE**:  Gerald Joe, J-O-E.

[15]     **THE COURT**:  Where do you live, Mr. Joe?

[16]     **GERALD JOE**:  2463 West 77th Avenue.

[17]     **THE COURT**:  Thank you, sir.

[18]     Is there anybody to your right, Mr. Joe?

[19]     **GERALD JOE**:  Yes.

[20]     **THE COURT**:  Your name, sir?

[21]     **ERIC LAWS**:  Eric Laws.

[22]     **THE COURT**:  Where do you live, Mr. Laws?

[23]     **ERIC LAWS**:  2463 West 77th Avenue.

[24]     **THE COURT**:  All right.  If you young men

[25] would be so kind as to wait outside until you're

Jaclyne Wilson

Page 119

[1] called back in, I'd appreciate it.

[2]      (Pause.)

[3]      **THE COURT**:  Are you ready?

[4]      **MS. FORCHETTI**:  I am.

[5]      **THE COURT**:  Mr. Lorusso, are you ready?

[6]      **MR. LORUSSO**:  I am, Your Honor.

[7]      **THE COURT**:  Let's have our jurors come

[8] in.

[9]      (Jury enters the courtroom at 2:31 p.m.)

[10]     **THE COURT**:  Good afternoon, ladies and

[11] gentlemen.  Bear with me one second, please.

[12]     (Pause.)

[13]     **THE COURT**:  Ms. Forchetti, you may call

[14] your next witness.

[15]     **MS. FORCHETTI**:  Thank you.  At this time

[16] the Commonwealth calls Kyle Holman.

[17]     **THE COURT**:  Very well.  Let's have

[18] Mr. Holman sworn in, please.

[19]     ...KYLE HOLMAN, after having been first

[20] duly sworn, was examined and testified as follows:

[21]      _ _ _

[22]     **COURT CRIER**:  State your name for the

[23] record and spell your last name.

[24]     **THE WITNESS**:  Kyle Holman, H-O-L-M-A-N.

[25]

Jaclyne Wilson

Page 120

[1]      _ _ _

[2]      DIRECT EXAMINATION

[3]      _ _ _

[4] **BY MS. FORCHETTI**:

[5] **Q.**  Good afternoon, Mr. Holman.

[6] **A.**  Good afternoon.

[7] **Q.**  Mr. Holman, I'd like to direct your attention to

[8] February 4th of this year, 2011, at about two o'clock in the

[9] afternoon.

[10]     Were you in the area of Stenton and Johnson Streets

[11] on that day?

[12] **A.**  That is correct.

[13] **Q.**  And what were you doing in that area at that time?

[14] **A.**  Changing the brakes in my car in my driveway.

[15] **Q.**  Do you live in that area?

[16] **A.**  Correct.

[17] **Q.**  Without giving us the exact address of your house,

[18] could you tell us the block that you live?

[19] **A.**  Duval Street.

[20] **Q.**  And what hundred block?

[21] **A.**  Fourteen hundred.

[22] **Q.**  Okay.  And you told us you were changing the brakes on

[23] your car?

[24] **A.**  Correct.

[25] **Q.**  Okay.  What was the weather like that day?

Jaclyne Wilson

Page 121

[1] **A.** It was cold but it wasn't -- snow on the ground and ice
[2] in my driveway.
[3] **Q.** You had ice in your driveway?
[4] **A.** Correct.
[5] **Q.** Do you have a separate driveway or do you have a common
[6] driveway?
[7] **A.** Common driveway.
[8] **Q.** You share that with other residents on your block?
[9] **A.** Correct. On Johnson Street.
[10] **Q.** Okay. And what hundred block of Johnson?
[11] **A.** Fourteen hundred.
[12] **Q.** Okay. Did you see anything that day that was unusual?
[13] **A.** A gentleman -- I heard gunshots. A gentleman came at a
[14] high pace down the driveway walking past me at a high pace out
[15] of breath.
[16] **Q.** Did you recognize this person?
[17] **A.** I didn't recognize the person. He had a hoody on so I
[18] didn't really recognize him. I was into what I was doing. I
[19] just happened to notice him coming towards me.
[20] **Q.** Do you see that person in this courtroom today?
[21] **A.** Yes.
[22] **Q.** Where do you see that person?
[23] **A.** To my right.
[24]      **MS. FORCHETTI:** Looking in the direction
[25]      of the defendant, Johnnie Simmons.
                    Jaclyne Wilson

Page 122

[1]      **THE WITNESS:** Correct.
[2] **BY MS. FORCHETTI:**
[3] **Q.** And what was the defendant doing when you saw him?
[4] **A.** He had his hands in his pocket, running, walking kind
[5] of fast pace, kind of trying not to fall because there was ice
[6] on the driveway. I asked the defendant is he okay. He said
[7] he's just exhausted and kept walking. He was looking around
[8] like someone was following him.
[9] **Q.** And then what did you do?
[10] **A.** I continued to fix my brakes but I was watching where
[11] the defendant was going. I called 911 after the defendant
[12] walk past me because I heard the gunshots and I hear the
[13] police in the area. So I let the dispatcher know what I saw
[14] and where I was.
[15] **Q.** Okay. Were you aware whether or not police were
[16] arriving on scene after the shooting?
[17] **A.** You could hear them in the vicinity.
[18] **Q.** Okay. Were you in view of the defendant at the time
[19] you heard the sirens?
[20] **A.** Correct.
[21] **Q.** And did you observe whether or not there was any change
[22] in the defendant's behavior when the sirens were heard?
[23] **A.** When he got to the next block, he ran up in the
[24] driveway to the next block and went between the houses.
[25] **Q.** Okay. When you say the next block, what block would
                    Jaclyne Wilson

Page 123

[1] that be?
[2] **A.** I assume that's the 1500 or 1300. I forget which way
[3] it goes on the other side of Mansfield Avenue.
[4] **Q.** Okay. Is that still on Johnson Street then?
[5] **A.** In between the houses. In between Johnson and Duval.
[6] I forget which way the houses go.
[7] **Q.** So where your driveway was it's sharing with Johnson
[8] Street?
[9] **A.** Correct.
[10] **Q.** And you called into 911 and explained to the dispatcher
[11] what you had observed?
[12] **A.** Correct.
[13] **Q.** And why did you think what you observed was
[14] significant?
[15] **A.** I wouldn't be running on ice for one. And, two, after
[16] I heard the gunshots, he just seemed like he was coming from
[17] that area and I wouldn't be walking with hands in my pockets
[18] with three or four inches of ice on the ground and looking
[19] around to make sure no one was, like, following him, I guess.
[20] **Q.** How much time passed between when you heard the
[21] gunshots and when you saw the defendant?
[22] **A.** About two minutes, if that.
[23] **Q.** And how far is your house from the 1300 block of
[24] Johnson?
[25] **A.** A hundred and fifty yards maybe.
                    Jaclyne Wilson

Page 124

[1] **Q.** Now, the entire time you are observing the defendant,
[2] did he ever take his hand out of his pockets?
[3] **A.** No, ma'am.
[4] **Q.** And was that the last time you saw the defendant that
[5] day?
[6] **A.** That is correct.
[7] **Q.** And after you called into 911, were you contacted by
[8] the police?
[9] **A.** I was. About ten minutes later -- well, you could see
[10] the officers arriving in the area but no one came up my
[11] driveway. About ten minutes later an officer came up and
[12] asked me if I was the one who called. I stated, Yes. Told
[13] him which way the defendant was going and what he did and they
[14] turned around and went the other way looking. And about 20
[15] minutes later after that another cop came and asked me the
[16] same thing.
[17] **Q.** Were you ever asked to identify anyone?
[18] **A.** No. I was notified, I think, a day or so later by a
[19] detective. I forgot the detective's name. He asked me to
[20] come down to the 35th precinct. I did that at about 9:30, ten
[21] o'clock that night and gave my statement.
[22] **Q.** Okay.
[23]      **MS. FORCHETTI:** Your Honor, I would ask
[24]      to mark this two-page document as Commonwealth
[25]      Exhibit 19.
                    Jaclyne Wilson

Page 125

[1] **THE COURT**: It may be marked.

[2] **MS. FORCHETTI**: Thank you.

[3] (Statement (Holman) marked Commonwealth

[4] Exhibit C-19 for identification.)

[5] **COURT CRIER**: So marked C-19, Your Honor.

[6] **BY MS. FORCHETTI**:

[7] **Q.** Mr. Holman, you're being shown a two-page document

[8] that's been marked as Commonwealth Exhibit C-19.

[9] Do you recognize that document?

[10] **A.** I do.

[11] **Q.** And what is that document?

[12] **A.** It's a document -- statement that the detective took

[13] when I was at the 35th precinct.

[14] **Q.** Okay. What day did you go in for your interview?

[15] **A.** I think it was a day after. I'm not sure. I don't

[16] remember exactly.

[17] **Q.** Do you see a date on the 75-483?

[18] **A.** Two, ten.

[19] **Q.** And about what time?

[20] A. It says 10:15.

[21] **Q.** Okay. Does that seem about right with your memory?

[22] A. He called me around 9:00, 9:30. I was on my way around

[23] that area. He said he can either come to my house or I can

[24] come to the police station. I said it's okay. I'm on Ogontz

[25] Avenue. I stopped at Dunkin Donuts, grabbed coffee and went

Jaclyne Wilson

Page 126

[1] straight there. I was already in my car.

[2] **Q.** All right. And do you remember which detective took

[3] your interview?

[4] **A.** I forget -- it's on here. Hassel. I forget his name.

[5] **Q.** Have you seen him outside in the hallway?

[6] **A.** Earlier today.

[7] **Q.** Earlier today?

[8] **A.** Yes.

[9] **Q.** Okay. And did you tell Detective Hassel what you're

[10] telling us today?

[11] **A.** I told him -- not today I didn't, no.

[12] **Q.** I mean not -- I'm not asking. I'm sorry if that was

[13] unclear.

[14] I'm not asking if you talked to Detective Hassel

[15] today. I'm asking back on February 10th when you talked to

[16] Detective Hassel, did you tell him what you had observed?

[17] **A.** Correct.

[18] **Q.** Okay. Were you asked to look at any photographs at

[19] that time?

[20] **A.** No, ma'am.

[21] **Q.** Okay. Did the detective ask you if you believed that

[22] you could recognize that person if you had seen him again?

[23] **A.** Yes.

[24] **Q.** And what did you say?

[25] **A.** I said I wasn't sure but I probably could.

Jaclyne Wilson

Page 127

[1] **Q.** Now, Mr. Holman, how sure are you that the person

[2] sitting in the courtroom today is the same person you observed

[3] walking through your driveway?

[4] **A.** Positive.

[5] **Q.** And how close did he get to you?

[6] **A.** Within 3 feet, 3 or 4 feet. I was at the end of my

[7] driveway at the back of my car because I pulled my car in

[8] forward facing my house. He walked by me on the right side of

[9] the driveway because you can't walk directly in the middle of

[10] it because it was too much ice.

[11] **Q.** And it was in broad daylight?

[12] **A.** Correct.

[13] **Q.** And did the defendant have anything covering his face?

[14] **A.** No. He had a hoody on but that was it and the hood was

[15] over his head but not his face.

[16] **Q.** Does the defendant today look any different in

[17] appearance then how he appeared to you on February 4th?

[18] **A.** A little bit. His platts were coming out of the -- I

[19] guess it was platted or cornrowed coming out.

[20] **Q.** His hair was down?

[21] **A.** Yes.

[22] **Q.** It wasn't tied back as it is today?

[23] **A.** Correct.

[24] **Q.** So you directed the officers who came to speak to you

[25] in the direction in which you believed the defendant went but

Jaclyne Wilson

Page 128

[1] you're not certain if it was to 1500 or 1300?

[2] **A.** Correct. That's correct.

[3] **Q.** Okay. All right.

[4] **MS. FORCHETTI**: Your Honor, I would ask

[5] that the witness be shown the map that's been marked

[6] as D-1.

[7] **THE COURT**: He may be shown D-1.

[8] **BY MS. FORCHETTI**:

[9] **Q.** Mr. Holman, you're being shown a map that's been marked

[10] as Defense Exhibit 1.

[11] Do you recognize the area depicted in that map?

[12] **A.** Yes, I do.

[13] **Q.** Does looking at that map help refresh your memory in

[14] terms of the direction the defendant was headed?

[15] **A.** Fifteen hundred.

[16] **Q.** Fifteen hundred which block?

[17] **A.** Between Johnson and Duval Street.

[18] **Q.** All right. Thank you.

[19] **MS. FORCHETTI**: I have no further

[20] questions.

[21] **THE COURT**: Mr. Lorusso?

[22] **MR. LORUSSO**: Thank you, Your Honor.

[23]

[24]

[25]

Jaclyne Wilson

Page 129

[1]              _ _ _
[2]            CROSS - EXAMINATION
[3]              _ _ _
[4] BY MR. LORUSSO:
[5] Q.   Good afternoon, Mr. Holman.
[6] A.   Good afternoon.
[7] Q.   Have you ever seen my client, the man you've
[8] identified, had you ever seen him before February 4th of 2011?
[9] A.   No, sir.
[10] Q.   Until coming into this courtroom and telling this jury
[11] that this is the person that walked past you on February 4th,
[12] had you seen him?
[13] A.   Correct.
[14] Q.   Had you seen him between February 4th and presently
[15] five minutes ago when you started testifying?
[16] A.   No, sir.
[17] Q.   Had you seen any photographs of Mr. Simmons from
[18] February 4th until today?
[19] A.   No, sir.
[20] Q.   And you're sure you never had any contact with
[21] Mr. Simmons before February 4th, correct?
[22] A.   Almost positive.
[23] Q.   Okay.
[24] A.   Unless I walk past him in the neighborhood but no.
[25] Q.   And he was walking -- this person in the driveway that
                        Jaclyne Wilson

Page 130

[1] you identified as Mr. Simmons, walking or running?
[2] A.   Walking at a fast pace.
[3] Q.   Fast pace?
[4] A.   But trying to keep his balance in the process because
[5] there was ice on the ground.
[6] Q.   Right.  And you were by your car outside of your home?
[7] A.   Correct.
[8] Q.   Did he engaged you in a conversation or did you engage
[9] him?
[10] A.   I engaged him.  I asked him was he okay.
[11] Q.   And did he stop and --
[12] A.   He didn't stop.  He just said he was exhausted.
[13] Q.   Okay.  And as he said he was exhausted, he kept
[14] walking?
[15] A.   Correct.
[16] Q.   So the period of time within which you observed this
[17] person in the frontal view was at least quite brief; would
[18] that be fair to say?
[19] A.   Depends.  I watched him walk down the driveway.  So I
[20] watched him walk towards me.
[21] Q.   Okay.  So how far away from you was this person when
[22] you were first able to discern physical characteristics?
[23] A.   About 10 feet.
[24] Q.   Ten feet.  So in the period of time that it took this
[25] person to walk quickly 10 feet that's the extent of the
                        Jaclyne Wilson

Page 131

[1] observation upon which you come in here and base your
[2] identification; is that correct?
[3] A.   I guess you can say that.
[4] Q.   The person was wearing a hoody, correct?
[5] A.   Correct.
[6] Q.   And the person, did he have any other hat or anything
[7] like that on?
[8] A.   No.  He had jeans on.
[9] Q.   Jeans.  What color jeans?
[10] A.   Blackish with a grayish tint.
[11] Q.   Okay.  And a black hoody, correct?
[12] A.   Correct.
[13] Q.   A black hoody and black jeans with a grayish tint?
[14] A.   They looked grayish to me.
[15] Q.   Okay.  Were you able to see and did you recall the type
[16] of footwear he had on?
[17] A.   No, I didn't.  All I saw was hair.  That was it.
[18] Q.   Hair?
[19] A.   Yes.
[20] Q.   So you saw braids?
[21] A.   Cornrows, braids, whatever.
[22] Q.   And they were sticking out from down in the neck area
[23] or were they --
[24] A.   Correct.
[25] Q.   -- above the neck?
                        Jaclyne Wilson

Page 132

[1] A.   I couldn't tell if they were going backwards but you
[2] could see them sticking --
[3]        MS. FORCHETTI:  Indicating, for the
[4]    record, on either side of his collarbone.
[5]        THE WITNESS:  Correct.
[6] BY MR. LORUSSO:
[7] Q.   Okay.  You called 911, right?
[8] A.   Correct.
[9] Q.   This person walked right past you that you just
[10] identified as my client, correct?
[11] A.   Correct.
[12] Q.   How tall are you?
[13] A.   About 5'10, 5'11.
[14] Q.   When you called 911, you said to the radio officer that
[15] the person who just walked past me, you said, specifically,
[16] I'm 5'10 so he was 5'10; is that correct?
[17] A.   I said he's around about.  I wasn't sure.  I'm not a
[18] tape measurer.
[19] Q.   You were giving a description of an individual that you
[20] thought might be involved in criminal activity to the police,
[21] right?
[22] A.   Correct.
[23] Q.   And you were attempting to describe to the best of your
[24] ability that individual so that in the event he was involved
[25] in criminal activity the police would know who to look for,
                        Jaclyne Wilson

Page 133

[1] correct?

[2] **A.** Correct.

[3] **Q.** And are you disputing that you specifically said that

[4] you're 5'10, telling the operator that you're 5'10 and then

[5] saying that this person that walked past me was 5'10? Are you

[6] disputing that?

[7] **A.** Around about. I didn't say he was exactly. Like I

[8] said, I didn't say exactly.

[9] **Q.** Okay. Fair to say you're around about 5'10, right?

[10] Have you accurately been measured your height?

[11] **A.** I said around 5'10, 5'11.

[12] **Q.** So this person was around your height; is that fair to

[13] say?

[14] **A.** I would go with that. Yes, I would.

[15] **Q.** You would go with that.

[16]     **MR. LORUSSO:** I'm going to ask if

[17]     Mr. Simmons could stand next to Mr. Holman for the

[18]     jury's viewing.

[19]     **MS. FORCHETTI:** I would object to that.

[20]     I will stipulate for the record that Mr. Simmons has

[21]     given his height as 5'5.

[22]     **THE COURT:** All right.

[23]     **THE WITNESS:** He was standing on ice.

[24]     Like I said, my driveway was full of ice. So

[25]     maybe --

Jaclyne Wilson

Page 134

[1] **BY MR. LORUSSO:**

[2] **Q.** So were you not standing on the same ice?

[3] **A.** No. My driveway was -- I was changing my brakes. I

[4] couldn't change my brakes on ice. My car will slide into my

[5] garage. I don't want to replace my garage door.

[6] **Q.** So it was six inches of ice you assume or seven inches

[7] of ice that he was standing on that gave you that impression,

[8] correct?

[9] **A.** Around about. I have a couple people that own trucks

[10] in that driveway that drive down. So we don't really drive

[11] down the driveway when it snows because they make an embank so

[12] you can't really get your car down there. So if he's standing

[13] on it --

[14] **Q.** But I think actually what you said was that he was

[15] standing towards your driveway because you couldn't walk down

[16] the center because of these embankments, right?

[17] **A.** I said you couldn't walk -- okay.

[18] **Q.** Didn't you say that?

[19] **A.** Did I say that?

[20] **Q.** That's my question.

[21] **A.** I said that he was walking down one side of it, of the

[22] driveway, because it was probably harder to walk in the center

[23] because of the more harder ice.

[24] **Q.** Because as you just said you have trucks that go down

[25] that driveway, I guess, and they make ridges in the ice and

Jaclyne Wilson

Page 135

[1] that the center of the driveway would be, I guess --

[2] **A.** But he didn't tight rope walk in the middle where the

[3] tire --

[4] **Q.** Did I say anything about tight rope? I'm asking you

[5] where he was and what the height of the ice was.

[6] **A.** I don't know. I didn't measure it.

[7] **Q.** Well, did you take that into consideration when you

[8] gave this description to police radio about the height of the

[9] person that hey, I'm saying 5'10 but really actually he was

[10] walking on six, seven inches of ice?

[11] **A.** He could have had on boots with lifts. I don't know.

[12] I just know the person was almost eye level with me at the

[13] time.

[14] **Q.** So do I gather from what you're saying you were seven

[15] inches lower than him?

[16] **A.** Considering I was changing my brakes, sir.

[17] **Q.** Okay.

[18] **A.** I was almost sitting down actually bending over at the

[19] time. So I stood up to ask him so, yeah, he was about almost

[20] eye level with me. So I don't know if it's the hoody that I'm

[21] looking at the top of. I know he was almost eye level with me

[22] or was he standing on ice. I didn't look at his feet or what

[23] he was standing on.

[24] **Q.** So you're surmising that he was standing on seven

[25] inches of ice and that's what made you eye level; is that

Jaclyne Wilson

Page 136

[1] right?

[2]     **MS. FORCHETTI:** Objection. Asked and

[3]     answered.

[4]     **THE COURT:** Overruled.

[5] **BY MR. LORUSSO:**

[6] **Q.** I'm only going by the measurements here. You said

[7] you're 5'10, five inches of ice. I'm sorry.

[8]     He was eye level with you, correct?

[9] **A.** Almost about.

[10] **Q.** You told the police 5'10, correct?

[11] **A.** I said about.

[12] **Q.** Right.

[13] **A.** Give or take.

[14] **Q.** Well, you didn't say give or take. You said 5'10,

[15] right?

[16] **A.** Well, about.

[17] **Q.** Now you're saying about, right?

[18] **A.** No, I told them about.

[19] **Q.** Okay.

[20]     **MR. LORUSSO:** I'm going -- I guess I'm

[21]     going to ask that the police radio track be played

[22]     and see if this witness can identify himself as

[23]     being that person with the Court's permission.

[24]     **THE COURT:** Do you have it?

[25]     **MR. LORUSSO:** Yes.

Jaclyne Wilson

[1]     MS. FORCHETTI:  We do have it, Your
[2] Honor.  If Mr. Lorusso doesn't mind, I can operate
[3] it since it's on my table.
[4]     MR. LORUSSO:  That's fine.
[5]     THE COURT:  Do you need some time to
[6] identify where you should start or stop or are you
[7] isolated there?
[8]     MS. FORCHETTI:  I thought we had isolated
[9] it.
[10]     THE COURT:  The two of you may proceed.
[11]     (Audio played.)
[12] BY MR. LORUSSO:
[13] Q.   Is that you calling police radio?
[14] A.   I guess so.  I can't tell.  It sounds like me.
[15] Q.   Okay.
[16]     (Audio played.)
[17] BY MR. LORUSSO:
[18] Q.   Mr. Holman, would you agree that was you?
[19] A.   Correct.
[20] Q.   Okay.  By the way, would you tell me what decorative
[21] jeans are?
[22]     MS. FORCHETTI:  Objection.
[23]     THE COURT:  What's the --
[24]     MR. LORUSSO:  The description given on
[25]     the tape was decorative jeans.
          Jaclyne Wilson

[1]     THE COURT:  Is that what he says?
[2]     THE WITNESS:  That's correct.
[3]     THE COURT:  You may ask the question.
[4]     THE WITNESS:  Urban like jeans.
[5] BY MR. LORUSSO:
[6] Q.   I apologize.  What does that mean?
[7] A.   Something African-American males wear, I guess.
[8] Q.   Look, I mean no disrespect.  I don't know what it
[9] means.
[10]     What does decorative jeans mean?
[11] A.   Just a style.
[12] Q.   A style?
[13] A.   Yes.
[14] Q.   Okay.  Thank you.
[15]     MR. LORUSSO:  I have nothing further.
[16]     THE COURT:  Do you have any additional
[17]     questions?
[18]     MS. FORCHETTI:  Just a little bit,
[19]     Your Honor, yes.
[20]                 _ _ _
[21]         REDIRECT EXAMINATION
[22]                 _ _ _
[23] BY MS. FORCHETTI:
[24] Q.   Mr. Holman, I'm going to ask you to take a look at your
[25] interview that's been marked as Commonwealth Exhibit 18.
          Jaclyne Wilson

[1]     After Detective Hassel interviewed you, did you sign
[2] that interview?
[3] A.   I did.
[4] Q.   Both pages?
[5] A.   Correct.
[6] Q.   And Detective Hassel had asked you to describe the
[7] person that you had seen walking in your driveway; is that
[8] right?
[9] A.   Correct.
[10] Q.   Now, prior to talking to Detective Hassel, had you
[11] heard your 911 call?
[12] A.   No.
[13] Q.   Okay.  Is today the first time you're hearing your 911
[14] call?
[15] A.   That is correct.
[16] Q.   And is today the first time you're testifying in
[17] relation to this shooting?
[18] A.   Correct.
[19] Q.   And your answer to Detective Hassel was, He wasn't that
[20] old.  I would give him 22 at the most.  He looked young.  He
[21] was a black male.  He was light brown skin.  He had a dirty
[22] look to him.  He had a black hoody on.  It had individual
[23] pockets and it was zipped all the way.  He had the hood up but
[24] put it wasn't pulled tight by any drawstrings.  I could see
[25] the tips of his cornrows sticking out of the hood.  He had
          Jaclyne Wilson

[1] baggie black jeans on.  They had a grayish shiny tint to them.
[2]     Is that what you remember telling Detective Hassel?
[3] A.   That is correct.
[4] Q.   And when Detective Hassel asked you to describe what
[5] you had seen in relation to the shooting, you told him, I was
[6] in my driveway which is in the rear of my house.  My driveway
[7] shares the driveway with the 1400 block of Johnson Street.  I
[8] heard four gunshots.  Not even two minutes later I saw a male
[9] walking at a quick pace through my driveway from Stenton
[10] towards Mansfield.  My whole driveway is a sheet of ice and
[11] the male was walking with both hands in his hoody.  He was
[12] sliding around and he never took his hands out of his pockets.
[13] I was changing the brake calibers on my car.  It was the rear
[14] passenger side of my car and the male walked right past me.
[15] He passed within 4 feet of me.  I heard him panting and I
[16] asked him if he was okay.  He said, Just exhausted.  He kept
[17] walking and never turned around.  I heard police sirens and he
[18] picked up his pace.  He was looking around but never turned
[19] back in my direction.  He went up to the next driveway about
[20] 13 houses up.  He turned around and looked back.  He then went
[21] in between the houses.  I didn't see him again after that.
[22] After he got past me, I called 911 and described to the
[23] dispatcher everything he was doing, which way he was walking,
[24] everything that he had on and where I was.
[25]     Is that what you told Detective Hassel?
          Jaclyne Wilson

Page 141

[1] **A.** That is correct.

[2] **Q.** Okay. Do you know the victim in this shooting?

[3] **A.** No, I don't.

[4] **Q.** Prior to this day had you ever seen Johnnie Simmons?

[5] **A.** No.

[6] **Q.** Thank you.

[7]     **THE COURT:** Mr. Lorusso, anything else?

[8]     **MR. LORUSSO:** No, Your Honor.

[9]     **THE COURT:** Ladies and gentlemen, would

[10] you indulge us for a moment? We're going to take a

[11] short recess and then resume testimony.

[12]     (Jury exits the courtroom at 3:02 p.m.)

[13]     **THE COURT:** Let the record reflect the

[14] jurors have left the room.

[15]     (Witness excused.)

[16]     **THE COURT:** Counsel, it's just after

[17] three o'clock. I'd like to work until 4:00 knowing

[18] full well that Mr. Lorusso has a flight. He has to

[19] be out of here by 4:00.

[20]     **MR. LORUSSO:** Yes, sir.

[21]     **THE COURT:** So keep that in mind when you

[22] call your next witness.

[23]     **MS. FORCHETTI:** Okay.

[24]     **THE COURT:** So that the record is clear,

[25] I am now instructing Mr. Menna to invite the

    Jaclyne Wilson

Page 142

[1] gentlemen who were excluded for that testimony to

[2] come back into the courtroom, and as soon as that's

[3] done, we'll bring the jurors back.

[4]     (Pause.)

[5]     **THE COURT:** All right.

[6]     (Jury enters the courtroom at 3:12 p.m.)

[7]     **THE COURT:** Thank you, ladies and

[8] gentlemen.

[9]     Ms. Forchetti, call your next witness,

[10] please.

[11]     **MS. FORCHETTI:** Yes. At this time the

[12] Commonwealth calls Detective Robert Hassel.

[13]     ...DETECTIVE ROBERT HASSEL, after having

[14] been first duly sworn, was examined and testified as

[15] **follows**:

[16]     – – –

[17]     **COURT CRIER:** State your name, badge

[18] number for the record and spell your last name.

[19]     **THE WITNESS:** Detective Robert Hassel,

[20] H-A-S-S-E-L, Badge No. 8160, assigned to Northwest

[21] Detectives.

[22]     **THE COURT:** You may proceed, ma'am.

[23]     **MS. FORCHETTI:** Thank you.

[24]

[25]

    Jaclyne Wilson

Page 143

[1]     – – –

[2]     DIRECT EXAMINATION

[3]     – – –

[4] **BY MS. FORCHETTI:**

[5] **Q.** Good afternoon, detective.

[6] **A.** Good afternoon.

[7] **Q.** Detective, how long have you been with the Philadelphia

[8] police?

[9] **A.** Fourteen years.

[10] **Q.** How much of that time have you spent in Northwest

[11] Detectives?

[12] **A.** Eight years.

[13] **Q.** Over that time how many shootings would you say you've

[14] investigated?

[15] **A.** Numerous shootings. I couldn't really give you a

[16] number at this point.

[17] **Q.** More than ten?

[18] **A.** More than ten. Probably 50 to 100 even maybe more than

[19] that.

[20] **Q.** Okay. And who was your partner?

[21] **A.** Detective Michael Acerenza, A-C-E-R-E-N-Z-A.

[22] **Q.** And for how long has Detective Acerenza been your

[23] partner?

[24] **A.** Going on three years I think.

[25] **Q.** And are the two of you assigned to a particular

    Jaclyne Wilson

Page 144

[1] division within Northwest Detectives?

[2] **A.** Yes, 14th District.

[3] **Q.** Okay. And within Northwest are the two of you assigned

[4] to a special team?

[5] **A.** We're in the Special Investigations Unit part of a

[6] shooting team.

[7] **Q.** So are you and Detective Acerenza assigned to all the

[8] shootings that occur while you are on duty?

[9] **A.** Yes.

[10] **Q.** Okay. Did you become involved with Detective Acerenza

[11] in investigating a shooting that had occurred on February 4th

[12] of 2011, on the 1300 block of Johnson Street?

[13] **A.** Yes.

[14] **Q.** As a result of your investigation of that shooting did

[15] you come to interview a witness by the name of Kyle Holman?

[16] **A.** Yes.

[17] **Q.** When did you interview Mr. Holman?

[18] **A.** I believe it was February 10th of 2010.

[19] **Q.** Okay. And how did you become aware of Mr. Holman's

[20] existence as a potential witness?

[21] **A.** From calls to 911 in reference in the incident.

[22] **Q.** How does that work, detective?

[23] **A.** Well, after an incident to obtain any information of

[24] who calls 911, a search warrant has to be prepared and

[25] executed at our police administration building, police

    Jaclyne Wilson

### Page 145

[1] headquarters at 8th and Race. With that search warrant we

[2] were able to get the names of whoever called 911.

[3] **Q.** And was such a search warrant executed in relation to

[4] this shooting?

[5] **A.** Yes.

[6] **MS. FORCHETTI:** Your Honor, I would ask

[7] to mark this document as Commonwealth Exhibit 20.

[8] **THE COURT:** It may be marked.

[9] (Search warrant marked Commonwealth

[10] Exhibit C-20 for identification.)

[11] **COURT CRIER:** So marked C-20.

[12] **BY MS. FORCHETTI:**

[13] **Q.** Detective, you're being shown an exhibit that's been

[14] marked as Commonwealth Exhibit 20.

[15] Do you recognize the document?

[16] **A.** That is correct.

[17] **Q.** What is that?

[18] **A.** That's the search warrant that was prepared in

[19] reference to this incident to obtain any caller information

[20] made to 911.

[21] **Q.** Okay. At what's the search warrant number?

[22] **A.** Search Warrant No. 154766.

[23] **Q.** And once you submit that search warrant, what happens?

[24] **A.** We get a print out of the entire incident. It's a

[25] display that our police radio has of all the cars, police cars

Jaclyne Wilson

### Page 146

[1] and everyone who responded to the scene and it gives who

[2] called 911, information like telephone numbers so they can be

[3] contacted.

[4] **Q.** Once you obtain that information in this case, what do

[5] you then do?

[6] **A.** Called the numbers or meet with the people that called

[7] 911 to see if they have any information in reference to the

[8] incident.

[9] **Q.** And that is how you found Mr. Holman in this case?

[10] **A.** Yes.

[11] **Q.** Okay. And when was this search warrant submitted?

[12] **A.** This search warrant was executed February 9th, 2011, at

[13] 2:50 a.m. -- I'm sorry. The date is February 9th, 2010, at

[14] 2:50 a.m.

[15] **Q.** Okay. February 9th, 2010, is that --

[16] **A.** No. There's a misprint on the date up top. It's 2011.

[17] I apologize.

[18] **Q.** Okay.

[19] **A.** February 9th, 2011, 2:50 a.m.

[20] **Q.** Did you obtain the information on February 9th?

[21] **A.** Looks like the information was obtained by Detective

[22] Sloan. He's the one that prepared the search warrant. So

[23] that time, that 2:50 a.m., that's when it's executed. That's

[24] when the information was obtained.

[25] **Q.** Okay. So that was in the early morning hours of the

Jaclyne Wilson

### Page 147

[1] 9th?

[2] **A.** Yes.

[3] **Q.** Do you remember when you contacted Mr. Holman?

[4] **A.** Exact time, no, I don't.

[5] **Q.** And when you contacted Mr. Holman, what was his

[6] response?

[7] **A.** From what I believe he heard the gunshots and he

[8] observed someone walking through his driveway in a hurried

[9] motion. So we asked him to come in and have an interview and

[10] we formally interviewed him on his observations.

[11] **Q.** Okay.

[12] **MS. FORCHETTI:** Your Honor, I would ask

[13] that the witness be shown what has been marked as

[14] Commonwealth Exhibit 19.

[15] **THE COURT:** Very well.

[16] **BY MS. FORCHETTI:**

[17] **Q.** Detective, you're being shown a document that's been

[18] marked Commonwealth Exhibit 19.

[19] Do you recognize that document?

[20] **A.** Yes.

[21] **Q.** Is that the interview you conducted of Mr. Holman?

[22] **A.** Yes.

[23] **Q.** On what day did you conduct it?

[24] A. I conducted it on February 10th, 2011, at 10:15 p.m.

[25] Q. Okay. Detective, if you remember, how much time passed

Jaclyne Wilson

### Page 148

[1] between when you contacted Mr. Holman and he actually came in

[2] to be interviewed?

[3] **A.** I don't recall. It had to be some time between the

[4] date when the information was received, February 9th, 2011,

[5] 2:50 a.m., and the time of the interview. So within a day or

[6] little over.

[7] **Q.** Okay. Well, you're not typically contacting witnesses

[8] at three o'clock in the morning, are you?

[9] **A.** No.

[10] **Q.** Okay. When you interviewed Mr. Holman, did you ask him

[11] whether or not he would be able to recognize the person he

[12] saw?

[13] **A.** Yes, I did. On the second page.

[14] **Q.** What was his response to you?

[15] **A.** I think so.

[16] **Q.** Now, at that time did you conduct any identification

[17] procedure with respect to this investigation?

[18] **A.** No, I didn't.

[19] **Q.** Why is that?

[20] **A.** Because the defendant was arrested for this incident.

[21] **Q.** What do you mean?

[22] **A.** Well, I mean, the defendant was arrested on February

[23] 9th. So I didn't want to show any photographs or make any

[24] identifications of anybody due to him being arrested.

[25] **Q.** Okay. Why is that not proper?

Jaclyne Wilson

Page 149

[1] **A.**    Because I believe that should happen in court after
[2] that.
[3] **Q.**    Is that your typical way of proceeding in
[4] investigations when new witnesses come forward?
[5] **A.**    Well, once someone has been arrested for an incident,
[6] after the arrest, any information pertaining to that case will
[7] be forwarded to the District Attorney's Office.  So if it
[8] comes up in court, I believe there's procedures that can
[9] happen in reference to that.
[10] **Q.**    And procedures, do youyou mean by requesting a line up?
[11] **A.**    Correct.
[12] **Q.**    Okay.  And in your experience, detective, who requests
[13] a line up?
[14] **A.**    My experience?  I believe it's the defense of the
[15] counsel usually requests it at preliminary hearings.
[16] **Q.**    Okay.  Detective, was that the extent of your contact
[17] with Mr. Holman?
[18] **A.**    Yes.
[19] **Q.**    Have you spoken to him after you interviewed him?
[20] **A.**    Just hello today.  That's pretty much it.  Today was
[21] the first time I've seen him, I believe, to my recollection
[22] since this incident, since the day I interviewed him.
[23] **Q.**    Thank you.
[24]          **MS. FORCHETTI**:  I don't have any further
[25]     questions.

                        Jaclyne Wilson

Page 150

[1]          **MR. LORUSSO**:  I have no questions,
[2] Your Honor.
[3]          **THE COURT**:  All right.  Thank you, sir.
[4] You may step down.
[5]          (Witness excused.)
[6]          **THE COURT**:  May I see counsel for a
[7] second?
[8]     (Sidebar held off the record.)
[9]          **THE COURT**:  You may proceed.
[10]          **MS. FORCHETTI**:  Your Honor, at this time
[11] the Commonwealth calls Detective Stephen Grace.
[12]          **THE COURT**:  Mr. Ferguson, hold the
[13] witness for a second.
[14]          May I see counsel for a second?
[15]          **MS. FORCHETTI**:  Sure.
[16]          (Sidebar held off the record.)
[17]          **THE COURT**:  Counsel, call your next
[18] witness, please.
[19]          **MS. FORCHETTI**:  Your Honor, at this time
[20] the Commonwealth calls Detective Stephen Grace.
[21]
[22]
[23]
[24]
[25]

                        Jaclyne Wilson

Page 151

[1]          ...DETECTIVE STEPHEN GRACE, after having
[2]     been first duly sworn, was examined and testified as
[3] **follows**:
[4]              _ _ _
[5]          **COURT CRIER**:  State your name, badge
[6]     number for the record and spell your last name.
[7]          **THE WITNESS**:  Detective Stephen Grace,
[8]     G-R-A-C-E, Badge No. 923, assigned to Northwest
[9]     Detectives.
[10]          **THE COURT**:  You may proceed.
[11]          **MS. FORCHETTI**:  Thank you.
[12]              _ _ _
[13]          DIRECT EXAMINATION
[14]              _ _ _
[15] **BY MS. FORCHETTI**:
[16] **Q.**    Good afternoon, detective.
[17] **A.**    Good afternoon.
[18] **Q.**    Detective, how long have you been with the Philadelphia
[19] police?
[20] **A.**    Twenty-three years.
[21] **Q.**    And how much time have you spent as a detective?
[22] **A.**    Sixteen.
[23] **Q.**    And have you spent your entire career in Northwest
[24] Detectives?
[25] **A.**    Yes, I have.

                        Jaclyne Wilson

Page 152

[1] **Q.**    Are you assigned to a particular division within
[2] Northwest Detectives?
[3] **A.**    Special Investigations Unit.
[4] **Q.**    And specifically what does the Special Investigations
[5] Unit handle?
[6] **A.**    Shootings and usually pattern crimes, patrolling within
[7] certain districts.
[8] **Q.**    How many shootings would you say you've investigated
[9] over the course of your career?
[10] **A.**    Over a thousand.
[11] **Q.**    A thousand.  Wow.
[12]     Detective, were you part of the team that
[13] investigated a shooting that had occurred on February 4th of
[14] 2011 in the 1300 block of Johnson Street here in Philadelphia?
[15] **A.**    Originally, no.  I was asked to assist and follow-up in
[16] an execution of a search warrant in reference to this case.
[17] **Q.**    Okay.  Is that the first time you joined in that
[18] investigation?
[19] **A.**    Yes.
[20] **Q.**    Who asked you to assist?
[21] **A.**    The assigned detectives which would have been
[22] Detectives Acerenza and Hassel.
[23] **Q.**    And they asked you to help execute a search warrant?
[24] **A.**    Yes.
[25] **Q.**    Okay.  Of any particular residence or vehicle?

                        Jaclyne Wilson

## Page 153

[1] **A.** It was of a residence.

[2] **Q.** Okay.

[3] **MS. FORCHETTI:** Your Honor, I would ask

[4] that the detective be shown what has been marked as

[5] Commonwealth Exhibit 13.

[6] **THE COURT:** Yes.

[7] **COURT CRIER:** Showing the witness exhibit

[8] 13.

[9] **BY MS. FORCHETTI:**

[10] **Q.** Detective, you're being shown a three-page document

[11] that's been marked as Commonwealth Exhibit 13.

[12] Do you recognize the document?

[13] **A.** Yes. That's the search warrant they asked my partner

[14] and I to execute.

[15] **Q.** And of what location was that?

[16] **A.** 1528 East Johnson Street.

[17] **Q.** And why was that location of significance with respect

[18] to this investigation?

[19] **A.** Well, based upon the probable cause, it was in

[20] reference to clothing and a firearm that they were looking for

[21] at that time.

[22] **Q.** Okay. And why was it believed that there may have been

[23] evidence at this particular location?

[24] **A.** Well, it indicated in reference to the defendant,

[25] Mr. Johnnie Simmons, that that was his residence and

Jaclyne Wilson

## Page 154

[1] belongings may be in that property as well.

[2] **Q.** Okay. And when did you execute this search warrant?

[3] **A.** Bear with me, on February the 9th, 2011.

[4] **Q.** Okay. And at what time?

[5] A. 6:30 a.m.

[6] **Q.** Nice and early?

[7] **A.** Yes.

[8] **Q.** Okay. When you arrived at that location, did you go

[9] with anyone?

[10] **A.** Yes. We have a Warrant Unit assigned to Northwest

[11] Detectives that handle all of our executions of arrest

[12] warrants and search warrants and also my partner, Detective

[13] Suchinsky, S-U-C-H-I-N-S-K-Y, was there as well.

[14] **Q.** Okay. And what happens when you go to this location to

[15] execute the search warrant?

[16] **A.** Well, in any execution of arrest or search warrant the

[17] first thing you do is secure the property. If you're looking

[18] for a person and the person is there, you take the person into

[19] custody. But you also check the entire house to make sure

[20] there is no more chance of anybody else, including the

[21] occupants, being injured. Once that's done, in this case

[22] where a search warrant is done, after that portion's done,

[23] then you begin your search.

[24] **Q.** Okay. When you arrived at this location, 1528 East

[25] Johnson Street, did you see anyone there that you see here in

Jaclyne Wilson

## Page 155

[1] court today?

[2] **A.** Actually two people.

[3] **Q.** Okay. Who did you see?

[4] **A.** Mr. Simmons and his mother in the courtroom.

[5] **Q.** Okay. And that's Ms. Jackson?

[6] **A.** Yes.

[7] **Q.** Okay. Listed as one of the owners of the property; is

[8] that right?

[9] **A.** Yes.

[10] **Q.** Okay. And did you also have an arrest warrant for

[11] Mr. Simmons at the time?

[12] **A.** I don't know if there was an arrest warrant or not.

[13] **Q.** Was Mr. Simmons taken into custody?

[14] **A.** Yes, he was.

[15] **Q.** Once the house was secured and you begin to execute

[16] your search warrant, for what are you looking for at that

[17] time?

[18] **A.** Well, in reference to this case is a firearm, any other

[19] ballistics evidence, clothing that would match the description

[20] and any proof of residency.

[21] **Q.** Okay. And what did you find?

[22] **A.** Found some clothing and proof of residency as well.

[23] **Q.** Okay.

[24] **MS. FORCHETTI:** Your Honor, I would ask

[25] to mark this document as Commonwealth Exhibit C-21

Jaclyne Wilson

## Page 156

[1] and I would ask to mark these physical items as

[2] Commonwealth Exhibit 22.

[3] **THE COURT:** They may be marked.

[4] (Property receipt marked Commonwealth

[5] Exhibit C-21 for identification.)

[6] (Clothing marked Commonwealth Exhibit

[7] C-22 for identification.)

[8] **COURT CRIER:** So marked C-21 and C-22,

[9] Your Honor.

[10] **BY MS. FORCHETTI:**

[11] **Q.** All right. Detective, let's start first with the

[12] document you have in front of you that's been marked

[13] Commonwealth Exhibit 21.

[14] Can you describe for the jury what evidence is

[15] described on that property receipt?

[16] **A.** Sure. Any time any items are confiscated by the

[17] police, it's placed on what we call a property receipt. The

[18] items typed up, what we have here is one pair of tan Dickie

[19] pants, one brown jacket and an appointment card in the name of

[20] Johnnie Simmons. It also has the circumstances listed below

[21] that what is recovered on the search warrant, the date and the

[22] search warrant number as well is also listed.

[23] **Q.** Okay. And was the appointment card taken as proof of

[24] residence?

[25] **A.** Yes, it was.

Jaclyne Wilson

Page 157

[1] **Q.** Okay. Did it have the defendant's address as well as
[2] his name?

[3] **A.** I don't remember if it had the address or not. I have
[4] to look at it but it did have his name.

[5] **Q.** If you could open up the bag that's been marked
[6] Commonwealth Exhibit 22.

[7] **A.** It's just an appointment card. It doesn't contain the
[8] address but it does have his name.

[9] **Q.** Okay.

[10] **A.** This would be the Dickie pants and the brown jacket.

[11] **Q.** Now, detective, why were these items of clothing
[12] seized?

[13] **A.** Well, based upon the search warrant the items that they
[14] were looking for to recover were tan or beige-colored cargo
[15] type clothing set. Based upon the clothing described to me
[16] seemed like items that may have been used or items that they
[17] were specifically looking for in a search warrant.

[18] **Q.** And, detective, you're referring to the part of the
[19] search warrant, the second page.

[20] **A.** Actually, it's on the first page as well as the cover
[21] sheet. It says items to be searched for and seized.

[22] **Q.** And within that section it states: Any and all
[23] firearms, specifically a gray-colored handgun, any ballistics
[24] evidence, tan or beige-colored type clothing set, proof of
[25] residency and all items of evidentiary value.

Jaclyne Wilson

Page 158

[1] **A.** Yes.

[2] **Q.** Okay. And attached to that application for the search
[3] warrant is also a section of probable cause; is that correct?

[4] **A.** Yes.

[5] **Q.** Where the detective outlines why it -- well, explain
[6] to the jury, what does the probable cause section refer to?

[7] **A.** It's the second page of the search warrant. This would
[8] be the cover page of the search warrant itself. The second
[9] page is basically to establish for us to submit to first to a
[10] district attorney who then approves it or does not approve it
[11] and then once it's approved, then you have to go to an
[12] independent arbiter which would be a judge or a bail
[13] commissioner who then will review it and determine whether
[14] there's enough probable cause to search that property. So you
[15] have to specifically spell out the reason why you're going
[16] there and what you're going to be looking for while you're
[17] there.

[18] **Q.** And within that section for probable cause it's
[19] mentioned that one of the individuals was wearing tan or beige
[20] cargo set clothing; is that correct?

[21] **A.** Yes.

[22] **Q.** Once you seized these items and placed them on a
[23] property receipt, what do you then do with them?

[24] **A.** They go to what we call the evidence custodian.
[25] Depending on what evidence you recover it goes to different

Jaclyne Wilson

Page 159

[1] locations. These items because they're not a firearm would go
[2] to City Hall and that's where the main depository would be for
[3] items of this thing.

[4] **Q.** Okay. Is that where these items were picked up from
[5] today?

[6] **A.** Yes.

[7] **Q.** Okay. Detective, was that the extent of your role in
[8] this investigation was the seizure of items from the property
[9] and the arrest of the defendant?

[10] **A.** Yes.

[11] **Q.** And how far is 1528 East Johnson Street from 1300
[12] Johnson Street, Johnson and Stenton?

[13] **A.** Two blocks.

[14] **Q.** All right. Thank you.

[15]     **MS. FORCHETTI**: I don't have any further
[16] questions.

[17]     **THE COURT**: Mr. Lorusso?

[18]     **MR. LORUSSO**: Thank you, Your Honor.

[19]     _ _ _

[20]     CROSS - EXAMINATION

[21]     _ _ _

[22] **BY MR. LORUSSO**:

[23] **Q.** Good afternoon, detective.

[24] **A.** Good afternoon.

[25] **Q.** Detective, the extent of clothing that was described as

Jaclyne Wilson

Page 160

[1] being searched for was a tan or beige-colored cargo type
[2] clothing set, correct?

[3] **A.** Yes.

[4] **Q.** The tan pants that you have there, you retrieved them
[5] just because they were tan?

[6] **A.** Well, they also have like that cargo pocket on the legs
[7] themselves.

[8] **Q.** Can I see that?

[9] **A.** Sure.

[10] **Q.** Okay. That's an inside pocket on the back of the
[11] pants; is that right?

[12] **A.** No, they're on the side.

[13] **Q.** They're on the side. Okay. All right. I see that.

[14]     So that's why you retrieved those?

[15] **A.** Yes. That and the color.

[16] **Q.** And that pursuant to the warrant was -- if you look at
[17] the affidavit of probable cause, the last line there I guess
[18] in the -- above the second paragraph from the bottom, Offender
[19] No. 1 shot the complainant one more time and the complainant
[20] said it sounded like the offender was trying to shoot him
[21] again, right, and the second photograph says, The complainant
[22] described Offender No. 1, that would be the shooter, as a
[23] black male, thin build, short, tan or beige cargo set
[24] clothing, right? So that's the basis for seeking the warrant
[25] for the clothes and you retrieved the tan pants, correct?

Jaclyne Wilson

**Page 161**

[1] A. Yes.

[2] Q. Okay. The jacket was -- is that a jacket, the other

[3] thing?

[4] A. Yes, it is. It's a jacket.

[5] Q. Okay.

[6] A. Now it's little darker but people's perspective on

[7] colors tend to be different.

[8] Q. Sure. Thank you, detective.

[9]       MR. LORUSSO: I have nothing further.

[10]       THE COURT: Anything else, ma'am?

[11]       MS. FORCHETTI: No.

[12]       THE COURT: Thank you, sir. You may step

[13] down.

[14]       (Witness excused.)

[15]       THE COURT: May I see counsel?

[16]       MS. FORCHETTI: Sure.

[17]       (Sidebar held off the record.)

[18]       MS. FORCHETTI: Your Honor, at this time

[19] the Commonwealth recalls Officer Alexander.

[20]       THE COURT: Very well.

[21]

[22]

[23]

[24]

[25]

Jaclyne Wilson

---

**Page 162**

[1]       ...POLICE OFFICER RICHARD ALEXANDER,

[2] after having been first duly sworn, was examined and

[3] **testified as follows**:

[4]       _ _ _

[5]       COURT CRIER: State your name, badge

[6] number for the record and spell your last name.

[7]       THE WITNESS: Police Officer Richard

[8] Alexander, Badge No. 1707, 6th District.

[9]       MS. FORCHETTI: May I proceed, Your

[10] Honor?

[11]       THE COURT: Yes, please.

[12]       _ _ _

[13]       DIRECT EXAMINATION

[14]       _ _ _

[15] **BY MS. FORCHETTI:**

[16] Q. Good afternoon, officer.

[17] A. Good afternoon.

[18] Q. Officer, after you testified yesterday, did remain

[19] outside of Courtroom 802, this courtroom?

[20] A. Yes.

[21] Q. And while you were waiting outside of Courtroom 802,

[22] did you observe anything that you brought to my attention?

[23] A. Yes.

[24] Q. What did you see?

[25] A. One of the witnesses, I think Mr. Wright, the tall

Jaclyne Wilson

---

**Page 163**

[1] gentleman, he was in the hallway embracing the defendant's

[2] mother and in the hallway for about five to seven minutes

[3] letting her know that everything is going to be okay.

[4] Q. You overheard a conversation?

[5] A. Yes.

[6] Q. What did you hear?

[7] A. Well, we heard him say that --

[8]       MR. LORUSSO: Object to "we".

[9]       THE COURT: Sustained.

[10] **BY MS. FORCHETTI:**

[11] Q. Tell us what you observed.

[12] A. I observed him hugging the defendant's mother and

[13] telling her everything is going to be okay and she was crying.

[14] Q. Okay. And how did that encounter end?

[15] A. It ended with him walking to the elevator and her

[16] walking back towards the courtroom.

[17] Q. Officer, was court still in session?

[18] A. Yes, court was still in session.

[19] Q. I was in here, Mr. Lorusso was in here, the jury was

[20] in the box?

[21] A. That is correct.

[22] Q. There was testimony still going on?

[23] A. Yes. That is correct.

[24] Q. Okay. When did you tell me about this?

[25] A. Yesterday. Once you had a break, you came out to the

Jaclyne Wilson

---

**Page 164**

[1] corridor and that's when I informed you of what happened.

[2] Q. Okay. Thank you, officer.

[3]       MS. FORCHETTI: I don't have anymore

[4] questions.

[5]       THE COURT: Mr. Lorusso?

[6]       MR. LORUSSO: Thank you, Your Honor.

[7]       _ _ _

[8]       CROSS - EXAMINATION

[9]       _ _ _

[10] **BY MR. LORUSSO:**

[11] Q. Officer, the way I see it, you've testified for less

[12] than two minutes here. Is it still your testimony that this

[13] embrace lasted five to seven minutes that you observed?

[14] A. Yes. They were hugging for a long time. She was

[15] crying, sir.

[16] Q. Two times longer than you've testified?

[17] A. Yes, sir.

[18] Q. Where did this all take place?

[19] A. Right at the end of the hallway before you make the

[20] right to the elevator.

[21] Q. And the extent of which you heard was Mr. Wright saying

[22] everything's going to be okay?

[23] A. Yes.

[24] Q. And you heard Ms. Jackson say what?

[25] A. Ms. Jackson was crying, sir.

Jaclyne Wilson

Page 165

[1] **Q.** Crying. Thank you, officer.

[2]         **THE COURT**: Anything else?

[3]         **MS. FORCHETTI**: No.

[4]         **THE COURT**: You may step down, sir.

[5] (Witness excused.)

[6]         **THE COURT**: Ladies and gentlemen of the

[7] jury, we are obliged to recess at this point and as

[8] I advised you during jury selection, there will not

[9] be court on Thursday or Friday. We shall resume

[10] promptly on Monday morning at nine o'clock.

[11]      So I must again instruct you as follows:

[12] Please, keep an open mind. Don't discuss the case

[13] amongst yourselves. Don't discuss the case with

[14] anyone else. Ladies and gentlemen, you must avoid

[15] reading anything that might be in the media about

[16] this case. Don't do any research. Don't try any

[17] experiments. Equally as important, do not go onto

[18] the internet. It's important that the only

[19] information that you have when you retire to

[20] deliberate is the information that we all saw and

[21] heard here in this courtroom during the course of

[22] the trial.

[23]      With that, enjoy your evening. Enjoy

[24] your days off. Enjoy your weekend and we'll see you

[25] all back here Monday morning at nine o'clock. Thank

        Jaclyne Wilson

Page 166

[1] you.

[2] (Jury exits the courtroom at 3:47 p.m.)

[3]         **THE COURT**: Mr. Lorusso, Ms. Forchetti,

[4] we had the sidebar where the two of you agreed that

[5] the reference by Mr. Kyle Holman on the 911 where he

[6] articulated his home address will be deleted?

[7]         **MR. LORUSSO**: Yes.

[8]         **THE COURT**: So I can direct our reporter

[9] not to transcribe his home address?

[10]         **MS. FORCHETTI**: Yes. Thank you.

[11]         **MR. LORUSSO**: No objection.

[12] (Hearing adjourned at 3:50 p.m.)

        Jaclyne Wilson

Page 167

[1]        CERTIFICATE

[2]

[3] I HEREBY CERTIFY THAT THE PROCEEDINGS AND EVIDENCE ARE

[4] CONTAINED FULLY AND ACCURATELY IN THE NOTES TAKEN BY ME ON THE

[5] TRIAL OF THE ABOVE CAUSE, AND THIS COPY IS A CORRECT

[6] TRANSCRIPT OF THE SAME.

[7]

[8]

[9]

[10]

[11]        JACLYNE A. CRAIGHEAD

[12]        OFFICIAL COURT REPORTER

[13]

[14]

[15]

[16]

[17] (THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY

[18] TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE

[19] DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING REPORTER.)

[20]

[21]

[22]

[23]

[24]

[25]

        Jaclyne Wilson

Lawyer's Notes

