# First Judicial District of Pennsylvania

*51CR00047732011*
*Johnnie Simmons*

---

*Trial (Jury) Volume 1*
*December 12, 2011*



---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 121211-Simmons.txt, 186 Pages*
*CRS Catalog ID: 12080850*

Page 1

[1]           IN THE COURT OF COMMON PLEAS
[2]      FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]              CRIMINAL TRIAL DIVISION
[4]                     - - -
[5] COMMONWEALTH       : CP-51-CR-0004773-2011
                       :
[6]                    :
       vs.             :
[7]                    :
                       :
[8] JOHNNIE SIMMONS    :
                       :
[9]
[10]                   - - -
[11]            COURTROOM 908
[12]          CRIMINAL JUSTICE CENTER
[13]          PHILADELPHIA, PENNSYLVANIA
[14]                   - - -
[15]        Monday, December 12, 2011
[16]                   - - -
[17] **BEFORE**:  THE HONORABLE SANDY L.V. BYRD, J.
[18]                   - - -
[19]
[20] **APPEARANCES**:
[21]
  STACY FORCHETTI, ESQUIRE
[22] For the Commonwealth
[23] VINCENT LORUSSO, ESQUIRE
  For the Defendant
[24]
[25]

            KIM S. KENDALL, RPR
            OFFICIAL COURT REPORTER

Page 2

[1]                  INDEX
[2]          COMMONWEALTH'S EVIDENCE
[3]
[4] WITNESS           DR.  CR.  RDR.  RCR.  REB.
[5] Detective Timothy Hartman  13  20   38
[6]
[7]              EXHIBITS
[8]                 FOR    IN
  No.       Description    IDENT. EVD.
[9]
  C-23 thru C-27   Photographs    15
[10] C-28         Document        16
[11]
[12]            DEFENSE EVIDENCE
[13]
[14] WITNESS           DR.  CR.  RDR.  RCR.  REB.
[15] Leland Kent       62   63   65
[16] Gerald Wright     68   70
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]      **THE COURT**:  On the record in the trial
[2]  case of Commonwealth versus Johnnie Simmons,
[3]  CP-51-CR-0004773-2011.  Simmons is here, the
[4]  attorney Mr. Lorusso, are you ready?
[5]      **MR. LORUSSO**:  I am.
[6]      **THE COURT**:  Ms. Forchetti.
[7]      **MS. FORCHETTI**:  Yes.
[8]      **THE COURT**:  How many witnesses do you
[9]  expect to call today?
[10]     **MS. FORCHETTI**:  I expect to call two more
[11]  witnesses, Your Honor.  And also have the
[12]  medical records moved in by way of stipulation.
[13]     **THE COURT**:  All right.  I need to colloquy
[14]  the defendant on the stipulation.  I need you
[15]  to tell me what the stipulation is so that I
[16]  don't have the scenario where one person is
[17]  reading the stipulation and the other person is
[18]  saying I didn't agree to that.  Have you
[19]  written it out?
[20]     **MS. FORCHETTI**:  I've written out extensive
[21]  notes in terms of what all the medical records
[22]  reflect.
[23]     **THE COURT**:  You two need to agree on the
[24]  stipulation.  As soon as you do we'll have a
[25]  colloquy.

Page 4

[1]      **MS. FORCHETTI**:  Your Honor, I went over my
[2]  notes with Mr. Lorusso and I believe we are
[3]  clear.
[4]      **THE COURT**:  All right.
[5]      Mr. Lorusso, just advise your client of
[6]  what a stipulation is to see if he has any
[7]  objection.
[8]      **MR. LORUSSO**:  My issue that I might have,
[9]  Your Honor, is Gerald Wright is still under
[10]  subpoena and I haven't seen him here this
[11]  morning yet.
[12]     **THE COURT**:  You have a number for him?
[13]     **MS. FORCHETTI**:  I do, Your Honor.  You
[14]  want me to contact him?
[15]     **THE COURT**:  Either one of you.  Whichever
[16]  one you think can get him in here.
[17]     **MR. LORUSSO**:  I have discussed the
[18]  stipulation with my client.
[19]     **THE COURT**:  As soon as you make your phone
[20]  call I'll colloquy your client and we'll get on
[21]  the way.
[22]                - - -
[23]     **THE COURT**:  Let's swear in Mr. Simmons
[24]  please.
[25]     **COURT CRIER**:  State your full name and

Page 5

[1]   spell your last name.
[2]     THE DEFENDANT:  Johnnie Simmons,
[3]   S-I-M-M-O-N-S.
[4]           - - -
[5]       JOHNNIE SIMMONS, after having been
[6]   duly sworn, was examined and testified as
[7]   **follows**:
[8]           - - -
[9]     THE COURT:  Tell us your name again.
[10]    THE DEFENDANT:  Johnnie Simmons.
[11]    THE COURT:  How old are you, sir?
[12]    THE DEFENDANT:  20.
[13]    THE COURT:  What is your date of birth?
[14]    THE DEFENDANT:  March 15, 1991.
[15]    THE COURT:  How far did you go in school?
[16]    THE DEFENDANT:  To high school.
[17]    THE COURT:  What's the highest grade you
[18]  completed?
[19]    THE DEFENDANT:  Ninth.
[20]    THE COURT:  Where was that?
[21]    THE DEFENDANT:  King High School.
[22]    THE COURT:  Do you read, write, and
[23]  understand English?
[24]    THE DEFENDANT:  Yes.
[25]    THE COURT:  Have you ever been diagnosed

Page 6

[1]   with or treated for a mental illness or
[2]   disease?
[3]     THE DEFENDANT:  No.
[4]     THE COURT:  Are you now under the
[5]   influence of drugs, alcohol, or medication?
[6]     THE DEFENDANT:  No.
[7]     THE COURT:  Mr. Simmons, you appreciate
[8]   that you are the defendant in this case,
[9]   correct?
[10]    THE DEFENDANT:  Yes.
[11]    THE COURT:  You've been here throughout
[12]  the trial and you are aware of the various
[13]  rights that's been afforded you by our
[14]  Constitution, agreed?
[15]    THE DEFENDANT:  Yes.
[16]    THE COURT:  One of those rights is the
[17]  right to confront and/or cross-examine
[18]  witnesses called against you, you seen that
[19]  played out over the last week of trial, is that
[20]  a fair statement?
[21]    THE DEFENDANT:  Yes.
[22]    THE COURT:  Your attorney and the
[23]  Assistant District Attorney have advised me
[24]  that regarding the medical records there is a
[25]  stipulation.  A stipulation is nothing more

Page 7

[1]   than an agreement; do you understand that?
[2]     THE DEFENDANT:  Yes.
[3]     THE COURT:  The medical records are not a
[4]   mystery in this case.  They have been
[5]   subpoenaed and/or available to both sides so
[6]   your attorney and the Assistant District
[7]   Attorney knows what's contained in those
[8]   records; you understand that?
[9]     THE DEFENDANT:  Yes.
[10]    THE COURT:  It is a document available for
[11]  inspection by both sides, is that clear to you?
[12]    THE DEFENDANT:  Yes.
[13]    THE COURT:  Your attorney has indicated as
[14]  has the Assistant District Attorney that there
[15]  is a stipulation that if the custodian of
[16]  records were called he or she will articulate
[17]  what is contained in the records; do you
[18]  understand?
[19]    THE DEFENDANT:  Yes.
[20]    THE COURT:  Now, you could compel the
[21]  Commonwealth to subpoena the custodian and have
[22]  him or her come in, take the stand, and tell
[23]  the jury what's in the records or you could
[24]  agree to have the stipulation read to the jury
[25]  where your attorney and the Assistant District

Page 8

[1]   Attorney agree and have that information
[2]   relayed to the jury, the fact finders, in this
[3]   case; do you understand that?
[4]     THE DEFENDANT:  Yes.
[5]     THE COURT:  When you stipulate you give up
[6]   the right to confront and/or cross-examine that
[7]   custodian; do you understand?
[8]     THE DEFENDANT:  Yes.
[9]     THE COURT:  Now, the law is as follows,
[10]  sir, when the Commonwealth and the defense
[11]  stipulate, that is when they agree that certain
[12]  facts are true then that stipulation is
[13]  evidence of those facts and the jurors will be
[14]  instructed to regard stipulated or agreed upon
[15]  facts as proven, is that clear to you?
[16]    THE DEFENDANT:  Yes.
[17]    THE COURT:  Now, would you please, Ms.
[18]  Forchetti, advise the defendant on the record
[19]  what the agreement is that you and Mr. Lorusso
[20]  have come to.
[21]    MS. FORCHETTI:  Yes.  Your Honor, there
[22]  has been an agreement by and between counsel
[23]  that were Dr. Mark Captain called to testify he
[24]  would state that he was the attending physician
[25]  on duty at Albert Einstein Medical Center on

Page 9

[1] February 4, 2011. At which time Mr. Charles
[2] Tolbert at the time of 14:25, that's 2:25, in
[3] the afternoon Mr. Tolbert was admitted as a
[4] level one trauma. When he was admitted he was
[5] observed to have multiple gunshot wounds. He
[6] went in for an emergent exploratory laparotomy.
[7] He was also operated on and had a small bowl
[8] resection in three different places. There was
[9] a partial rectal resection as well as a partial
[10] splenic flexure resection. He was intubated
[11] and sedated.
[12]     On the following day, February 5th, he
[13] went back into the operating room for
[14] additional surgery. He had another exploratory
[15] laparotomy. There was a removal of packing.
[16] He had a left colectomy, a transverse
[17] colostomy. He had a Reanastomosis in two
[18] separate parts and his abdominal wall was
[19] closed. He was in guarded and intubated
[20] condition at that time.
[21]     It was observed that he had a bullet
[22] lodged in the medial left gluteus maximus, that
[23] he had a comminuted fracture of the distal
[24] sacrum or proximum coccyx that was medial to
[25] the bullet wound. There was a bullet lodged in

Page 10

[1] the superficial back soft tissues. And there
[2] was evidence of a bullet fragment overlying the
[3] heart. A chest x-ray showed that that's where
[4] the bullet lie. He was found to have two
[5] bullet wounds in his right upper extremity and
[6] remained on an IV diet until February 11th at
[7] which time he was permitted to have clear
[8] liquids at that time. He remained at Albert
[9] Einstein Medical Center until February 22nd.
[10] For the last several days of his stay he was
[11] transferred from the SICU down to the general
[12] floor. It was observed that he was in police
[13] custody at the time and that recovered from him
[14] upon his arrival were 38 bags of a green leafy
[15] substance that was turned over to the police.
[16] There was also a small bullet like material
[17] that was turned over to the police at that
[18] time. He was diagnosed as having acute stress
[19] disorder and antisocial personality disorder.
[20] During his stay he developed several fevers and
[21] it was observed that he had a peritoneal
[22] abscess that required several different
[23] draining. Your Honor, that's a summary.
[24]     **THE COURT**: Is that stipulated?
[25]     **MR. LORUSSO**: It is, Your Honor.

Page 11

[1]     **THE COURT**: Mr. Simmons, did you hear the
[2] proposed stipulation?
[3]     **THE DEFENDANT**: Yes.
[4]     **THE COURT**: Are you in agreement that may
[5] be read to the jury without the necessity of
[6] bringing in the treating physician or the
[7] custodian of records?
[8]     **THE DEFENDANT**: Yes.
[9]     **THE COURT**: Did you discuss this with your
[10] attorney?
[11]     **THE DEFENDANT**: Yes.
[12]     **THE COURT**: Are you satisfied with his
[13] services?
[14]     **THE DEFENDANT**: Yes.
[15]     **THE COURT**: Did anybody force you or
[16] threaten you to enter into the stipulation?
[17]     **THE DEFENDANT**: No.
[18]     **THE COURT**: Is this your decision?
[19]     **THE DEFENDANT**: Yes.
[20]     **THE COURT**: Is it made of your own free
[21] will?
[22]     **THE DEFENDANT**: Yes.
[23]     **THE COURT**: We'll accept the stipulation.
[24] Counsel, is your first witness ready?
[25]     **MS. FORCHETTI**: I believe so.

Page 12

[1]     **THE COURT**: Let's bring the jurors out.
[2] It's 10:00 o'clock. We still haven't heard
[3] from the court administration of the assigned
[4] cases out. If you want to come back in a half
[5] hour, counsel, maybe I'll know something then.
[6]              - - -
[7]     (The jury entered the courtroom at
[8] 10:03 a.m.)
[9]              - - -
[10]     **THE COURT**: Good morning, ladies and
[11] gentlemen. You may call your next witness.
[12]     **MS. FORCHETTI**: Thank you. Your Honor, at
[13] this time the Commonwealth calls Detective
[14] Timothy Hartman.
[15]     **COURT CRIER**: State your full name, spell
[16] your last name, badge number, and assignment.
[17]     **THE WITNESS**: Detective Timothy Hartman,
[18] H-A-R-T-M-A-N, Badge No. 9206, assigned to
[19] Northwest Detectives.
[20]              - - -
[21]     DETECTIVE TIMOTHY HARTMAN, after
[22] having been duly sworn, was examined and
[23] **testified as follows**:
[24]
[25]

Page 13

[1]              - - -
[2]        DIRECT EXAMINATION
[3]              - - -
[4] BY MS. FORCHETTI:
[5]    Q    Good morning, Detective.  Detective, how
[6] long have you been with the Philadelphia police?
[7]    A    Twelve years.
[8]    Q    How much of that time have you spent in
[9] Northwest as a detective?
[10]    A    Six as a detective in Northwest.
[11]    Q    During that time as a detective in
[12] Northwest have you developed a particular specialty?
[13]    A    Right now I'm assigned to the special
[14] investigations unit and one of my main
[15] responsibilities is to process crime scenes.
[16]    Q    Did you process a crime scene of a
[17] shooting that had occurred on February 4, 2011 in
[18] the area of Stenton and Johnson Streets?
[19]    A    Yes, I did.
[20]    Q    When did you arrive at that crime scene?
[21]    A    It was sometime in the afternoon.  I
[22] believe it was probably around 2:30 or three o'clock
[23] in the afternoon.
[24]    Q    Was that your first step in this
[25] investigation, your first part of your involvement?

Page 14

[1]    A    Yes, it was.
[2]    Q    When you arrived in the area of Stenton
[3] and Johnson Streets what did you observe?
[4]    A    There was two other detectives already
[5] there and some 14th district police officers there
[6] securing the scene.  They had some police cars
[7] blocking some roads and some yellow police tape
[8] around blocking everybody out of the scene.
[9]    Q    So when you arrived and you see that,
[10] detective, what do you then do?
[11]    A    I speak with the officers or anybody
[12] that's on location to see what they know that I
[13] don't know as I'm pulling up.
[14]    Q    What did you find out?
[15]    A    The only thing that they had located was a
[16] white towel in the middle of Johnson Street that had
[17] what appeared to be blood on it.  It was some red
[18] substance and there was some red blood in the snow
[19] on the ground.  There was some items inside a store,
[20] a sneaker store on the corner of Stenton and Johnson
[21] still left at the counter and they then closed the
[22] store for business.  They stopped letting customers
[23] go in and out.  When I arrived I did my own thorough
[24] search.  I walked through a lot of the alleyways and
[25] the streets looking for any physical evidence such

Page 15

[1] as fired cartridge casings or other evidence or
[2] something somebody may have discarded and I didn't
[3] find anything other than that white bloody towel and
[4] the stuff left at the store.
[5]    Q    Did you then take photographs of the area?
[6]    A    I did.  I took overall photographs of the
[7] entire area.
[8]        MS. FORCHETTI:  Your Honor, I would ask
[9]    that the witness be shown what has been marked
[10]    as C-1, C-2 and C-4 through C-7.
[11]        THE COURT:  The witness may be shown those
[12]    exhibits.
[13]        MS. FORCHETTI:  I would ask to mark
[14]    additional photographs as Commonwealth's
[15]    Exhibit 23, 24, 25, 26, and 27.
[16]        THE COURT:  So ordered.
[17]              - - -
[18]        (Commonwealth's Exhibits 23 through
[19]    27 were marked for identification.)
[20]              - - -
[21] BY MS. FORCHETTI:
[22]    Q    Detective, you're being shown let's start
[23] first with the photographs that have been marked as
[24] Commonwealth's Exhibit 1 and Commonwealth's Exhibit
[25] 2.  Do you recognize those?

Page 16

[1]    A    I do.
[2]    Q    Are all of the photographs in front of
[3] you, C-1, C-2, C-4 through C-7 and C-23 through C-27
[4] photographs that you have taken?
[5]    A    Yes, they are.
[6]    Q    Do those photos fairly and accurately show
[7] what the scene looked like on the day you were
[8] present?
[9]    A    They do.
[10]    Q    Did you recover any physical evidence from
[11] the scene?
[12]    A    The items from inside the sneaker store
[13] were recovered and later returned to Mr. Tolbert.
[14]    Q    Did you have contact with Mr. Tolbert or
[15] any of the witnesses?
[16]    A    No, I didn't.
[17]    Q    Was a crime scene log prepared in this
[18] case?
[19]    A    There was, yes.
[20]        MS. FORCHETTI:  Your Honor, I would ask
[21]    this two-page document be marked as
[22]    Commonwealth's Exhibit 28.
[23]        THE COURT:  It may be marked.
[24]              - - -
[25]        (Commonwealth's Exhibit 28 was marked

Page 17

[1]    for identification.)
[2]            - - -
[3] BY MS. FORCHETTI:
[4]    Q    Detective, you're being shown a document
[5] that's been marked Commonwealth's Exhibit 28, do you
[6] recognize that document?
[7]    A    I do.
[8]    Q    What is that?
[9]    A    It's the crime scene log that was prepared
[10] by Police Officer Carroll of the 14th district.
[11]    Q    Can you explain to the members of the jury
[12] what is a crime scene log?
[13]    A    Yes.  A crime scene log any time a patrol
[14] responds to a crime scene the initial responding
[15] officer his responsibility is to secure that crime
[16] scene after making sure he's safe and renders first
[17] aid then you want to protect the crime scene so we
[18] can come collect evidence.  Once you protect that
[19] crime scene you're supposed to fill out what's
[20] called a crime scene log and it will list various
[21] preliminary information along with any and all
[22] people who entered the crime scene such as myself or
[23] any other officers just so there's documentation of
[24] who came to that crime scene.
[25]    Q    Detective, once the initial officer begins

Page 18

[1] the crime scene log and detectives arrive do the
[2] detectives take over the crime scene from the
[3] officer?
[4]    A    Yes.
[5]    Q    Is that what happened in this case?
[6]    A    It is.
[7]    Q    So what sort of information other than as
[8] you've told us about officers are present, what
[9] other kinds of information appears on the crime
[10] scene log?
[11]       MR. LORUSSO:  Objection.
[12]       THE COURT:  Sustained.
[13] BY MS. FORCHETTI:
[14]    Q    In this particular case, detective, was it
[15] noted what kind of evidence, if any, was recovered?
[16]    A    I believe it notes what kind of evidence
[17] was present.
[18]    Q    What is noted there?
[19]    A    It has blood in the street, a white towel,
[20] and inside the store, a cell phone, bag, and
[21] clothes.
[22]    Q    Does the victim's name appear on the crime
[23] scene log?
[24]    A    It does, yes.
[25]    Q    Are there any other witnesses listed on

Page 19

[1] the crime scene log?
[2]       MR. LORUSSO:  Objection.
[3]       THE COURT:  Overruled.
[4]       THE WITNESS:  In this case there is not.
[5] BY MS. FORCHETTI:
[6]    Q    Is there information about where the
[7] victim was being treated?
[8]    A    Yes; Albert Einstein Hospital.
[9]    Q    Is there information about a description
[10] of a suspect?
[11]       MR. LORUSSO:  Objection.
[12]       THE COURT:  Overruled.
[13]       THE WITNESS:  Yes.  A light skinned black
[14] male, dark hoodie, black skully with braids.
[15] BY MS. FORCHETTI:
[16]    Q    Now, detective, in the photographs that
[17] depict the area it appears that there's a
[18] significant amount of snow and ice on the ground, is
[19] that accurate?
[20]    A    There was snow and ice on the ground, yes.
[21]    Q    How does that affect your investigation in
[22] terms of recovering physical evidence?
[23]    A    I'm still going to do the same thorough
[24] search and try to make sure I don't miss anything
[25] but obviously it does hinder it a little bit.  If a

Page 20

[1] fired cartridge case comes out of a firearm when it
[2] comes out it's going to be hot, if it hits the snow
[3] or ice it could melt, go under and then be recovered
[4] so it may be something we can't locate if it is out
[5] there.
[6]    Q    Detective, how long were you on the scene
[7] of Stenton and Johnson?
[8]    A    If I recall I was there at least an hour.
[9]    Q    Were there other people out on the street?
[10]    A    There were, yes.
[11]    Q    Now, following your conclusion at the
[12] crime scene was that the extent of your role in this
[13] investigation?
[14]    A    Yes.
[15]       MS. FORCHETTI:  Thank you, detective.
[16]       THE COURT:  You may cross-examine.
[17]       MR. LORUSSO:  Thank you, Your Honor.
[18]            - - -
[19]            CROSS-EXAMINATION
[20]            - - -
[21] BY MR. LORUSSO:
[22]    Q    Good morning, detective.
[23]    A    Good morning.
[24]    Q    Detective, C-1, the photograph that you
[25] took, would you be kind enough to hold that up.  So

Page 21

[1] that depicts the white Lexus and an apartment
[2] building on the right side, I guess, right and then
[3] there's a driveway just to the left of that
[4] apartment building?
[5] A That's correct.
[6] Q You say that that area when you arrived at
[7] the location had been cordoned off with police cars
[8] and yellow crime scene tape and etc.?
[9] A It had, yes.
[10] Q Do you recall how many police cars were in
[11] that block between Stenton Avenue and where that
[12] apartment building was, if you recall?
[13] A How many police cars?
[14] Q Yes.
[15] A I don't recall. I remember there being at
[16] least one or two cars right at Stenton and Johnson
[17] and I believe another marked car on Johnson Street
[18] south of Stenton.
[19] Q Did they have their overhead lights on?
[20] A I don't recall.
[21] Q The crime scene tape, the police marked
[22] vehicles, looking at C-1 would they have been
[23] readily visible to someone looking out of one of
[24] those windows facing Johnson Street?
[25] A I believe they would have been up at

Page 22

[1] Stenton Avenue is not that far out of the view of
[2] this picture. Stenton Avenue would be up the street
[3] here. There would have been a marked police car
[4] here. There was the yellow crime scene tape going
[5] across the driveway. I don't know if that would
[6] have been visible from the windows. I believe there
[7] was another marked car on Johnson Street.
[8] Q The information that you testified to
[9] concerning a description that was contained on the
[10] crime scene log is there an indication of where that
[11] information came from?
[12] A No, there's not.
[13] Q So as we speak today this description that
[14] I think you read of light skin black male, dark
[15] hoodie, skully, with braids, we don't know who gave
[16] that, is that correct?
[17] A I don't know who gave that, no.
[18] Q There's no indication on the report as to
[19] who the source of that information, is that correct?
[20] A No, not on the report, no.
[21] Q Anywhere else that you know of?
[22] A Just from my experience of filling these
[23] out I know the officer that fills this out would get
[24] the information from various people he may have
[25] talked to or other officers who give him the

Page 23

[1] information over police radio.
[2] Q So that could be a compilation of
[3] information from any number of sources basically, is
[4] that it?
[5] A That's fair to say, yes.
[6] MR. LORUSSO: Thank you, Detective. I
[7] have nothing further.
[8] THE COURT: You have any redirect?
[9] MS. FORCHETTI: I do not.
[10] THE COURT: Thank you, sir. You may step
[11] down.
[12] MS. FORCHETTI: I would ask at this time
[13] that the photographs be published to the jury.
[14] THE COURT: Any objection?
[15] MR. LORUSSO: No, Your Honor.
[16] THE COURT: All right. Which photographs
[17] are you referring to?
[18] MS. FORCHETTI: C-1 C-2, C-4 through C-7
[19] and C-23 through C-27.
[20] ---
[21] (Commonwealth's Exhibits C-1, C-2,
[22] C-4 through C-7 and C-23 through C-27 were
[23] published to the jury.)
[24] ---
[25] THE COURT: The aforementioned photographs

Page 24

[1] may be published.
[2] MR. LORUSSO: May we see you at sidebar.
[3] THE COURT: Yes.
[4] (Discussion was held off the record.)
[5] THE COURT: The photos have been
[6] published.
[7] (Discussion was held off the record.)
[8] MR. LORUSSO: If the Court please I would
[9] move to object, move to strike the testimony
[10] presented by Detective Hartman concerning an
[11] identification that he testified to as having
[12] been contained on the crime scene log since
[13] there is no --
[14] THE COURT: He didn't testify to an
[15] identification. He testified to a description.
[16] MR. LORUSSO: I apologize.
[17] THE COURT: If you ask to strike the
[18] description the motion is granted.
[19] MR. LORUSSO: I would ask Your Honor to --
[20] THE COURT: Disregard the detective's
[21] reference to a description.
[22] MR. LORUSSO: Thank you.
[23] THE COURT: You may call your next
[24] witness.
[25] MS. FORCHETTI: Your Honor, when I last

Page 25

[1] checked Mr. Kent was not outside.
[2]     THE COURT: Is that your next witness?
[3]     MS. FORCHETTI: It is my next witness.
[4]     THE COURT: Let's take a short recess.
[5]         - - -
[6]         (The jury exited the courtroom at
[7] 10:26 a.m.)
[8]         - - -
[9]     THE COURT: Let the record reflect the
[10] jurors left out the room. Who is this Mr.
[11] Kent?
[12]     MS. FORCHETTI: He's an employee at my
[13] office.
[14]     THE COURT: Who does he work for?
[15]     MS. FORCHETTI: My office.
[16]     THE COURT: It's coming up on 10:30.
[17] We've been here since nine o'clock. To whom
[18] does he report? You can't get an employee of
[19] the district attorney's office over here.
[20]     MS. FORCHETTI: I told him to be here
[21] bright and early this morning and he text me
[22] back after I talked to him on Friday this
[23] morning saying he would be here by 10:15.
[24]     THE COURT: That's big of him. It's now
[25] 10:30 and he's not here. Why don't you call

Page 26

[1] Mr. Williams or whomever you need to call and
[2] tell him if he's not here within the next five
[3] minutes I'm going to preclude his testimony.
[4]     MR. LORUSSO: I would have a motion
[5] dealing with precluding his testimony
[6] regardless Your Honor. I believe this is the
[7] offer of proof on that this is the person --
[8]     THE COURT: What's the offer of proof.
[9]     MS. FORCHETTI: The offer of proof is Mr.
[10] Kent has constituted relocation proceedings in
[11] this case due to instances of witness
[12] intimidation.
[13]     THE COURT: You have some background for
[14] that, is there some basis for that, did the
[15] complainant testify that he asked to be
[16] relocated?
[17]     MS. FORCHETTI: The complainant did
[18] testify about his contact with Mr. Kent that he
[19] did have contact with him and --
[20]     THE COURT: Did he ask to be relocated?
[21]     MS. FORCHETTI: I don't know if he
[22] testified to that in this instance but because
[23] he was incooperative at trial but to explain
[24] the demeanor of the complainant.
[25]     THE COURT: Well, what exactly is going to

Page 27

[1] testify to that is if he favors us with his
[2] appearance.
[3]     MS. FORCHETTI: That he was contacted by
[4] Charles Tolbert and Mr. Tolbert asked to be
[5] relocated and that Mr. Kent did so.
[6]     THE COURT: Is that it?
[7]     MS. FORCHETTI: That's pretty much it.
[8]     THE COURT: All right. Well, you make
[9] your phone call, ma'am. It amazes me that
[10] someone who works for the city, who knows that
[11] we're on trial, can't be here in a timely
[12] manner.
[13]     MS. FORCHETTI: We had a conversation
[14] about it on Friday. I was under the
[15] understanding he would be here first thing.
[16]     THE COURT: We have 20 cases on the list.
[17] We have nothing to do but wait for Mr. Kent.
[18] Is that your last witness?
[19]     MS. FORCHETTI: Yes, Your Honor.
[20]     THE COURT: Are you going to be ready to
[21] go forward?
[22]     MR. LORUSSO: Mr. Wright said he would be
[23] here within 15 minutes from now. Then we have
[24] a colloquy I expect of Mr. Simmons.
[25]     THE COURT: Who does he work for? Call

Page 28

[1] his supervisor and tell him he's 15 minutes
[2] late and the judge is on the bench.
[3]     MS. FORCHETTI: I believe he reports
[4] directly to Mr. Williams.
[5]     THE COURT: Call Mr. Williams, tell him
[6] that he was supposed to be here and he still
[7] isn't here.
[8]         - - -
[9]     THE COURT: Are you ready?
[10]     MS. FORCHETTI: Yes, Your Honor.
[11]     THE COURT: Make your offer of proof
[12] again.
[13]     MS. FORCHETTI: Your Honor, Mr. Kent would
[14] testify that he is an employee of the district
[15] attorney's office. That he is a victim witness
[16] coordinator who handles witnesses who need to
[17] be relocated. He would testify that he was
[18] contacted by Mr. Charles Tolbert in this case
[19] shortly after Mr. Tolbert was shot.
[20] Mr. Tolbert intimated to Mr. Kent that he was
[21] scared and that he requested relocation because
[22] he did live in the neighborhood where he was
[23] shot and felt that the people who shot him knew
[24] where he lived and that Mr. Kent remained in
[25] contact with Mr. Tolbert to relocate

Page 29

[1]  Mr. Tolbert.
[2]      MR. LORUSSO:  Your Honor, I'm not sure
[3]  what characterization of intimating that your
[4]  scared.
[5]      MS. FORCHETTI:  He said he was scared.
[6]      MR. LORUSSO:  I think Mr. Tolbert has
[7]  testified to the contrary that everything was
[8]  an attempted money grab.
[9]      THE COURT:  I think it's an issue for the
[10]  jury.  That goes to his credibility or lack
[11]  thereof, does it not?
[12]      MR. LORUSSO:  It does, Your Honor.  The
[13]  only request that I would make then also is
[14]  that if Mr. Kent has any documentation dealing
[15]  with this that I be provided with it.
[16]      THE COURT:  If you have documents give
[17]  them to the defense now.
[18]      MS. FORCHETTI:  No.
[19]      THE COURT:  I trust that Mr. Kent
[20]  appreciates that's the extent of his testimony
[21]  there would be no freelancing.
[22]      MS. FORCHETTI:  Yes, Your Honor.
[23]      THE COURT:  You should advise Mr. Kent
[24]  that when he tells the Assistant District
[25]  Attorney he's going to be in court at 10:15

Page 30

[1]  typically the Assistant District Attorney tells
[2]  that to the judge and the judge relies on it.
[3]      MS. FORCHETTI:  Yes, Your Honor.
[4]      THE COURT:  We had to lose half an hour to
[5]  wait for Mr. Kent to get here and as I
[6]  understand it he's a paid representative of
[7]  your office.
[8]      MS. FORCHETTI:  Correct.
[9]      THE COURT:  I'm not pleased with that.
[10]      MS. FORCHETTI:  Yes, Your Honor.
[11]      THE COURT:  Bring the jury out.  Who do
[12]  you have after Mr. Kent?
[13]      MS. FORCHETTI:  I have the medical
[14]  records.  I have the certificate of
[15]  non-licensure.  Counsel and I had asked playing
[16]  the 911 footage for the jury which lasts
[17]  approximately 28 minutes.
[18]      THE COURT:  Then you rest?
[19]      MS. FORCHETTI:  Then I would rest.
[20]      THE COURT:  You'll be ready after that?
[21]      MR. LORUSSO:  Yes, Your Honor.
[22]      THE COURT:  I wonder how many other
[23]  jurisdictions with judges just sit around and
[24]  wait on employees of the district attorney's
[25]  office to show up.  I wonder if that's the

Page 31

[1]  routine in Montgomery county for instance or a
[2]  county or Lackawanna county.  I wonder if
[3]  anybody cares about the fact that there is a
[4]  time certain for trials and we start at
[5]  9:00 o'clock.
[6]      MS. FORCHETTI:  I wouldn't know, Your
[7]  Honor.
[8]      THE COURT:  Yes, I'm sure.  Philadelphia
[9]  is special in that way.
[10]      MR. LORUSSO:  I would have an objection to
[11]  the playing of the 911 tape.
[12]      THE COURT:  The two of you would have
[13]  listened to the tape together.
[14]      MS. FORCHETTI:  We have listened to the
[15]  tape together.
[16]      THE COURT:  What's the basis of playing
[17]  the tape?
[18]      MS. FORCHETTI:  Your Honor, I think the
[19]  relevant portions were already played for the
[20]  jury.
[21]      THE COURT:  Your objection is sustained.
[22]                - - -
[23]      (The jury entered the courtroom at
[24]  10:41 a.m.)
[25]                - - -

Page 32

[1]      THE COURT:  You may continue your case.
[2]      MS. FORCHETTI:  Thank you, Your Honor.
[3]  Your Honor, at this time the Commonwealth calls
[4]  Mr. Leland Kent.
[5]      COURT CRIER:  State your full name, spell
[6]  your last name, and current assignment.
[7]      THE WITNESS:  Leland Kent; L-E-L-A-N-D
[8]  K-E-N-T.  I'm the executive director of Victims
[9]  Services and Community Outreach.
[10]                - - -
[11]      LELAND KENT, after having been duly
[12]  sworn, was examined and testified as follows:
[13]                - - -
[14]      DIRECT EXAMINATION
[15]                - - -
[16]  BY MS. FORCHETTI:
[17]   Q   Good morning, Mr. Kent.  Mr. Kent, how are
[18]  you employed?
[19]   A   Currently employed by the District
[20]  Attorney's Office as the Executive Director of
[21]  Victim Services.
[22]   Q   For how long have you been employed with
[23]  the District Attorney's office?
[24]   A   For 17 years.
[25]   Q   Have you always worked with victims?

Page 33

[1]　A　Yes.

[2]　Q　What do your duties entail over at the

[3] District Attorney's Office?

[4]　A　My main responsibility is aiding and

[5] assisting witnesses who are being intimidated and

[6] relocating them.

[7]　Q　Were you contacted by a Mr. Charles

[8] Tolbert in reference to this case?

[9]　A　I was.

[10]　Q　When was that?

[11]　A　February 22, 2011 from Albert Einstein

[12] Hospital.

[13]　Q　How was Mr. Tolbert when he contacted you,

[14] what was his demeanor?

[15]　A　He was scared.  He was a shooting victim

[16] and he was requesting assistance with relocation.

[17]　Q　Did you assist him?

[18]　A　I interviewed him for relocation

[19] assistance and we provided him a safety plan and we

[20] did assist him.

[21]　Q　Why is it necessary to interview someone

[22] who states that they want assistance from the

[23] District Attorney's Office?

[24]　A　Well, the interviewing process is we go

[25] through a memorandum of understanding which outlines

Page 34

[1] what we can do, what the victim or witness can

[2] expect from us, and what we expect from them.  So it

[3] clearly outlines the parameters of the program.

[4]　Q　Was Mr. Tolbert cooperative with this

[5] process?

[6]　A　He was very cooperative.

[7]　Q　When was the last time you had contact

[8] with Mr. Tolbert?

[9]　A　May of 2011.

[10]　Q　From February until May was Mr. Tolbert

[11] cooperative with the process?

[12]　A　Yes.

[13]　Q　What happened in May of 2011?

[14]　A　He was staying with a friend outside the

[15] danger area and that was his safety plan.

[16]　Q　Did there come a time when the District

[17] Attorney's Office no longer needed to house

[18] Mr. Tolbert?

[19]　A　He was staying with a friend.  We were not

[20] housing him.

[21]　Q　Did there become a time where you were

[22] aware that Mr. Tolbert was no longer staying with

[23] that friend?

[24]　A　No.

[25]　Q　Did you give Mr. Tolbert any money?

Page 35

[1]　A　We provided no financial assistance to

[2] Mr. Tolbert.

[3]　Q　Why not?

[4]　A　Mr. Tolbert was staying with a friend and

[5] the process for assisting Mr. Tolbert was for him to

[6] find a place of his choice and we would pay six

[7] months rent up front for him.  Mr. Tolbert continued

[8] to stay with a friend and never found a place to

[9] move separate from the friend.

[10]　Q　Before Mr. Tolbert contacted you did you

[11] have any knowledge of this case?

[12]　A　No.

[13]　Q　When you discuss a safety and relocation

[14] plan with a witness do you discuss their testimony

[15] with the witness?

[16]　A　We do not.  I do not.

[17]　Q　You don't get involved in that part of the

[18] case?

[19]　A　My only role would be to assist him in

[20] relocating.

[21]　Q　Mr. Kent, you relocate just any witness

[22] who says they want to be relocated?

[23]　A　No.  We only relocate families who are in

[24] imminent danger.  Imminent meaning if we don't do

[25] anything more than likely something is going to

Page 36

[1] happen to them.

[2]　　　MR. LORUSSO:  Objection.  Move to strike.

[3]　　　THE COURT:  Motion granted.  You will

[4]　　disregard that, ladies and gentlemen.  You have

[5]　　any other questions?

[6]　　　MS. FORCHETTI:  No, Your Honor.

[7]　　　THE COURT:  You have cross-examination.

[8]　　　　　　　- - -

[9]　　　　　CROSS-EXAMINATION

[10]　　　　　　- - -

[11] BY MR. LORUSSO:

[12]　Q　Mr. Kent, you said that February 22nd is

[13] when you receive a phone call from Mr. Tolbert,

[14] correct?

[15]　A　That's correct, sir.

[16]　Q　Do you have any documentation with regard

[17] to the contact between your office and Mr. Tolbert?

[18]　A　We have a interview sheet and I have a

[19] referral sheet from the district attorney Stacey

[20] Forchetti requesting relocation services.

[21]　Q　Do you have that with you today?

[22]　A　I do not have it with me today.

[23]　Q　Do you have a document dealing with the

[24] interview of Mr. Tolbert?

[25]　A　Yes, sir.

Page 37

[1] **Q** Do you have that with you today?

[2] **A** No, I do not.

[3] **Q** Did you review that information before
[4] testifying here today?

[5] **A** Yes, I did.

[6] **Q** Was it some reason you thought it not
[7] appropriate to bring that information to court with
[8] you today?

[9] **A** Our information in regards to witness
[10] relocation is not discoverable as far as to be
[11] handed over. We hand over how much financial or
[12] money that we spend on witnesses but in regards to
[13] internal documents I generally do not bring that to
[14] court.

[15] **Q** How about when you testify in cases, you
[16] still don't bring it to court?

[17] **A** When I testify in cases I will have notes
[18] where as though the date that we interviewed a
[19] witness. However, any internal documents are not
[20] brought to court or taken out of the district
[21] attorney's office for the safety of the witness that
[22] we're assisting.

[23] **MR. LORUSSO**: I'd ask the Court to
[24] instruct the witness to provide the
[25] documentation.

Page 38

[1] **THE COURT**: On what basis do you need
[2] that?

[3] **MR. LORUSSO**: To see what it is the
[4] representations made by this witness concerning
[5] Mr. Tolbert's outreach and to determine whether
[6] or not the documents support that.

[7] **MS. FORCHETTI**: Your Honor --

[8] **THE COURT**: Finish your cross-examination.

[9] **MR. LORUSSO**: I have nothing further.

[10] **THE COURT**: Do you have any redirect?

[11] - - -

[12] REDIRECT EXAMINATION

[13] - - -

[14] BY MS. FORCHETTI:

[15] **Q** Mr. Kent, why is that information not
[16] discoverable?

[17] **A** Information has a lot of personal
[18] information --

[19] **MR. LORUSSO**: Objection to this witness
[20] giving an opinion as to what under the law is
[21] discoverable.

[22] **THE COURT**: Overruled.

[23] **THE WITNESS**: Information has a lot of
[24] personal information including family members
[25] that may be still in the neighborhood who would

Page 39

[1] be in harms way including a personal close
[2] relatives of the witness in this case or all
[3] cases.

[4] BY MS. FORCHETTI:

[5] **Q** So you typically do not provide that
[6] information to defense, is that correct?

[7] **A** We do not. We typically dispose how much
[8] money we spent, what the purposes of the money
[9] spent, whether that's for lodging, whether that's
[10] for moving expenses, paying for a mover, security
[11] deposit. All of these expenses are itemized and
[12] shared with the defense prior to a trial. In this
[13] particular case there was no money spent. There was
[14] simply victim services with a safety plan coming up
[15] that we provided the witness to stay with a friend
[16] in which he chose that was the method that he chose.

[17] **MS. FORCHETTI**: Thank you, Mr. Kent.

[18] **MR. LORUSSO**: I have no recross.

[19] **THE COURT**: You may step down.

[20] (Witness excused.)

[21] **THE COURT**: You may continue.

[22] **MS. FORCHETTI**: Your Honor, Mr. Kent was
[23] my last live witness.

[24] **THE COURT**: May I see you at sidebar.

[25] (Discussion was held off the record.)

Page 40

[1] **THE COURT**: Please continue.

[2] **MS. FORCHETTI**: Your Honor, there's been a
[3] stipulation by and between counsel concerning
[4] the medical records in this case.

[5] **THE COURT**: Very well. Ladies and
[6] gentlemen, you will recall that in my
[7] preliminary instructions I told you that
[8] statements made by the attorneys did not
[9] constitute evidence and therefore they were not
[10] binding on you. Well, there are exceptions to
[11] that rule and a stipulation is one such
[12] exception. The law is that when the
[13] Commonwealth and the defense stipulate, that is
[14] when they agree that certain facts are true
[15] then their stipulation is evidence of those
[16] facts and you, ladies and gentlemen, should
[17] regard stipulated or agreed upon facts as
[18] proven. You may offer your stipulation.

[19] **MS. FORCHETTI**: Thank you, Your Honor.
[20] Good morning, ladies and gentlemen of the jury.
[21] There's been an agreement by and between
[22] counsel, Mr. Lorusso and I, that were Dr. Mark
[23] Kaplan were called in to testify he would tell
[24] you that he was the attending physician at
[25] Albert Einstein Medical Center on February 4,

Page 41

[1] 2011 at which time at 2:25 in the afternoon a
[2] Mr. Charles Tolbert was admitted. He was
[3] diagnosed as a level one trauma. Several
[4] gunshot wounds were observed. Mr. Tolbert he
[5] immediately went in for emergent exploratory
[6] laparotomy. There was a small bowel resection
[7] performed on him as well in three separate
[8] places. There was a partial rectal resection
[9] of Mr. Tolbert. And a partial splenic flexure
[10] resection. He underwent those surgeries on
[11] February 4, 2011 and remained in intubated and
[12] sedated condition on that day.
[13] On February 4th at 14:55, at 2:55 in the
[14] afternoon there was a small bullet like
[15] material that was recovered from Mr. Tolbert
[16] and turned over to the Philadelphia police. At
[17] that time there were also 38 bags of a green
[18] leafy substance that was turned over to the
[19] police.
[20] On February 5th there was another
[21] exploratory laparotomy performed on him. There
[22] was a removal of packing from his abdominal
[23] cavity. A left colectomy was performed as well
[24] as a transverse colostomy. In two separate
[25] parts of his abdomen there was a Reanastomosis

Page 42

[1] performed and his abdominal wall was closed.
[2] He was remained in guarded and intubated
[3] condition.
[4] As a result of several x-rays and CAT
[5] scans he was observed to have a bullet lodged
[6] in his medial left gluteus muscle. He was also
[7] observed to have a comminuted fracture of the
[8] distal sacrum or the proximum coccyx that was
[9] medial to the bullet wound. There was another
[10] bullet found lodged in his superficial back
[11] soft tissues. And there was a bullet fragment
[12] overlying the heart. He was observed to have
[13] gunshot wounds in his left anterior chest, two
[14] gunshot wounds to his right upper arm, and a
[15] gunshot wound to his abdomen. He remained
[16] taking nothing by mouth until February 11, 2011
[17] at which time he was permitted to ingest clear
[18] liquids. He was diagnosed as having acute
[19] stress disorder and antisocial personality
[20] disorder. And he was observed to be in police
[21] custody while he was in the SICU. He was
[22] discharged from Albert Einstein Medical Center
[23] on February 22, 2011 at which time a visiting
[24] nurse was prescribed to care for his wounds and
[25] dressings as he still had open wounds.

Page 43

[1] Your Honor, that is a brief summary of the
[2] close to 2000 pages of medical records which
[3] the Commonwealth would mark as Commonwealth's
[4] Exhibit 29.
[5] THE COURT: So stipulated, Mr. Lorusso?
[6] MR. LORUSSO: It is so stipulated.
[7] THE COURT: Records will be marked as
[8] Commonwealth's Exhibit 29. You may continue.
[9] MS. FORCHETTI: Your Honor, the
[10] Commonwealth would next mark as Commonwealth's
[11] Exhibit 30 the certificate of non-licensure,
[12] showing that this defendant Johnnie Simmons who
[13] gave an address of 1528 East Johnson Street in
[14] the city and county of Philadelphia with a date
[15] of birth of March 15, 1991, did not have a
[16] license to carry a firearm nor did he have a
[17] valid sportsman permit or a hunters permit.
[18] That document was prepared by the commissioner
[19] of Pennsylvania state police custodian of
[20] records a Colonel Frank Newman.
[21] THE COURT: That will be accepted. You
[22] have any objection?
[23] MR. LORUSSO: No, Your Honor.
[24] MS. FORCHETTI: We would ask that this be
[25] marked C-30.

Page 44

[1] THE COURT: It will be marked as C-30.
[2] - - -
[3] (Commonwealth's Exhibits 29 and 30
[4] were marked for identification.)
[5] - - -
[6] MS. FORCHETTI: Your Honor, at this time
[7] the Commonwealth would seek to mark C-1 through
[8] C-30 -- I'm sorry. I would also like to mark
[9] the 911 footage that was played for the jury
[10] the portion of which that related to Mr. Kyle
[11] Holman's car. I would seek to mark that as
[12] Commonwealth's Exhibit 31.
[13] THE COURT: It's been received.
[14] - - -
[15] (Commonwealth's Exhibit 31 was marked
[16] for identification.)
[17] - - -
[18] MS. FORCHETTI: At which time the
[19] Commonwealth will now rest.
[20] THE COURT: You move in admission of C-1
[21] through C-31?
[22] CW. ATTY.: Correct.
[23] THE COURT: It will be received.
[24] Commonwealth having rested we'll take another
[25] short recess.

Page 45

[1]         - - -
[2]       (The jury exited the courtroom at
[3]  10:58 a.m.)
[4]         - - -
[5]     **THE COURT**: Let the record also reflect
[6]  the jurors have left the room. Mr. Lorusso,
[7]  the Commonwealth having rested what is your
[8]  pleasure?
[9]     **MR. LORUSSO**: I make the motion for
[10]  judgment of acquittal as to all charges.
[11]     **THE COURT**: Any argument?
[12]     **MR. LORUSSO**: No, Your Honor.
[13]     **THE COURT**: Motion denied.
[14]     **MR. LORUSSO**: Thank you. I would like to
[15]  see whether Mr. Wright has arrived yet. If not
[16]  I would ask that at least initially if the
[17]  court intends to colloquy Mr. Simmons with
[18]  regard to his testimony that we do that and if
[19]  Mr. Wright hasn't arrived I'll rest after the
[20]  admission of one stipulation.
[21]     **THE COURT**: You were asked at sidebar to
[22]  have the record of Mr. Kent, I don't know if
[23]  there's any real need for those, but I've
[24]  directed the Assistant District Attorney to
[25]  have Mr. Kent produce those records. I'll

Page 46

[1]  review them and make a determination as to
[2]  whether or not they're discoverable.
[3]     **MS. FORCHETTI**: Your Honor, I do have the
[4]  relocation memo that I prepared but I would
[5]  submit that that is an attorney work product,
[6]  it's an internal document.
[7]     **THE COURT**: Where is Mr. Kent?
[8]     **MS. FORCHETTI**: I don't know. I haven't
[9]  left this courtroom.
[10]     **THE COURT**: Does he have the records or
[11]  not?
[12]     **MS. FORCHETTI**: I informed him to go back
[13]  to the office to get the document that he used
[14]  and he did that.
[15]     **THE COURT**: Let's take a short recess
[16]  until he gets back. It might be this month, it
[17]  might be next month.
[18]     (Short recess taken.)
[19]     **THE COURT**: This is the case of
[20]  Commonwealth versus Simmons. You heard Mr.
[21]  Kent testify. What is it that you expect to
[22]  find in the records that would further the
[23]  inquiry as to whether or not the man asked to
[24]  be relocated and he was put up with a friend
[25]  and that was the beginning and the end of it.

Page 47

[1]     **MR. LORUSSO**: I don't know whether there
[2]  were any notes that would contradict the
[3]  characterization that this jury has of
[4]  Mr. Tolbert being intimidated or fearful.
[5]     **THE COURT**: Mr. Tolbert testified that he
[6]  asked to be relocated.
[7]     **MR. LORUSSO**: I appreciate that. I would
[8]  only ask and I have no objection at all, when
[9]  these records eventually get here with the
[10]  court's permission assuming they would get here
[11]  before we get to the jury.
[12]     **THE COURT**: Who knows. I have no idea.
[13]     **MR. LORUSSO**: I don't want to hold the
[14]  court up right now. So with your permission I
[15]  have no problem proceeding and in the event
[16]  that there is anything that would suggest I
[17]  should proceed on that then as long as I can do
[18]  that if there is nothing --
[19]     **THE COURT**: Is your witness here?
[20]     **MR. LORUSSO**: Yes. That witness will be
[21]  very brief, I would think.
[22]     **THE COURT**: Can you see if Mr. Kent is
[23]  going to come back any time soon?
[24]     **MS. FORCHETTI**: Yes. I'll reach out to
[25]  him, Your Honor.

Page 48

[1]     **MR. LORUSSO**: Will we address the charges
[2]  beforehand?
[3]     **THE COURT**: Yes. Let the record reflect
[4]  the two young men were asked to leave because
[5]  they were disrupting the court, laughing.
[6]  There's also no sleeping in the courtroom. If
[7]  you want to sleep, go outside. That's you,
[8]  sir. Finish your nap outside.
[9]     Do you know where Mr. Kent is right now?
[10]     **MS. FORCHETTI**: I did attempt to contact
[11]  him. I haven't heard back.
[12]     **THE COURT**: Did he answer when you called
[13]  him?
[14]     **MS. FORCHETTI**: He did not. That was
[15]  seven minutes ago.
[16]     **THE COURT**: Does he have a number in his
[17]  office?
[18]     **MS. FORCHETTI**: Yes. He has an office
[19]  line.
[20]     **THE COURT**: Could you call his office
[21]  line?
[22]     Does he have a sergeant?
[23]     **MS. FORCHETTI**: There's a unit secretary.
[24]     **THE COURT**: Did anybody answer the phone?
[25]     **MS. FORCHETTI**: No, Your Honor.

Page 49

[1]      (Recess taken.)
[2]      **THE COURT**:  We're still waiting for Mr.
[3]  Kent?
[4]      **MS. FORCHETTI**:  I received a message from
[5]  him that he is on his way up.  Your Honor,
[6]  there are other things that we can do.
[7]      **THE COURT**:  I'd like to finish with this.
[8]  We have been consumed with Mr. Kent from 10:15
[9]  when he did not appear.  Now it's a quarter to
[10]  12:00 and we're waiting for him again.  You
[11]  think that's the way it should be?
[12]      **MS. FORCHETTI**:  No, Your Honor.
[13]      **THE COURT**:  You have the file?
[14]      **MS. FORCHETTI**:  No, Your Honor, I do not.
[15]      **THE COURT**:  Why not?
[16]      **MS. FORCHETTI**:  Mr. Kent was unable to
[17]  find it.
[18]      **THE COURT**:  All right.  We are back on the
[19]  record Mr. Simmons is here in the courtroom
[20]  with his attorney Mr. Lorusso and Ms. Forchetti
[21]  for the Commonwealth.  Before we recessed this
[22]  last time it was my understanding that Mr. Kent
[23]  was going to produce his file in this case.
[24]  I'll hear from you.
[25]      **MS. FORCHETTI**:  Your Honor, Mr. Kent after

Page 50

[1]  he concluded his testimony upon your request
[2]  went back to his office to attempt to locate
[3]  the file.  He had a binder with him in court on
[4]  the witness stand when this case was last
[5]  heard, other detectives recall seeing him with
[6]  the binder, recall seeing it in the anteroom
[7]  adjacent to courtroom 802.  They seem to recall
[8]  Mr. Kent leaving when he went to interview with
[9]  Mr. Kyle Holman that he took the binder with
[10]  him.  He did do additional work in connection
[11]  with this case with respect to Mr. Holman and
[12]  recalls using the file at that time.  At this
[13]  time he is unable to locate his file.  That is
[14]  the extent of my conversation with him in the
[15]  brief amount of time I saw him just now outside
[16]  of courtroom 802.  Mr. Kent is present in the
[17]  room.
[18]      **THE COURT**:  Mr. Lorusso.
[19]      **MR. LORUSSO**:  Under the circumstances I
[20]  would ask Your Honor to strike Mr. Kent's
[21]  testimony and instruct the jury to disregard
[22]  it.  I have no opportunity or basis to inquire
[23]  concerning the characterization that made of
[24]  Mr. Tolbert's demeanor.  And obviously there is
[25]  information in that vane and obviously it was

Page 51

[1]  information that was fresh on Mr. Kent's mind
[2]  because he was very specific in terms of the
[3]  dates involved or the date he first spoke with
[4]  Mr. Tolbert, the circumstances of the
[5]  relocation, and at what point in time it was in
[6]  May of 2011 when there was no further contact
[7]  with him.
[8]      **MS. FORCHETTI**:  Your Honor, it's clear
[9]  that Mr. Kent testified from his own memory
[10]  from his own personal contact with Mr. Charles
[11]  Tolbert.  There would be no legal basis for
[12]  striking Mr. Kent's testimony.  It's averred
[13]  that the information contained within
[14]  Mr. Kent's file would contain both attorney
[15]  work product and sensitive information that
[16]  would not be discoverable to defense counsel
[17]  anyway.  So it's somewhat of a moot point to
[18]  ask that the testimony be stricken based on
[19]  information that cannot be provided at this
[20]  time.
[21]      **THE COURT**:  Mr. Lorusso, your motion to
[22]  strike is denied.  However, if you wish to call
[23]  Mr. Kent as your witness and have him testify
[24]  to this jury that the file has gone missing
[25]  that's entirely up to you.

Page 52

[1]      **MR. LORUSSO**:  Thank you.  I would ask that
[2]  he remain and I would probably do that.
[3]      **THE COURT**:  Is there anything else in your
[4]  case?
[5]      **MS. FORCHETTI**:  No, Your Honor.  I rest.
[6]      **THE COURT**:  Are you ready to proceed?
[7]      **MR. LORUSSO**:  I am, Your Honor.
[8]      **THE COURT**:  All right.  Who will be your
[9]  first witness?
[10]      **MR. LORUSSO**:  I'll call -- I would ask
[11]  that Mr. Kent be asked to remain.
[12]      **MS. FORCHETTI**:  I will do so.
[13]      **MR. LORUSSO**:  Actually I'll call Mr. Kent
[14]  as my first witness.
[15]      **THE COURT**:  Before the jury is brought
[16]  back Mr. Lorusso how will you be proceeding.
[17]      **MR. LORUSSO**:  I'll call Mr. Kent briefly,
[18]  Mr. Ingram.  I will call him to testify
[19]  concerning the embrace in the hallway.
[20]      **THE COURT**:  Who is Mr. Ingram?
[21]      **MS. FORCHETTI**:  He's thinking of the
[22]  defense attorney.
[23]      **MR. LORUSSO**:  I'm sorry.  Mr. Wright.
[24]  Mr. Simmons has indicated that he will elect
[25]  not to testify.

Page 53

[1]    THE COURT: Swear in Mr. Simmons again.
[2]    COURT CRIER: State your full name and
[3] spell your last name.
[4]    THE DEFENDANT: Johnnie Simmons,
[5] S-I-M-M-O-N-S.
[6]        - - -
[7]    JOHNNIE SIMMONS, after having been
[8] duly sworn, was examined and testified as
[9] follows:
[10]       - - -
[11]   THE COURT: Tell us your full name again,
[12] sir.
[13]   THE DEFENDANT: Johnnie Simmons.
[14]   THE COURT: How old are you?
[15]   THE DEFENDANT: Twenty.
[16]   THE COURT: What is your date of birth?
[17]   THE DEFENDANT: March 15, 1991.
[18]   THE COURT: How far did you go in school?
[19]   THE DEFENDANT: Ninth grade.
[20]   THE COURT: Where?
[21]   THE DEFENDANT: King High School.
[22]   THE COURT: Do you read, write, and
[23] understand English?
[24]   THE DEFENDANT: Yes.
[25]   THE COURT: Have you ever been diagnosed

Page 54

[1] or treated for a mental illness or disease?
[2]    THE DEFENDANT: No.
[3]    THE COURT: Are you now under the
[4] influence of drugs, alcohol, or medication?
[5]    THE DEFENDANT: No.
[6]    THE COURT: Mr. Simmons, your attorney has
[7] advised me on the record that it is your
[8] decision to invoke your right of silence and
[9] not testify in this case; is that right?
[10]   THE DEFENDANT: Yes.
[11]   THE COURT: I'm advised to conduct this
[12] colloquy which is nothing more than a
[13] conversation so that I can make a decision on
[14] the record whether or not this is your decision
[15] made knowingly, intelligently, and voluntarily;
[16] do you understand that?
[17]   THE DEFENDANT: Yes.
[18]   THE COURT: First order of business is to
[19] tell you the following: Every defendant has a
[20] right against self-incrimination. The
[21] defendant in a criminal case is presumed
[22] innocent. It's the Commonwealth burden of
[23] proof to prove guilt beyond a reasonable doubt.
[24] So a defendant has no obligation to testify; do
[25] you understand that?

Page 55

[1]    THE DEFENDANT: Yes.
[2]    THE COURT: You may, if you wish, invoke
[3] your right of silence and in effect if the
[4] Commonwealth brought these charges were proven
[5] and not testify, is that clear to you?
[6]    THE DEFENDANT: Yes.
[7]    THE COURT: You have a constitutional
[8] right of silence; is that clear?
[9]    THE DEFENDANT: Yes.
[10]   THE COURT: On the other hand, you as a
[11] defendant in a criminal case is afforded an
[12] absolute right to testify; do you understand
[13] that?
[14]   THE DEFENDANT: Yes.
[15]   THE COURT: You have a right to testify,
[16] you have a right to subpoena, call witnesses.
[17] You have a right to present any defense
[18] justification or excuse, do you understand?
[19]   THE DEFENDANT: Yes.
[20]   THE COURT: Whether or not you testify is
[21] entirely up to you. It's your decision and
[22] yours alone, do you understand that?
[23]   THE DEFENDANT: Yes.
[24]   THE COURT: Now, do you understand your
[25] rights?

Page 56

[1]    THE DEFENDANT: Yes.
[2]    THE COURT: You understand on the one hand
[3] you have no obligation to testify and indeed
[4] have been afforded a constitutional privilege
[5] against self-incrimination which allows you to
[6] invoke your right of silence at trial?
[7]    THE DEFENDANT: Yes.
[8]    THE COURT: On the other hand do you
[9] understand that you have an absolute right to
[10] testify, a right founded upon our constitution?
[11]   THE DEFENDANT: Yes.
[12]   THE COURT: Have you discussed this with
[13] your attorney?
[14]   THE DEFENDANT: Yes.
[15]   THE COURT: Do you understand, however,
[16] that it's not his decision, it's yours and
[17] yours alone, is that clear to you?
[18]   THE DEFENDANT: Yes.
[19]   THE COURT: Have you thought about this?
[20]   THE DEFENDANT: Yes.
[21]   THE COURT: After thinking about it have
[22] you made a decision?
[23]   THE DEFENDANT: Yes.
[24]   THE COURT: What is your decision?
[25]   THE DEFENDANT: I don't want to testify.

Page 57

[1]      THE COURT: I do not want to testify or I
[2] want to testify?
[3]      THE DEFENDANT: I do not.
[4]      THE COURT: Say it clearly and distinctly.
[5] You want to testify or I do not want to?
[6]      THE DEFENDANT: I do not want to testify.
[7]      THE COURT: Was that your decision?
[8]      THE DEFENDANT: Yes.
[9]      THE COURT: Is it yours alone?
[10]      THE DEFENDANT: Yes.
[11]      THE COURT: Did anyone promise you
[12] anything, threaten you, or force you to make
[13] this decision?
[14]      THE DEFENDANT: No.
[15]      THE COURT: You understand that it makes
[16] perfect sense to discuss these matters with
[17] your attorney?
[18]      THE DEFENDANT: Yes.
[19]      THE COURT: Have you discussed it with
[20] him?
[21]      THE DEFENDANT: Yes.
[22]      THE COURT: Having discussed it with him
[23] have you concluded that you wish not to
[24] testify?
[25]      THE DEFENDANT: Yes.

Page 58

[1]      THE COURT: All right. Did anyone promise
[2] you anything, threaten you, or your force you
[3] to make this decision?
[4]      THE DEFENDANT: No.
[5]      THE COURT: Is it yours?
[6]      THE DEFENDANT: Yes.
[7]      THE COURT: Did you make it of your own
[8] free will?
[9]      THE DEFENDANT: Yes.
[10]      THE COURT: Did you discuss it with your
[11] attorney?
[12]      THE DEFENDANT: Yes.
[13]      THE COURT: Are you satisfied with his
[14] service?
[15]      THE DEFENDANT: Yes.
[16]      THE COURT: Let the record reflect the
[17] court finds that the defendant has knowingly,
[18] intelligently, and voluntarily invoked his
[19] right to silence and he will not be testifying.
[20]      Mr. Lorusso, it is my practice in cases
[21] such as this to ascertain from you whether or
[22] not the defendant wishes me to give the no
[23] adverse inference charge at the appropriate
[24] time. Once again, this is the defendant's
[25] decision. I'm going to read the standard

Page 59

[1] instruction into the record so that your client
[2] hears it and you hear it. I want you to
[3] discuss it with him and tell me whether or not
[4] he wishes me to give this instruction.
[5]      Mr. Simmons, you may if you wish, have the
[6] court give the following instruction. It
[7] **reads**: It is entirely up to the defendant in
[8] every case whether or not to testify. He has
[9] an absolute right founded on the Constitution
[10] to remain silent. You must not draw any
[11] inference of guilt or any other inference
[12] adverse to the defendant to the fact he did not
[13] testify. Did you hear that?
[14]      THE DEFENDANT: Yes.
[15]      THE COURT: Did you understand those
[16] words?
[17]      THE DEFENDANT: Yes.
[18]      THE COURT: Mr. Lorusso, would you
[19] discuss.
[20]      (Discussion was held off the record.)
[21]      MR. LORUSSO: I've discussed it with
[22] Mr. Simmons, Your Honor.
[23]      THE COURT: What's his decision?
[24]      MR. LORUSSO: His decision is for Your
[25] Honor to instruct the jury in that manner.

Page 60

[1]      THE COURT: Did you hear what your
[2] attorney is asking?
[3]      THE DEFENDANT: Yes.
[4]      THE COURT: He has advised me that you
[5] wish me to give this instruction, is that
[6] correct?
[7]      THE DEFENDANT: Yes.
[8]      THE COURT: Is he correct when he tells me
[9] that's your decision?
[10]      THE DEFENDANT: Yes.
[11]      THE COURT: Is it your decision?
[12]      THE DEFENDANT: Yes.
[13]      THE COURT: Did you make it of your own
[14] free will?
[15]      THE DEFENDANT: Yes.
[16]      THE COURT: Did anyone threaten you,
[17] promise you anything, or force you to make this
[18] decision?
[19]      THE DEFENDANT: No.
[20]      THE COURT: You discussed this with your
[21] attorney?
[22]      THE DEFENDANT: Yes.
[23]      THE COURT: You satisfied with his
[24] services?
[25]      THE DEFENDANT: Yes.

Page 61

[1]      THE COURT:  Mr. Lorusso has advised me
[2] that he will be calling on your behalf Mr. Kent
[3] and Mr. Wright.  He then will be resting, is
[4] that a fair statement?
[5]      MR. LORUSSO:  And a stipulation, Your
[6] Honor.
[7]      THE COURT:  What's the stipulation?
[8]      MR. LORUSSO:  The stipulation is between
[9] counsel that the letter of Charles Tolbert
[10] marked exhibit C-12 was provided to the
[11] Assistant District Attorney by myself.
[12]      THE COURT:  Did you hear what he said,
[13] Mr. Simmons?
[14]      THE DEFENDANT:  Yes.
[15]      THE COURT:  Your attorney advised me that
[16] he will offer up the formal stipulation, he
[17] will call Mr. Wright and call Mr. Kent and then
[18] he will rest his case.  Are you in agreement
[19] that's how you should proceed?
[20]      THE DEFENDANT:  Yes.
[21]      THE COURT:  Are there any other witnesses
[22] you wish to call?
[23]      THE DEFENDANT:  No.
[24]      THE COURT:  All right.  Let's finish the
[25] case then.  Bring the jurors out.

Page 62

[1]                       - - -
[2]      (The jury entered the courtroom at
[3] 12:02 p.m.)
[4]                       - - -
[5]      THE COURT:  Mr. Lorusso, the Commonwealth
[6] having rested you may proceed.
[7]      MR. LORUSSO:  Thank you.  With the Court's
[8] permission we call Mr. Leland Kent.
[9]      COURT CRIER:  State your full name and
[10] spell your last name.
[11]      THE WITNESS:  Leland Kent, K-E-N-T,
[12] executive director of victim services.
[13]                       - - -
[14]      LELAND KENT, after having been duly
[15] sworn, was examined and testified as follows:
[16]                       - - -
[17]              DEFENSE EVIDENCE
[18]              DIRECT EXAMINATION
[19]                       - - -
[20] BY MR. LORUSSO:
[21]      Q    Mr. Kent, you have indicated previously
[22] that you did not have your file with you concerning
[23] Charles Tolbert, is that correct?
[24]      A    That is correct.
[25]      Q    Subsequent to testifying were you ordered

Page 63

[1] by the Court to produce your file?
[2]      A    That is correct.
[3]      Q    Have you been able to do that?
[4]      A    No.
[5]      Q    When did you last see your file?
[6]      A    Last Wednesday in the prep room right
[7] outside of 802.
[8]      Q    Do I understand that you haven't seen it
[9] since then?
[10]      A    That's correct?
[11]      MR. LORUSSO:  Thank you.  I have nothing
[12] further.
[13]      THE COURT:  Cross-examine.
[14]                       - - -
[15]              CROSS-EXAMINATION
[16]                       - - -
[17] BY MS. FORCHETTI:
[18]      Q    Mr. Kent, when were you asked to obtain
[19] this file and bring it to court?
[20]      A    Today maybe an hour and a half ago.
[21]      Q    When is the last time you did work on this
[22] file that you added to it?
[23]      A    In May of this year, 2011.
[24]      Q    Were you here last Wednesday prepared to
[25] testify?

Page 64

[1]      A    Yes.
[2]      Q    But we didn't get to you on Wednesday; is
[3] that right?
[4]      A    That's correct.
[5]      Q    Did you return to the office at the
[6] conclusion of the court day?
[7]      A    Yes.
[8]      Q    Were you involved in relocating a witness
[9] at the conclusion of the court day?
[10]      A    Yes.
[11]      Q    Was that an unexpected event?
[12]      A    Yes.
[13]      Q    Did you, in fact, forget your umbrella
[14] when you left this courtroom?
[15]      A    That is correct.
[16]      Q    I returned it to you?
[17]      A    That's correct.
[18]      Q    Are you hiding this file from the defense?
[19]      A    No.
[20]      Q    The file contains the contents of your
[21] conversations with the witnesses involved in this
[22] case; is that right?
[23]      A    Yes; the interview.
[24]      Q    Did you testify today from your own
[25] memory?

Page 65

[1]    **A**    That's correct.

[2]    **Q**    Did you have any notes in front of you
[3] when you testified?

[4]    **A**    No.

[5]    **Q**    So you remember Mr. Tolbert fairly well?

[6]    **A**    I do.

[7]    **Q**    How many conversations would you say you
[8] had with Mr. Tolbert during the course of this case?

[9]    **A**    Many.  From February through May we would
[10] talk three or four times a week.

[11]    **Q**    That is how you were able to remember him,
[12] the specificity?

[13]    **A**    That's correct.

[14]    **MS. FORCHETTI**:  Thank you.  I have nothing
[15] further.

[16]    **THE COURT**:  Thank you, Mr. Kent.

[17]    **MR. LORUSSO**:  I have one more.

[18]                    - - -

[19]            REDIRECT EXAMINATION

[20]                    - - -

[21] **BY MR. LORUSSO**:

[22]    **Q**    Mr. Kent, the witness that you helped to
[23] relocate on Wednesday after leaving here I assume
[24] had nothing to do with this prosecution?

[25]    **A**    I'm sorry.

Page 66

[1]    **Q**    You were asked a question I guess in your
[2] hurried state of mind to get out of here where you
[3] left your umbrella and you last saw your file you
[4] said you were in response to a question helping to
[5] relocate a witness, is that right, it was a sudden
[6] event?

[7]    **A**    It was.

[8]    **Q**    Had nothing to do with this case, is that
[9] right?

[10]    **A**    That's not correct.

[11]    **Q**    You were attempting to relocate a witness
[12] with regard to this case?

[13]    **A**    Yes.

[14]    **Q**    What witness would that be?

[15]    **A**    Mr. Holman.

[16]    **Q**    Kyle Holman asked -- is that the person
[17] you testified asked you to relocate him?

[18]    **A**    Yes, on Wednesday.

[19]    **Q**    Do you have that file?

[20]    **A**    Do I have that file, no, I don't have that
[21] file.  Another one of my staff has that file.

[22]    **Q**    The date, February 22nd, you said this
[23] morning that was your first conversation with
[24] Charles Tolbert are you saying that's from your
[25] memory also?

Page 67

[1]    **A**    Yes.  I recall receiving a memo from
[2] Stacey Forchetti once I notified her that
[3] Mr. Tolbert called me requesting relocation services
[4] and that's the date that the memo that Ms. Forchetti
[5] provided me approved by her chief and deputy to
[6] approve for witness relocation assistance.  So I
[7] recall that based on the date of the memo that was
[8] given to me.

[9]    **Q**    That's a memo that you had a chance to
[10] look at before you testified, is that correct?

[11]    **A**    Yes.

[12]    **MR. LORUSSO**:  Thank you.

[13]    **THE COURT**:  Anything else?

[14]    **MS. FORCHETTI**:  No.

[15]    **THE COURT**:  You may step down.

[16]            (Witness excused.)

[17]    **THE COURT**:  Call your next witness.

[18]    **MR. LORUSSO**:  Gerald Wright.

[19]    **COURT CRIER**:  State your full name and
[20] spell your last name.

[21]    **THE WITNESS**:  Gerald Wright, W-R-I-G-H-T.

[22]                    - - -

[23]            GERALD WRIGHT, after having been duly

[24] sworn, was examined and testified as follows:

[25]

Page 68

[1]

[2]                    - - -

[3]            DIRECT EXAMINATION

[4]                    - - -

[5] **BY MR. LORUSSO**:

[6]    **Q**    Mr. Wright, good afternoon.  You testified
[7] before this jury last Tuesday, is that correct?

[8]    **A**    Yes.

[9]    **Q**    Following your testimony did something
[10] occur outside of the courtroom that caused me to
[11] request your continued presence in court until I
[12] could call you to testify?

[13]    **A**    Yes.

[14]    **Q**    Would you tell the jury what that was?

[15]    **A**    Basically the lady came out the courtroom
[16] after I was done, walking down the hall, she came
[17] out crying, hysterical.  She came over and
[18] introduced herself to me and gave me a hug and
[19] that's pretty much the extent of it.

[20]    **Q**    Did that lady identify herself?

[21]    **A**    She said she was little Johnnie's mother.

[22]    **Q**    Do you know that woman?

[23]    **A**    No, I don't.

[24]    **Q**    Do you see her in the courtroom?

[25]    **A**    Yes, I do.

Page 69

[1]   **Q**  Would you point her out for the record?

[2]   **A**  The lady right there.

[3]   **Q**  The lady waving her hand?

[4]   **A**  Yes.

[5]      **MS. FORCHETTI**:  Indicating by point of

[6]  finger the woman that we have previously

[7]  identified as Johnnie Simmons' mother.

[8] **BY MR. LORUSSO**:

[9]   **Q**  Did she say anything to you?

[10]   **A**  Just thank you and I told her, for what.

[11] I basically just told her I don't know what you're

[12] thanking me for.  I really didn't understand what

[13] was going on.  She came out.  She was distraught.

[14] She was crying.  She reached out, she gave me a hug

[15] and me being a gentleman that's all it was.  I

[16] didn't push her away or anything.  That was the

[17] extent of the conversation.

[18]   **Q**  This hug or embrace, whatever, how long

[19] did that last, by the way?

[20]   **A**  A few seconds.  I mean she was real

[21] distraught.  It's just not my nature to push a

[22] crying woman away, didn't matter what the

[23] circumstances was because it kind of caught me off

[24] guard.

[25]   **Q**  Did you hug her back at all?

Page 70

[1]   **A**  Yes.  When she reached out and hugged me

[2] she was crying.  She was distraught.  I just told

[3] her I hope everything work out for her.

[4]   **Q**  You characterize that as lasting a few

[5] seconds?

[6]   **A**  Yes.

[7]      **MR. LORUSSO**:  Thank you.  I have nothing

[8] further.

[9]      **THE COURT**:  You may cross.

[10]      - - -

[11]      CROSS-EXAMINATION

[12]      - - -

[13] **BY MS. FORCHETTI**:

[14]   **Q**  Good afternoon, Mr. Wright.  When you

[15] testified before do you remember telling us that you

[16] didn't know the defendant?

[17]   **A**  No.  I don't know him.

[18]   **Q**  When the defendant's mom approached you

[19] and said I'm little Johnnie's mother you knew who

[20] she was talking about though, right?

[21]   **A**  No, I didn't know.  When she came out she

[22] came out and said I'm little Johnnie's mother.  As

[23] far as him being little Johnnie, yeah, that's the

[24] extent of it, but I don't know her.

[25]   **Q**  So you do know who little Johnnie is?

Page 71

[1]   **A**  Yes, from the name, yes.

[2]   **Q**  You worked in that neighborhood for a

[3] considerable period of time, right?

[4]   **A**  Yes.

[5]   **Q**  So you know little Johnnie from the

[6] neighborhood?

[7]   **A**  Yes.

[8]   **Q**  Mr. Wright, were you aware that the

[9] testimony was still ongoing, there was a witness who

[10] testified after you?

[11]   **A**  Yes.

[12]   **Q**  You left another person came in?

[13]   **A**  Right, but I wasn't aware of that.  You

[14] have to understand when I left it was to my

[15] knowledge that I was done, I was leaving.  As I'm

[16] walking down the hall she came out the other door.

[17] I mean I went out this way, she came out that way.

[18] She kind of just came right out in front of me and

[19] cut me off.

[20]   **Q**  So the defendant's mother came out looking

[21] for you?

[22]   **A**  Yeah.  I mean if somebody told you they

[23] saw me hug her they obviously came to you and said

[24] they saw her hug me.  It's not like I searched her

[25] out.  I didn't even know the lady.  I was just being

Page 72

[1] a gentleman.  I mean that's what you call being a

[2] gentleman.  I'm not going to push a crying lady away

[3] no matter what the circumstances is.  She's not on

[4] trial.  All I saw was a crying lady.  She came

[5] running into my arms.  What was I supposed to do,

[6] push her away.

[7]   **Q**  So it's your testimony here today that

[8] this woman, the defendant's mother is a complete

[9] stranger to you?

[10]   **A**  Yes, don't know her.

[11]   **Q**  She left an active courtroom of her son's

[12] trial to seek you out, a complete stranger, just to

[13] throw herself into your arms?

[14]   **A**  See you making it look like -- you're

[15] making it look like she just came -- listen, I don't

[16] know the lady.  If you're asking what she felt about

[17] the situation you have to ask her.  I know when I

[18] left out of here my intent was I'm done, I'm going

[19] home with my family.

[20]   **Q**  You didn't really want to be a part of

[21] this case, right?

[22]   **A**  I don't want to be a part of none of this

[23] right now.  I want to get home to my grandmother.  I

[24] told you that.  If a woman runs up to a guy, I

[25] wasn't raised to be disrespectful.  That's not me.

### Page 73

[1] She came out, she was crying. What was I supposed
[2] to do, tell her to get away from me? That would
[3] have been rude. I'm not raised like that. You can
[4] come crying and I would have hug you just the same
[5] if you needed it. But I don't understand where this
[6] is going. Like I said, I thought I was done. I'm
[7] going home. Now I'm back in here two days for a
[8] hug.

[9] **Q** You never wanted to be a part of this case
[10] at all?

[11] **A** I was going to work. I was at work. None
[12] of this had took place I would probably still be at
[13] work.

[14] **MS. FORCHETTI**: Thank you. I have nothing
[15] further.

[16] **THE COURT**: You have anything further?

[17] **MR. LORUSSO**: No, Your Honor.

[18] **THE COURT**: You may step down.

[19] (Witness excused.)

[20] **THE COURT**: Mr. Lorusso, you may continue.

[21] **MR. LORUSSO**: There is a stipulation

[22] that's been entered into by and between

[23] counsel.

[24] **THE COURT**: Ladies and gentlemen, please

[25] recall the instruction I gave you on how you

### Page 74

[1] should receive stipulated testimony. You may
[2] proceed.

[3] **MR. LORUSSO**: Ladies and gentlemen, the
[4] stipulation or the agreement is that the letter
[5] that has been marked into evidence as
[6] Commonwealth's Exhibit 12, a letter that's been
[7] identified as having been authored by Charles
[8] Tolbert and addressed to Johnnie Simmons was
[9] provided to Ms. Forchetti, the district
[10] attorney's office, by me as Johnnie Simmons'
[11] attorney. That's the stipulation.

[12] **THE COURT**: So stipulated?

[13] **MS. FORCHETTI**: Yes, Your Honor.

[14] **THE COURT**: Very well.

[15] **MR. LORUSSO**: With that stipulation the
[16] defense would rest and move for the admission
[17] of defense exhibits and rest on behalf of
[18] Johnnie Simmons.

[19] **THE COURT**: Any objection?

[20] **MS. FORCHETTI**: No, Your Honor.

[21] **THE COURT**: They will be received.

[22] Defense rest.

[23] **MR. LORUSSO**: Yes, Your Honor.

[24] **THE COURT**: May I see counsel for a

[25] moment.

### Page 75

[1] (Discussion was held off the record.)

[2] **THE COURT**: Ladies and gentlemen, you've
[3] now heard all the evidence which is to be heard
[4] in this case. The next thing is for the
[5] attorneys to make closing arguments after which
[6] I shall instruct you in the law. It's now a
[7] quarter after 12:00 and I must meet with the
[8] attorneys before the arguments commence so we
[9] will take our lunch and recess now. I should
[10] hope that we can be back in the courtroom ready
[11] to proceed at 1:45. So if you would get back
[12] in the site designated by the crier and the
[13] court officer at about 1:30 we can have you
[14] here in the box at 1:45 at that point closing
[15] arguments will commence. I shall thereafter
[16] instruct you in the law that you will need for
[17] deliberations. Enjoy your lunch.

[18] - - -

[19] (The jury exited the courtroom at
[20] 12:17 p.m.)

[21] - - -

[22] **THE COURT**: Let the record reflect the
[23] jurors are all out of the room. I very much
[24] appreciate if everybody will remain in place
[25] until such time as the jurors are off the

### Page 76

[1] floor. We know that when the court officer
[2] comes back to advise us. Mr. Lorusso, Ms.
[3] Forchetti, the court will now convene a
[4] charging conference. If you have points for
[5] charge you wish me to present to the jury
[6] please hand them up.

[7] **MR. LORUSSO**: Your Honor, forgive the
[8] informality of those.

[9] **THE COURT**: Do you have something you
[10] wanted to hand up?

[11] **MS. FORCHETTI**: No, Your Honor. I believe
[12] we discussed it already.

[13] **MR. LORUSSO**: I request the standard
[14] charge except for the one I had written out.
[15] Can I also inquire concerning your no adverse
[16] inference charge. Does Your Honor instruct the
[17] jury at all with regard to his right founded
[18] upon the right of self-incrimination.

[19] **THE COURT**: I read it to you.

[20] **MR. LORUSSO**: The one that you just gave
[21] during the -- that's fine.

[22] **THE COURT**: Mr. Lorusso, I'll hear first
[23] from you. Which points you wish to offer?

[24] **MR. LORUSSO**: I would ask Your Honor to
[25] charge in the typed portion of what I wrote

Page 77

[1] that point of law dealing with the information
[2] about an anonymous call that Johnnie Simmons
[3] was the shooter is not for the truth of the
[4] matter stated.
[5]     THE COURT:  Would you read it into the
[6] record?
[7]     MR. LORUSSO:  I ask Your Honor to charge
[8] as follows:  There was testimony that an
[9] anonymous phone call was received that the
[10] defendant Johnnie Simmons was the person who
[11] shot Charles Tolbert.  This testimony was
[12] presented not for the truth of its contents but
[13] to show what may have been a reason for the
[14] arrest of Johnnie Simmons.  Since this
[15] information was received from an unnamed source
[16] who did not testify in court you may not
[17] consider this testimony as evidence that
[18] Johnnie Simmons was in fact the person who shot
[19] Charles Tolbert but may consider it only to the
[20] extent that it may assist you in determining
[21] the basis for Johnnie Simmons' arrest.
[22]     THE COURT:  Commonwealth.
[23]     MS. FORCHETTI:  I would object to it as
[24] being unnecessary.  You were clear in
[25] instructing the jury at the time why that

Page 78

[1] testimony was admissible.
[2]     THE COURT:  What aspects of the case is
[3] this?  Is this when he was picked up and a
[4] photograph was taken?
[5]     MS. FORCHETTI:  Correct.
[6]     THE COURT:  Is that it?
[7]     MR. LORUSSO:  It is, Your Honor.
[8]     THE COURT:  I'll charge it.  Next.
[9]     MR. LORUSSO:  I'd ask Your Honor to charge
[10] false in one, false in all.
[11]     THE COURT:  Granted.
[12]     MR. LORUSSO:  Prior inconsistent
[13] statement.
[14]     THE COURT:  I'm not sure what you mean by
[15] that.  That's why I asked you guys on Wednesday
[16] to present the proposed instructions that you
[17] want.  Can you tell me what it is that you mean
[18] by that, read the instruction as it appears.
[19]     MR. LORUSSO:  I don't have the
[20] instruction.
[21]     THE COURT:  We've been in recess since
[22] last Wednesday.
[23]     MR. LORUSSO:  I'm just asking for the
[24] standard charge.
[25]     THE COURT:  There is no standard

Page 79

[1] instruction.  It's an alternative instruction,
[2] counsel.  I have no idea what this means and I
[3] want to do this in a way that is appropriate.
[4] So when we left here on Wednesday I asked the
[5] two of you if you had requests for points you
[6] had all day Thursday and Friday to get this.
[7]     MR. LORUSSO:  I apologize.  I was
[8] referring Your Honor to the use of a prior
[9] inconsistent statement for impeachment
[10] purposes.
[11]     THE COURT:  I would like to know precisely
[12] what you're asking for, counsel.  They're
[13] standard instructions.  I don't know what that
[14] means so I want the words that you want me to
[15] give to the jury.  Like you wrote out the first
[16] one.  That's what I asked you to do.  They're
[17] all in the books.  What else do you want?
[18]     MR. LORUSSO:  Your Honor, I would ask Your
[19] Honor to charge on flight.  There was testimony
[20] from Kyle Holman who identified Mr. Simmons
[21] that upon hearing sirens or activity that he
[22] speeded up or I don't recall specifically
[23] whether he started walking fast from the area
[24] in the driveway.  So I would ask Your Honor to
[25] charge the jury that flight in and of itself is

Page 80

[1] not evidence of a crime.
[2]     THE COURT:  I am going to recess now.  If
[3] either one of you have standard instructions
[4] you wish me to offer get the instructions and
[5] present it to me.  Let's take a recess until
[6] 1:30.
[7]         (Luncheon recess taken.)
[8]             - - -
[9]         (Court reconvened at 1:30 p.m.)
[10]             - - -
[11]     THE COURT:  We're on the record in the
[12] trial case Commonwealth versus Simmons
[13] CR-0004773-2011.  Mr. Simmons is here with his
[14] attorney Mr. Lorusso.  The Commonwealth, Ms.
[15] Forchetti.  When we recessed for lunch we had
[16] commenced our charging conference and I want
[17] you both to appreciate that this is a formal
[18] charging conference so if there are points you
[19] wish me to consider and/or impart the jury this
[20] is the time to raise them.  Mr. Lorusso.
[21]     MR. LORUSSO:  If Your Honor please I have
[22] requests for false in one/false in all charge
[23] in addition to the one this morning Your Honor
[24] indicated you will instruct the jury.
[25]     THE COURT:  All right.  I'll charge on

Page 81

[1] that. What else do you want?
[2] **MR. LORUSSO**: That's it, Your Honor. that
[3] and the one from this morning.
[4] **THE COURT**: Commonwealth.
[5] **MS. FORCHETTI**: Your Honor, I did provide
[6] to you during the lunch break the flight
[7] charge. I also provided the motive charge. I
[8] think the motive is standard charge 3.13 and
[9] the flight charge is 3.14, the standard
[10] criminal jury instructions.
[11] I also handed up to Your Honor several
[12] points of charge that have to do with the
[13] charge of attempted murder. I'm not sure if
[14] Your Honor has assembled his own charge of
[15] attempted murder.
[16] **THE COURT**: I have but I appreciate it
[17] when counsel presents all charges, I always do,
[18] but thank you for presenting what you did. I
[19] will charge on flight. I will charge on
[20] motive. I will charge on attempted murder. Is
[21] there anything else?
[22] **MS. FORCHETTI**: The statement of prior
[23] inconsistent statement I would ask that you
[24] give the first alternative, prior inconsistent
[25] statement, as substantive evidence that does

Page 82

[1] give the option as Mr. Lorusso had requested
[2] that the jury may decide whether or not to
[3] consider the evidence as substantive evidence
[4] or merely as going to credibility.
[5] **THE COURT**: That's appropriate in this
[6] case. I'll charge. Anything else?
[7] **MS. FORCHETTI**: No, Your Honor.
[8] **THE COURT**: Okay. As soon as the jurors
[9] come back we'll have speeches and charge.
[10] (Short recess taken.)
[11] **MS. FORCHETTI**: Your Honor, I know I
[12] mentioned on Wednesday that I asked you if you
[13] charge direct and circumstantial evidence as
[14] part of your standard.
[15] **THE COURT**: Yes, I do. Anything else,
[16] Mr. Lorusso?
[17] **MR. LORUSSO**: No, Your Honor.
[18] **THE COURT**: Are the two of you ready?
[19] **MS. FORCHETTI**: Yes. I would ask that the
[20] court have the exhibits ready.
[21] **THE COURT**: What I request is that the
[22] attorneys do is go through the pile so that
[23] you're not trying to close and looking for the
[24] exhibits and what you want isn't there because
[25] that can be embarrassing. If the two of you

Page 83

[1] want to come around and look at it to make sure
[2] that what you want is there please feel free to
[3] do that.
[4] Counsel, before we bring the jurors out I
[5] have a proposed draft of the verdict sheet
[6] which is not yet written in stone. Take a look
[7] at it and mark it up. If there's something in
[8] it you take objection with just line it out and
[9] we can go through this and get it prepared
[10] before you close. Are you asking for a charge
[11] on my aggravated assault causing serious bodily
[12] injury, attempted serious bodily injury, one,
[13] the other, or both?
[14] **MS. FORCHETTI**: I think causing serious
[15] bodily injury. I don't think there's any issue
[16] with respect to that.
[17] **THE COURT**: Okay. Have the two of you had
[18] an opportunity to review the sheet?
[19] **MS. FORCHETTI**: Yes, Your Honor.
[20] **THE COURT**: Let's start with you,
[21] Mr. Lorusso, is there anything you find
[22] objectionable?
[23] **MR. LORUSSO**: No, Your Honor.
[24] **THE COURT**: Ms. Forchetti.
[25] **MS. FORCHETTI**: No, Your Honor.

Page 84

[1] **THE COURT**: So as soon as the jurors come
[2] in we'll go right into closing arguments.
[3] Counsel, I'm advised that the jurors are
[4] on their way up. So is the evidence close on
[5] the Commonwealth side?
[6] **MS. FORCHETTI**: Yes, Your Honor.
[7] **THE COURT**: Is everything closed on the
[8] defense side?
[9] **MR. LORUSSO**: Yes, Your Honor.
[10] - - -
[11] (The jury entered the courtroom at
[12] 1:49 p.m.)
[13] - - -
[14] **THE COURT**: Good afternoon, ladies and
[15] gentlemen. Members of the jury, now that
[16] you've heard all the evidence which is to be
[17] presented in this case the next step is for the
[18] attorneys to make closing arguments. Now, even
[19] though these arguments do not constitute
[20] evidence, you should consider them very
[21] carefully. In their arguments the attorneys
[22] for both sides will call to your attention the
[23] evidence which they consider material and they
[24] will ask you to draw certain inferences from
[25] that evidence. You must keep in mind, however,

Page 85

[1] that you are not bound by the attorneys'
[2] recollection of the evidence.  It is your
[3] recollection of the evidence and yours alone
[4] which must guide you during your deliberations.
[5] so if there is a discrepancy between an
[6] attorney's recollection and your own you are
[7] obviously guided by your recollection of the
[8] evidence.  Nor are you limited in your
[9] consideration of the evidence to that which is
[10] mentioned by these attorneys.  You must
[11] consider all of the evidence which you deem
[12] material to the issues involved in this case.
[13] Now, to the extent that an inference or
[14] the inferences which an attorney or the
[15] attorneys ask you to draw is supported by the
[16] evidence and appeals to your reason and your
[17] judgment then you may consider that inference
[18] or those inferences in your deliberations.
[19] Jurors, the attorneys may also call to
[20] your attention certain principles of law in the
[21] course of their closing arguments.  You must
[22] remember, however, that you are not bound by
[23] any principle of law mentioned by either
[24] attorney.  You must on your oath accept and
[25] apply only the law which I instruct you to the

Page 86

[1] facts as you jurors determine the facts to be
[2] in reaching your verdict in this case.
[3] Now, ladies and gentlemen, under the rules
[4] promulgated by the Supreme Court of
[5] Pennsylvania Mr. Lorusso, counsel to the
[6] defendant, will address you first followed
[7] thereafter by Mrs. Forchetti, counsel for the
[8] Commonwealth, and thereafter, I shall instruct
[9] you in the law of the case.
[10] Ms. Forchetti, Mr. Lorusso, are you two
[11] ready to proceed?
[12] **MS. FORCHETTI**:  Yes, Your Honor.
[13] **MR. LORUSSO**:  Yes, Your Honor.
[14] **THE COURT**:  Then I shall call first on
[15] you, Mr. Lorusso.  You may address the jury.
[16] **MR. LORUSSO**:  Thank you, Your Honor.  May
[17] it please the court, Ms. Forchetti, ladies and
[18] gentlemen of the jury, good afternoon.
[19] Again, I want to thank you personally and
[20] on behalf of Johnnie Simmons for taking this
[21] time to serve this most important function.
[22] I'm sure this has not been a television
[23] thriller for you for the most part.
[24] Nevertheless, I know this, as we all did that,
[25] you really paid attention to the evidence

Page 87

[1] presented in this case and you really
[2] demonstrated to us that you'll take your oath
[3] seriously.  You'll abide by the instructions of
[4] law that His Honor gives you upon which to
[5] deliberate and you will reach a verdict in this
[6] case based upon your careful determination of
[7] the facts in conjunction with the principles of
[8] law that His Honor will instruct you to apply
[9] in this case.  And for your service up until
[10] now and through the determination of this case
[11] Johnnie Simmons and I both thank you.
[12] This is an opportunity at this point as
[13] His Honor said to suggest to you what I believe
[14] the evidence of this case shows and did you
[15] want show.  You see by that clock right now
[16] it's about according to that clock eight
[17] minutes to 2:00 and I just want to set this so
[18] that I remember when five minutes goes by when
[19] I look at that clock.  What I want to go over
[20] and I'm not going to go over every witness's
[21] testimony in the case and certainly the
[22] witnesses that I go over I'm going to really
[23] try and hit what I suggest to you are the high
[24] points or the relevant points because I'm
[25] pretty sure you don't want to spend another day

Page 88

[1] and a half listening to me telling you what you
[2] already heard over the past couple of days.
[3] Let's go to I believe the first witness
[4] that was called in this case was Police Officer
[5] Alexander.  Police Officer Alexander was the
[6] witness if you remember who was actually
[7] getting his eyeglasses fixed or something
[8] across Stenton Avenue across where this
[9] incident occurred.  He hears gunshots.  He
[10] arrives, gun drawn, running down the street,
[11] sees a victim in the street, sees blood, learns
[12] from a witness that the person who at least the
[13] witness describes as the shooter is heading
[14] down the driveway.  You recall that we had
[15] marked a photograph that depicted the driveway
[16] as C-1 and that's been admitted into evidence
[17] and if you'll recall the testimony and again
[18] I'm going to tell you what my recollection of
[19] the evidence is, as is Ms. Forchetti, but it's
[20] really your recollection of the evidence that
[21] controls in this matter.  I'm sure if either of
[22] us says something that's different from what
[23] you recall you be guided by what you recall the
[24] evidence to be or in your deliberations you
[25] determine the evidence to be.  But with that

[1]  disclaimer my recollection is that the
[2]  information provided to Officer Alexander was
[3]  that the person described as the shooter headed
[4]  down the driveway depicted in C-1 here which
[5]  would have been, if you recall, south of
[6]  Stenton Avenue in the 1300 block of Johnson
[7]  Street. Officer Alexander gave chase down that
[8]  driveway. Officer Alexander's description of
[9]  that person that he was chasing in his
[10]  testimony was of a male who was six foot tall
[11]  in height, in fact, asked a question on the
[12]  Commonwealth's Exhibit "C" that he accepted as
[13]  being his statement, it was the same as his
[14]  testimony, he said that that person who he saw
[15]  running down the alleyway was about six foot
[16]  tall, had on a black hoodie, black pants. The
[17]  hoodie was up on his head so he didn't see his
[18]  face. Officer Alexander was behind him.
[19]  That's what he said that day. My recollection
[20]  is that is what his testimony was when he
[21]  appeared before you. He said when I asked him
[22]  that he observed and he followed this man down
[23]  the driveway until and recall this in there if
[24]  you will because I do he says the person made a
[25]  turn and at that point in time since Officer

[1]  Alexander didn't have a vest on he didn't want
[2]  to get ambushed and that's certainly very
[3]  understandable. So he stopped pursuit. But
[4]  when he was asked which direction the gentleman
[5]  turned or the individual described as six foot
[6]  tall wearing black turned, I think he said to
[7]  the right but I don't know if I was sure with
[8]  the answer so I said to him was he heading
[9]  toward Center City or heading toward Cheltenham
[10]  Avenue and my recollection is he said he was
[11]  heading toward Center City. He made a right
[12]  turn on what he initially described as
[13]  Washington Lane. Then I said to him, if you
[14]  look at this map here and this is a map that we
[15]  identified as D-1 for identification, which
[16]  depicts Stenton Avenue and the 1300 block of
[17]  Johnson Street over on this side south of
[18]  Stenton Avenue, the officer said when I showed
[19]  him the map I said if I told you it's Duvul
[20]  Street that he turned on and not Washington
[21]  Lane which would be further down would that be
[22]  accurate and I think he said yeah. He has this
[23]  six foot tall individual running through the
[24]  driveway and then running south on Duval Street
[25]  and he's chasing him at the time this is right

[1]  after the incident occurs.
[2]      After Officer Alexander testifies and
[3]  gives us that information we hear from Gerald
[4]  Wright. We actually heard from him twice. You
[5]  heard from him today because it seems as though
[6]  there are three rings going on in this trial.
[7]  There are too many trials that are encompassed
[8]  here. One of them has to do with who shot
[9]  Charles Tolbert and I think that's the one that
[10]  you're here to determine whether the
[11]  Commonwealth has proved this case against
[12]  Johnnie Simmons beyond a reasonable doubt. I'm
[13]  sorry. So that would mean I guess that I've
[14]  talked to you for five minutes now from when I
[15]  initially called your attention to that. I
[16]  will ask you to keep that in mind as it relates
[17]  to the second mini trial, the one about the
[18]  embrace by Johnnie Simmons' mother outside the
[19]  courtroom.
[20]      The testimony presented by Joel Wright and
[21]  just to jump ahead a bit. The detective who
[22]  took his statement my recollection is
[23]  characterized Gerald Wright as being a
[24]  forthcoming witness when he was being
[25]  interviewed. What did Mr. Wright say. He was

[1]  privy to an individual coming into the store.
[2]  He knew Charles Tolbert from the neighborhood
[3]  because Charles Tolbert said he had just gotten
[4]  out of jail, he was looking for a phone, and
[5]  Mr. Wright said, come back, I'll hook you up
[6]  when you're ready. He said I did do that so
[7]  Charles Tolbert is in the store and my
[8]  recollection is that Gerald Wright tells us
[9]  that he observed another individual come into
[10]  the store, grab a shirt, put it on the counter
[11]  I believe, I don't recall whether he purchased
[12]  it or not, I don't think that was the
[13]  testimony. But observes and maybe even hears a
[14]  comment to Charles Tolbert from this person,
[15]  can I holler at you. And Mr. Wright tells us I
[16]  just assumed he was talking about can you get
[17]  me a cigarette or something like that. So next
[18]  thing that happens I mean Mr. Wright is on the
[19]  phone with his wife. He's done with the female
[20]  customer. He says he looks out the door and
[21]  sees a car that's stuck in the driveway, goes
[22]  out, then sees Officer Alexander running by,
[23]  the person he later describes I guess from
[24]  seeing the police pants with a gun in his hand,
[25]  realizes that he's a police officer. Well, you

Page 93

[1] know this case is about who done it and Gerald
[2] Ingram testifies with respect to description
[3] and this is obviously again your recollection
[4] but we actually saw him again today. But when
[5] I asked him about the complexion of the
[6] individual he said he was his complexion. When
[7] I asked him to describe that he said brown, I'm
[8] brown. That's what he was saying the other
[9] day. When I asked him to compare that
[10] complexion to Johnnie Simmons' complexion, no,
[11] Johnnie Simmons isn't my complexion, Johnnie
[12] Simmons is light. When I asked Mr. Wright if
[13] he could approximate the height of this
[14] individual who came in the store and grabbed
[15] this shirt you'll recall, and I guess it makes
[16] sense if you're six foot nine, he said
[17] everybody is short to me. But what he did say
[18] was for purposes of comparison he said and he
[19] worked in that store for sometime I believe
[20] that the racks were about five foot ten, the
[21] clothing racks, and we've got photographs of
[22] that, and he said ball parking it with the
[23] signs that are above the racks I would say
[24] they're about six foot seven. He said this guy
[25] that came in I could barely see him over the

Page 94

[1] racks of clothing. So that limits -- that
[2] means that the guy may be no more than five
[3] foot ten. We've got evidence on the record
[4] here that Johnnie Simmons because you recall,
[5] and I'll get to that point, when they arrested
[6] him, when Officer Long took him down and they
[7] took him in and photographed him at Northeast
[8] Detectives on February 4th Johnnie Simmons was
[9] described in that exhibit as being five foot
[10] five inches, 140 pounds. A little different,
[11] I'm going to suggest to you, than five foot ten
[12] inches or six foot.
[13]     Let's get to because my recollection
[14] isn't in terms of the sequences of witnesses
[15] Charles Tolbert came after Gerald Wright. But
[16] if you would bear with me I would like to go
[17] right to Officer Long's testimony because what
[18] I think we have in Officer Long's testimony is
[19] really the meat of this case. Do you remember
[20] that what I suggested to you in my opening
[21] remarks to you was that this prosecution
[22] reminded me of Admiral Ferugot's battle cry
[23] damn the torpedos, full speed ahead. This was
[24] damn the evidence full speed ahead in terms of
[25] prosecuting Johnnie Simmons. The reason I say

Page 95

[1] that is you know there was evidence in this
[2] case and His Honor is going to tell you what
[3] you can consider this evidence for as it
[4] relates to guilt or innocence. Evidence in
[5] this case that something happened somewhere not
[6] the captain who was being driven by Officer
[7] Long but another captain gets an anonymous
[8] phone call saying Johnnie Simmons was the
[9] shooter. So lo and behold what are we doing
[10] now with that information. We're locking
[11] Johnnie Simmons up. What does Officer Long do
[12] he's the captain driver, they're out there on
[13] the street, and what happens they see Johnnie
[14] Simmons, he goes into, Officer Long, into the
[15] barbershop following him, takes him down
[16] because Johnnie Simmons I guess according to
[17] the officer's testimony is offering some type
[18] of resistance, takes him down to the extent
[19] let's consider the disparity in sizes, takes
[20] him down and the report even he said that
[21] Johnnie Simmons refused hospital treatment so I
[22] don't know why that issue even came up unless
[23] it seemed to be warranted at the time. But
[24] they take Johnnie Simmons in and we don't learn
[25] this from Officer Long -- I'm sorry, we do

Page 96

[1] learn from Officer Long that they take Johnnie
[2] Simmons into custody at the barbershop at
[3] Washington Lane and Stenton Avenue. They
[4] actually drive him to Gerald Wright's place of
[5] employment. Johnnie Simmons is in the police
[6] car and there's an identification procedure
[7] that we have no documentation about but we
[8] learned from Officer Long that at that time
[9] within hours of this shooting Gerald Wright
[10] said I can't make an identification of this
[11] person.
[12]     So what do they do next, Officer Long, I
[13] think he said he wasn't sure whether they
[14] transported him or they got somebody else to
[15] transport Johnnie Simmons into Northwest
[16] Detectives. They take a photograph of Johnnie
[17] Simmons on February 4th so that they can show
[18] Johnnie Simmons' picture to Charles Tolbert at
[19] some point in time. So they get this
[20] photograph of Johnnie Simmons and fortunately I
[21] guess to a certain extent they also record the
[22] clothing that Johnnie was wearing at the time
[23] on that 48A, 75-48A, I believe it was called.
[24] And at the time when he was arrested I guess
[25] this is a couple of hours after the shooting,

Page 97

[1] he is wearing blue jeans because I asked
[2] Officer Long blue jeans like Wranglers as
[3] oppose to black jeans. He was wearing a blue
[4] and black hoodie and I asked him to describe
[5] that further and he just didn't recall. I
[6] suggested like you mean maybe black sleeves
[7] different color sleeves and he said, yeah,
[8] something like that. He was wearing blue
[9] boots. This is while he's inside Northwest
[10] Detectives Division a couple of hours after
[11] this shooting occurs. The interesting thing is
[12] and why I'm going to suggest to you that
[13] Officer Long really with his statement tells
[14] you a whole lot more about this case than first
[15] meets the eye is this whole, again, the focus
[16] on Johnnie Simmons. The focus on Johnnie
[17] Simmons doesn't have a thing to do with fitting
[18] any descriptions. The focus on Johnnie Simmons
[19] has to do with this anonymous phone call. And
[20] let's look at how this anonymous phone call is
[21] so forthrightly mentioned in Officer Long's
[22] statement. You'll recall that was a
[23] Commonwealth's Exhibit C-18 and the officer
[24] said, yes, this was the information that he
[25] provided on February 24th. He is asked a

Page 98

[1] question by the assigned detective, Detective
[2] Acerenza, can you tell me about the pedestrian
[3] information that you conducted on Johnnie
[4] Simmons on February 4, 2011? And Officer
[5] Long's answer is: "After the shooting occurred
[6] myself and my Captain Dales, Badge 17 were in
[7] the area. We were talking to people and asking
[8] them about the shooting. A person that refused
[9] to give his name stated that, quote, Johnnie
[10] Simmons also known as Little Johnnie, a short
[11] guy with medium brown skin and a lot of hair
[12] just walked into the barbershop. He said
[13] Little Johnnie was the shooter from 1300 East
[14] Johnson Street. Johnnie walked into the
[15] barbershop, he point to the barbershop." This
[16] person pointed to the barbershop who gave that
[17] information. Other question goes down: "Did
[18] that male that gave you the information that
[19] Johnnie Simmons was the shooter say anything
[20] else?
[21] "No. He just said Johnnie Simmons was the
[22] shooter.
[23] "Question: Can you describe the male that
[24] gave you the information.
[25] "Black male, late 30s to early 40 years

Page 99

[1] old." No further information. He didn't want
[2] to get involved.
[3] I'm going to defy you to conclude anything
[4] other than what Officer Long and Detective
[5] Acerenza were composing here was a suggestion
[6] that this person who fingered Johnnie Simmons
[7] was present at the location and pointed to
[8] Johnnie Simmons or pointed to the barbershop as
[9] oppose to a call going down the road. A call
[10] to some captain and then a call to another
[11] captain and then lock Johnnie Simmons up as
[12] oppose to the clear impression that you get
[13] here that Officer Long was talking to this
[14] person, a person that refused to give his name,
[15] stated Johnnie Simmons just walked into the
[16] barbershop. Give me a break. When I asked
[17] him, well, you know, because he did admit that
[18] yeah this was all telephone call information.
[19] It was from an anonymous person, we don't know
[20] who that was. I said, how do you describe that
[21] person if you don't know who it was. What's
[22] his response. Well, I went to captain in the
[23] interim from February 4th to February 24th.
[24] When I told him that they wanted to interview
[25] me about the arrest of Johnnie Simmons on

Page 100

[1] February 4th when we got his picture and I said
[2] what can I do there. Oh, he gave me the
[3] description of who that person was that called.
[4] You really believe that. I mean when you are
[5] selected as jurors you don't check your common
[6] sense outside the jury box. I don't mean to
[7] offend anybody, but I'm going to tell you that
[8] that reminds me a long time ago I'm not a big
[9] show goer but I saw the show I remember the
[10] line and boy, oh boy as I heard Officer Long's
[11] testimony the line rang true to me. It was a
[12] line in the show, saw it as I said 25 years ago
[13] my wife but still remember the line. Best
[14] Little Whorehouse of Texas. The guy says when
[15] he's getting the business from somebody a lot
[16] of hot air, a lot of nonsense he says, "stop
[17] pissing on my cowboy boots and telling me that
[18] it's a rainstorm." That's exactly what came to
[19] my mind when I heard the testimony of Officer
[20] Long and compared it to the composition that
[21] was an effort to state that this anonymous tip
[22] came from a real live person who was really
[23] present at the time and pointed into the
[24] barbershop at Johnnie Simmons. So that's what
[25] this prosecution is based upon, an anonymous

Page 101

[1] tip.
[2]　　What is there in the evidence that
[3] corroborates Johnnie Simmons as being the
[4] shooter. Let's see. We've got descriptions of
[5] tall people, black hoodie, six foot person.
[6] Charles Tolbert, what does he do? What's the
[7] description that he gives of the shooter? In
[8] his statement you heard Charles Tolbert testify
[9] and I don't think a whole lot more needs to be
[10] said about Charles Tolbert or the extent of any
[11] weight that you should give to his testimony.
[12] And of course that all flies into the third
[13] ring of this episode and that will be the ring
[14] of witness intimidation. Did Charles Tolbert
[15] appear an individual to you who would be
[16] intimidated by anything. That's a
[17] determination again that you make based upon
[18] your every day experience. But what does
[19] Charles Tolbert describe the shooter as looking
[20] like? Well, according to this statement on
[21] February 8th at 9:55 p.m., that's the day
[22] that's five minutes after the photographs which
[23] I'll get into later, he's asked a question:
[24]　　"Can you describe the male that shot you?
[25]　　"Answer: Slim, light skinned, short

Page 102

[1] skinny face, small head, khaki set or cargo
[2] set, tan or beige. No facial hair. Nineteen
[3] to 20 years old."
[4]　　Kyle Holman, I think the last person who
[5] testified, is the guy who is fixing the caliber
[6] or changing the caliber on his brakes inside of
[7] his driveway on this snowy day. Kyle Holman I
[8] think I just personally had a problem with
[9] somebody who under the circumstances that he
[10] said occurred that day and those circumstances
[11] I mean are somebody that's wheeling by on ice
[12] next to him in the driveway wearing a hoodie
[13] that's covering his head and everything like
[14] that and he sees this guy for however long a
[15] period that is and doesn't see him again until
[16] he comes into court and sees Johnnie Simmons
[17] and says, oh, that's him, under the
[18] circumstances. Gee, let's see you're going to
[19] testify at trial, who's the young black guy
[20] that might be charged in this case, yeah, he's
[21] the one. So I hid in my mind I just had a
[22] problem I guess with the idea that somebody
[23] could really make that identification and I
[24] guess that's what motivated me to maybe I don't
[25] know, I got in his face a little bit or I tried

Page 103

[1] to get in his face a little bit challenging a
[2] lot of things that maybe I really shouldn't
[3] have challenged. Because when you think about
[4] it he says that this individual picked up his
[5] pace when I think he heard sirens or something.
[6] Of course, God only knows how many people would
[7] pick up their pace in that neighborhood or any
[8] other number of neighborhoods when they heard
[9] sirens that they have nothing to do with the
[10] what the purpose of the what the sirens is for.
[11] He also says that this male was walking quickly
[12] up the street, crossed over, we're talking
[13] about the 1400 block of Johnson Street where
[14] Kyle Holman was making these observations. So
[15] that would be on the north side of Stenton
[16] Avenue. He says that the person walks through
[17] the driveway between Johnson and Duval on the
[18] 1400 block. The person then crosses the next
[19] street which would be Mansfield according to
[20] this map, walked 12 or 13 houses and then makes
[21] a left turn towards Johnson Street. Now, he's
[22] in the 1500 block of Johnson Street. The
[23] reason I'm saying, well, maybe the guy actually
[24] can identify the guy is because obviously
[25] Johnnie Simmons you heard evidence lives in

Page 104

[1] that neck of the woods right around that area
[2] 12 or 13 houses probably is 15, 20 something
[3] Johnson Street. So maybe that was Johnnie
[4] Simmons that he saw that maybe I shouldn't have
[5] tried to lip him around a little bit with
[6] inconsistencies. The reason for that would be
[7] that was like right while it was happening.
[8] His description wasn't of a guy wearing a khaki
[9] or a cargo set. It was a description of a guy
[10] wearing silver, black, I think he said with a
[11] silver shine to them, jeans. And you remember
[12] I forget what he characterized it as decorator
[13] jeans but I don't know. But I think he took
[14] from that that I was suggesting something
[15] racial about it and I just really didn't know
[16] what the term was he was using. He said, well,
[17] these are jeans that African American males
[18] would wear. Okay. That's fine. They weren't
[19] khaki or tan cargo pants, were they, or let
[20] alone a set because that's what Charles Tolbert
[21] said was worn by the person who shot me. Kyle
[22] Holman gives a description and we heard his
[23] description played on police radio even. That
[24] description was he said I think I recall his
[25] words exactly, he said, well, as he's talking

Page 105

[1] to the 911 operator, I'm five, ten, he's about
[2] my height. Well, last time we all know that
[3] five, five and five, ten is pretty significant
[4] difference. But that's not going to stop Kyle
[5] Holman because he says, well, it's the ice in
[6] the driveway that caused me to think that he
[7] was five inches taller than he really is.
[8] Again if that was Johnnie Simmons and he was
[9] walking away from that area and he was walking
[10] toward his house he sure wasn't wearing the
[11] type of clothing that Charles Tolbert said the
[12] shooter was wearing and so now let's go get to
[13] Charles Tolbert's testimony.
[14]    Charles Tolbert you recall that Detective
[15] Acerenza said, I brought the photographs in,
[16] this photoarray. That was marked already as
[17] C-10. I asked Charles Tolbert if he could
[18] identify and point to anybody in there that may
[19] have been involved. The detective said so he
[20] pointed to I think he said number six, Johnnie
[21] Simmons' photograph. He was asked a question,
[22] the detective, well, why did you just give him
[23] the photograph initially and ask him. The
[24] detective's response was, well, I didn't want
[25] them to mess around with the photoarray. I

Page 106

[1] wanted to see what they said first. So lo and
[2] behold the point of the fingering was suppose
[3] to be to Johnnie Simmons. What does Charles
[4] Tolbert do when he's handed the photograph and
[5] asked to circle that person, he circles two
[6] people. What is his response, Charles Tolbert,
[7] to the question like why did you do that? His
[8] response is, well, he may have been the guy
[9] also. That's the detective's testimony. Do
[10] you recall? One of the things in Charles
[11] Tolbert's statement that I suggest should give
[12] you pause as it relates to this case and this
[13] investigation is the metamorphosis, the big
[14] change from in a matter of a couple of pages.
[15] From Charles Tolbert's statement that don't
[16] know this guy Johnnie Simmons, never saw him
[17] before. Just so it's not only my recollection
[18] in page two of the exhibit, this is right after
[19] he's asked the question, can you describe the
[20] male that shot you. The answer was I said
[21] before that was somebody wearing beige or khaki
[22] set. It says not just pants, cargo khaki set
[23] or cargo set, tan or beige. So then the next
[24] question is, have you ever seen him before.
[25] What's Charles Tolbert's answer: No. Then

Page 107

[1] he's questioned how about the second photograph
[2] and everything like that. He said, I was
[3] scared. Does that make a whole lot of sense to
[4] you, I'm scared, so I'm going to circle two
[5] photographs. It makes no sense whatsoever,
[6] ladies and gentlemen. But we go from the
[7] answer, no, I've never seen this person before
[8] to now we get a question by the detective a
[9] couple after that, I showed you a photoarray
[10] where they photographed, did you see the person
[11] that shot you in the photoarray? Answer: I
[12] think the one in the bottom is the one that
[13] shot me. Now that I think about it his name is
[14] Johnnie. I think he's the one that shot me.
[15] Out of the blue he just as he's in bed there
[16] hours after being shot five times out of the
[17] blue suddenly he realizes. Did I just tell you
[18] I never saw that person before. Not only had I
[19] not seen him before, but I know his name and he
[20] was the young boy that has been around for a
[21] few years. Just flip that switch and suddenly
[22] Charles Tolbert is on the same track of the
[23] anonymous phone call. What does he say,
[24] Charles Tolbert, when he comes to this person
[25] who I guess the suggestion would be that he's

Page 108

[1] scared out of his boots, he says, he's not the
[2] guy that did it. I think it may have been
[3] number four. He says I'm not sending an
[4] innocent person to jail. I'm not telling you
[5] Johnnie Simmons was involved in the case. But
[6] we're still damning those torpedos. This is
[7] where we're going and this is what we have and
[8] this is all that genesis of all of this is an
[9] anonymous phone call. His Honor is going to
[10] tell you that the only purpose and the only
[11] reason you can hear that anonymous phone call
[12] was because that showed the basis for the
[13] police making an arrest of Johnnie Simmons.
[14] They didn't just pick Johnnie Simmons out of
[15] the blue, somebody gave them a name of Johnnie
[16] Simmons. Your Honor is also going to tell you
[17] that statement can't be used as evidence of
[18] guilt of Johnnie Simmons. That statement for
[19] all we know could have been made by the
[20] shooter. There's no reliability in that
[21] statement whatsoever. The only reason that
[22] it's before you is because it demonstrated why
[23] it is that Johnnie Simmons out of the blue got
[24] picked up. He doesn't match any descriptions.
[25] There's no witness saying that Johnnie Simmons

Page 109

[1] was the person inside the store or the person
[2] out on the street or the person that ran away.
[3] You might have evidence from Kyle Holman that
[4] Johnnie Simmons is the guy who was walking
[5] north toward Cheltenham Avenue minutes after
[6] the incident occurred as opposed to south
[7] toward Center City not on Duval Street, but in
[8] a driveway. You might have that evidence. You
[9] might have that evidence that it was Johnnie
[10] Simmons he wasn't wearing the clothing
[11] described by anybody in this case that the
[12] shooter was wearing silver pants, black hoodie.
[13] He got the works. How many people do you think
[14] in Philadelphia wear black hoodies. How many
[15] people do you think might have braids or corn
[16] rows in Philadelphia?
[17]      We got a letter from Charles Tolbert and
[18] you heard evidence that we provided that letter
[19] to the district attorney from Charles Tolbert.
[20] That didn't just land on the district
[21] attorney's desk. That was provided by us. So
[22] why does Charles Tolbert say put a thousand
[23] dollars on my books and I'll be quiet or I
[24] won't testify against you and then still come
[25] in and say what he tells you is the truth that

Page 110

[1] it wasn't Johnnie Simmons that shot him. Well,
[2] he says I'm a hustler. I think we know that.
[3] I think we know that he's in jail now. We know
[4] from Gerald Wright that he had just got out of
[5] jail when he was in the market for a cell
[6] phone. And we know that when he was arrested
[7] he had 38 bags of a green leafy substance on
[8] his possession. I'm a hustler. I'm looking to
[9] make money. Well, why the district attorney
[10] asked him would you say if you don't put that
[11] money on my books I'm going to come in and say
[12] that you're the shooter. Well, because in case
[13] I got jammed up with this thing I was going to
[14] say that he was the shooter. I wasn't going to
[15] be out there hanging on a limb trying to extort
[16] somebody for money so I would tell them the
[17] truth if they paid me. So I'm just going to
[18] say in my letter that the truth is that you
[19] shot me and if you don't pay me the money I'm
[20] covered because I already said that in my
[21] letter. This is the type of person that you
[22] would rely upon for what? What does Charles
[23] Tolbert might tell you would you take to the
[24] bank as being worthy of belief. That's what
[25] this is all about. You're fact finders in this

Page 111

[1] case. You have to determine from all of the
[2] evidence presented who is worthy of my belief.
[3] That's the starting point. You have to decide
[4] in my every day world would I believe what this
[5] guy is trying to sell me. Because if you don't
[6] get past that then you don't even have to
[7] concern yourself with the burden of proof in a
[8] criminal prosecution because His Honor told you
[9] initially and will instruct you as to what that
[10] is. Because as Johnnie Simmons sits there and
[11] as every other accused individual in the county
[12] sits in that chair he has a presumption of
[13] innocence. You go in to deliberation giving
[14] Johnnie Simmons and any other accused one foot
[15] up in the game. He's presumed to be innocent.
[16] It's the Commonwealth by its evidence that has
[17] the burden of proving guilt in this and every
[18] other criminal prosecution beyond a reasonable
[19] doubt.
[20]     Again, I'm jumping ahead past the
[21] evidence, but before I forget this, because I'm
[22] getting too old I guess, Johnnie didn't
[23] testify. And His Honor is going to tell you
[24] and you were told initially and in your
[25] questionnaires you all agreed I guess after

Page 112

[1] learning the law you did initially that you
[2] can't draw any adverse inference against the
[3] person and accused for not testifying. That
[4] makes perfect sense for any number of reasons
[5] if we look at the logic involved. The
[6] Commonwealth has the burden of proving guilt
[7] beyond a reasonable doubt. So if the defense
[8] has no burden how could you hold it against the
[9] defense for not going forward with any
[10] evidence. They don't have a burden to prove
[11] anything. So doesn't it logically make sense
[12] that a person who stands accused and doesn't
[13] have to present any evidence that you shouldn't
[14] hold it and the law says you can't hold it
[15] against the person for not doing that. No. He
[16] has a right like everybody to stand here and
[17] say you're bringing this case against me,
[18] you're challenging me based upon this evidence,
[19] you prove this to a jury of peers beyond a
[20] reasonable doubt and I'll live with their
[21] verdict whatever it is.
[22]     So we've got the five to seven minute
[23] embrace by Johnnie Simmons' mother. I don't
[24] want to beat a dead horse, but we've already
[25] been down the road in terms of what five

Page 113

[1] minutes encompasses, let alone five to seven.
[2] When I asked I honestly don't recall which one,
[3] whether it was Officer Alexander or Officer
[4] Long. They were both on target. One said five
[5] minutes and one said seven. I said kind of
[6] like really five minutes. Yeah, five minutes.
[7] Now, if you had the opportunity to see what
[8] five minutes is and how much hot air I can give
[9] you in five minutes you think an embrace
[10] outside took five minutes. Wouldn't you think
[11] it was more consistent with what Gerald Wright,
[12] the guy who's sitting around here for how many
[13] days now so he can tell you what was involved
[14] out there. You think it's more consistent with
[15] what he said occurred. What's that all about
[16] again that's one of the rings. The ring here
[17] that we're supposed to be focused on is did
[18] Johnnie Simmons shoot Charles Tolbert and are
[19] you convinced beyond a reasonable doubt on
[20] that. I'm not faulting anybody, if I was
[21] prosecuting the case maybe I'll throw that
[22] stuff out there too but it may be relevant if
[23] you think there's some legs on that testimony
[24] about five minute embraces and everything like
[25] that well maybe you should hear that. But I'm

Page 114

[1] going to suggest to you that that's ridiculous.
[2] We got that in there and then we have the
[3] intimidation factor in here. Everybody is
[4] intimidated. I'm not blaming anybody if they
[5] are intimidated in this kind of a case. If
[6] somebody is being shot down the street from
[7] where I live I might be a little afraid. My
[8] fear may have no basis whatsoever in reality,
[9] but if that's who I am I'm not faulting anybody
[10] for that. But what does that have to do with
[11] the price of eggs. Nothing, ladies and
[12] gentlemen, nothing at all with regard to
[13] description. What evidence is there of Johnnie
[14] Simmons as being involved in this shooting.
[15] Nothing.
[16]     When you are down in that jury
[17] deliberation room this is what's going to
[18] happen. There will be 30 other things that
[19] when I sit down I'm going to say, geez, I can't
[20] believe I forgot to mention this. The problem
[21] is I guess or the reality is, it might not be a
[22] problem, once I sit down I can't get back up so
[23] that's kind of why I just need to throw out to
[24] you whatever I can. The rules say that I
[25] address you first and then the Commonwealth has

Page 115

[1] the opportunity to address you. But back again
[2] to the address I have when you were in the jury
[3] selection room there were some people that were
[4] in that jury room that was sent out to civil
[5] courtrooms over in City Hall. Obviously you
[6] folks came up to the Criminal Justice Center
[7] and you were selected to sit on this jury.
[8] There are different burdens of proof involving
[9] various types of litigation. In a civil
[10] prosecution generally a civil prosecution will
[11] be the type where I'm involved in an automobile
[12] accident. I hit you and because I went through
[13] a light you got injured. So you're going to
[14] sue me because you're saying I breached a duty
[15] to you, a duty of care, and I was negligent and
[16] any negligence caused you injuries and you
[17] should be compensated for that. These people
[18] maybe you were sharing coffee with down there
[19] before you got selected and they may be over in
[20] City Hall right now listening to one of those
[21] types of cases. In those types of cases you
[22] have a plaintiff which would be the moving
[23] party, that would be the Commonwealth
[24] counterpart, then you have a defendant.
[25] There's still a defendant in a criminal case.

Page 116

[1] So then the court will instruct the jury at the
[2] conclusion of the evidence. As a fact finder
[3] you believe that the plaintiff, the moving
[4] party, has met its burden ever so slightly. If
[5] you find that the plaintiff has proven its case
[6] by a preponderance of the evidence, tip the
[7] scales, then your verdict should be for the
[8] moving party, the plaintiff. That's what the
[9] burden would be for those people before you who
[10] were selected down here. Then you have a
[11] prosecution where for example the state
[12] attempting to take a child from its mother
[13] saying that the mother is not fit and the
[14] child's best interest is to serve as a ward of
[15] the state. In that type of prosecution the
[16] moving party will be a representative of the
[17] Commonwealth they would have the burden of
[18] proving not just tipping the scales by a
[19] preponderance of the evidence, but they would
[20] have a burden of proving by what's known as
[21] clear and convincing evidence that that child's
[22] interests are better served as a ward of the
[23] state than with its parent. In a criminal
[24] prosecution in this country where the
[25] Commonwealth is attempting to deprive a citizen

Page 117

[1] of his or her liberty for even a day the
[2] Commonwealth has to prove guilt beyond a
[3] reasonable doubt. His Honor will tell you
[4] that's the kind of doubt that would cause a
[5] reasonable person to hesitate when they were
[6] acting in matters that were important in their
[7] lives. It's a doubt that arises from the
[8] evidence or from the lack of evidence in a
[9] case. It's not a doubt that you make up. I'm
[10] going to suggest to you that you don't have to
[11] make anything up in this case to have a
[12] reasonable doubt. I'm going to suggest to you
[13] that when you view the testimony of the
[14] witnesses that were presented, when you look at
[15] the script or recall the script that was drawn
[16] between Officer Long and Detective Acerenza
[17] when you see that really the only evidence in
[18] this case is something that you can't even
[19] consider for purposes of guilt which is an
[20] anonymous call, yes, did Charles Tolbert at one
[21] point in life say Johnnie Simmons was the guy,
[22] yeah, but he brings a little bit of baggage
[23] with him. How many times do you think somebody
[24] circles two photographs and says it may have
[25] been him too. I'm going to suggest to you that

Page 118

[1] you got a reasonable doubt before you get past
[2] ten of 10:00 on February 28th based upon that.
[3]   I want to again thank you. I'm confident
[4] that you will continue with your thoughtful
[5] attention and deliberations through the Ms.
[6] Forchetti's remarks and the court's charge, Ms.
[7] Forchetti, excellent lawyer. I'm confident that
[8] after she addresses you she's going to raise
[9] certain questions. They're going to have a
[10] different spin on it than maybe I suggest to
[11] you the evidence shows or doesn't show. You
[12] can beat that as I sit there I love to have the
[13] opportunity to come up and rebut whatever those
[14] suggestions are, as I said to you, I can't do
[15] it, but I'm going to rely on your good common
[16] sense and your intelligence and your focus on
[17] the evidence that was presented in this case to
[18] answer those questions or queries on my behalf
[19] and on the behalf of Johnnie Simmons. Again,
[20] thank you. On behalf of Johnnie and personally
[21] I trust that you'll reach a verdict in this
[22] case that is fair. Not only to the
[23] Commonwealth, but also to Johnnie Simmons. And
[24] as I'm almost done but as I say that, ladies
[25] and gentlemen, His Honor will tell you that

Page 119

[1] when you go back to that jury room to
[2] deliberate in order to reach a verdict in this
[3] case in any criminal case on any charge the
[4] verdict has to be unanimous. That means all 12
[5] members of the jury have to agree. To find
[6] someone guilty you have to be convinced, all 12
[7] jurors, beyond a reasonable doubt that the
[8] person is guilty. To find someone not guilty
[9] you have to not be convinced beyond a
[10] reasonable doubt that that person was guilty.
[11] We all want you to reach a verdict in this
[12] case. We don't, any of us, want you to reach a
[13] verdict based upon horse trading. The court
[14] will give you instructions concerning how you
[15] deliberate. If you deliberate in this case and
[16] your views are different than your fellow
[17] jurors and you can't reconcile what you recall
[18] the evidence to be with what they recall the
[19] evidence to be or vice versa, you don't
[20] compromise your findings that's whether you're
[21] in a majority or in a minority solely for the
[22] purpose of reaching a unanimous verdict in a
[23] case. You listen to the views of other jurors.
[24] If you think after listening to their views
[25] that you're wrong you change your view

Page 120

[1] certainly because now you've made a conscious
[2] decision that your views were wrong. But if
[3] after deliberating you're still convinced that
[4] your views are correct and the other jurors
[5] views are incorrect you don't surrender your
[6] beliefs solely to reach a verdict in this case.
[7] That's the law. Nothing more than anyone would
[8] expect, nothing less than anyone would expect.
[9] Certainly the rules that we're governed by and
[10] that's the law even if at some point, and I'm
[11] not asking you to not reach a verdict, believe
[12] me and I'm sure Ms. Forchetti is not, but
[13] that's the law even if you can't reach a
[14] unanimous verdict on the charges.
[15]   Again, I thank you. You served in an
[16] excellent capacity so far. And believe me
[17] there are jurors that are half asleep for most
[18] of a trial and I certainly haven't observed
[19] that as being the case in this instance. So I
[20] thank you for that and I'm confident that when
[21] you follow the instructions that the court
[22] gives you that you'll reach a verdict in this
[23] case that will vindicate Johnnie Simmons
[24] because of the Commonwealth's having failed to
[25] meet its burden of proof. Thank you.

Page 121

[1]　　**THE COURT**: Thank you, Mr. Lorusso.
[2] Ms. Forchetti, you may address the jury.
[3]　　**MS. FORCHETTI**: Thank you. Good afternoon
[4] everyone. Is everyone okay, does anyone need a
[5] break?
[6]　　Do you see what's going on here? Have you
[7] seen that in this trial; what happened on
[8] February 4th was street justice. Charles
[9] Tolbert did someone wrong and he was marked.
[10] He was out for less than a month before he was
[11] gunned down in the street in broad daylight.
[12] What does that tell you? That arrogance of
[13] Johnnie Simmons to gun Charles Tolbert down in
[14] broad daylight on a Friday afternoon in the
[15] middle of a busy street. Johnnie Simmons was
[16] trying to kill Charles Tolbert. Charles
[17] Tolbert was supposed to be dead. Six holes in
[18] him. Charles Tolbert was supposed to be dead
[19] and no one was going to say boo about Johnnie
[20] Simmons being the shooter. That's what was
[21] supposed to happen. That's what was supposed
[22] to happen that day as Charles Tolbert would
[23] have been dead and all of those neighbors
[24] wouldn't have said a word about who did it.
[25] Wouldn't have had the courage to come forward

Page 122

[1] because Johnnie Simmons and his boys have so
[2] much juice in that neighborhood that that
[3] neighborhood is terrified of him. The only
[4] people willing to come forward because they
[5] didn't really want Johnnie Simmons to get away
[6] with it, they didn't want Little Johnnie to
[7] kill someone out on the street and not face the
[8] consequences of it. The only people who would
[9] speak were anonymously under anonymous
[10] conditions. The police officers wanted to
[11] protect the identity of those people. That's
[12] why Officer Long couldn't tell you who gave him
[13] that information and that information was just
[14] a tool, just an investigative tool to point
[15] them in the right direction to lead them
[16] towards the evidence and lo and behold all
[17] paths pointed back to Little Johnnie.
[18]　　Gerald Wright was cooperative until he was
[19] told you have to come down to the station to
[20] give a statement. What did Officer Long tell
[21] you, at that point he backed up, whoa, whoa,
[22] whoa, I'm not making any kind of statement. I
[23] don't want to come down. Why did the officers
[24] come by with Little Johnnie to Gerald? Because
[25] Gerald had held himself out as a witness to the

Page 123

[1] shooting until he was told you're going to have
[2] to go on record, we're going to put your name
[3] on a piece of paper and you're going to come
[4] down to the station. Then all of a sudden
[5] Gerald changed his whole game. Not that he
[6] couldn't identify anyone but that he wouldn't.
[7] That's what he told you from the stand, that he
[8] wouldn't identify anyone. What did he tell you
[9] when he first took the stand. He told you he
[10] didn't know him. He said, I don't know the
[11] defendant. Never saw him before. Then after
[12] Little Johnnie's mother follows him out after
[13] he finishes testifying to thank him for his
[14] testimony. Why is she thanking him for his
[15] testimony, because it changed. It changed
[16] because when he talked to the police about the
[17] guy that he saw coming into the store he
[18] described him as a short guy. Described him as
[19] lighter complected. What did he tell you,
[20] ladies and gentlemen, he made him taller. He
[21] made him darker. He altered his testimony.
[22] That's why she was thanking him. So he comes
[23] back in here today to try and explain it away
[24] and admits, well, I do know Johnnie. I know
[25] Little Johnnie from the neighborhood. Gerald

Page 124

[1] Wright didn't have the courage to tell you what
[2] he knew. And can you blame him. Every person
[3] that has identified Johnnie has had to be
[4] relocated by my office. The consequences, the
[5] specter of what could happen to a witness that
[6] has the courage to come forward are very real,
[7] ladies and gentlemen. The courage of Kyle
[8] Holman and the courage of Charles Tolbert are
[9] not to be overlooked. Charles Tolbert lying in
[10] that hospital bed with a big open wound to his
[11] stomach with a bullet lodged close to his heart
[12] says to the detective, I'm scared I'm not going
[13] to make it. Charles Tolbert thinks that his
[14] opportunity for revenge for street justice
[15] isn't going to come to him. So he doesn't want
[16] Johnnie to get away with it. So he tells the
[17] police however reluctantly what happened that
[18] day. As he talks it comes out more and more.
[19] Well, this is what he looks like. No, I don't
[20] know. Okay, I do know him. I know Little
[21] Johnnie from the neighborhood. He's one of the
[22] boys coming up in the neighborhood and
[23] identifies him. But when he's handed that pen
[24] that fear of what he just said hitting him like
[25] a ton of bricks he realizes I'm putting my name

Page 125

[1] to paper and I'm coming forward on this. I'm
[2] vulnerable lying here in this hospital bed.
[3] I'm vulnerable because my family still lives in
[4] that neighborhood. His courage falters ever so
[5] slightly. He quickly circles that other
[6] picture. What does Detective Acerenza tell
[7] you, that that has never happened in his
[8] career, in all the years, in all the shootings
[9] that he's investigated, hundreds of them, that
[10] was so notable to him that he made a note of
[11] it. And if this were really some kind of frame
[12] up job like the defense is asking you to
[13] believe don't you think Detective Acerenza if
[14] he was willing to stake his career on who shot
[15] Charles Tolbert would have buried that array,
[16] would have put together a new array, would have
[17] manufactured some evidence. Because that's
[18] what the defense is asking you to believe.
[19] That Detective Acerenza is willing to stake his
[20] career, stake his pension, stake his
[21] credibility because someone shot a two-bit thug
[22] like Charles Tolbert. That's not what happened
[23] here. What happened here is that Little
[24] Johnnie shot Charles Tolbert and he had the
[25] courage enough to say it. But he didn't say it

Page 126

[1] just once when he was interviewed. He said it
[2] again when he came in court. He testified. He
[3] took an oath and got up on that witness stand
[4] and pointed to him, not once, not twice, three
[5] times over the course of testimony. That's
[6] him. I'm a 109 percent sure. I don't forget
[7] faces. That's what he said.
[8]     The judge is going to charge you on the
[9] law because you see the law recognizes that
[10] witnesses sometimes lose courage when it comes
[11] to taking the stand. Sometimes they're so
[12] scared they have to face the consequences of
[13] pointing out someone that hurt them because
[14] they're afraid of that person. The judge will
[15] tell you that this testimony is substantive
[16] evidence. And what that means is that evidence
[17] is as real as if it's speaking to you from the
[18] witness stand. That Charles Tolbert's prior
[19] testimony you can rely on as real evidence.
[20] The fact that he came into court and pointed
[21] out Johnnie Simmons that that's real. That's
[22] not imaginary. He did that on that day. He
[23] was cooperative on February 8th. He was
[24] cooperative on April 26th when he testified.
[25] He was cooperative every time he talked to

Page 127

[1] Leland Kent. And then less than a month before
[2] we start meeting for trial he sends a letter to
[3] Little Johnnie, postmarked October 13th, and
[4] he's offering to purger himself. And then what
[5] happens, he tells us what he's going to do in
[6] this letter. He gives you the game plan.
[7] Getting on the stand ain't my twist. He tells
[8] you that. He says just tell me who did it.
[9] Tell me who told you to shoot me because you
[10] and I don't have any kind of beef. That's what
[11] he says. You thought you killed me, didn't
[12] you? That's what he says to Little Johnnie.
[13] What was Charles Tolbert's reaction when I read
[14] this letter to him? He was upset. He was
[15] angry. He said that was between me and him.
[16] He never thought that this letter would see the
[17] light of day. The defense had no idea, no one
[18] had any idea that Charles Tolbert was going to
[19] go south because he was cooperative.
[20]     You heard every officer testify. You
[21] heard Mr. Kent testify that he was cooperative
[22] up until he took that witness stand. But he
[23] told you what he was going to do right here.
[24] You want this shit up off you then you need to
[25] be straight up with me, Little Nigga. I know

Page 128

[1] you don't want to sit in jail. But I can be a
[2] dick head and keep you there. You want to be a
[3] killer, huh. Ha ha. Well, option number two
[4] is you can turn down this offer and go to
[5] trial. I got a bullet in my back and my hip.
[6] I also got a colostomy bag. It says testifying
[7] ain't in my blood. Like I said I lost drugs
[8] and money from the police when your dumb ass
[9] shot me. Look, you got until November 1st to
[10] get a stack put into my account and a letter
[11] saying who sent you at me. The choice is
[12] yours. Time is ticking. I know you want out
[13] of there. I want you out of there. I don't
[14] ever want to shoot you back. I just want to
[15] beat you the fuck up. That's what he says to
[16] Little Johnnie. He wants to take this back to
[17] the streets, get it out of the courts. So is
[18] it any surprise that he comes in and tries to
[19] say no, that's not him. Tries to use the magic
[20] words, I don't want an innocent man to go to
[21] jail. None of us believe that Little Johnnie
[22] is innocent. The question for you all to
[23] decide and the only question, there are no mini
[24] trials here. There is one question to answer
[25] and that is did Little Johnnie shoot Charles

Page 129

[1] Tolbert. That's it. That's the question I
[2] need you to answer. That's what I want you
[3] focussed on. Every little bit of evidence in
[4] this case when you add it up tells you that,
[5] yes, he did.
[6]     Now, the judge is going to instruct you on
[7] direct and circumstantial evidence. He's going
[8] to tell you that circumstantial evidence can be
[9] enough to convict someone beyond a reasonable
[10] doubt. But you don't need a video, that you
[11] don't need DNA, that you don't need
[12] fingerprints. When you add up all those little
[13] bits and pieces if they convince you beyond a
[14] reasonable doubt that Johnnie Simmons is the
[15] one that shot Charles Tolbert then you have to
[16] convict him. There's a lot of circumstantial
[17] evidence in this case.
[18]     He is in the neighborhood when it happens.
[19] Kyle Holman sees him running, sees him speeding
[20] up when the sirens are heard, running away from
[21] the scene of the crime within two minutes of
[22] the shots being fired. Right on that ice with
[23] his hands in his hoodie which kind of tells me
[24] that's kind of weird because why would you be
[25] running on ice with hands in your pockets. Do

Page 130

[1] you think maybe he was holding a gun in there?
[2] That gun was long gone before the police even
[3] stopped him in the barbershop. The gun was
[4] disposed of, that's a criminal law 101, get rid
[5] of the gun, get rid of any physical evidence
[6] that will tie you to the crime. The gun is
[7] gone. His outfit is changed. He's wearing
[8] something completely different. Counsel
[9] focussed a lot on the clothes described in this
[10] case. Why do defense attorneys love
[11] descriptions because they are so often wrong.
[12] See because description is merely a tool. It's
[13] a tool to get you to recognize someone whether
[14] or not you describe someone accurately means
[15] nothing if you don't recognize the person. Let
[16] me ask you how many people know how much a
[17] dollar bill weighs. Does anyone? How many
[18] ounces? Less than an ounce. How long is a
[19] dollar bill? How wide is it? How many times
[20] does the word "one" appear on the dollar bill?
[21] Do any of you know? But how many of you would
[22] tell me that you don't recognize this. Every
[23] single one of you recognizes this. There is a
[24] vast gulf between description and recognition.
[25] I give you another example. Last year I went

Page 131

[1] to the movie theater. Rainy Friday night. I
[2] had my hair pulled back in a ponytail. I was
[3] wearing a hoodie. The cashier asked me for
[4] identification because I was seeing a rated R
[5] movie. She wanted to make sure that I was over
[6] the age of 18. I laughed at her and I said,
[7] thank you, you made my day. She was six inches
[8] from me and yet if she had been asked to
[9] describe me she would have described me in my
[10] late teens early 20s. I appreciate the
[11] compliment but she would have been wrong but
[12] does that mean she wouldn't have recognized me
[13] if she had seen me again. Description is only
[14] a tool. There was no doubt in Kyle Holman's
[15] mind that he recognized Little Johnnie. No
[16] doubt at all. He was describing him on the
[17] phone as he's running by to the police because
[18] he thinks it's unusual. He had no idea about
[19] what was going on with Charles Tolbert. He
[20] just thought it was strange that after hearing
[21] gunshots he sees this young guy running down
[22] the ice with his hands in his pocket. So he's
[23] trying to be a good citizen so he calls the
[24] police and he's describing him. He gets his
[25] height wrong. Does that mean he didn't

Page 132

[1] recognize him. Think about the consequences of
[2] Kyle Holman recognizing Little Johnnie. Do you
[3] really think he wanted to recognize him?
[4] Having to relocate his family, to pack up and
[5] leave the house that he loves. No. He did it
[6] because that's right. That was the truth. He
[7] was doing his duty. He recognized him because
[8] that's who he saw. That is another piece of
[9] circumstantial evidence tying Johnnie Simmons
[10] to the shooting. It's not merely a coincidence
[11] that Kyle Holman sees him running away, away
[12] from the direction of the shooting towards his
[13] house. Kyle Holman has no horse in this game.
[14] Has nothing to gain by recognizing him. Has a
[15] lot to lose by recognizing him. But he
[16] recognizes him. And he comes in and he tells
[17] you that's him. I'm completely certain.
[18]     The detectives and officers in this case
[19] have nothing to gain by arresting Johnnie
[20] Simmons. They are simply following the
[21] evidence. How do we know that the officers are
[22] merely doing their jobs? Look at the
[23] investigation into Kalif Collins. There is
[24] someone that Charles Tolbert identified as I
[25] think that's the setup man. Detective Acerenza

Page 133

[1] looks into it, doesn't find enough evidence,
[2] doesn't find enough corroboration. So he
[3] doesn't arrest him because it's the right
[4] responsible thing to do. Just pointing someone
[5] out in and of itself is not enough. That's
[6] what the detective tells you. We don't have
[7] any evidence of Little Johnnie knowing Kalif
[8] Collins. We don't have any evidence of any of
[9] the other witnesses who talk about the second
[10] guy of their recognizing Kalif Collins. So he
[11] may have been the person that lured Charles
[12] Tolbert out there so he can get shot in the
[13] street but we don't know. The investigation
[14] into Johnnie Simmons took many paths. But all
[15] of those paths lead back to him. That's how
[16] you can know that we have the right guy.
[17]     Look, I'm not asking you to invite Charles
[18] Tolbert over to your house or have dinner with
[19] him or Facebook friend him. I'm not asking you
[20] to do any of those things. Charles Tolbert is
[21] who he is. He told you he's a thug. He's a
[22] criminal. But that's who Johnnie Simmons chose
[23] to shoot that day. He had a motive to do so.
[24] But that doesn't mean that Charles Tolbert can
[25] be gunned down in the street and we're going to

Page 134

[1] just let it happen, just going to let him walk
[2] by. We're going to let Johnnie walk because
[3] Charles Tolbert is not a savory person. That's
[4] not justice. In Philadelphia we don't allow
[5] shooters to get away with it because they shoot
[6] other criminals. That's not how it works.
[7] That's the company that Johnnie Simmons keeps.
[8] One of the young boys in the neighborhood
[9] coming up that's how Charles Tolbert says he
[10] knows him. So the fact that Charles Tolbert is
[11] not a very nice person doesn't make him any
[12] less of a victim. The law protects us all.
[13] His word is not worth any less because he has a
[14] criminal background. We didn't hide that from
[15] you. I didn't try to build him up and make him
[16] more than what he was. He is who he is. And
[17] he also saw what he saw. As close as the court
[18] reporter and I are to each other is the
[19] distance that Johnnie Simmons says or that
[20] Charles Tolbert says Johnnie Simmons was to him
[21] when he shot him. Nothing in the way between
[22] them, just bam, bam, bam, bam, left him to die.
[23] Thought he was going to die. But it's only
[24] because of the excellent medical care that he
[25] received that Charles Tolbert was able to speak

Page 135

[1] to the police and make an identification.
[2] Charles Tolbert wanted you to hate him, wanted
[3] you not to believe him. He was working at it.
[4] He was trying to get you to, don't believe me,
[5] don't listen to me, because he wants to handle
[6] this out on the street. Don't you dare let
[7] that happen. Because when you look at the
[8] evidence in this case this evidence convinces
[9] you that Little Johnnie shot him. Don't you
[10] dare take the easy way out and say I want
[11] fingerprints, I want a video. The question is
[12] not about what you want in terms of evidence.
[13] If I had that Johnnie would have pled guilty on
[14] Monday and I would have been out Christmas
[15] shopping. The evidence is about what you have
[16] and what you have is enough. What you have is
[17] Charles Tolbert's in-court identification.
[18] What you have is his photographic
[19] identification. What you have is his prior
[20] testimony against him. What you have is the
[21] letter that he wrote. This says it all. This
[22] letter says everything. Because he thought
[23] this was private. These are his own private
[24] thoughts. We get a glimpse into the mind of a
[25] common street thug. And not for one minute

Page 136

[1] does he ever say that anyone other than Johnnie
[2] shot him. Yo, I'm going to make this nice and
[3] clear for you. For one I'm going to say that
[4] was some nut shit you did. Right there. Right
[5] in the very opening lines of the letter. If
[6] they come up here and do this I won't testify
[7] on you in court. I will let you back out and
[8] keep it street. So Charles Tolbert is asking
[9] you to keep it street. And I'm telling you
[10] that your obligation as jurors is to keep it
[11] here in court. Don't let it go back to the
[12] street. This evidence here is enough. By
[13] telling Johnnie Simmons he's not guilty that's
[14] letting it go right back out into the street
[15] and letting this cycle continue.
[16]     What happened on February 4th was a
[17] cold-blooded shooting. The evidence demands
[18] that you call it as such. He's charged with
[19] attempted murder, Johnnie Simmons. That
[20] requires a specific intent to kill. Now, he
[21] didn't need to sit there and draw out a game
[22] plan and map it all out. Specific intent to
[23] kill can be formed really, really quickly. The
[24] amount of time it takes you to decide to kill a
[25] bug. There's your specific intent to kill.

Page 137

[1] The judge will instruct you that aiming a
[2] deadly weapon such as a gun at a vital part of
[3] someone's body you can infer that there's a
[4] specific intent to kill. When you shoot
[5] someone between four and six times you're not
[6] just trying to scare them. You're trying to
[7] kill them, to eliminate them from the face of
[8] this earth.
[9] The defendant is also charged with
[10] aggravated assault, inflicting serious bodily
[11] injury. There is absolutely no dispute that
[12] remaining in the hospital for three weeks and
[13] receiving this type of medical treatment to
[14] generate over a thousand pages of medical
[15] records is anything but serious bodily injury.
[16] There's no dispute about that. The level of
[17] intent required there is knowingly,
[18] intentionally, or recklessly. When you fire a
[19] firearm at someone from three feet away you are
[20] knowingly or intentionally or even recklessly
[21] causing them serious bodily injury. Either you
[22] don't care how seriously injured they are, you
[23] want to cause serious bodily injury, and you
[24] actively try and do it. That's what happened
[25] in this case.

Page 138

[1] The defendant is charged with conspiracy.
[2] Meaning when that second guy, the setup guy, we
[3] don't need to prove who he is, just that the
[4] defendant acted with another person when they
[5] conspired together to lure Charles Tolbert out
[6] of that store onto the street that there was a
[7] conspiracy to commit either attempted murder or
[8] aggravated assault.
[9] The defendant is charged with unlawfully
[10] possessing a firearm. You heard he didn't have
[11] a license to carry. He's not allowed to have a
[12] firearm on the streets of Philadelphia.
[13] Therefore, in possessing one and using it to
[14] shoot Charles is illegal. Just possessing it
[15] was illegal.
[16] He's also charged with possessing an
[17] instrument of crime. That's when you use
[18] something, in this case a gun, to commit a
[19] crime. That's an instrument of crime, the gun
[20] becomes an instrument of crime. Not only is it
[21] used illegally, but it's used to commit a
[22] crime. the defendant is charged with that.
[23] All the witnesses in this case they gave
[24] you what they could. The neighbors gave you
[25] what they could. They gave the police what

Page 139

[1] they could. They didn't want to come forward.
[2] They didn't want to give names, but they
[3] pointed the police in the right direction.
[4] Kyle Holman gave he what he could. Gerald
[5] Wright, I don't think he gave you what he
[6] could, but I think it's been pretty well
[7] established that he had some motive going on,
[8] some bias as to why his testimony was changed,
[9] was altered, was not what it could have been
[10] however much he tried to shy away from it.
[11] So this is not a perfect case, may not
[12] have all the evidence you want, but it's
[13] enough. That feeling in your gut that you know
[14] Johnnie Simmons is the shooter here that's
[15] beyond a reasonable doubt where you just know
[16] that he did it. Same as you make any other big
[17] decision in your life, buying a house. You
[18] look at a house, it's in the right
[19] neighborhood, the right school district, the
[20] neighbors seem really nice. Maybe the
[21] wallpaper in the kitchen is really ugly and the
[22] toilet runs when you flush it. That house may
[23] not be perfect, but is that enough. It has
[24] what you need. So you make that decision. You
[25] overcome that doubt. And you say, well, the

Page 140

[1] house isn't exactly everything I wanted, but is
[2] that what I need. You make that decision. The
[3] decision you make to get married, to find
[4] someone you love and you want to spend the rest
[5] of your life with. Some people don't always
[6] make the right decision. But you ask those of
[7] us who are happy what it is. It's usually not
[8] one thing. It's usually not, oh, he's so
[9] fabulously handsome or she's so tremendously
[10] brilliant. It's a million tiny little things
[11] that when you add up give you the right answer
[12] that feeling in your gut you just know that
[13] what you're doing is right. When you look at
[14] the evidence in this case you just know that
[15] Johnnie Simmons is the shooter. You know
[16] because everything that you consider leads you
[17] back to him.
[18] Charles Tolbert's very reluctance to face
[19] Johnnie Simmons in court in this trial tells
[20] you that it's the right guy. That fear of
[21] facing him tells you that it's the right guy,
[22] that he didn't want to do it, that that courage
[23] failed him at the last minute. Luckily the
[24] detectives did a thorough job investigating and
[25] Charles Tolbert testified so openly before that

Page 141

[1] that gives you the tools you need to come to
[2] the right verdict on this case.
[3]    I'm asking you, I'm counting on all of you
[4] to have the courage to do what Kyle Holman did,
[5] to have the courage to do what Charles Tolbert
[6] did when they pointed at Johnnie Simmons,
[7] knowing about his cred in the neighborhood,
[8] knowing his posse, knowing about the
[9] consequences that they had the courage to say
[10] that's him. I'm asking all of you to have the
[11] courage to do what the evidence compels you to
[12] do and that's convict this defendant. Don't
[13] keep it street. Keep it here in the courtroom
[14] and you use that verdict, veredicto, to speak
[15] the truth, and call him what he is, guilty.
[16] Thank you.
[17]    THE COURT: Thank you, Ms. Forchetti.
[18] Mr. Ferguson, make the appropriate
[19] announcement.
[20]           - - -
[21]    (Court crier announced the
[22] commencement of jury instructions.)
[23]           - - -
[24]    THE COURT: Ladies and gentlemen of the
[25] jury, now that all the evidence has been

Page 142

[1] presented in this case and the attorneys for
[2] both sides have made their closing arguments it
[3] becomes my duty to instruct you in the law
[4] which you must on your oath both accept and
[5] apply to the facts as you determine the facts
[6] to be in reaching your verdict. Now, in doing
[7] so in instructing you in the law I will be
[8] reading from a written charge as almost all
[9] judges do to make certain that what I'm telling
[10] you is in accordance with the law and is both
[11] standard and uniform. I advise you of this
[12] because there is a tendency not to pay close
[13] attention to anyone who is reading to you.
[14] However, because it's most important that the
[15] law in which I now instruct you be accurate and
[16] in accordance with the laws of this
[17] Commonwealth I will be reading. I give you
[18] those warnings and nevertheless ask you to pay
[19] full attention.
[20]    If you understand that what I'm about to
[21] say for perhaps the next 30 minutes, 45
[22] minutes, will provide you with the tools that
[23] you need to make your decision in this case
[24] then you will understand the importance of what
[25] I have to say and the necessity for you to pay

Page 143

[1] full attention despite the fact that I'm
[2] reading. As I've said, ladies and gentlemen,
[3] and it bears repeating you must accept and
[4] apply only the law in which I instruct you.
[5] You may not apply any other law which you know
[6] or think you know. If you jurors wish
[7] instructions in the law in addition to these
[8] that I give you presently or if at some later
[9] time you desire clarifications of these
[10] instructions then you may, through your
[11] foreperson, send an appropriate written request
[12] and I will accommodate you.
[13]    As I mentioned at the outset, ladies and
[14] gentlemen, it is my responsibility as the
[15] presiding judge to decide all questions of law
[16] and you must accept and follow my rulings and
[17] instructions in matters of law. I am not,
[18] however, I am not the judge of the facts in
[19] this case. So it is not for me to decide what
[20] the facts are concerning the charges against
[21] this defendant. You jurors, the jury, is the
[22] sole judge. The jury is the only judge of the
[23] facts. So it will be your collective
[24] responsibility to weigh the evidence and based
[25] on that evidence and of course any logical

Page 144

[1] inferences which flow from that evidence you
[2] must determine the facts, apply the rules of
[3] law which I now impart to you to those facts,
[4] and then decide whether the defendant has or
[5] has not been proven guilty beyond a reasonable
[6] doubt to the charges made against him. In your
[7] determination of the facts you are to consider
[8] only the evidence which has been presented in
[9] this courtroom and again, of course, the
[10] logical inferences which have derived from that
[11] evidence. You are not to rely upon supposition
[12] or guess on any matters which are not in
[13] evidence. You should not regard as true any
[14] evidence which you find to be incredible even
[15] if it is uncontradicted. Your determination of
[16] the facts should not be based upon sympathy for
[17] or prejudice against either the defendant or
[18] the complainant nor on which attorney made the
[19] better speech nor on which attorney you liked
[20] better.
[21]    Now, jurors, in the course of these
[22] instructions I may, but if I do so at all, it
[23] will be to a very limited extent, I may refer
[24] to some particular evidence in this case. I
[25] certainly do not propose to refer to all of the

Page 145

[1]    evidence.  I leave that to your recollection.
[2]    Because as I said previously and it bears
[3]    repeating it is your recollection and yours
[4]    alone which must govern during your
[5]    deliberations.  So you are not bound by my
[6]    recollection of the evidence nor are you bound
[7]    by the recollection of the attorneys as
[8]    expressed in their arguments.  Nor are you to
[9]    conclude that any evidence which I call to your
[10]   attention or which the attorneys have already
[11]   called to your attention is the only evidence
[12]   which you should consider.  You are fact
[13]   finders in this case.  It is your
[14]   responsibility to consider all the evidence
[15]   which you believe material when deliberating on
[16]   your verdict.
[17]        Ladies and gentlemen, a fundamental
[18]   principle of our system of criminal law is that
[19]   a defendant is presumed to be innocent.  So the
[20]   fact that Johnnie Simmons was arrested and is
[21]   charged with crimes is not evidence of his
[22]   guilt.  Furthermore, the defendant is presumed
[23]   to remain innocent throughout the trial unless
[24]   and until you conclude based upon a careful and
[25]   impartial consideration of the evidence that

Page 146

[1]    the Commonwealth has proven him guilty beyond a
[2]    reasonable doubt to the charge made against
[3]    him.  It is not the defendant's burden to prove
[4]    that he is not guilty.  Instead it is the
[5]    Commonwealth that always has the burden of
[6]    proving each and every element of the charges
[7]    charged and that the defendant is guilty of
[8]    those crimes beyond a reasonable doubt.  So a
[9]    person accused of a crime is not required to
[10]   present evidence or to prove anything in his
[11]   own defense.  If the evidence presented fails
[12]   to meet the Commonwealth's burden then your
[13]   verdict must be not guilty.  On the other hand,
[14]   if the evidence does prove beyond a reasonable
[15]   doubt that the defendant is guilty of the
[16]   crimes charged then your verdict should be
[17]   guilty.
[18]        Although the Commonwealth has the burden
[19]   of proving that the defendant is guilty this
[20]   does not mean that the Commonwealth must prove
[21]   its case beyond all doubt or to a mathematical
[22]   certainty.  Nor must the Commonwealth
[23]   demonstrate the complete impossibility of
[24]   innocence.  A reasonable doubt is the doubt
[25]   that would cause a reasonably careful and

Page 147

[1]    sensible person to pause, hesitate, or refrain
[2]    from acting upon a matter of highest importance
[3]    in his or her own affairs or to his or her own
[4]    interests.  A reasonable doubt must fairly
[5]    arise out of the evidence that was presented or
[6]    out of the lack of evidence presented with
[7]    respect to some element of each of the crimes
[8]    charged.  A reasonable doubt must be a real
[9]    doubt.  It may not be an imagined one nor may
[10]   it be a doubt manufactured to avoid carrying
[11]   out an unpleasant duty.  So, ladies and
[12]   gentlemen, to summarize, you may not find the
[13]   defendant guilty based upon a mere suspicion of
[14]   guilt.  The Commonwealth has the burden of
[15]   proving the defendant guilty beyond a
[16]   reasonable doubt.  If the Commonwealth has met
[17]   that burden then the defendant is no longer
[18]   presumed to be innocent and you should find him
[19]   guilty.  On the other hand, if the Commonwealth
[20]   has not met its burden then you must find the
[21]   defendant not guilty.
[22]        You must consider and weigh the testimony
[23]   of each witness and give it such weight as in
[24]   your judgments it fairly entitled to receive.
[25]   The matter of the credibility of the witness,

Page 148

[1]    that is whether his or her testimony is
[2]    believable and accurate in whole or in part is
[3]    solely for your determination.  As judges of
[4]    the facts you are the sole judges of the
[5]    credibility of the witnesses.  This means you
[6]    must judge the truthfulness and accuracy of
[7]    each witness's testimony and decide whether you
[8]    believe some, all, or none of that testimony.
[9]    I shall mention factors which bear on that
[10]   determination and which you may and should
[11]   consider during your deliberations.  They
[12]   **include the following**:
[13]        Whether the witness has an interest in the
[14]   outcome of the case or has friendship or
[15]   animosity toward other persons concerned in the
[16]   case.  The behavior of the witness on the
[17]   witness stand and his or her demeanor, his or
[18]   her manner of testifying and whether he or she
[19]   shows any bias or prejudice which might color
[20]   his or her testimony.  The accuracy of his or
[21]   her memory and recollection.  His or her
[22]   ability and opportunity to acquire knowledge of
[23]   or to observe the matters concerning which he
[24]   or she testifies.  The consistency or
[25]   inconsistency of his or her testimony as well

Page 149

[1] as its reasonableness or unreasonableness in
[2] light of all of the evidence in the case. If
[3] you conclude that one of the witnesses
[4] testified falsely and did so intentionally
[5] about any fact which is necessary to your
[6] decision in this case then, for that reason
[7] alone, you may, if you wish, disregard
[8] everything that the witness said. However, you
[9] are not required to disregard everything that
[10] the witness said for this reason. It is
[11] entirely possible that a witness may have
[12] testified falsely and intentionally in one
[13] respect but truthfully about everything else.
[14] If you find that to be the situation then you
[15] may accept that part of his or her testimony
[16] which you find to be truthful and which you
[17] believe and you may reject that part which you
[18] find to be false and not worthy of belief. If
[19] you find there were conflicts in the testimony
[20] you, the jury, you have the duty of deciding
[21] which testimony to believe. But you should
[22] first try to reconcile, that is fit together
[23] any conflicts in the testimony if you can
[24] fairly do so. Discrepancies in and conflicts
[25] between the testimony of different witness may

Page 150

[1] or may not cause you to disbelieve some or all
[2] of their testimony. But you should remember
[3] that two or more persons witnessing an incident
[4] may see or hear it happen differently. Also it
[5] is not uncommon for a witness to be innocently
[6] mistaken in his or her recollection of how
[7] something happened. If you cannot reconcile a
[8] conflict in the testimony it is up to you to
[9] decide which testimony, if any, to believe and
[10] which to reject as not true or inaccurate. In
[11] making a decision consider whether the conflict
[12] involves a matter of importance to your
[13] decision in this case or merely some
[14] unimportant detail. And whether the conflict
[15] is brought about by an innocent mistake or by
[16] an intentional falsehood. You should also keep
[17] in mind, jurors, the other factors already
[18] discussed which go into deciding whether or not
[19] to believe a particular witness.
[20]    In deciding which of conflicting testimony
[21] to believe you should not necessarily be swayed
[22] by the number of witnesses on either side. You
[23] should consider whether the witnesses appear to
[24] be biased or unbiased. Whether they are
[25] interested or disinterested persons, and you

Page 151

[1] should consider all other factors which go to
[2] the reliability of their testimony. The
[3] important thing, jurors, is the quality of the
[4] testimony of each witness. You should also
[5] consider the extent to which conflicting
[6] testimony is supported by other evidence.
[7]    Now, evidence may be of two different
[8] types in a criminal case. On the one hand
[9] there is direct evidence which is testimony by
[10] a witness from his or her own personal
[11] knowledge which is something he or she saw or
[12] heard himself or herself. The other type is
[13] circumstantial evidence which is testimony
[14] about facts which point to the existence of
[15] other facts which are in question. The example
[16] I use to illustrate circumstantial evidence
[17] **goes as follows**:
[18]    Suppose you retire on a winter night and
[19] the streets were clear. And when you awoke
[20] snow was on the street and on the sidewalk and
[21] you saw footsteps in the snow. You would
[22] properly conclude that snow had fallen during
[23] the night although you didn't see it snowing,
[24] and that someone had walked in the snow
[25] although you saw no one walking in the snow.

Page 152

[1] That, jurors, is an example of circumstantial
[2] evidence. Whether or not circumstantial
[3] evidence is proof of the other facts in
[4] question depends in part on the application of
[5] common sense and human experience. In deciding
[6] whether or not to accept circumstantial
[7] evidence as proof of the facts in question you
[8] must be satisfied first, that the testimony of
[9] the witness who is presenting the
[10] circumstantial evidence is truthful and
[11] accurate; and second, that the existence of the
[12] facts the witness testifies to leads to the
[13] conclusion to the facts in question also
[14] happened.
[15]    You, ladies and gentlemen, will recall in
[16] my preliminary instructions I told you
[17] statements made by the attorneys did not
[18] constitute evidence and therefore they were not
[19] binding on you. Thereafter, in the course of
[20] this trial an exception to this rule was
[21] brought to your attention. A stipulation is
[22] one such exception. There were stipulations in
[23] this case. The law is that when the
[24] Commonwealth and the defense stipulate, that is
[25] when they agree that certain facts are true

## Page 153

[1] then their stipulation is evidence of that fact
[2] or those facts and you jurors should regard
[3] stipulated or agreed upon facts as proven. In
[4] their testimony Charles Tolbert and Kyle Holman
[5] have identified the defendant as the person who
[6] committed the crimes in this case. In
[7] evaluating their testimony in addition to the
[8] other instructions I have provided to you for
[9] judging testimony of witnesses you should
[10] consider the additional following factors:
[11]     Did the witness have a good opportunity to
[12] observe the perpetrator of the offense? Was
[13] there sufficient lighting for him to make his
[14] observations? Was he close enough to the
[15] individual to know his facial and/or other
[16] physical characteristics as well as any
[17] clothing he was wearing? Has he made a prior
[18] identification of the defendant as the
[19] perpetrator of these crimes at any other
[20] proceedings? Was his identification positive
[21] or was it qualified by any hedging or
[22] inconsistencies? During the course of this
[23] case did the witness identify anyone else as
[24] the perpetrator. In considering whether or not
[25] to accept the testimony you should consider all

## Page 154

[1] other circumstances under which the
[2] identifications were made. Furthermore, you
[3] should consider all other evidence relative to
[4] the question of who committed the crime
[5] including the testimony of any witness from
[6] which identity or non-identity of the
[7] perpetrator of the crimes may be inferred. You
[8] cannot find the defendant guilty unless you are
[9] satisfied beyond a reasonable doubt by all the
[10] evidence direct and circumstantial not only
[11] that the crimes were committed but it was the
[12] defendant who committed that crime or those
[13] crimes.
[14]     In the course of this case there was
[15] testimony regarding an arrest after which a
[16] photograph of the defendant was taken and the
[17] defendant thereafter released and subsequently
[18] arrested again. In the course of this case
[19] there was testimony that an anonymous phone
[20] call was received by a police captain that the
[21] defendant Johnnie Simmons was the person who
[22] shot the complainant, Charles Tolbert. That
[23] testimony was presented not for the truth of
[24] its contents, but to show what may have been a
[25] reason or reasons for the initial arrest of

## Page 155

[1] Johnnie Simmons. During which time he was
[2] photographed and thereafter released. Since
[3] that information was received from an anonymous
[4] source who did not testify in court you may not
[5] consider that testimony as evidence that
[6] Johnnie Simmons was, in fact, the person who
[7] shot Charles Tolbert. However, you may
[8] consider it to the extent that it may assist
[9] you in determining the basis for Johnnie
[10] Simmons, his initial arrests.
[11]     There was evidence including the testimony
[12] of one Kyle Holman that tended to show that the
[13] defendant fled from the police. The
[14] credibility, weight, and effect of this
[15] evidence is for you to decide. Generally
[16] speaking, when a crime has been committed and a
[17] person thinks he is or may be accused of
[18] committing it and he flees, such flight is a
[19] circumstance tending to show the person is
[20] conscious of guilt. Such flight does not
[21] necessarily show consciousness of guilt in
[22] every case. A person may flee for some other
[23] motive and may do so even though innocent.
[24] Whether the evidence of flight in this case
[25] should be looked at as tending to show guilt

## Page 156

[1] depends upon the facts and circumstances of
[2] this case and especially upon motives that may
[3] be prompted the flight. You may not find the
[4] defendant guilty solely on the basis of
[5] evidence of flight.
[6]     You heard evidence that a witness, to wit,
[7] Charles Tolbert, may have made a statement on
[8] an earlier occasion that was inconsistent with
[9] his present courtroom testimony. That is for
[10] you to decide. As to any such prior
[11] inconsistent statement either given under oath,
[12] such as at a preliminary hearing or in writing
[13] and signed and adopted by the witness, you may,
[14] if you choose, regard this evidence as proof of
[15] the truth of anything that the witness said in
[16] the earlier statement. You may also consider
[17] this evidence to help you judge the credibility
[18] and weight of the testimony given by the
[19] witness at this trial. When you judge the
[20] credibility and weight of testimony you are
[21] deciding whether you believe the testimony and
[22] how important you think it is for the
[23] resolution of the issues before you.
[24]     Ladies and gentlemen, it is entirely up to
[25] the defendant in every criminal trial whether

Page 157

[1] or not to testify. A defendant has an absolute
[2] right founded on the Constitution to remain
[3] silent at trial. So you must not draw any
[4] inference of guilt or any other inference
[5] adverse to the defendant from the fact that he
[6] did not testify in this case.
[7]     Members of the jury, the defendant in this
[8] case, Johnnie Simmons, is on trial before you
[9] having been charged with various offenses. And
[10] to each of these offenses the defendant has
[11] pled not guilty and elected to be tried by you,
[12] ladies and gentlemen of the jury. Specifically
[13] the defendant has been charged with attempted
[14] murder, aggravated assault, possession of an
[15] instrument of crime, violation of section 6106
[16] of the uniform firearms act and criminal
[17] conspiracy. Now, I have already instructed you
[18] jurors concerning the manner in which you
[19] should consider the evidence in this case and
[20] the general rules of law concerning the same.
[21] I must now instruct you on each of the specific
[22] charges made against the defendant, Johnnie
[23] Simmons.
[24]     The first offense charged is attempted
[25] murder. The defendant Johnnie Simmons, has

Page 158

[1] been charged with attempted murder. To find
[2] him guilty of this offense you must find that
[3] the following three elements have been proven
[4] **beyond a reasonable doubt**:
[5]     First, that the defendant did a certain
[6] act, that is he shot the complainant Charles
[7] Tolbert.
[8]     Second, that the time of this alleged act
[9] the defendant had the specific intent to kill
[10] Charles Tolbert, that is he had a fully formed
[11] intent to kill and was conscious of his own
[12] intentions.
[13]     Third, that the act constituted a
[14] substantial step toward the commission of the
[15] killing the defendant intended to bring about.
[16]     The specific intent to kill including
[17] premeditation does not require planning or
[18] previous thought or any particular length of
[19] time. It can be formed in an instant. All
[20] that is necessary is that there be time enough
[21] so that the defendant can and does fully form
[22] an intent to kill and is conscious of that
[23] intention. When deciding whether a defendant
[24] had the specific intent to kill you should
[25] consider all the evidence regarding his words

Page 159

[1] and conduct and the attending circumstances
[2] that may show his state of mind. If you
[3] believe that the defendant intentionally used a
[4] deadly weapon on a vital part of the
[5] complainant's body you may regard that as
[6] circumstantial evidence from which you may, if
[7] you choose, infer that the defendant had the
[8] specific intent to kill.
[9]     So let me explain the meaning of a
[10] substantial step. A person cannot be guilty of
[11] an attempt to commit a crime unless he does an
[12] act that constitutes a substantial step toward
[13] the commission of that crime. An act is a
[14] substantial step if it is a major step toward
[15] the commission of a crime and also strongly
[16] corroborates the jury's belief that the person
[17] at the time he did the act and had a firm
[18] intent to commit that crime. An act can be a
[19] substantial step even though other steps would
[20] have to be taken before the crime can be
[21] carried out. If you are satisfied that the
[22] three elements of attempted murder have been
[23] proven beyond a reasonable doubt then you
[24] should find the defendant guilty of this
[25] offense. Otherwise you must find him not

Page 160

[1] guilty of attempted murder.
[2]     The defendant Johnnie Simmons has been
[3] charged with aggravated assault. To find him
[4] guilty of this offense you must find that each
[5] of the following elements has been proven
[6] **beyond a reasonable doubt**:
[7]     First, that the defendant caused serious
[8] bodily injury to the complainant, Charles
[9] Tolbert. Serious bodily injury is bodily
[10] injury that creates a substantial risk of death
[11] or that causes serious permanent disfigurement
[12] or protracted loss or impairment of the
[13] function of any bodily member or organ.
[14]     Second, that the defendant acted
[15] intentionally or knowingly or recklessly under
[16] circumstances manifesting extreme indifference
[17] to the value of human life. A person acting
[18] intentionally with respect to serious bodily
[19] injury when it is his conscious object or
[20] purpose to cause such injury. A person acts
[21] knowingly with respect to serious bodily injury
[22] when he is aware that it is practically certain
[23] that his conduct will cause such a result. A
[24] person acts recklessly with respect to serious
[25] bodily injury when he consciously disregards a

Page 161

[1] substantial and unjustifiable risk that serious
[2] bodily injury will result from his conduct.
[3] The risk must be of such a nature and degree
[4] that considering the nature and intent of the
[5] defendant's conduct and the circumstances known
[6] to him it's disregard involves a gross
[7] deviation from the standard of conduct that a
[8] reasonable person would observe in the
[9] defendant's situation.  It is shown by the kind
[10] of reckless conduct which a life threatening
[11] injury is almost certain to occur.
[12]     If after considering all of the evidence
[13] you find that the Commonwealth the evidence
[14] just stated beyond a reasonable doubt then you
[15] should find the defendant guilty of aggravated
[16] assault.  Otherwise, you must find him not
[17] guilty of this crime.
[18]     Johnnie Simmons is charged with possession
[19] of an instrument of crime.  In order to find
[20] the defendant guilty of possessing a criminal
[21] instrument as charged in this case you must be
[22] satisfied that the following three elements
[23] have been proven beyond a reasonable doubt:
[24]     First, that the defendant possessed a
[25] certain item, that is a firearm.  For a person

Page 162

[1] to possess an item he must have the power to
[2] control and the intent to control that item.
[3]     Second, that the item was an instrument of
[4] crime.  An instrument of crime is anything
[5] specially made for criminal use or anything
[6] specially adapted for criminal use or anything
[7] that is used for criminal purposes and
[8] possessed by the defendant at the time of the
[9] alleged offense under circumstances not
[10] manifestly for lawful uses it may have.  That a
[11] thing could somehow facilitate the possible
[12] commission of a crime is not enough.  To be an
[13] instrument of crime the thing must be something
[14] the defendant would need to use in the
[15] commission of the underlying offense.
[16]     Third, that the defendant possessed the
[17] item with the intent to employ it criminally,
[18] that is with intent to attempt or to commit a
[19] crime with it.  The Commonwealth has charged
[20] here that the crime the defendant intended to
[21] commit with the instrument alleged was assault
[22] and/or murder.  If after considering all of the
[23] evidence you find that the Commonwealth has
[24] proven the elements just stated beyond a
[25] reasonable doubt then you should find the

Page 163

[1] defendant guilty of possession of an instrument
[2] of crime.  Otherwise you must find him not
[3] guilty of this offense.
[4]     The defendant has been charged with
[5] violating section 6106 of the uniform firearms
[6] act which prohibits carrying a firearm without
[7] a license.  To find the defendant guilty of
[8] this offense you must find that each of the
[9] following elements have been proven beyond a
[10] **reasonable doubt**:
[11]     First, that the defendant carried a
[12] firearm concealed on or about his person.  A
[13] firearm is any pistol or revolver with a barrel
[14] length less than 15 inches.  Shotgun with a
[15] barrel less than 18 inches.  Rifle with a
[16] barrel less then 16 inches or any pistol,
[17] revolver, rifle, or, shotgun with an overall
[18] length of less than 26 inches.  To be a firearm
[19] the specific object charged must be capable of
[20] firing a projectile.
[21]     Second, that the defendant was not in his
[22] place of abode, that is his home, or his fixed
[23] place of business at the time of the crime.
[24]     Third, that the defendant did not have a
[25] valid or lawfully issued license for carrying

Page 164

[1] the firearm.
[2]     If after considering all the evidence you
[3] find that the Commonwealth has proven the
[4] elements just stated beyond a reasonable doubt
[5] then you should find the defendant guilty of
[6] carrying a firearm without a license.
[7] Otherwise you must find him not guilty of this
[8] offense.
[9]     Finally, the defendant is charged with
[10] conspiracy.  The defendant Johnnie Simmons is
[11] charged with conspiracy to commit the crime of
[12] assault and/or murder.  In Pennsylvania joining
[13] in a conspiracy or creating a conspiracy is
[14] itself a crime.  Even if the crime or crimes
[15] the person is planning are not carried out the
[16] members of a conspiracy are still responsible
[17] for the distinct crime of conspiracy.  In
[18] general terms a conspiracy is an agreement
[19] between two or more persons to commit a crime
[20] or crimes.  A conspiracy exists once two
[21] conditions are met.  There is an agreement and
[22] one of the members then commits some act to
[23] help achieve the goal of the conspiracy.
[24]     The first element of conspiracy is an
[25] agreement.  It can be stated in words or

Page 165

[1] unspoken but acknowledged. But it must be an
[2] agreement in the sense that two or more persons
[3] have come to an understanding that they agree
[4] to act together to commit a crime or crimes.
[5] Their agreement does not have to cover the
[6] details of how that crime or those crimes will
[7] be committed nor does it have to call for all
[8] of them to participate in actually committing
[9] the crime or crimes. They can agree that one
[10] of them will do the job. What is necessary is
[11] that the parties do agree. In other words,
[12] come to a firm common understanding that a
[13] crime will be committed. Although the
[14] agreement itself is the essence of the
[15] conspiracy a defendant cannot be convicted of
[16] conspiracy unless he or a fellow conspirator
[17] does something more, does an overt act in
[18] furtherance of the conspiracy. The overt act
[19] is an act by any member of the conspiracy that
[20] would serve to further the goal of the
[21] conspiracy. The overt act can be criminal or
[22] noncriminal in itself as long as it is designed
[23] to put the conspiratorial agreement into
[24] effect. This is to show that the parties have
[25] a firm agreement and are not just thinking or

Page 166

[1] talking about committing a crime. The overt
[2] act shows that the conspiracy has reached the
[3] action stage. If a conspirator actually
[4] commits or attempts to commit the agreed upon
[5] crime or crimes that obviously would be an
[6] overt act in furtherance of the conspiracy.
[7] But a small act or step that is much more
[8] preliminary and a lot less significant can
[9] satisfy the overt act requirement.
[10]     The Commonwealth may prove a conspiracy by
[11] direct evidence or by circumstantial evidence.
[12] People who conspire often do their conspiring
[13] secretly and cover up afterwards. In many
[14] conspiracy trials circumstantial evidence is
[15] the best or only evidence on the question of
[16] whether there was an agreement. That is a
[17] common understanding. Whether the conspirators
[18] shared the intent to promote or facilitate the
[19] commission of the object crime or crimes.
[20] Thus, you may, if you think it proper, infer
[21] that there was a conspiracy from the
[22] relationship, conduct, and acts of the
[23] defendant and his alleged co-conspirators and
[24] the circumstances surrounding their activities.
[25] However, the evidence of this must support your

Page 167

[1] conclusion beyond a reasonable doubt.
[2]     In this case the Commonwealth alleges that
[3] the defendant conspired with another unknown
[4] person. In this case the Commonwealth alleged
[5] that the crime or crimes of assault and/or
[6] murder was the object of the conspiracy. In
[7] this case the Commonwealth alleges that the
[8] following act was an overt act, to wit, the
[9] Commonwealth alleges the defendant shot the
[10] complainant. Before any defendant can be
[11] convicted all 12 jurors must agree on the same
[12] person with whom the defendant allegedly
[13] conspired the same object crime and the same
[14] overt act.
[15]     Ladies and gentlemen, I have already
[16] defined for you assault. The defendant is
[17] charged with attempted murder, aggravated
[18] assault, possession of an instrument of crime,
[19] and carrying a firearm without a license. He
[20] is not charged with murder. The complainant
[21] obviously did not die. He is charged with
[22] attempted murder. Since one cannot conspire to
[23] attempt to murder someone. The defendant is
[24] charged with conspiracy to commit murder. This
[25] means that I must in addition to defining

Page 168

[1] assault for you which I have already done I
[2] must also define murder for you.
[3]     The following is the definition of murder.
[4] Murder is a criminal homicide committed with a
[5] specific intent to kill and done with malice.
[6] An intentional killing is a killing by any kind
[7] of willful, deliberate, and premeditated act.
[8] Therefore, in order to be a murder the killing
[9] must be a willful, deliberate, and premeditated
[10] act. If an intention to kill exists then in
[11] the eyes of the law the killing is willful. If
[12] this intent is accompanied by such
[13] circumstances as evidence a mind fully
[14] conscious if it's of its own purpose then it is
[15] deliberate. And if sufficient time has been
[16] afforded to enable the mind of killer to fully
[17] frame the design to kill and to select an
[18] instrument or frame the plan to carry this
[19] design into execution then it is premeditated.
[20] although a defendant must premeditate in order
[21] to have a specific intent to kill premeditation
[22] can be very brief, indeed formulated in a
[23] fraction of a second. All that is necessary is
[24] that there be time enough so that the defendant
[25] has fully formed the intent to kill and is

Page 169

[1] conscious of that intention.
[2]     If you believe that a defendant
[3] intentionally used a deadly weapon on a vital
[4] part of the complainant's body you may regard
[5] that as an item of circumstantial evidence of
[6] which you may infer that the defendant had the
[7] specific intent to kill.
[8]     Turning now to malice.  Malice has a
[9] special legal meaning.  Malice may be two
[10] **kinds**:  Either direct malice as where there
[11] existed a particular ill-will against a
[12] particular person; or indirect malice, as in
[13] the case of a crime committed with depravity of
[14] heart, cruelty, recklessness of consciousness,
[15] and a disposition of mind regardless of social
[16] duty indicating and unjustified disregard for
[17] the probability of death or serious bodily
[18] injury and an extreme indifference to the value
[19] of human life.  Legal malice may be inferred
[20] and found from the attending circumstances:
[21]     You may infer malice from the intentional
[22] use of a deadly weapon to a violent part of a
[23] complainant's body.
[24]     Now, ladies and gentlemen, in order to
[25] find the defendant guilty of conspiracy to

Page 170

[1] commit assault and/or murder you must be
[2] satisfied that the following three elements
[3] have been proven beyond a reasonable doubt:
[4]     First, that the defendant agreed with
[5] another person that one or more of them would
[6] engage in conduct or the planning and
[7] commission of the object crime, assault and/or
[8] murder.
[9]     Second, that the defendant and the other
[10] person intended to promote or facilitate the
[11] commission of a crime or those crimes.  In
[12] other words, they shared the intention to bring
[13] about that crime or those crimes or to make it
[14] easier to commit assault and/or murder.
[15]     Third, that the defendant or the other
[16] person did the act that is alleged to have been
[17] an overt act and did it in furtherance of their
[18] conspiracy.  It is then the conspirators have
[19] agreed to commit a crime and after that one of
[20] the conspirators does an act to carry out or
[21] advance their agreement then he has done an
[22] overt act in furtherance of their conspiracy.
[23] The other conspirator does not have to
[24] participate in the act or even know about it
[25] and essentially like partners and like partners

Page 171

[1] they are responsible for each other's actions.
[2]     Now, at the appropriate time you'll find
[3] on the verdict sheet that there will be a
[4] special section of the crime conspiracy.  If
[5] you find the Commonwealth has proved the
[6] defendant guilty beyond a reasonable doubt you
[7] will then be asked to mark the crime or crimes
[8] that you find proven beyond a reasonable doubt
[9] to be the objective of the conspiracy.  I
[10] instruct you now that a conspiracy can have as
[11] its objective one crime or many crimes.  But it
[12] is your task to determine what object has been
[13] proven beyond a reasonable doubt.
[14]     Ladies and gentlemen, in the course of my
[15] instructions I have given you the legal
[16] definition for the crimes charged in this case.
[17] Motive is not a part of those definitions.  The
[18] Commonwealth is not required to prove a motive
[19] for the commission of the crimes charged.
[20] However, you should consider the evidence of
[21] motive or lack of motive.  Knowledge of human
[22] nature tells us that an ordinary person is more
[23] likely to commit a crime or crimes if he has a
[24] motive than if he has none.  You should weigh
[25] and consider the evidence tended to show motive

Page 172

[1] or absence of motive along with all other
[2] evidence in deciding whether the defendant is
[3] guilty or not guilty.  It is entirely up to you
[4] to determine what weight should be given to the
[5] evidence concerning motive.
[6]     Now, ladies and gentlemen, I must now
[7] instruct you as to the standards by which you
[8] must be guided as you deliberate on your
[9] verdict.  In order to return a valid verdict
[10] each juror must agree.  Your verdict must be
[11] unanimous.  A majority vote is not permissible.
[12] You as jurors have a duty to consult with one
[13] another and to deliberate with the view to
[14] reaching a unanimous agreement if it can be
[15] done without violence to individual judgment.
[16] That is to say that each juror must decide the
[17] case for himself or herself but only after an
[18] impartial consideration of the evidence with
[19] his and her fellow jurors.  In a course of such
[20] deliberations a juror should not hesitate to
[21] re-examine his or her own views and to change
[22] his or her opinion if convinced that it is
[23] erroneous.  But no juror should surrender his
[24] or her honest convictions as to the weight or
[25] effect of the evidence or as to the guilt or

**Page 173**

[1] innocence of the defendant solely because of
[2] the opinion of his fellow jurors or for the
[3] mere purpose of returning a unanimous verdict.
[4]      In deliberating upon your verdict you must
[5] not be influenced by anything outside of the
[6] evidence presented in this case and the law as
[7] given by this judge.
[8]      Now, ladies and gentlemen, I have
[9] essentially concluded my instructions in the
[10] law. I must meet briefly with the attorneys
[11] and our reporter after which I shall return and
[12] submit the case to you for your deliberations.
[13] Please jurors bear with us for one additional
[14] moment.
[15]            - - -
[16]      (Discussion held on the record in
[17] chambers.)
[18]            - - -
[19]      **THE COURT**: We're now in the anteroom
[20] outside the hearing of the jury. I have with
[21] me Mr. Lorusso for the defendant and Ms.
[22] Forchetti for the Commonwealth. Commonwealth,
[23] I have essentially concluded my instructions on
[24] the law. This is your opportunity to submit to
[25] me a request for additional instructions,

**Page 174**

[1] request for clarifications, objections,
[2] comments of any sort. Let's start with you,
[3] Mr. Lorusso.
[4]      **MR. LORUSSO**: If Your Honor please the
[5] court in the instructions indicated that
[6] Charles Tolbert and Kyle Holman have IDed the
[7] defendant as the person who committed the
[8] crime. I believe the extent of any evidence
[9] concerning Kyle Holman is that he IDed someone
[10] walking or possibly running through a driveway
[11] not as a person who committed a crime and I
[12] would ask Your Honor to correct any
[13] misinformation that may have flowed from that
[14] statement.
[15]      **THE COURT**: Anything else?
[16]      **MR. LORUSSO**: No, Your Honor.
[17]      **THE COURT**: Let's go off the record.
[18]      (Discussion was held off the record.)
[19]      **THE COURT**: Mr. Lorusso, your objection is
[20] founded. What I intended to say, and obviously
[21] did not say, so I intend to correct that as
[22] **follows**: Ladies and gentlemen, I charge you as
[23] to the law of identification. You will recall
[24] the evidence in this case. It is your
[25] recollection which controls. Kyle Holman did

**Page 175**

[1] not testify that he was an eyewitness to the
[2] crime. So if I told you that he identified the
[3] defendant Simmons as the person who committed
[4] the crime I misspoke. He identified Johnnie
[5] Simmons as the person walking in the alleyway
[6] after he heard gunshots at or about the time
[7] that he heard police sirens. Is that
[8] sufficient?
[9]      **MR. LORUSSO**: Yes, Your Honor.
[10]      **THE COURT**: Any objection?
[11]      **MS. FORCHETTI**: No, Your Honor.
[12]      **THE COURT**: Is there anything else?
[13]      **MR. LORUSSO**: No, Your Honor.
[14]      **THE COURT**: How about you, ma'am?
[15]      **MS. FORCHETTI**: No, Your Honor.
[16]      **THE COURT**: I'm going to hand counsel I'm
[17] going to show you again the verdict sheet that
[18] will go out with the jury so there can be no
[19] question that this is the one we agreed upon,
[20] is that it?
[21]      **MR. LORUSSO**: It is, Your Honor.
[22]      **THE COURT**: Ms. Forchetti.
[23]      **MS. FORCHETTI**: Yes, Your Honor.
[24]      **THE COURT**: I'll give it back to
[25] Mr. Ferguson. He will give it to the jury.

**Page 176**

[1] I'll make this correction and we will submit
[2] the case to the jury.
[3]            - - -
[4]      **THE COURT**: Ladies and gentlemen, before I
[5] conclude my instructions please permit me to
[6] make a correction the attorneys brought to my
[7] attention an apparent misstatement. I
[8] instructed you, ladies and gentlemen, in the
[9] law of identification testimony. You will
[10] recall what the evidence was and it's your
[11] recollection which controls. However, Kyle
[12] Holman did not testify that he was an
[13] eyewitness to the crimes. So if I told you
[14] that he identified the defendant Simmons as the
[15] person who committed the crime in this case I
[16] misspoke. It is my recollection that he
[17] identified Johnnie Simmons as the person
[18] walking in the alleyway after he heard gunshots
[19] at or about the time that he heard police
[20] sirens in the area.
[21]      Is that a fair statement, counsel?
[22]      **MR. LORUSSO**: Yes, Your Honor.
[23]      **MS. FORCHETTI**: Yes, Your Honor.
[24]      **THE COURT**: So you will disregard any
[25] inadvertence if I referred to him otherwise.

Page 177

[1]      Now, ladies and gentlemen, when you go out
[2] to deliberate on your verdicts in this case you
[3] will select one of your members as a
[4] foreperson, foreman or forewoman, and he or she
[5] will have the duty of leading you in your
[6] discussions during the deliberations.  That
[7] person will also have the responsibility of
[8] announcing your verdict in open court.  Bear in
[9] mind, that the foreperson has only one vote,
[10] the same as the rest of you.
[11]      Now, when you, ladies and gentlemen, go
[12] out to deliberate on your verdict in this case
[13] you will take with you this verdict sheet and
[14] what is important upon this verdict sheet is
[15] what appears on the word charges in this column
[16] and what you will write under word verdict in
[17] this column.  So you can see that it's styled
[18] the Commonwealth versus Simmons and it lists
[19] the various offenses charged against this
[20] defendant.  You, Ladies and gentlemen, will
[21] deliberate on the verdict on the charge rather
[22] of attempted murder complainant Charles Tolbert
[23] in writing your verdict, guilty or not guilty.
[24] You, ladies and gentlemen, will deliberate on
[25] the charge of aggravated assault, complainant

Page 178

[1] Charles Tolbert, and write in your verdict,
[2] guilty or not guilty.  You, ladies and
[3] gentlemen, will deliberate on the charge of
[4] possession of instrument of crime, to wit
[5] firearm, and write in your verdict, guilty or
[6] not guilty.  You, ladies and gentlemen, will
[7] deliberate on the charge of carrying a firearm
[8] without a license and write in your verdict,
[9] guilty or not guilty.  And you will deliberate
[10] on the charge of conspiracy and write in your
[11] verdict guilty or not guilty.
[12]      There are two interrogatories which is a
[13] fancy word for question.  The first reads:
[14] Answer only if your verdict is guilty to
[15] attempted murder.  The question is, do you find
[16] that complainant suffered a serious bodily
[17] injury and you will check yes or you will check
[18] no.  The second reads as follows:  Answer only
[19] if your verdict is guilty to conspiracy.  The
[20] question is, what was the object crime?  Murder
[21] and/or aggravated assault.
[22]      Remember, I told you there may be one or
[23] more object crimes so you will articulate or
[24] rather check what, if any, to be the object
[25] crime proved beyond a reasonable doubt if your

Page 179

[1] verdict is guilty to the charge of conspiracy.
[2]      Now, in order for this verdict sheet to be
[3] valid it must be completed by your foreperson
[4] who has the duty of signing his or her name,
[5] affixing his or her juror number, and dating
[6] the verdict sheet.
[7]      The last thing I wish to say, ladies and
[8] gentlemen, is to suggest to you that it will be
[9] best for all concerned if during the course of
[10] your deliberations you treat each other and his
[11] or her views and opinions with the same
[12] courtesy and respect you treat others in your
[13] every day life.  I want to tell you that there
[14] is no time limit to your deliberations.  You
[15] have as much time as you need.
[16]      Mr. Lorusso, Ms. Forchetti, I finished the
[17] instructions, is there any objection to the
[18] first 12 selected going out and begin
[19] deliberating?
[20]      **MS. FORCHETTI**:  No, Your Honor.
[21]      **MR. LORUSSO**:  No, Your Honor.
[22]      **THE COURT**:  Then I'm going to first invite
[23] jurors number 13 and 14 to collect your
[24] belongings from the jury deliberation room and
[25] take a seat in the very first row in the

Page 180

[1] courtroom.  Everybody in the courtroom would
[2] you please, please, please sit in the very last
[3] row.
[4]                  - - -
[5]      (Jurors 13 and 14 were excused.)
[6]                  - - -
[7]      **THE COURT**:  Ladies and gentlemen, to you
[8] jurors, number one through 12, you are now a
[9] deliberating body.  You may retire to commence
[10] your deliberations.  Thank you very much.
[11]                  - - -
[12]      (The jury exited the courtroom and
[13] began deliberations at 4:20 p.m.)
[14]                  - - -
[15]      **THE COURT**:  Let the record also reflect
[16] the jurors number one through 12 have exited
[17] the courtroom.  I shall now like to address
[18] jurors number 13 and 14.
[19]      Ladies and gentlemen, you are not yet
[20] excused.  I want you to appreciate the
[21] **following**:  That this is a matter of great
[22] importance to both sides and it is of course a
[23] human event and we are attempting to guard
[24] against anything that might go awry.  So please
[25] as I instructed you previously do not discuss

Page 181

[1] the case amongst yourselves, don't permit
[2] anyone to discuss the case with you. The first
[3] 12 deliberating have the obligation of reaching
[4] a verdict in this case. However, if for some
[5] reason one or two of them cannot conclude the
[6] deliberative process it will be necessary to
[7] call upon one or both of you to fill in. In
[8] such an event it is absolutely required that
[9] you have not discussed the case. So to that
[10] end you are obviously free to go about your
[11] duties as members of society, go to work, but
[12] you may not discuss the case with people at
[13] work nor will you discuss the case with any of
[14] your family members. You may not discuss the
[15] case with anyone. You may not discuss the case
[16] with yourselves. Commencing tomorrow at
[17] 10:00 o'clock and again at 4:00 o'clock you are
[18] instructed to call the courtroom asking
[19] Mr. Ferguson and he will tell you whether or
[20] not the jury has reached a verdict. If they
[21] have then you are excused. If it is necessary
[22] for him to call upon you he will so advise you
[23] and you will be required to come down and join
[24] the remaining jurors at which time the
[25] deliberation will start afresh with you as a

Page 182

[1] deliberating juror. Do you understand, juror
[2] number 13?
[3]     THE WITNESS: Yes.
[4]     THE COURT: Do you understand me, juror
[5] number 14?
[6]     THE WITNESS: Yes.
[7]     THE COURT: Thank you kindly and Mr. Menna
[8] will instruct you downstairs and you enjoy your
[9] evening and please call us tomorrow at 10:00
[10] and again at 4:00 and we will let you know
[11] where we stand. Thank you very much.
[12]     (Alternate jurors excused.)
[13]     THE COURT: Counsel, it's coming up on
[14] 4:25. We've had a full day. How long you
[15] suggest we stay this afternoon, Mr. Lorusso?
[16]     MR. LORUSSO: 4:30 works for me, Judge.
[17]     THE COURT: Ms. Forchetti.
[18]     MS. FORCHETTI: I would say until
[19] 5:00 o'clock.
[20]     THE COURT: All right. So a quarter to
[21] 5:00 we'll tell them that they start afresh
[22] tomorrow if they have not reached a verdict.
[23] That's cutting it down the middle. Let the
[24] record reflect that 13 and 14 have left the
[25] courtroom. Everybody who is in the room remain

Page 183

[1] in place until such time that 13 and 14 have
[2] left the floor. Jurors deliberating,
[3] Mr. Lorusso, shall we have your client
[4] accompany the sheriff?
[5]     MR. LORUSSO: That's fine, Your Honor.
[6]     THE COURT: All right. We'll see what
[7] happens in the next 15 minutes or so.
[8]     (Court took a short recess.)
[9]     MS. FORCHETTI: Your Honor, we looked
[10] through the photographs and the exhibit I think
[11] the only ones to which counsel and I would not
[12] have an objection on either side is all the
[13] crime scene photographs, the photographic array
[14] that's been marked as Commonwealth's Exhibit
[15] 10, and the track of the 911 testimony that we
[16] played track 17 as it relates to Kyle Holman's
[17] 911 call, and the map which has been marked as
[18] Defense Exhibit 1.
[19]     THE COURT: Those are the ones you can
[20] agree on?
[21]     MS. FORCHETTI: We can agree on that they
[22] can go back. Anything else I think would be
[23] subject to argument.
[24]     THE COURT: Okay. So Mr. Menna, can you
[25] get a file to put these in. Those are the ones

Page 184

[1] you agree on right there.
[2]     MS. FORCHETTI: Yes.
[3]     THE COURT: What are the others, those
[4] others need rulings?
[5]     MS. FORCHETTI: Yes.
[6]     THE COURT: Okay.
[7]     MS. FORCHETTI: Obviously, Your Honor, if
[8] they want to be recharged on any portion of the
[9] law I won't object to that.
[10]     THE COURT: All right. But you expect to
[11] be here by what.
[12]     MS. FORCHETTI: A little after 11:00 is my
[13] hope.
[14]     THE COURT: If they have something in the
[15] morning and it's something we can hold off on I
[16] will.
[17]     Counsel, shall we prepare ourself to
[18] release the jurors until tomorrow?
[19]     MS. FORCHETTI: I believe it's reached the
[20] agreed upon hour.
[21]     MR. LORUSSO: Yes, Your Honor.
[22]         - - -
[23]     (The jurors entered the courtroom at
[24] 4:50 p.m.)
[25]         - - -

Page 185

[1]     **THE COURT**:  Ladies and gentlemen, it's
[2]  just past 4:45 p.m., 4:50 p.m.  It's been a
[3]  long day.  You've been here since nine o'clock
[4]  this morning.  We are at this juncture going to
[5]  take an evening recess.  We will adjourn for
[6]  the day.  I think it's important that I
[7]  reiterate the instructions that you keep an
[8]  open mind and remind you that you may not
[9]  discuss the case with anyone.  Ladies and
[10]  gentlemen, you can't call a fellow juror and
[11]  discuss the case on the telephone.  The only
[12]  time that you may discuss the case is when the
[13]  12 of you are together in the jury room
[14]  deliberating.  So with that in mind please have
[15]  a good evening and we'll see you all back here
[16]  tomorrow at 9:00.  Would everyone else please
[17]  remain in place while the jurors exit the
[18]  courtroom?
[19]          - - -
[20]        (The jury exited the courtroom at
[21]  4:52 p.m.)
[22]          - - -
[23]
[24]
[25]



Page 186

[1]              CERTIFICATION
[2]
[3]       I hereby certify that the proceedings
[4]  and evidence are contained fully and accurately
[5]  in the notes taken by me on the trial of the
[6]  above cause, and that this copy is a correct
[7]  transcript of the same.
[8]
[9]
[10]          Kim S. Kendall, RPR
           Official Court Reporter
[11]
[12]
[13]
[14]
[15]
[16]
[17]       (The foregoing certification of
[18]  this transcript does not apply to any
[19]  reproduction of the same by any means unless
[20]  under the direct control and/or supervision
[21]  of the certifying reporter.)
[22]
[23]
[24]
[25]

Court Reporting System (Generated 2023/03/07 14:29:05)

Lawyer's Notes

