IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHNNIE SIMMONS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARK GARMAN, *et al.* | : | NO. 19-2624 |

**REPORT AND RECOMMENDATION**

CAROL SANDRA MOORE WELLS
UNITED STATES MAGISTRATE JUDGE                                                             April 30, 2024

Presently before the court is a counseled Petition and Amended Petition for a Writ of Habeas Corpus filed by Johnnie Simmons ("Petitioner"), pursuant to 28 U.S.C. § 2254. Petitioner, a state prisoner, is currently serving a twenty-to-forty-year term of incarceration at the State Correctional Institution-Rockview. He seeks habeas relief based on an *Apprendi*[1] claim, a *Brady*[2] claim, and several ineffective assistance of counsel claims. The Honorable Edward G. Smith[3] referred this matter to the undersigned for preparation of a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Petitioner be afforded habeas relief, based upon his *Brady* claim.

**I.    FACTUAL AND PROCEDURAL HISTORY**[4]

Petitioner was tried in Philadelphia County for attempted murder, conspiracy to commit murder, aggravated assault, possession of an instrument of crime, and carrying a firearm without a license, however, the jury was deadlocked on most charges and, on December 15, 2011, found

---

[1] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).
[2] *Brady v. Maryland*, 373 U.S. 83 (1963).
[3] This case was originally assigned to the Honorable Edward G. Smith. However, on November 29, 2023, it was reassigned to Judge Gerald A. McHugh.
[4] The facts set forth in this background and procedural history were gleaned from Petitioner's Habeas Corpus Petition ("Pet."), Amended Petition for Writ of Habeas Corpus and Memorandum of Law ("Amended Pet." and "Pet. Mem."), Petitioner's Exhibits ("Ex."), the Commonwealth's Response ("Resp."), Petitioner's Reply ("Reply"), Petitioner's December 19, 2023 Amendment ("Pet. Am."), the Commonwealth's Amended Response thereto ("Am. Resp."), and Petitioner's Reply thereto ("Reply 2").

him guilty of only the conspiracy to commit murder offense.[5]  Pet. Mem. at 1; Ex. at A001; Resp. at 1.

Consistent with the jury's verdict, the evidence reveals that, on February 4, 2011, at approximately 2:00 p.m., Petitioner shot Charles Talbert ("Talbert") five times as a result of a failed drug transaction.  Opinion of the Philadelphia County Court of Common Pleas (October 2012), Ex. at A002.  Talbert sold a bag of marijuana to Khalif Collins ("Collins") and then entered a variety store at the intersection of Stenton Avenue and Johnson Street.  Ex. at A002.  Petitioner entered the same store and informed Talbert that the bag of marijuana sold to Collins was "too small."  *Id*.  Talbert gave Petitioner a different bag after they exited the store.  *Id*.  Next, Collins approached Talbert and informed him that someone across the street wanted to buy marijuana.  *Id*.  Talbert crossed the street, approached Petitioner and asked, "what's up?"  *Id*.  In response, Petitioner shot Talbert several times.  *Id*.

Richard Alexander ("Officer Alexander"), an off-duty police officer, was in a nearby store.  Ex. at A002.  When he heard the gunshots, Officer Alexander immediately ran to the intersection of 1300 Johnson Street, where he saw Talbert bleeding on the ground.  *Id*.  Officer Alexander approached and asked Talbert to identify the shooter, instead, the victim requested transport to a hospital.  *Id*.

An unidentified bystander pointed to a particular alleyway and informed Officer Alexander that the shooter had run in that direction.  Ex. at A003.  Once in the alleyway, Officer Alexander encountered Kyle Holman ("Holman"), who reported that he had seen Petitioner walk hurriedly down the alleyway, approximately two minutes after he heard the gunshots.  *Id*.  Holman further observed that Petitioner seemed out of breath and kept looking around as if he was being followed.

---

[5] Petitioner filed a successful motion for mistrial on the remaining charges for which the jury was deadlocked.  Amend. Pet. Br. at 1; Ex. at A001.

*Id*. Holman informed Officer Alexander that he asked Petitioner if he was okay; Petitioner had responded that he was "just exhausted" and continued his fast pace. *Id*. Holman observed Petitioner run between the houses on the 1500 blocks of Johnson and Duval Streets and called 911 to report the suspicious behavior. *Id*. Officer Alexander followed the path Petitioner had taken, immediately spotted him, and gave chase. Ex. at A003. The officer abandoned pursuit and returned to the crime scene, however, because he was alone and concerned for his safety. *Id*. Upon his return to the intersection, Officer Alexander met Officer Edmiston; both officers waited with Talbert, until the paramedic arrived. Ex. at A003-04.

At Albert Einstein Medical Center, Talbert underwent multiple surgeries for gunshot wounds in his left anterior chest, his upper arm, and his abdomen, as well as a "comminuted fracture of the distal sacrum or the proximum coccyx that was medial to the bullet wound." Ex. at A004. Doctors also found a bullet lodged in Talbert's medial left gluteus muscle, another in his back soft tissue, and a third bullet fragment overlay his heart. *Id*. Talbert was limited to a liquid diet until February 11, 2011; he was discharged eleven days later. *Id*. Talbert's wounds took multiple months to heal; he still wore a colostomy bag at Petitioner's trial eight months later. *Id*.

As the ambulance transported Talbert to the hospital, Officer Edmiston gathered Petitioner's description from Officer Alexander and another bystander. He then called the police station and informed them that Petitioner was a "short, black male [with] light skin," running southbound on Stenton Avenue. Ex. at A004. Other officers and one bystander, Gerard Wright, gave similar descriptions. *See* Ex. at A005. Officers also described Petitioner's accomplice as Khalif Collins, but, after interviewing Collins, police determined that there was insufficient evidence to charge him with an offense related to the shooting. Ex. at A004, A007.

Later that day, Philadelphia Police received an anonymous tip that Petitioner was at a barbershop, a block from the shooting. Ex. at A006. Officer Long arrested Petitioner there and then drove him to Gerald Wright, a person who saw Petitioner prior to the shooting, for an identification, which Wright was unable to make. *Id*. Officer Long transported Petitioner to the precinct where he photographed him in preparation for a photo array for Talbert. *Id*.

On February 8, 2011, Detectives Acerenza, Geliebter, and Sloan went to the hospital[6] to show Talbert the photo array and interview him. Ex. at A006. Talbert "appeared frightened," but pointed to and circled Petitioner's photograph. Ex. at A007. Talbert also identified another man, John Rivera, but said Petitioner was the shooter. *Id*. Talbert, in a signed statement, described Petitioner and the gun. *Id*.

During the course of the investigation and trial, Talbert and Holman requested relocation assistance. Ex. at A008-09. Talbert contacted Leland Kent, the executive director of Victims Services and Community Outreach, on February 22, 2011, because he was frightened; Holman requested relocation assistance during trial and advised the court that he was afraid to testify with Petitioner's friends in attendance. Ex. at A009. The court excluded from the courtroom the nine individuals Holman identified as Petitioner's friends for the duration of his testimony; however, they were allowed to observe the remainder of the trial. *Id*. Once the courtroom was partially closed, Holman identified Petitioner as the man he saw in the alleyway. *Id*.

At trial, Talbert reluctantly testified; he denied signing his statement and identifying Petitioner from the photo array. Ex. at A009. He claimed to have "said anything" so police would stop "badgering" and "harassing" him. *Id*. However, prosecutors confronted Talbert with a letter

---

[6] Detective Acerenza recovered Talbert's bloody clothes, a silver projectile removed from his body during surgery, and 38 bags of marijuana. Ex. A005-06. Talbert was charged with possession with intent to deliver and placed in police custody as he recovered; eventually the charges were dismissed. Ex. at A006.

he wrote to Petitioner, identifying Petitioner as the shooter and requesting payment as to not to testify against him. Ex. at A009. Talbert tried to explain the letter as a way to extract money from Petitioner and described himself as a "hustler." *Id*.

On December 15, 2011, after a three-day trial, a jury convicted Petitioner of conspiracy to commit murder. Ex. at A001; Pet. Br. at 1; Resp. at 1. On February 10, 2012, Petitioner was sentenced to a term of twenty-to-forty years in a state correctional institution. Ex. at A001.

On May 21, 2012, Petitioner, through counsel, presented five post-trial claims: (1) the trial court erred when it failed to grant Petitioner's Motion to Suppress Identification given out-of-court, because the identification was unduly suggestive; (2) the trial court erred when it failed to grant Petitioner's Motion to Suppress, even after the Commonwealth's failure to sustain its burden; (3) the Commonwealth failed to satisfy the elements of conspiracy to prove a specific agreement existed between Petitioner and another to engage in criminal conduct; (4) the Commonwealth failed to prove that Petitioner, or any other potential actor, possessed malice, an essential element in the alleged murder conspiracy charge; and (5) the court erred when it pronounced twenty-to-forty year sentences as it "was inconsistent with the mandates of the Sentencing Code." Ex. at A010-11. The trial court denied relief on the sufficiency of the evidence of conspiracy ground, finding that "the record supports the conclusion that [Petitioner] entered into an illicit agreement with another to murder [Talbert]." Ex. at A016; Pet. Mem. at 14. The trial court held that the sentence was reasonable, because "[t]he stipulated medical records establish that [Talbert] suffered serious bodily injury as a result of this shooting." Ex. at A017.

On direct appeal, Petitioner's appellate counsel raised the discretionary aspects of Petitioner's sentence as the sole issue. *Commonwealth v. Simmons*, No. 1559 EDA 2012, 2013 WL 1125501, at *1 (Pa. Super. Ct. Aug. 16, 2013) ("1559 EDA 2012"). The Superior Court

affirmed the trial court's decision.  *Id*.  Appellate counsel did not challenge the legality of Petitioner's twenty to forty-year sentence.  Pet. Br. at 15.

On December 16, 2013, Petitioner filed a timely *pro se* Post-Conviction Relief Act ("PCRA") petition in which he raised the following issues: (1) an alleged *Apprendi* violation; (2) two claims of ineffective assistance of appellate counsel; (3) a public trial violation; (4) a sufficiency of evidence claim, (5) a claim that the trial court erred when it refused to strike Leeland Kent's testimony; and (6) two ineffective assistance of trial counsel claims, for failing to object to and request a limiting instruction on double hearsay testimony and failing to object to Petitioner's absence from the *in camera* hearing regarding the courtroom closure.  Pet. Mem. at 15; Ex. at A277-304.  Two amended PCRA petitions alleged: (1) ineffective assistance of counsel for failure to object to the prosecutor's prejudicial comments during summation, and (2) a *Brady* violation, because the Commonwealth failed to disclose that Talbert had been relocated in the past and had an ongoing feud with certain people in the neighborhood where he was shot.  Pet. Mem. at 15; Ex. at A335-357.

On July 15, 2015, the PCRA court appointed David Rudenstein who, on January 16, 2016, filed an amended petition.  Pet. Mem. at 16.  Mr. Rudenstein reiterated four of the eight claims Petitioner had raised in his prior *pro se* petitions[7] and a standalone claim that challenged the sufficiency of the evidence.  Pet. Mem. at 16; Ex. at A373.  Thereafter, on February 16, 2017 and March 3, 2017, PCRA counsel filed two more amended counseled petitions asserting: (1) trial counsel's ineffectiveness for failing to object to prejudicial remarks in the prosecutor's closing argument, and (2) an illegal sentence claim.  Pet. Mem. at 16.  Mr. Rudenstein argued, without citing *Apprendi*, that: (1) trial counsel failed to ask the court to instruct the jury on the element of

---

[7] Mr. Rudenstein echoed the three ineffective assistance of appellate counsel claims and one ineffective assistance of trial counsel claim pertaining to double hearsay testimony.  Ex. at A359-360

6

serious bodily injury, and (2) the court failed to instruct the jury on that necessary element to enhance the sentence. *Id*.

On May 5, 2017, the PCRA court dismissed Petitioner's PCRA and, on May 15, 2017, that decision was appealed. *Commonwealth v. Simmons*, No. 1649 EDA 2017, 2013 WL 6629154, at *2 (Pa. Super. Ct. Dec. 19, 2018) ("1649 EDA 2017"). On May 30, 2017, Petitioner filed a motion to proceed *pro se* and the Superior Court remanded the case for a *Grazier*[8] hearing. *Id*. After a hearing, the trial court held that Petitioner could continue *pro se*; Petitioner then presented eight issues for review.[9] *Id*. On December 19, 2018, the Superior Court addressed and denied relief on

---

[8] *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998) (The Pennsylvania Supreme Court held that there needs to be an on-the-record determination of the voluntariness of waiver of counsel before the denial of defendant's request to conduct a *pro se* appeal of denial of postconviction relief.)

[9] Petitioner raised: "(1)(a) was it error for counsel to allow the jury to consider hearsay and speculative testimony for the truth of the matter asserted? (b) [w]as PCRA counsel ineffective for failing to develop the cautionary instruction aspect of [Petitioner]'s argument and failing to argue that the evidence was inadmissible to establish motive? (c) [c]ould the error have contributed to the verdict by allowing the jury to infer that the alleged calls were made in furtherance of a conspiracy?; (2) Is [Petitioner]'s sentence illegal pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) where none of the requirements of *Apprendi* were met? Did the PCRA court err by finding that *U.S. v. Cotton*, 535 U.S. 625 (2002) subjects [Petitioner] to harmless error analysis?; (3)(a) Was Appellate counsel ineffective for failing to litigate that [Petitioner]'s public trial rights were violated by the trial court where the closure did not protect the interest advanced? (b) does [Petitioner] have to show prejudice pursuant to *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) even though the ruling in *Weaver* was made specifically and only for instances where the structural error is not objected to at trial?; (4)(a) [d]id the Commonwealth introduce evidence consistent with two opposing propositions rendering the subsequent conviction for conspiracy unconstitutional pursuant to *Commonwealth v. New*, 47 A.2d 450 (Pa. 1946)? (b) [w]as PCRA counsel ineffective for failing to further [Petitioner]'s argument and litigate the claim using the Superior Court's recitation of the facts rather than the notes of testimony, because he was missing the notes of testimony?; (5) (a)[d]id the trial court erroneously conclude that the [Petitioner] was not entitled to access the victim's relocation file under the confrontation clause and compulsory process, even though Kent testified about his interaction with Talbert and testified that he has a pre-trial statement made by Talbert? (b) [w]as it error to allow the jury to consider this evidence in regards to Talbert's credibility even though the Commonwealth lost Kent's file?; (6) Did the PCRA Court commit an error of law and fact when it held that [Petitioner]'s rights under *Brady v. Maryland*, 373 U.S. 83 (1963) were not violated when the prosecutor failed to disclose material evidence that Talbert was relocated in the past and that Talbert had an ongoing feud with individuals from the neighborhood, which could have been used to show that Talbert had knowledge of the criteria of the program and to contradict the Commonwealth's theory of motive? Was PCRA Counsel ineffective for failing to further develop and litigate this issue?; (7) [d]id the PCRA Court commit an error of law and fact when it denied [Petitioner]'s request for discovery of Talbert's interaction with Leeland Kent both past and present where [Petitioner]'s discovery of Talbert's testimony in a civil suit revealed that the two are correlated by way of Talbert's testimony, and the testimony demonstrates that the Commonwealth violated *Brady*?; and (8) [d]id the PCRA Court commit an error of law and fact when it held that trial counsel was not ineffective for failing to object to the prosecutor's improper, prejudicial, and inflammatory remarks during closing arguments which deprived the [Petitioner] due processes and a fair trial?" 1649 EDA 2017 at 2-3.

7

each claim and affirmed the PCRA court's decision, as well as Petitioner's conviction and sentence. Pet. Br. at 20; 1649 EDA 2017, at *10.

Petitioner filed his first *pro se* federal habeas petition on July 28, 2016; but, on March 15, 2017, the court dismissed it, without prejudice, because he had not exhausted his claims. Pet. Mem. at 20; Ex. at A059. After exhausting his claims in state court, Petitioner filed a second *pro se* habeas petition, on June 10, 2019[10], and a motion for appointment of counsel, on September 9, 2019. Pet. Mem. at 20. A month later, this court granted his motion and appointed the Federal Community Defender's Office to represent him. *Id*.

On March 13, 2020, Petitioner's attorney filed an amended petition. Pet. Mem. at 20. Therein, Petitioner asserted five claims: (1)(a) his 20 to 40 years sentence for conspiracy to commit murder was unconstitutional under *Apprendi* and (b) trial counsel rendered ineffective assistance when he failed to object to the trial court's imposition of sentence without a jury finding of serious bodily injury; (2) appellate counsel rendered ineffective assistance by failing to argue on direct appeal that his right to a public trial was violated by the exclusion of several people from the courtroom; (3) appellate counsel rendered ineffective assistance by failing to argue on direct appeal that the evidence was insufficient to convict him of conspiracy to commit murder; (4) trial counsel rendered ineffective assistance by failing to object to the prosecutor's prejudicial comments during closing arguments; and (5) trial counsel rendered ineffective assistance by failing to object to the admission of hearsay evidence presented through a witness's prior testimony for the truth of the matter. Amend. Pet. at 1, 3, and 5-6.

---

[10] The Clerk of Court docketed this habeas corpus petition on June 17, 2019. However, Petitioner was a *pro se* inmate at the time, hence, his petition is deemed filed on the date he gave it to prison officials for mailing. *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998). Under penalty of perjury, Petitioner stated that he placed his habeas petition in the prison mailing system on June 10, 2019. Pet. at 15 (The Court employs the pagination imposed on the Petition when it was scanned for purposes of electronic filing.) Hence, this Court will deem June 10, 2019 the filing date pursuant to *Burns*.

The Commonwealth contended that the state court's resolution of Petitioner's claims were reasonable, hence the AEDPA standard bars relief. Resp. at 13, 24, 32, 36, and 42. The Commonwealth argued, in the alternative, even if the state court adjudications were unreasonable, Petitioner's claims are meritless. *Id*. at 15, 21, 24, 33, 36, and 43.

In a January 25, 2021 Report and Recommendation ("R&R"), the undersigned recommended that all of Petitioner's claims be denied. After being granted two extensions of time to file objections, Petitioner did not object; instead, he filed a motion for leave to file an amendment, to add a potential *Brady* claim he had uncovered as a result of Respondent disclosing the police file and District Attorney's file to him, after the R&R was filed. On June 15, 2021, Judge Smith granted the motion to amend, placed the case in suspense so that Petitioner could exhaust his *Brady* claim, and vacated the January 25, 2021 R&R. On February 28, 2023, Judge Smith set a new briefing schedule. Numerous extensions of the briefing schedule were granted and, on December 20, 2023, the undersigned granted Petitioner's motion to file an Amendment to further elucidate his *Brady* claim. On January 4, 2024, the Commonwealth filed its Amended Response to Petitioner's Amendment. After more extensions of time, Petitioner filed his second Reply, on April 17, 2024.

This court sees no reason to disturb the January 25, 2021 R&R and incorporates by reference the R&R's disposition of Petitioner's first five claims.[11] This R&R will address Petitioner's new *Brady* claim which alleges that a February 12, 2011 police interview of Talbert resulted in a report containing favorable evidence, that was suppressed by the Commonwealth, is material to guilt, and justifies a new trial. The Commonwealth concedes that the interview report was favorable and was suppressed by it. It disputes, however, that is the report is material. In his

---

[11] In his second Reply, Petitioner asks this court to reconsider its decision concerning his fifth claim. Reply 2 at 15 n.9. However, since this court finds Petitioner's *Brady* claim has merit, it is unnecessary to revisit his fifth claim.

second Reply, Petitioner counters the Commonwealth's assertion that the report is material. This court finds that the report is material and habeas relief is warranted.

## II. DISCUSSION

Three things are required to successfully litigate a *Brady* claim:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is the materiality requirement, *id.* at 282, to wit, the defendant must show that there is a reasonable probability that, if the omitted evidence had been disclosed to him, the outcome of the proceeding would have been different. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). In order for omitted evidence to be material, it is not necessary that the evidence establish by a preponderance that its disclosure would have resulted in an acquittal. *Id.* at 434. Instead, the omitted evidence must detract from the reviewing court's confidence in the outcome that the jury, or fact-finder, did reach. *Id.* The requisite lack of confidence may exist, although sufficient record evidence to convict remains, even after discounting the inculpatory evidence impacted by the undisclosed evidence. *Id.* at 434-35. Materiality is evaluated by examining the collective effect of all undisclosed evidence, not by evaluating the impact of each item of undisclosed evidence separately. *Id.* at 436. However, to determine whether any particular piece of undisclosed evidence is favorable, each item is evaluated separately. *Id.* at 436 n.10.

The evidence Petitioner relies upon is a February 12, 2011 report of a police interview conducted with Talbert, the shooting victim. Pet'r Exhibit to Amendment ("PEA") at 4.[12] In the report, which is not signed by Talbert, he informs the police that, previously, he had testified

---

[12] The court employs the pagination the Clerk of Court affixed to the Exhibit when it was filed electronically.

10

against Christopher Edge but Edge was not convicted; Sergio Highland pled guilty to charges in the same case. *Id.* Talbert also states that he was incarcerated with Highland at SCI-Greene prior to his release on January 7, 2011. *Id.* Talbert's release date was less than a month before he was shot, on February 4, 2011. Talbert believed that Highland asked a guard about him, which is how Highland may have learned his release date. *Id.* Approximately two days before Talbert was released from prison, he heard someone refer to him as "dead man walking." *Id.* at 5. Talbert also told the police that he now believed that T.I., a person he had previously believed might be involved in his shooting, was not involved in his being shot, because he and T.I. had spoken about their prior dispute and had resolved their differences.[13] *Id.* Instead, Talbert believed Highland and Edge were involved in his shooting, although he had no proof. *Id.*

The Commonwealth concedes that Talbert's February 12, 2011 interview report is favorable and that it suppressed the report. Am. Resp. at 18-19. The report was favorable, because it could have been used to cross-examine Talbert at trial and, prior to trial, would have allowed trial counsel to investigate if there was any connection between Petitioner and Highland and Edge. *Id.* at 18. Furthermore, if trial counsel had found that Highland and Edge had a connection to someone other than Petitioner, this could have allowed Petitioner to challenge the reliability of the Commonwealth's investigation, which is also favorable.

The question of materiality remains. This is a close question, but the court concludes that the suppressed evidence was material. First, had this evidence been disclosed prior to trial, Petitioner's attorney could have investigated whether Highland and Edge had a connection to someone other than Petitioner. If so, this person would have been a potential suspect. Even though

---

[13] As noted in the prior R&R, Talbert had told police in his first statement that he thought T.I. might be involved in his killing, because they had a dispute and Talbert's cousin had told him that T.I. intended to set him up. January 25, 2021 R&R at 25.

a criminal defendant has no burden to provide any evidence of his innocence at trial, being able to suggest a different suspect is a well-known trial strategy. *Dennis v. Sect. Pa. Dept. of Corrections*, 834 F.3d 263, 302 (3d Cir. 2016) (*en banc*). Suppressed evidence which would have supported this tactic can be material. *Id.*

Second, even if Petitioner's attorney could not have established any connection between Highland and Edge and another suspect, the Commonwealth's failure to investigate them could have been used to question the quality of the Commonwealth's investigation. This too, is a well-recognized trial strategy. *Kyles*, 514 U.S. at 446; *Dennis*, 834 F.3d at 302. Additionally, suppressed evidence which allows such questioning can be material. *Id.*

Third, at trial, this evidence could have been used to cross-examine Talbert about his suggestion that T.I. might have set him up. Although this is not directly exculpatory, casting doubt on the credibility of a prosecution witness's testimony is also a well-known defense trial strategy. *Dennis*, 834 F.3d at 286. Furthermore, suppressed evidence which allows such impeachment can be material. *Id.* at 294.

At trial, Talbert denied that Petitioner shot him, N.T. 12/6/2011 at 150, 209, called Petitioner innocent, *id.* at 150, 211, and identified someone else as the shooter. *Id.* at 184. Furthermore, the Commonwealth never recovered the gun used in the shooting, so Petitioner could not be connected physically to the weapon and the bullets fired to injure Talbert. Aside from Talbert's prior inculpatory statements, the only other trial evidence of Petitioner's possible guilt was his questionable identification by Kyle Holman. Holman did not witness the actual shooting, but rather, he saw a male, whom he testified was Petitioner, walking quickly away from the direction of the shooting. N.T. 12/7/2011 at 121. However, Holman indicated that the person he saw was about his own height, which is 5' 10" to 5' 11", notably Petitioner is only 5' 5." *Id.* at

132-33.  Moreover, he said the person was wearing black clothing, *id.* at 131, whereas Talbert, in his police statement, said the shooter wore tan or beige clothing.  N.T. 12/6/2011 at 165.  In short, the Commonwealth's evidence to prove its theory that Petitioner was the shooter, N.T. 12/12/2011 at 121, 125, was sparse.

Bearing in mind the weakness of the Commonwealth's case and the useful attacks Petitioner could have brought to bear had the, admittedly, favorable evidence not been suppressed, this court finds the suppressed evidence raises the reasonable probability of a different outcome. In all cases, the question of materiality is a matter of degree.  In this case, the jury deliberated for over three days and failed to convict Petitioner of most of the charges against him.  The evidence of Petitioner's identity as the shooter was weak; therefore, this court lacks confidence in the outcome of the sole count for which Petitioner was convicted.  In conclusion, this court finds a *Brady* violation and renders the following:

## **RECOMMENDATION**

**AND NOW**, this 30th day of April, 2024, for the reasons contained in the preceding Report, it is hereby **RECOMMENDED** that Petitioner be afforded habeas relief based upon his *Brady* claim. Within 180 days of the order approving and adopting this Recommendation, the Commonwealth shall retry Petitioner, or else he shall be released from custody in case number CP-51-CR-4773-2011.

It be so **ORDERED**.

                                               */s/ Carol Sandra Moore Wells*
                                               CAROL SANDRA MOORE WELLS
                                               United States Magistrate Judge