IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHNNIE SIMMONS** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner** | : | |
| v. | : | **NO. 19-2624** |
| | : | |
| **MICHAEL GOURLEY, et al.,** | : | |
| | : | |
| **Respondents** | : | |

**REPLY TO RESPONDENTS' OBJECTION TO REPORT AND RECOMMENDATION**

Petitioner, Johnnie Simmons, through counsel, hereby replies to Respondents' Objection to the Report and Recommendation (R&R) issued on April 30, 2024. Simmons requests that this Court overrule Respondents' Objection and approve and adopt the Magistrate Judge's April 2024 R&R. He relies on the arguments below and those in his December 2023 Amendment and April 2024 Reply. ECF Nos. 55, 65. In accordance with this Court's May 8, 2024 Order, Simmons reserves his right to object to the Magistrate Judge's January 2021 R&R in the event this Court denies relief on the *Brady* claim addressed in the April 2024 R&R.

Respondents object to the Magistrate Judge's finding that the suppressed notes from the police file were material and take issue with the three bases for the Magistrate Judge's Recommendation. ECF No. 67 at 2. First, Respondents dismiss as "mere speculation" the Magistrate Judge's finding that the disclosure of the police notes would have allowed trial counsel to investigate whether Hyland and Edge had a connection to someone other than Simmons who could have been responsible for Talbert's shooting. *Id.* As the Magistrate Judge pointed out, "being able to suggest a different suspect is a well-known trial strategy," ECF No. 66 at 12, and Simmons has no burden to identify the actual shooter. "[D]efense counsel could have urged that [Simmons's]

was a case where police arbitrarily put blinders on as to the possibility that someone else committed the crime and pursued the easy lead." *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 302 (3d Cir. 2016).

Respondents suggest that the reference to Hyland and Edge in the police notes would not have been relevant to Simmons's defense and that trial counsel would not have been able to establish their "connection to the crime." ECF No. 67 at 3. The fact that Hyland was incarcerated at the time of the shooting is, of course, immaterial. The police notes indicate that Talbert was called a "dead man walking" at SCI Greene once Hyland learned from a corrections officer that Talbert was going to be released. Exhibit 1 at 1-2.[1] And Talbert was shot only one month after his release, in the same location where he had previously sold drugs to Edge – the corner of Stenton and Johnson Streets. *See* Exhibit 2 at 1. Further, the theory of motive presented by the Commonwealth at trial – that TI was behind the shooting – also relied on a suspect who was incarcerated, as Talbert stated that TI had been "calling from jail" to let people know he had been released. N.T. 12/6/11 at 175.

Additionally, Respondents ignore the fact that the suppressed police notes not only named alternative suspects behind the shooting, but also eliminated the motive attributed to Simmons – TI's interest in seeking vengeance on Talbert for his earlier "testimony." *See* Exhibit 1 at 2 ("Compl. does not believe motive to stem from 'T.I.' States he & 'T.I.' spoke in past & squashed all arguments."). As outlined in Simmons's Reply, Talbert's identification of the shooter was unreliable; the shooter was not someone he initially recognized and not someone who had reason to assault him. *See* ECF No. 65 at 3-5. When Talbert finally landed on identifying Simmons as the

---

[1] The cited Exhibits refer to those included with Simmons's December 2023 Amendment and April 2024 Reply.

shooter, he believed Simmons had shot him because he had "ties to TI." N.T. 12/6/11 at 175. Considering "the weakness of the Commonwealth's case," ECF No. 66 at 13, and the conflicting evidence at trial, Simmons's purported connection to the person with a motive to hurt Talbert was likely very important to the jury. Therefore, evidence that such motive had in fact been eliminated by Talbert would have had a significant impact at trial and a reasonable probability of affecting the jury's verdict, which already failed to convict Simmons of aggravated assault.

Second, Respondents contend that using the notes to impeach the police investigation would do "nothing to rebut or diminish the central facts of the case: that Simmons conspired with someone else to lure Talbert into an ambush where Simmons gunned him down." ECF No. 67 at 3. To the contrary, the notes eliminating TI's motive would have eviscerated one of the bases the jury likely relied on to find that Simmons was guilty of conspiracy: that he conspired with TI to arrange Talbert's shooting. As Simmons argued in his initial memorandum of law, the evidence was insufficient to prove that he conspired with Khalif Collins, as Respondents allege, and it was not clear at trial who Simmons supposedly conspired with. *See* ECF No. 17-1 at 48-49. Detective Acerenza did not arrest Collins for his involvement in the shooting because he determined that although Collins was involved in the drug transaction described by Talbert, there was not "enough evidence to believe Khalif Collins knew that a shooting was going to happen." N.T. 12/7/11 at 18. The jury did not have to specify who Simmons conspired with in reaching its verdict, so it is unclear whether it was convinced by the prosecution's argument, but as the Commonwealth concedes, "it may have concluded that Simmons shot Talbert on behalf of TI." ECF No. 56 at 22.

In its post-trial opinion, the trial court found that "the jury could have inferred from the evidence that one of two named individuals conspired with defendant to murder Mr. Talbert" – Collins or TI. 10/19/12 Trial Court Opinion at 16. And on its review of the sufficiency of the

3

evidence, the Magistrate Judge relied on the evidence of conspiracy between Simmons and TI with no mention of Collins. *See* ECF No. 27 at 25. Had the jury heard that TI had no motive to assault Talbert because they had "squashed all arguments" then it may have concluded that no conspiracy took place at all, since Simmons only had a connection to TI, not to Hyland and Edge.

The rejoinder that "the police had everything they needed to convict Simmons because Talbert was an eyewitness to his own shooting" is far from obvious. ECF No. 67 at 3. Talbert initially identified two people from the photo array; first claimed he had never seen the shooter before, then suddenly remembered Simmons's name; and then recanted his police statement at trial. N.T. 12/6/11 at 99, 105, 166, 174. Further, as outlined in Simmons's Reply, none of the details Talbert provided about the shooter were corroborated by the other eyewitnesses on the scene. *See* ECF No. 65 at 5-9. As the Magistrate Judge pointed out, while all the other eyewitnesses described a shooter who was wearing all black, Talbert claimed that the shooter was wearing tan or beige clothing – which likely corresponded to the photo of Simmons included in the photo array, shown to Talbert *before* he provided his initial description of the shooter. *See* ECF No. 65 at 3-4; ECF No. 66 at 13. Talbert cooperated with the Commonwealth shortly after he was shot and during Simmons's preliminary hearing – when he was facing drug charges in connection with the marijuana he was selling and had a motive to identify his shooter – but he was otherwise an unreliable and uncooperative witness. *See* N.T. 4/26/11 at 5-6.

Third, Respondents contend that the suppressed notes would not have been useful for cross-examining Talbert about his suggestion that TI might have set him up because doing so "would have required trial counsel to jettison his strategy of ignoring Talbert and arguing that he was wholly unreliable." ECF No. 67 at 4. Of course, had trial counsel been aware of the evidence of an alternative suspect behind Talbert's shooting, the defense strategy could have changed in any

4

number of ways. Advancing a strategy that someone else wanted to shoot Talbert "for an entirely different motive than the one attributed to petitioner . . . as advanced by the prosecution at trial would have given [Simmons] the opportunity to establish reasonable doubt in the jury's mind as to who shot [Talbert]." *Mendez v. Artuz*, 303 F.3d 411, 413 (2d Cir. 2002). This could have been done either "through cross-examination or the presentation of contradictory testimony," and "would have provided a significant boost to the defense because the prosecution's motive theory . . . together with the weak and contradictory eyewitness testimony at the shooting was not compelling." *Id.* Armed with the evidence of Hyland and Edge's potential involvement, trial counsel could have simply asked Talbert whether he knew Simmons to have any connection to Hyland or Edge. *See id.* at 414 (recognizing that although the suppressed law enforcement report at issue did not name the contract killers hired by the alternative suspect, the alternative suspects did not indicate that they knew the defendant and the state presented no evidence connecting the defendant to the alternative suspects).

With the benefit of additional discovery, trial counsel could have further questioned Talbert about the reliability of his identification and his statement to police that a "detective told his wife that we were 99.9% sure that the guy shot compl. was the guy he picked out." 2/15/11 Police Notes, attached as Exhibit 10 (emphasis in original). At the time of trial, without the benefit of the suppressed police notes, it was a sound strategy for counsel not to question Talbert's recantation and insistence that Simmons was innocent. But had trial counsel had access to police notes impeaching the initial police statement and identification that the Commonwealth submitted as substantive evidence, there is a reasonable probability that counsel's approach would have changed.

5

Next, Respondents ignore several important facts in arguing that any testimony from Talbert eliminating TI as the person behind the shooting would have been cumulative. *See* ECF No. 67 at 4. Although Talbert's statements and testimony evolved after he initially identified Simmons, the Commonwealth in no way abandoned the TI theory at trial, arguing in closing that Talbert "did someone wrong and he was marked." N.T. 12/12/11 at 121. At the preliminary hearing, when Talbert was asked why Simmons would want to shoot him, he said, "I don't even know honestly," but said nothing about TI. N.T. 4/26/11 at 11. In the "hate letter" relied on by the Commonwealth, Talbert directs Simmons to "ask TI" about how he ultimately declined to testify against him in court, confirming that Simmons had a connection to TI, but making no reference to Hyland or Edge. N.T. 12/6/11 at 154. Instead, he questioned Simmons about who may have been behind the shooting, saying "[someone] you know must have paid you or sent you at me because that was none of our beef." N.T. 12/6/11 at 153.

Talbert's statements at the preliminary hearing and in the letter corroborate Simmons's argument that Talbert was not able to identify who shot him and was only concerned with who was behind the shooting. According to the February 15 police notes, Talbert seemed reliant on the detectives' confirmation that he chose the right person from the photo array. *See* Exhibit 10. He knew that Simmons was connected to TI, but as confirmed in the suppressed February 11 police notes, Talbert and TI had "squashed all arguments." Exhibit 1 at 2. Talbert likely chose Simmons from the photo array as a person was familiar with, provided a description matching his photo but not matching any other witness's description of the shooter, and then attempted to extort Simmons for money once he had been charged with the crime, while all along his real concern was with who ordered the shooting.

As the suppressed police notes indicate, the shooting was most likely ordered by Hyland and/or Edge, who had a powerful motive to seek revenge on Talbert once he was no longer incarcerated, and who communicated those threats to him through others at the prison only a month before he was shot. Both the suppressed police notes and the "hate letter" confirm that Simmons had no connection to Hyland or Edge, and had trial counsel had access to the notes, he could have confirmed and introduced the absence of that connection at trial, either through Talbert's cross-examination or extrinsic evidence.

Finally, Respondents' argument that any testimony from Talbert regarding Hyland and Edge being behind the shooting "would not have called into question the evidence that Simmons was the actual shooter" fails for several reasons. *See* ECF No. 67 at 5. Under *Brady*, "the suppressed information need not wholly discredit the prosecution's theory of the case; it must only 'put the whole case in such a different light as to undermine confidence in the verdict.'" *Mendez*, 303 F.3d at 414 n.1 (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)); *Dennis*, 834 F.3d at 287 ("That [the suppressed evidence] does not wholly undermine the prosecution's theory of guilt does not sap its exculpatory value."). Contrary to Respondents' repeated assertions, motive was central to the jury's verdict at Simmons's trial. The prosecutor focused on motive in her closing argument, and two judges relied on TI's motive as a basis for finding the evidence against Simmons was sufficient to establish a conspiracy – the only count for which he was convicted. The jury clearly struggled to determine whether Simmons was in fact the shooter, and "[w]hen identity is in question, motive is key." *House v. Bell*, 547 U.S. 518, 540 (2006). As outlined in Simmons's detailed reply to Respondents' arguments on materiality, Talbert's identification of Simmons was highly unreliable and contradicted by multiple eyewitnesses who described one six-

foot tall shooter wearing all black. *See* ECF No. 65 at 2-8.[2] Accordingly, the suppressed police notes revealing an alternative suspect behind the shooting would have *further* called into question the weak evidence from Talbert that Simmons was the shooter, and there is a reasonable probability that the outcome at trial would have been different.

**Conclusion**

For the reasons above and those stated in the December 2023 Amendment and April 2024 Reply, Simmons respectfully requests that this Court approve and adopt the Magistrate Judge's Report and Recommendation and grant habeas relief.

---

[2] Although Simmons requests that this Court adopt the Magistrate Judge's R&R in full, he seeks to clarify several key facts regarding the eyewitness observations of the shooter as he fled the scene. The Magistrate Judge mistakenly noted that after Officer Alexander began chasing the shooter down the alleyway near the location where Talbert was shot, he encountered Kyle Holman, who reported that he had seen Simmons walk hurriedly down that same alleyway. ECF No. 66 at 2. In fact, Officer Alexander never encountered Holman, nor any other eyewitness during his pursuit of the suspect in a southbound direction, toward Chew Avenue and Washington Lane. N.T. 12/6/11 at 45-46. Holman saw the man he later identified as Simmons near his home on the other side of Stenton Avenue, in the opposite direction of where the eyewitnesses saw the shooter run, and he called 911 to report the sighting. *See* Exhibit 14 (Google Map of Area); Exhibit 15 (911 Call Records). The Magistrate Judge correctly noted that Holman observed the person he believed to be Simmons on the 1500 block of Johnson Street, but incorrectly noted that Holman reported this to Officer Alexander in person. ECF No. 66 at 3. Regarding the description of the "short, black male [with] light skin," mentioned by the Magistrate Judge, that description came from Kyle Holman's 911 call, which described the man he saw as slim, light-skinned, and 5'10'' tall. *See* Exhibit 15. The Magistrate Judge is mistaken that other officers and one bystander, Gerald Wright, gave similar descriptions. ECF No. 66 at 3. The only officer on the scene who saw the suspect was Officer Alexander, who described a six-foot tall male wearing a black hoodie and jeans. N.T. 12/6/11 at 40. At trial, Gerald Wright testified that he saw Talbert leave the sneaker store with a suspect who was darker-skinned than both Talbert and Simmons and wearing a black hoodie. N.T. 12/6/11 at 71, 76-77. Simmons notes that the facts surrounding the observation of the shooter were complex and presented at trial with some confusion through Officer Edmiston. *See* ECF No.65 at 6-7; N.T. 12/7/11 at 47, 49, 51. Further, the Commonwealth's Response to his *Brady* Amendment incorrectly asserted that there were two suspects who fled the scene of the shooting, and that Officer Alexender obtained a description of the shooter that matched Simmons "from speaking to people at the scene." ECF No. 56 at 8.

Respectfully submitted,

/s/ *Claudia Flores*
CLAUDIA FLORES
Supervising Attorney, Non-Capital Habeas Unit
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
(215) 928-1100

*Counsel for Petitioner, Johnnie Simmons*

Date: May 16, 2024

## **CERTIFICATE OF SERVICE**

      I, Claudia Flores, hereby certify that on this date this document has been filed electronically and is available for viewing and downloading from the Court's ECF system. I have served this document electronically upon Andrew Metzger, Assistant District Attorney, Philadelphia District Attorney's Office.

                                                   /s/ *Claudia Flores*
                                                   CLAUDIA FLORES

May 16, 2024