# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHNNIE SIMMONS** : | |
| : | |
| v. : | **CIVIL ACTION NO. 19-2624** |
| : | |
| **MARK GARMAN, ET AL.** : | |

**McHUGH, J.**                                                                                                                                       **July 14, 2025**

## MEMORANDUM

This is a state habeas case in which petitioner Johnnie Simmons was convicted of conspiracy to commit murder, but the jury hung on charges of aggravated assault and attempted murder. The Commonwealth elected not to retry him, content with the lengthy sentence imposed on the conspiracy charge. Direct appeals and post-conviction proceedings in state court did not afford Mr. Simmons any relief, and this federal habeas action followed.

Multiple grounds for relief have been advanced over the life of this action, but the current focus is a purported violation of *Brady v. Maryland*, specifically the failure to produce detectives' notes of a subsequent interview with the victim in which he repudiated an earlier theory as to who was behind the attack, suggesting different individuals as the instigators. ECF 55.

A magistrate judge has recommended that relief be granted on this claim, sparking an objection from the Philadelphia Office of the District Attorney. Having heard argument, and having reviewed the record at length, I am constrained to agree that the evidence is only tangentially material and that its disclosure would not have made a different result reasonably probable.

The victim, Charles Talbert, was shot on February 4, 2011. (N.T. 12/06/2011, p. 151, ECF 58-2). He recounted selling a bag of marijuana to a friend of the Petitioner, Khalif Collins. (N.T.

1

12/07/2011, pp. 8, 15, 17, ECF 58-3). According to Talbert, the Petitioner then approached him and demanded that he replace it, which Talbert did. (N.T. 12/06/2011, pp. 161-63). As Talbert resumed sales from the corner, Collins approached him again, saying that another interested buyer was across the street. Talbert crossed and was shot multiple times but survived. *Id.*, pp. 163-64, 179-81.

On February 8, 2011, Talbert was interviewed by police for the first time. They brought a photo array that included Simmons, based upon an anonymous tip. *Id.*, pp. 165-66. Talbert identified Simmons, and then a second person in the array.[1] *Id.*, pp. 217-18. For present purposes, what is relevant is that Talbert also identified an individual nicknamed T.I. as someone with a motive to harm him, because T.I. had previously shot at him for dating T.I.'s former girlfriend, an incident that resulted in T.I.'s arrest. *Id.*, pp. 168-70.

Four days later, Talbert was interviewed again. In that second interview he advised detectives that he and T.I. had resolved their differences, and that two other individuals, Christopher Edge and Sergio Highland, had motive to harm him. ECF 53-2. Their purported motive stemmed from testimony Talbert gave against Edge in a murder trial. Edge was acquitted, but Highland later pleaded guilty.[2] Talbert had fought with Edge in prison, where Edge called him out as a snitch. And Talbert told the detectives he believed that Highland knew when Talbert would be released, while inside Talbert heard that he was "a dead man walking," and the shooting occurred less than a month after he was released. ECF 55. This statement was not produced until well after Simmons was convicted, and its late production is the basis for his *Brady* claim.

---

[1] According to the interviewing detectives, Talbert showed no hesitation in first identifying Simmons, and in their view circled a second suspect, John Rivera, out of fear.

[2] *See Commonwealth v. Edge*, No. 406591–2002 (Pa. C.P. Dec. 9, 2003); *Commonwealth v. Hyland*, Nos. 406601-2002, 306441-2002, N.T. 3/29/2004 (Pa. C.P. March 29, 2004).

Talbert expressed fear of testifying and sought relocation. (N.T. 12/12/2011, pp. 28-29, ECF 58-4.). Nonetheless, on April 26, 2011, Talbert testified at Simmons' preliminary hearing, identifying him as the shooter in testimony consistent with his initial statement to detectives. (N.T. 12/06/2011, p. 179-80). Then, on October 13, 2011, Talbert gave his attorney a letter for delivery to Simmons. In it, Talbert continued to identify Simmons as the shooter, but offered not to testify if Simmons would pay him and identify who sent Simmons to attack him. *Id.*, pp. 203-209. Sometime before trial, the letter was provided to the prosecution by defense counsel. (N.T. 12/12/2011, p. 74).

Shortly before trial commenced, the prosecution learned that Talbert intended to recant his prior testimony and statements to police, and did not wish to testify. ECF 77. He was nonetheless called as a witness, and the district attorney walked him through the details of his original statement to detectives, his sworn testimony at the preliminary hearing in April, 2011, and his letter to Simmons dated October 31, 2011, all of which identified Simmons as his assailant. (N.T. 12/06/2011, pp. 150-211). Talbert repeatedly repudiated his earlier statements, swearing that Simmons had not shot him, and repeatedly proclaimed Simmons' innocence. *Id*. When directed to his pretrial testimony that he was "a hundred and nine percent sure" that Simmons had shot him, Talbert denied that and testified "I remember seeing that top person in the corner shot me." *Id.*, p. 184. Defense counsel asked no questions on cross-examination. *Id.*, p. 211.

The Commonwealth concedes that the notes were favorable to Simmons and that they were improperly suppressed. It disputes materiality and prejudice, a question the magistrate judge aptly described as "close." ECF 66, p. 11. Having considered the issue at length, I am constrained to sustain the Commonwealth's objections because the information withheld is too peripheral and

3

given the posture of the case I cannot find a reasonable probability that the jury's verdict would have been different.

The Report and Recommendation deemed the evidence material in three ways. First, it posits that the supplemental interview notes would have enabled defense counsel to investigate whether Simmons had any connection to Highland and Edge, in support of a theory that someone other than Simmons was the shooter. In the face of Talbert's insistence that Simmons was the shooter up until the beginning of trial, it is speculative at best to suggest that the defense would have pursued such a theory, particularly when the Commonwealth itself made no effort to identify or indict any co-conspirator. And the lack of law enforcement insight into the identity of other conspirators was made plain to the jury. In cross-examination of Detective Acerenza, defense counsel emphasized the minimal investigation of Khalif Collins, also present that day, (N.T. 12/07/2011, pp. 8-20) and the detective conceded there was virtually no investigation of John Rivera, the second person identified by Mr. Simmons in the photo array. (N.T. 12/07/2011, pp. 33-34). And as to this latter point, defense counsel reminded the jury that Talbert at first professed not to have known his assailant but quickly claimed that he did. *Id.* In short, the theory of defense that might have been supported by the information not produced was effectively advanced through other evidence heard by the jury, providing scant basis on which to find materiality and prejudice.

Second, the Report and Recommendation concludes that the interview notes could have been used to question the quality of the police investigation, because detectives never pursued whether Edge or Highland had a grudge against Talbert. But cross-examination on that basis would invite the obvious rejoinder from detectives that until Talbert recanted immediately before trial, investigation into motive was unnecessary given his initial identification, followed by sworn testimony at the preliminary hearing, that consistently identified Simmons as the shooter. And as

4

reviewed above, the limited nature of the police investigation was otherwise made known to the jury.

Finally, the Report and Recommendation characterizes the interview notes as a basis for cross-examination of Talbert at trial, to cast doubt on his credibility. Theoretically, that is entirely correct. But in the real world of a criminal jury trial, when the victim of the crime completely recants and affirmatively exculpates the defendant, there is little to be gained by asking any questions, let alone questions that would probe into the identity of supposed co-conspirators. Indeed, questioning on such details would risk diluting the impact of the recantation. Defense counsel here predictably asked no questions of Talbert, (N.T. 12/06/2011, p. 211), and it cannot be said that having the additional interview notes would have changed that eminently sound strategy.

Moreover, to the extent that the goal of the cross-examination would be to undercut the theory that Simmons shot Talbert at the behest of "T.I.," Talbert's letter to Simmons, read to the jury, separately accomplished that. In the letter, one of Talbert's two conditions was that Simmons reveal who sent him, demonstrating that Talbert did not know who was behind the shooting, and in the letter, he even directed Simmons to talk to "T.I." as someone who would vouch for Talbert. *Id.* pp. 204-206. Once again, where evidence from other sources communicates information to the jury similar in nature to the evidence withheld, a finding of materiality and prejudice does not readily follow.

In evaluating a *Brady* claim, "the inquiry is whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a 'reasonable probability' of a different result." *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013). "The materiality of *Brady* material depends

almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Id.* at 129 (citing *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)).  I cannot in good conscience conclude that the record here meets the test.

I will therefore sustain the objections to the Report and Recommendation and decline to grant relief based solely on the *Brady* violation.  I will, however, grant Petitioner's request for leave to file objections addressed to the Report's conclusions about the sufficiency of the evidence.

      /s/ Gerald Austin McHugh
      United States District Judge